# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:22-cr-00200-APM** |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION TO COMPEL DISCOVERY

Defendant Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995), and Rule 5.1 of the Local Criminal Rules of the District Court for the District of Columbia, respectfully moves this Court for an Order compelling the Government to comply with its obligations and provide discovery that is material to the preparation of Dr. Navarro's defense.

## I. INTRODUCTION

> "We shouldn't be disqualifying people just because they believe the work of the committee or the functioning of government is important."
>
> - Assistant United States Attorney Molly Gaston *Voire Dire; United States v. Stephen K. Bannon* [1]

The Government's view of this case is perhaps best encapsulated in this one sentence and is forborne in the minimal discovery – just 633 documents and 2,664 pages – produced by the Government to date. In short, *the Government* has determined that the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select

---

[1] Spencer S. Hsu and Devlin Barrett, *Opening Statements Soon in Bannon Trial After Judge Rejects Delay*, *The Washington Post* (July 19, 20220, *available at* https://www.washingtonpost.com/dc-md-va/2022/07/18/steve-bannon-trial-jury/.

Committee") was properly constituted. *The Government* determined the subpoena the Select Committee issued Dr. Navarro was valid and enforceable. *And the Government* determined that former President Trump's invocation of Executive Privilege as to his closest aides and advisors was of no consequence. All this *before* either this Court or Dr. Navarro has had an opportunity to scrutinize the Government's rationale or its conclusions. This is not a simple misdemeanor prosecution. It is a test of the Separation of Powers as between the Executive Branch and the Legislative Branch. And *the only* forum for this dispute to be resolved is *this Court*. The prosecution of Dr. Navarro cannot stand if both the United States Congress and the United States Department of Justice have failed to follow *every* procedural process to which he is *entitled* under the law.

## II. PROCEDURAL BACKGROUND

### A. The Prosecution of Dr. Navarro by the Department of Justice Departs from Long-Standing Historical Precedent.

This case is far more than a simple misdemeanor prosecution: it stems from the intersection of congressional investigative power attempted to be enforced against this defendant, and the doctrine of executive privilege asserted by Presidents since the founding of the Republic and validated for over four decades by the Department of Justice Office of Legal Counsel opinions from 1984 to the present. While the criminal contempt statute, 2 U.S.C. § 192, was invoked hundreds of times by both the House and Senate against private parties during the McCarthy era, *see* Carl Beck, *Contempt of Congress: A Study of the Prosecutions Initiated By The Committee on House Un-American Activities*, 1945-1957 (The Hauser Press, New Orleans 1959) at 241-243, the vast majority of those cases resulted in dismissal, acquittal or reversal on appeal. *Id.* at 186.

More significantly, in the post-McCarthy era and since the 1982 certification for contempt of then EPA Administrator Anne Gorsuch (Burford) for refusing to turn over documents

subpoenaed by a committee relating to administration of the Superfund Act, no high-ranking cabinet or White House official has been charged under the statute. Instead of presenting the contempt certification from the House to the Grand Jury pursuant to 2 USC § 194, the Department of Justice filed a civil action against the House and its constitutional officers seeking injunctive and declaratory relief to "prevent any further action to enforce the outstanding subpoena," Complaint at 7-8, *United States v. United States House of Representatives* (D.D.C 1983) (Civ. Action No. 82-3583). Upon a motion to dismiss filed by the House, the U.S. District Court for the District of Columbia granted the motion. *United States v. United States House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983). In so ruling, the court stated that the Executive branch's "constitutional claims [of executive privilege] and other objections to congressional investigatory procedure may be raised as defenses in a criminal prosecution." *Id*. at 152.

Since that time forward, in an unbroken line of OLC opinions in both Republican and Democratic administrations spanning more than five decades, the Department of Justice has steadfastly and consistently declined to use the statute against close aides to the President, concluding that such aides are immune from congressional process as "alter egos" of the President. In the Department's view, prosecution under the statute for these officials would place a "heavy burden" upon the assertion of executive privilege. Plaintiff's Points & Authorities in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Motion to Dismiss at 36 n. ** in *United States v United States House of Representatives*.

Since the *Gorsuch* case in 1983, no other White House aide acting under a Presidential assertion of privilege has been charged under the statute despite numerous Executive-Legislative disputes involving both testimony and documents. *See Comm. on the Judiciary, United States House of Representatives v Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *House Comm. On Oversight v. Holder*, 979 F. Supp. 2d 1 (2013). In fact, it is because of the Department's practical nullification

3

of the statute to prosecute Cabinet and White House officials that the House has attempted to utilize civil suits to enforce its subpoenas. *See e.g., House Comm. on the Judiciary v McGhan,* 973 F. 3d 121 (D. C. Cir. 2020).

It is against this background that Dr. Navarro seeks to compel discovery based on the Department's clear and seemingly inexplicable departure from its settled policy. Through such discovery, we seek to ascertain whether: (1) selective or disparate treatment of his case from other similarly situated high ranking White House officials has occurred; (2) the Grand Jury process was abused through undue political interference from the current White House in contravention of defendant's right to the appearance of impartiality in the prosecution of his case; and (3) the procedures employed to obtain the indictment contravened his right to due process

### B. Dr. Navarro Has Steadfastly Honored the President's Invocation of Executive Privilege.

On February 9, 2022, the Select Committee served Dr. Navarro with a subpoena calling for his production documents and appearance for deposition.[2] In response, on March 9, he notified the Select Committee – as he had advised the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis ("COVID Subcommittee") in response to a subpoena it issued in November 2021— that President Donald Trump had publicly directed him as a Senior Advisor to the President to "protect executive privilege."[3]

---

[2] The Select Committee's subpoena failed to specify the place for the deposition beyond stating that it would be held at the "United States Capitol Building, Washington DC 20515 or by videoconference".

[3] Dr. Navarro, a layman who at the time was not represented by counsel, understood President Trump's instructions to be equivalent to an assertion of testimonial immunity. He advised the Coronavirus Subcommittee that he could not comply with its subpoena and suggested that it resolve the privilege issues directly with President Trump. The Subcommittee did not pursue the matter, which confirmed to Dr. Navarro his understanding that, in the absence of agreement between the Executive and Legislative branches, he was not obligated to comply with the subpoena.

> President Trump has invoked Executive Privilege; and it is not my privilege to waive. [The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me.

House Report 117-284 (March 29, 2022) ("House Report") at 3.

The objection Dr. Navarro tendered to the Select Committee's subpoena can be more accurately described as one of the immunity from Congressional process that the Department of Justice has recognized for the past fifty years.[4] For example, in 2019 the House Committee on Oversight and Reform issued a subpoena that sought to compel Kellyanne Conway, Assistant and Senior Counselor to President Trump, to testify concerning allegations that she had violated the Hatch Act by using her position to influence the 2018 midterm elections and 2020 Presidential election through media appearances and social media. The Department of Justice's Office of Legal Counsel ("OLC") was asked to opine whether Ms. Conway was required to respond to the committee. Relying on established precedent, OLC determined that, as a senior advisor to President Trump, Ms. Conway was "absolutely immune" from compelled congressional testimony. *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, O.L.C. Letter Opinion for the Counsel to the President, July 12, 2019. OLC's opinion is in line with the legal principles it has endorsed over the course of eight Democrat and Republican presidential administrations.[5]

On February 27, 2022, in response to an email from the Select Committee staff, Dr. Navarro again stated that

---

[4] Attorney General Janet Reno described testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4.

[5] This immunity continues even *after* the tenure of a particular advisor to the President because, absent a guarantee of lasting confidentiality, a "President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duty depends." *Nixon v. Admin'r of Gen Servs.*, 433 U.S. 425, 449 (1977).]

> President Trump has invoked [e]xecutive [p]rivilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

House Report at 3.

Although the Committee claimed that Dr. Navarro did not provide any evidence that President Trump had ever invoked executive privilege, it ignored the fact that President Trump had previously and publicly instructed him to "protect executive privilege" in response to process from the Coronavirus Subcommittee. Dr. Navarro understood those instructions applied to all Congressional process and requested that the Select Committee resolve the matter through negotiations with President Trump and his counsel. House Report at 3 & 4.

Inexplicably, the Select Committee and its staff never contacted President Trump or his attorneys to attempt to work through the executive privilege issues raised by Dr. Navarro.[6] He was thus unfairly caught between a dispute between the Executive and Legislative branches of government and placed on the horns of a dilemma: follow the explicit instructions he had received from the President he served as a senior advisor for four years or risk being held in contempt by the Select Committee. As *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962) notes: "Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights."

---

[6] The discovery provided thus far by the Government indicates that the Select Committee counsel who was the point of contact with Dr. Navarro did not communicate Dr. Navarro's assertion of executive privilege to Chairman Thompson or his designee. Counsel acknowledged that he did not know of any attempt by the Select Committee to negotiate the privilege issue with President Trump or his lawyers and he seems to have concluded on his own accord that Dr. Navarro did not have the right to invoke the privilege on behalf of the former President.  FBI Interview of Dan George (June 3, 2022)(US-000435).

On February 9, 2022, the United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") served Dr. Navarro with a subpoena directing him to produce documents on February 23, 2022, and appear for deposition on March 2, 2022. Indictment ¶¶ 7, 10 & 13. Dr. Navarro responded to the Select Committee on February 27, 2022, stating, in part, that "President Trump has invoked Executive Privilege in this matter… Accordingly, my hands are tied." Indictment ¶ 17. The next day, on February 28, Dr. Navarro reiterated by email to the Select Committee that he was unable to comply with the subpoena because the "privilege is not mine to waive" and it is "incumbent on the Select Committee to directly negotiate with President Trump and his attorneys" regarding the matter. Indictment ¶ 18. The Select Committee did not contact President Trump or his attorneys to attempt to resolve the privilege issues, a long-standing practice strongly encouraged by the United States Supreme Court.[7] Instead, the Select Committee moved forward with a recommendation that the House of Representatives hold Dr. Navarro in contempt of Congress.

On June 2, 2022, a federal Grand Jury returned an indictment against Dr. Navarro charging him with two misdemeanor counts for Contempt of Congress (Papers and Testimony) in violation of 2 U.S.C. §192,[8] and alleging that he failed to comply with the Select Committee's subpoena.

---

[7] *See Trump v. Mazars*, LLP, 591 U.S. __, 140 S.Ct. 2019 (2020)(". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

[8] Each of the two counts is punishable by a fine of not more than $1,000 nor less than $100 and imprisonment for not less than one month nor more than twelve months. 2 U.S.C. §192.

On June 17, this Court arraigned Dr. Navarro on the indictment and ordered him to file his Rule 12 motions by August 17. The Court also set November 16, 2022, as the date for trial. At a status hearing on July 15, the Court encouraged the parties to resolve discovery issues and scheduled a hearing on August 11 if those issues could not be resolved without the intervention of the Court.

The parties have had extensive discussions regarding discovery and are unable to reach agreement concerning Dr. Navarro's rights to discovery in this case.

**C. The Government's Presentation to the Grand Jury Highlights the Uniqueness of Dr. Navarro's Prosecution.**











**D. The Government Has Refused to Negotiate in Good Faith With Dr. Navarro.**

On June 27, 2022, after the Government provided its initial discovery production, Dr. Navarro's counsel sent a Rule 16 letter requesting specific materials that are necessary to his defense (Exhibit 4). The letter requested that the Government produce, among other things:

(1) documents relating to the Government's arrest of Dr. Navarro on June 3 including  the decision by the FBI and/or the Department of Justice to arrest Dr. Navarro at Ronald Reagan Washington National Airport and place him in security restraints (*i.e.,* "leg irons");

(2) communications between the  Department of Justice and the House Select Committee that reference or relate to Dr. Navarro;

(3) documents provided to the Select Committee by the White House Office of Counsel to the President, including Jonathan C. Su, that reference or relate to Dr. Navarro;

(4) communications and/or other evidence related to the application to Dr. Navarro or any other senior advisor to former President Donald J. Trump of the opinions of the Office of Legal Counsel of the Department of Justice;

(5) correspondence between the House Select Committee on the Coronavirus Crisis and Dr. Navarro in which Dr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump; and

(6) documents and other evidence establishing that the Select Committee was properly established pursuant to House Resolution 503. *See* Indictment ¶ 1.

On July 11, 2022, the Government responded and represented that it already provided any discoverable material that is in the possession, custody, or control of the "prosecution team." (Exhibit 5).

By letter of July 20, 2022, counsel for Dr. Navarro objected to the Government's attempt to restrict the definition of "prosecution team" to the individual prosecutors and agents assigned to this case and he renewed the discovery requests made in his Rule 16 letter. (Exhibit 6). That letter requested, among other things, documents relating to communications between the Department of Justice and the Select Committee (Item #9), and communications between the Select Committee and the White House Office of Counsel to President Biden (Item #10). Dr. Navarro explained that discovery of those matters is necessary so that the defense counsel can assess the veracity of any potential claim of improper political influence regarding the decision to hold Dr. Navarro in contempt of Congress. On July 22, 2022, the Government sent a letter to counsel for Dr. Navarro repeating its position that it had provided all discoverable materials. (Exhibit 7).

On July 26, 2022, counsel for Dr. Navarro again challenged the Government's representation that it had provided all discoverable information. The letter noted that it would be

premature for Dr. Navarro to make any definitive assertion with respect to the composition of the "prosecution team" but that "[t]o the extent that [Deputy Counsel to President Biden Jonathan] Su and the Department of Justice corresponded concerning the application of executive privilege as to *any former senior aide* to President Trump referred by the Select Committee for prosecution" then such communications potentially render him and/or his Office an arm of the prosecution team whose records are properly the subject of discovery in this case. (Exhibit 8).

On July 27, 2022, the Government responded that it did not have any correspondence between the White House, the Select Committee, and the Department of Justice *that is responsive* to Dr. Navarro's discovery requests. The Government further advised that, "if there are additional materials you believe may exist and to which you believe you are entitled in discovery, we should proceed to whatever motions you deem appropriate." (Exhibit 9). In short, the Government is unwilling to make any determination as to whether the records Dr. Navarro seeks exist such that the instant motion is unnecessary.

### III.  APPLICABLE DISCOVERY PRINCIPLES

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i)    the item is material to preparing the defense;
> (ii)   the government intends to use the item in its case-in-chief at trial; or
> (iii)  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1). The D.C. Circuit has emphasized that the prosecution must disclose evidence which is material "to the preparation of the defendant's defense." *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998). The Government must disclose both inculpatory and exculpatory evidence. *Id*. "Inculpatory evidence, after all, is just as likely to assist in 'the

preparation of the defendant's defense' as exculpatory evidence" because "it is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." *Marshall*, 132 F.3d at 67; *accord United States v. O'Keefe*, No. 06-0249 (PLF), 2007 WL 1239204, at *2 (Apr. 27, 2007).

The Government's discovery obligations are "intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case.'" *O'Keefe*, 2007 WL 1239204, at *2 (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (materiality standard "is not a heavy burden" – information is material and must be disclosed if it has the potential to play an "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal"); *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (discovery materiality hurdle "is not a high one").

"As a general matter, Rule 16 establishes the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." *United States v. Apodaca*, 287 F. Supp. 3d 21, 39 (D.D.C. 2017); *see also United States v. Karak*e, 281 F. Supp. 2d 302, 306 (D.D.C. 2003). Moreover, "the government cannot take a narrow reading of the term material in making its decisions on what to disclose under Rule 16." *O'Keefe*, *supra*, 2007 WL 1239204, at *2.

Government disclosure of exculpatory and impeachment evidence is essential to the constitutional guarantee to a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* are constitutional obligations, *Brady/Giglio*

evidence must be disclosed regardless of whether the defendant makes a request for the information. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Since it is sometimes difficult to assess the materiality of evidence before trial, prosecutors must err on the side of disclosure. *Kyles*, 514 U.S. at 439. *See also* Local Rule Crim. P. 5.1(b); Justice Manual § 9-5.001.

## IV.  ARGUMENT

Given the allegations in the indictment and applicable law, the Government is required to search for additional sources of potentially discoverable information and disclose it to Dr. Navarro so he can prepare his defense. Instead, here, the Government has apparently deliberately shielded itself from the knowledge of information that would be pertinent to several of the potential defenses defense counsel are contemplating. *See Marshall*, 132 F.3d at 69 ("[A] prosecutor may not sandbag a defendant by 'the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.'" (*quoting United States v. Brazel*, 102 F.3d 1120, 1150 (11th Cir. 1997)).

### A.  The Government May Not Limit the Prosecution Team so as to Avoid Knowledge of Discoverable Information.

The Government has asserted in response to several of Dr. Navarro's discovery requests that it has produced all discoverable information "in [its] possession, custody, or control," or "in the possession, custody, or control of the prosecution team." In its July 22, 2022, letter to defense counsel, the Government stated that:

> As an initial matter, your letter appears to suggest that President Biden, the White House Counsel's Office, the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"), and the House Select Committee on the Coronavirus Crisis are part of the prosecution team in this case. They are not. We have provided all discoverable materials we have received from those parties and thus have nothing more to provide in response to request in which you seek information in their possession.

Whether information is within the Government's possession, custody, or control is a fact-intensive inquiry that must be resolved on a case-by-case basis. *United States v. Libby*, 429 F. Supp. 2d 1, 9 (D.D.C. 2006) citing *United States v. Brazel*, 102 F.3d 1120, 1150 n. 19 (11th Cir. 1997). In determining whether records in the possession of other Executive Branch offices are discoverable, this Court has examined the extent to which those "different arms of the government" contributed to the criminal investigation and are closely aligned with it.

In *Libby*, Judge Reggie Walton held that the defendant in that case was entitled to information from both the Office of the Vice President and the CIA in an obstruction and false statements prosecution arising from the defendant's alleged disclosure of a CIA officer's identity. There, the White House Counsel's office directed all personnel to cooperate with the investigation and produce information to the Office of Special Counsel. In addition to producing documents to the Special Counsel, the CIA "undertook internal deliberations regarding whether to refer the alleged unauthorized disclosure of classified information to the Department of Justice for criminal investigation, created "pre-decisional preliminary evaluations and recommendations of government officials and also a legal analysis and opinion prepared by a CIA attorney, as well as communications between the CIA attorney and the Department of Justice." *Id*. at 10 (internal quotations omitted). The Court determined that the Office of the Vice President and the CIA "contributed significantly to the investigation" and were "closely aligned with the prosecution" based on the nature of their relationship with the Office of Special Counsel.  *Id*. at 15.

In reaching his decision in *Libby,* Judge Walton considered decisions by other courts in similar cases. The Fifth Circuit, for example, held that a defendant accused of bribing a U.S. Postal Service employee was entitled to the personnel file of that employee, who was a prosecution witness. *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973). The Ninth Circuit required the Government to provide a defendant charged with murdering a fellow prison inmate with the files

of several government witnesses from the Bureau of Prisons. *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995). A defendant in the W.R. Grace prosecution in the District of Montana was entitled to "documents that were in the physical possession of government agencies that were not part of a criminal investigation jointly undertaken by the Department of Justice and the Environmental Protection Agency, but who had provided files to the prosecution team and allowed their employees to be interviewed by the prosecution as part of that investigation." *United States v. W.R. Grace*, 401 F. Supp. 2d 1065, 1078-79 (D. Mont. 2005). Judge Paul Friedman of this District similarly held in the prosecution of David Safavian, that "'the government' includes any and all agencies and departments of the Executive Branch or the government and their subdivisions, not just the Justice Department, the FBI … and other law enforcement agencies." *United States v. Safavian*, 233 F.R.D. 12 at *2 (D.D.C. 2005), *quoted in Libby*, 429 F. Supp 2d at 6 n.10. *See also United States v. Safavian*, 233 F.R.D. 205 at *2 n.1 ("While, in this Court's view, the term "government" encompasses all Executive Branch agencies and departments and the obligation to search files extends beyond agencies "closely aligned" with the prosecution, it should be apparent that prosecutors are not required to search, or cause to be searched, the files of all Executive Branch agencies and departments in every criminal case. Both the duty to search and the imputation of knowledge necessarily are bounded by a rule of reason.").

In Dr. Navarro's case, there is compelling evidence that several government entities beyond the typical core group of prosecutors and agents contributed significantly to the investigation and were closely aligned with the prosecution. The FBI interviewed Select Committee Senior Investigative Counsel, Dan George, who explained his communications with Dr. Navarro, his responses to Dr. Navarro's assertion of executive privilege, and confirmed that the Select Committee failed to negotiate that issue with former President Trump or his lawyers.

As discussed more fully below, Jonathan Su, Deputy Counsel to President Biden, sent Dr.

Navarro an unsolicited letter on February 28, 2022 (just two days before the deposition testimony date in the Select Committee's subpoena) notifying him about President Biden's decision not to assert executive privilege. Mr. Su also cooperated with the Government's investigation and was interviewed by the FBI. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████

Dr. Navarro also received a letter dated June 1, 2022 – the day before the Grand Jury returned an indictment against him – from the Deputy Director of the Justice Department's Civil Division, Federal Programs Branch, threatening to initiate civil litigation with respect to a demand for Presidential Records from the National Archives and Records Administration ("NARA"). The records sought by the Department's Civil Division pertained primarily to documents that the COVID Subcommittee had unsuccessfully sought to obtain from Dr. Navarro by subpoena six months earlier. Now, within a week of reaching an impasse with defense counsel concerning the appropriate scope of discovery in *this* case, the Department of Justice has civilly sued Mr. Navarro seeking these records.[12]/

---

[12]/ The Presidential Records Act, by its plain language, applies only to Presidential records consigned to the National Archives for curation and preservation following the expiration of an incumbent's term in office. *Trump v. Thompson*, 20 F. 4th 10, 27 (D.C. Cir. 2022). The Act does not control the question of whether testimony by the President's closest aides is subject to Congressional process, nor has the Supreme Court resolved this important issue. At a minimum, the question is unsettled: nonetheless the Supreme Court did hold in *United States v. Nixon*, 418 U.S. 683, 696 (1974), that communications between the President and his closest aides are entitled to a presumptive privilege of confidentiality which can be overcome only by a particularized showing of need in a criminal case. No case has held that such communications are subject to Congressional process and to hold otherwise would implicate significant separation of powers principals, especially since the doctrine of executive privilege articulated in *Nixon* arises from the Constitution itself. As the Court explained in *Trump v. Mazars*, 140 S. Ct. 2019, 2034 (2020), the congressional subpoena power has limits in the context of a broad subpoena of a former President's personal business records because although the subpoena did not seek any official records, its impact was nevertheless an inter branch dispute that threatened "imperious control" of the President by the Legislature.

Until the Government conducts a diligent inquiry in order to determine what agents of *the United States* were doing to presage its prosecution of Dr. Navarro, it cannot definitively claim that it has "already provided you with any discoverable material that is in the possession, custody, or control of the prosecution team." To the extent the other relevant information is within the possession, custody, and control of *the United States* – the White House, the Justice Department, and NARA – that would explain the coincidence and timing of these events and allow him to seek appropriate relief, as discussed further below.[13]

## B. The Government Must Provide Information That is Material to the Preparation of Dr. Navarro's Defense.

Predictably, the Government downplays the significance of the Constitutional issues involved in this case and attempts to characterize its prosecution as simple and straightforward.[14] Counsel for Dr. Navarro has a very different view. In a number of important respects, this is a case of first impression involving fundamental Constitutional issues, including the Separation of Powers between the Office of the President and Congress and the immunity from Congressional

---

[13] We acknowledge that with respect to information in the possession of Congress that "it is settled that the government generally need not produce documents that are in the possession, custody or control of a separate branch of government such as Congress … or a state or local government." *Libby* at 7 citing *Safavian*, 233 F.R.D. 12 at *2; *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir.) (noting an exception for the D.C. Metropolitan Police Department). We submit, however, that the level of interaction between the Legislative and Executive Branches in this matter warrants a scrupulous inquiry into the communications as between these Branches.

[14] Based on the position it took in *United States v. Bannon*, the Government seems to believe that to establish a criminal violation of 2 U.S.C. § 192, it need only prove that Dr. Navarro knew the dates specified in the subpoena for the production of documents and deposition testimony and failed to comply. However, issues implicating the Separation of Powers between the Executive and Legislative branches are rarely that simple. This is the first time in our nation's history that the Department of Justice – in direct contradiction of its own established policies – is prosecuting a full-term senior advisor to a President for refusing on executive privilege grounds to comply with a Congressional subpoena.

process that has been recognized by Administrations of both political parties for the past fifty years.

### 1. The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Subpoena was Unenforceable

Dr. Navarro is entitled to information that would tend to demonstrate, and allow him to argue, that the Special Committee's subpoena was invalid because the Special Committee was improperly constituted and issued its subpoena in violation of House Rules and Resolutions, and because the subpoena was invalid on its face.

### a. The Subpoena was Unenforceable because the Select Committee was Improperly Constituted and Issued Its Subpoena Unlawfully.

The information presently available to Dr. Navarro indicates that the actions by the Select Committee were not in accordance with the authority conferred by the U.S. House of Representatives in Rules and Resolutions. House Resolution 503, the Resolution that established the Select Committee, provides that "[t]he Speaker *shall* appoint 13 members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader. (Emphasis added). This was not done despite the mandatory language of the Resolution. Additionally, the Committee's legal authority to issue subpoenas and conduct depositions is limited by H. Res 503, and the general Rules of the House of Representatives, which are incorporated by reference into that Resolution. That authority limits certain actions concerning subpoenas and depositions by requiring consultation with, and notice to, the ranking minority member of the Select Committee.[15]/ *See e.g.,* Amicus Curia Brief filed on May 24, 2022, in *United States v. Bannon* by

---

[15]/ "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena." H. Res. 503, Sec. 5 Procedure (c)(6)(A) (Emphasis added).

U.S. House of Representatives Minority Leader O. Kevin McCarthy and U.S. House of Representatives Minority Whip Stephen J. Scalise.



As the Justice Manual provides: "It is the policy of the Department of Justice, . . . that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that

directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." *Id.* at § 9-11.233. The Department has long recognized that this principle applies to invocations of executive privilege by a putative defendant. For example, in this testimony before the House Committee on Public Works and Transportation House of Representatives in 1983, former United States Attorney Stanley S. Harris, advised that "While I am not free to discuss the merits of the Burford contempt matter, illustratively the grand jury would be entitled to know that she was following the instructions of the President of the United States in conducting herself as she did.[16]

The information presented to the Grand Jury is obviously the prerogative of the Government – ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ In view of the Committee's role, and that of the House of Representatives in initiating this prosecution, the Government is obligated to make inquiry of those whose actions precipitated this prosecution, and to disclose any information that is material to the preparation of Dr. Navarro's defense.

### b. The Subpoena was Invalid on its Face

The Select Committee's subpoena, issued on its behalf by Chairman Bennie Thompson, failed to properly specify the place for Dr. Navarro's deposition beyond indicating that it would be held (somewhere) at the "United States Capitol Building, Washington DC 20515 or by

---

[16] "Examining and Reviewing the Procedures That Were Taken By The Office of the U. S. Attorney for the District of Columbia in Their Implementation of a Contempt Citation That Was Voted by the Full House of Representatives Against the Then Administrator of the Environmental Protection Agency, Anne Gorsuch Burford," Hearing Before the House Committee on Public Works and Transportation, 98th Cong., 1st Session. 29 (statement of Stanley S. Harris, U. S. Attorney for the District of Columbia) (1983).

videoconference".[17]/ By omitting any understandable description of where the deposition was to occur, the Committee eliminated any possibility that Dr. Navarro's nonappearance can support a criminal prosecution for contempt. However, the Committee muddled the issue even further when, on March 1, 2022 – the day before the deposition was to occur – Committee Counsel Dan George, sent Dr. Navarro an email that changed the place of the deposition to the O'Neil House Office Building.[18]/

House Resolution 503, which created the Select Committee, provides that Rule XI of the Rules of the House of Representatives shall apply to the Committee.[19]/ Paragraph (3)(A)(i) of Rule XI states in pertinent part that "Except as provided in subdivision (A)(ii) [Committee on Ethics], a subpoena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of an investigation or series of investigations or activities *only when authorized by the committee or subcommittee, a majority being present.* The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe. *Authorized subpoenas shall be signed by the chair of the committee or by a member designated by the committee*." (Emphasis added).

The Select Committee, with "a majority [of the members] being present", did not reissue the subpoena to move the location of the deposition from the Capitol Building to the O'Neill House

---

[17]/ The Capitol building has over 1.5 million square feet, more than 600 rooms, and miles of corridors. https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building.

[18]/ Mr. George's email said that: "We plan to proceed with the deposition at 10 AM in the O'Neil House Office Building at 200 C Street, SW, Washington, D.C. 20024. Please feel free to contact me when you arrive so someone can escort you to the conference room."

[19]/ SEC. 5 PROCEDURE … (c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee [except as provided].

Office Building. Moreover, in making the change the Committee violated its rule requiring only the Committee itself or the designee of the Chair may issue a subpoena. There is no evidence that a majority of the members of the Committee, or Chairman Thompson  authorized Mr. George to change place of deposition specified by the subpoena.

In *Liveright v. United State*s, 347 F.2d 473 (1965), the D.C. Circuit held that a subcommittee's failure to comply with its authorizing resolution is a valid defense to a prosecution for contempt of Congress under 2 U.S.C. § 192. The subpoena in *Liveright* was issued by subcommittee chairman without first consulting with the other members as required by the subcommittee's authorizing resolution. The failure to comply with subcommittee's resolution rendered the subpoena invalid and it could not provide the basis for a prosecution for criminal contempt of Congress. *Id.,* at 474-75. *See also, Shelton v. United States,* 327 F.2d 601,606 (1963) (holding that the subcommittee's authorizing resolution required that the subcommittee itself, and not in any individual member, held "the *power and the responsibility* of deciding who shall be called" by subpoena)

It appears that Mr. George made a material change to the subpoena that may not have been authorized by the Select Committee or its Chair. The facts concerning his actions are relevant to whether the subpoena can provide the basis for a prosecution for contempt of Congress. Dr. Navarro is entitled to know whether the Committee formally authorized the change or whether it was made exclusively by Committee staff, and any communications as between the Select Committee and the Department of Justice concerning the efficacy of Mr. Navarro's subpoena are not just relevant, but material, to his defense..

2. **The Unprecedented Posture of this Case Gives Rise to a Number of Potential Challenges to the Indictment.**

Ignoring decades of prudential policy, as expressed in numerous Office of Legal Counsel opinions that hold that senior advisors to a President are immune from compelled process by the Congress, the Department elected to charge Dr. Navarro with *criminal* contempt of Congress. It did so after its *Chief* Executive publicly opined that those in Dr. Navarro's position should be prosecuted. It did so despite choosing *not to* prosecute those similarly situated with Dr. Navarro.

█████████████████████████████████████████████

████████████████████████████████

a. **The Government Should be Required to Provide Information Regarding the Possible Effect of Unlawful Political Interference. on the Grand Jury**

"[A]n agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (1981)). Instead of attempting to resolve the privilege issues with the Executive to whom the privilege belongs, the Select Committee recommended to the Democrat-controlled House of Representatives that it hold Dr. Navarro in contempt of Congress. The House did so and then referred the matter to the Department of Justice for prosecution.

We do not know why the Department of Justice decided to ignore years of established precedent. A possible reason is that President Biden, the chief law enforcement official to whom the Department reports, publicly and improperly stated that the Department should prosecute all individuals who defy congressional subpoenas issued by the Select Committee. As reported by *The Hill* on October 15, 2021, President Biden told reporters, "I hope that the committee goes after them and holds them accountable." Asked if they should be prosecuted, President Biden said, "I do, yes."

It was improper for President Biden to attempt to influence the Department of Justice's prosecutorial discretion regarding individuals who failed to comply with Select Committee subpoenas. It is entirely possible that political appointees or others at the Department interpreted President Biden's statement as a directive to prosecute. That may explain the Department's departure from the OLC's long-established position that a senior advisor to a President is "absolutely immune" from a subpoena issued by Congress. Moreover, aside from issues of testimonial immunity, the decision to *criminally* prosecute a senior advisor to a President for refusing to appear before congressional committee is without precedent and constitutes a major diversion from the way the Department of Justice has always handled such matters.

The prosecution team has thus far shielded from Dr. Navarro whether there *exists* any communications as between the Department of Justice, including the Office of Legal Counsel, and the Select Committee and/or the White House. The unusual circumstances of this case require transparency into any such contacts that may have affected the decision to prosecute Dr. Navarro.

### i.   Communications between the Department of Justice and the Select Committee

The day after a federal Grand Jury in DC returned its indictment against him,  FBI Special Agents arrested Dr. Navarro as he was boarding a flight for a business trip to Tennessee at Washington's Reagan National Airport. They waited to arrest him at the Airport even though they knew that he lived across the street from FBI Headquarters and had spoken with him as recently as two days earlier. With national media apparently alerted that morning to its intentions, the FBI agents arrested, handcuffed, and transported Dr. Navarro to the courthouse, where he was strip-searched, placed in a holding cell, and then in leg irons by the US Marshals Service for his initial appearance in Court.

The Government's refusal to allow Dr. Navarro to self-report to court after being charged with two non-violent misdemeanors is indeed unusual and demonstrates a selective animus towards him by the Government officials responsible for the decisions made in this case.[20] We do not know how much, if any, of this animus is the result of communications between the Department of Justice, the Select Committee, and/or the White House. However, it is undeniable that the Government handled the arrest of Dr. Navarro much differently than it normally does individuals charged with non-violent misdemeanor offenses.

There are additional indications about the contacts between the Department of Justice and the Select Committee. One of the most important and unresolved issues in this case is whether the Select Committee was created in accordance with H. Res. 503 regarding the number of its members and the appointment of a ranking member by the minority party. Despite the complexity of these issues and their relationship to historical congressional prerogatives and procedures, █

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████      ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

_____

[20] Neither Mark Meadows, the former Chief of Staff to President Trump, nor Dan Scavino, former senior advisor to President Trump, appeared before the Select Committee in response to subpoena. Nonetheless, on June 4, 2022, the Department of Justice notified them that it had declined to prosecute for contempt of Congress. https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html The decision demonstrates an animus toward Dr. Navarro and raises questions about a selective prosecution of him motivated by improper purposes.

Dr. Navarro is entitled to discover any communications between the Department of Justice and the Select Committee that may have influenced the Government's decision to prosecute him for contempt of Congress.

### ii.  Contacts between the White House and the Department of Justice

On February 28, 2022, Jonathan C. Su, Deputy Counsel to President Biden, sent a letter to Dr. Navarro "regarding the subpoena issued [by the Select Committee]". In the letter, Mr. Su expressly noted certain subjects under investigation by the Select Committee and advised Dr. Navarro that "President Biden … has decided not to assert executive privilege as to your testimony regarding those subjects, or any documents he might possess that bear on them."

Mr. Su's instructions to Dr. Navarro were unusual since he had no prior contact with Dr. Navarro about the subpoena or anything else. When interviewed by the FBI, Mr. Su stated that he first heard "in the media" that the Select Committee had issued a subpoena to Dr. Navarro. Interview of Jonathan C. Su (June 6, 2022)(US-000485). He said that after learning about the subpoena, he contacted Dr. Navarro by email to advise him of President Biden's position regarding privilege. Mr. Su further said that he knew Dr. Navarro's email address from separate, unrelated investigation regarding January 6th.

These communications suggest that Mr. Su, or someone else at President Biden's White House, communicated with the Select Committee concerning its investigation and the subpoena to Dr. Navarro. It is also possible that the White House communicated with the Department of Justice regarding OLC's previously established position that a senior advisor to a President is absolutely immune from congressional process. It appears unlikely that on his own initiative Mr. Su would have contacted Dr. Navarro about President Biden's positions regarding executive privilege after learning of the subpoena "in the media" and without any other contact with the Committee or the Department. This possibility is made all the more likely given that Mr. Su had previously obtained

Dr. Navarro's email address from someone connected to the Select Committee. Interview of Jonathan C. Su (June 6, 2022)(US-000485).

It would be premature to suggest that Mr. Su or anyone else in the White House had improper contacts with the Select Committee or the Justice Department in an attempt to assert political influence over their decisions regarding Dr. Navarro. Nonetheless, the possibility exists, and Dr. Navarro is entitled to discovery of any such communications.

### 3. The Government Must Provide Information Regarding the Possibility that it has Engaged in the Selective Prosecution of Dr. Navarro.

"A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* Improper arbitrary classifications include a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs").

A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different treatment" to persons "similarly situated" to him. *Id.* at 470. When a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the

defendant. *Branch Ministries,* 211 F. 3d at 145. *Second,* a defendant must show that the prosecutorial policy had "a discriminatory *purpose.*" *Armstrong,* 517 U.S. at 465 (Emphasis provided).

Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong,* 517 U.S. at 467.

> If a defendant establishes a *prima facia* case of selective prosecution, the burden shifts to the Government to try to prove that the filing of charges did not arise from discriminatory motives. *Att'y Gen. v. Irish People, Inc.*, 684 F. 2d 928, 932 n. 11 (D.C. Cir. 1982). If the Government cannot satisfy that burden, a court will require discovery of the Government's decision or dismiss the charges against the defendant. *In re Aiken County,* 725 F. 3d 255, 264 n. 7 (D.C. Cir. 2013). (Kavanaugh, Circuit Judge, presiding).

On December 14, 2021, the House of Representatives voted to refer former White House Chief of Staff Mark Meadows to the Department of Justice for prosecution based on his refusal to appear for deposition before the Select Committee and answer questions about the January 6th riot at the U.S. Capitol.[21] Four months later, on April, 2022, the House referred Dan Scavino and Peter Navarro to the Department for prosecution for their refusal to comply with subpoenas from the Select Committee directing that they produce documents and appear for deposition.[22] The House

---

[21] Addressing the House decision to refer Mr. Meadows for prosecution, Select Committee Chairman, Bennie Thompson said, "This is about Mr. Meadows refusing to comply with the subpoena to discuss the records he himself turned over." https://www.nbcnews.com/politics/congress/house-expected-vote-mark-meadows-criminal-contempt-referral-n1285908.

[22] Chairman Thompson explained the reason for the House's criminal referral, "Both of these men have refused to comply with the Select Committee's subpoenas in any way." https://www.cnn.com/2022/04/06/politics/house-vote-contempt-referrals-scavino-navarro/index.html.

of Representatives made its criminal referrals for all three men for essentially the same reason: they had asserted executive privilege on behalf of President Trump and refused on that basis to appear for deposition.[23]/

After the House referred the matters to the Department of Justice,  However, the public record shows that the Department made a clear distinction regarding the treatment afforded these similarly situated individuals. It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

On June 2, 2022, the Grand Jury returned its indictment against Dr. Navarro for Contempt of Congress. Two days later, on June 4, 2022, media sources reported that U.S. Attorney Matt Graves had notified Doug Letter, the House General Counsel, that the Justice Department had completed its review and had decided it "will not be initiating prosecutions for criminal contempt, as requested in the referral against Messrs. Meadows and Scavino."[25]/ The Department provided

---

[23]/ Mr. Meadows produced documents to the Committee but declined to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[24]/ ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

[25]/ *See   e.g.,   https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html.*

no reasons for its different treatment of Dr. Navarro and there is no apparent distinction between the conduct of the three individuals in their refusal to comply with the deposition subpoena for reasons of privilege.

In view of this disparity, Dr. Navarro believes that the Department of Justice's decision to file criminal charges against him while declining to prosecute Mr. Meadows and Mr. Scavino is based on unlawful and discriminatory reasons involving his public expression of political beliefs.[26] He can think of no other reason for the decision and requests that this Court order the Government to produce discovery regarding its decision.

Thus, even based on the limited record now available to Dr. Navarro, the Department's decision to prosecute Dr. Navarro, *but not* Messrs. Meadows and Scavino, had a discriminatory *effect* on him. All three men were similarly situated and referred to the Department by the Select Committee for their refusal to appear for deposition in response to subpoena. There is no meaningful difference between these individuals for the purpose of demonstrating discriminatory effect.

The second prong of the test established by *Armstrong* requires Dr. Navarro to show that Department had an improper discriminatory purpose in deciding to prosecute him but not Mr. Meadows or Mr. Scavino. He does not, of course, have access to direct evidence of the Department's motivation but the circumstantial evidence that is available is sufficient to raise an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

---

[26] "In determining whether to commence or recommend prosecution or take action against a person, the attorney for the government should not be influenced by [t]he person's . . . political association, activities, or beliefs. . ." Justice Manual § 9-27.260.

Unlike Mr. Meadows and Mr. Scavino, who did not publicly discuss their views about the Select Committee or the Department of Justice, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Government. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[27]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent. It is highly unusual, and perhaps unprecedented, for the Department to not allow a defendant charged with nonviolent misdemeanors to self-report to court for arraignment.

---

[27]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []. House Report at 3.

The Government handled Dr. Navarro's arrest very differently from other cases. That, and the difference in treatment between Dr. Navarro and Messrs. Meadows and Scavino, satisfies *Armstrong's* requirement of a *prima facie* showing of both discriminatory effect and purpose. Dr. Navarro has demonstrated a colorable claim of selective prosecution and is entitled to discovery concerning the Government's motives in prosecuting this case.

### 4. The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Government Abused the Grand Jury Process

A court may authorize the disclosure of Grand Jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the Grand Jury." Fed. R. Crim. P. 6(e)(3)(E)(i). It is the defendant's burden to establish that the Government abused the Grand Jury system, which can be met by showing that it engaged in misconduct. *United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014), *aff'd*. 893 F.3d 811 (D.C. Cir. 2018). "A defendant seeking to overturn an indictment based on alleged errors in Grand Jury proceedings faces a 'heavy burden' of demonstrating that any alleged deficiency had a 'substantial influence' on the outcome of the Grand Jury proceeding." *United States v. Barrow*, 2021 U.S. Dist. LEXIS 30925 at *19 quoting *United States v. Saffarina*, 424 F. Supp. 3d 46, 80 (D.D.C. 2020). "[T]he mere suspicion that the Grand Jury may not have been properly instructed with respect to the legal definition of contribution is insufficient to establish that [the defendant] is entitled either to dismissal of the indictment or to disclosure of Grand Jury materials." *Id*. at *20 quoting *United States v. Trie*, 23 F.Supp. 2d 55, 62 (D.D.C 1998).

"The prosecutor's responsibility is to advise the Grand Jury on the law and to present evidence for its consideration. In discharging these responsibilities, the prosecutor must be scrupulously fair to all witnesses and must do nothing to inflame or otherwise improperly influence the grand jurors." Justice Manual § 9-11.010. A prosecutor may not, for example, opine as to the

sufficiency of evidence or credibility of witnesses. Federal Grand Jury Practice Manual at p. 165

(1983) citing *United States v*. Samango, 607 F.2d 827 (9th Cir. 1979); *United States v. Wells*, 163

F.2d 313 (D. Idaho 1908). While a prosecutor's failure to present exculpatory evidence to a Grand

Jury generally does not require dismissal of an indictment, *United States v. Williams*, 504 U.S. 36

(1992), "it is the policy of the Department of Justice … that when a prosecutor conducting a grand

jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject

of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand

jury before seeking an indictment against such a person."  Justice Manual § 9-11.233.





████████████████████████████████████████

The fact that the law places a "heavy burden" on the defendant to demonstrate a "substantial influence" on the outcome of the Grand Jury proceedings weighs in favor of further discovery that would provide the defendant with the information necessary to evaluate whether to seek relief from the Court.

## V.  CONCLUSION

Wherefore, for the reasons set forth above, Dr. Navarro respectfully requests an Order compelling the Government to produce the following requested discovery materials so that he may prepare a defense to the charges in this matter:

1. Any written or recorded statement or admission made by Mr. Navarro that is within the Government's possession, custody or control, the existence of which is known, or by the exercise of due diligence may become known, to the government, including but not limited to any statements Mr. Navarro made to the House Select Committee on the Coronavirus Crisis regarding invocations of Executive Privilege. *See* Fed. Crim. P. 16(a)(1)(B)(i). (Exhibit 4 at ¶ A; Exhibit 6 at p. 2 ).

2. All books, papers, documents, data, photographs, video recordings, or tangible objects, or copies or portions thereof, that are material to preparing Mr. Navarro's defense, including but not limited to the following items, see Fed. R. Crim. P. 16(a)(1)(E)(i). (Exhibit 4 at ¶ C(1); Exhibit 6 at pp. 3-4):

    a. With respect to any information produced or required to be produced in discovery in this case, all subpoenas or formal or informal requests for information by the Government to which the information was responsive, all information concerning communications relating to such subpoenas or requests, and any written responses by the producing party, including but not limited to cover letters, inventories, and/or privilege logs. (Exhibit 4 at ¶ C(4); Exhibit 6 at p. 3).

    b. All documents, records and reports relating to the Government's arrest of Mr. Navarro on June 3, 2022 including, but not limited to, the decision by the FBI and/or the Department of Justice to arrest Mr. Navarro at Ronald Reagan Washington National Airport and place him in security restraints (i.e., "leg irons"). (Exhibit 4 at ¶ C(7); Exhibit 6 at p. 2).

c. All documents, records, or reports relating to communications between the Department of Justice and the House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") referencing or relating to Mr. Navarro. (Exhibit 4 at ¶ C(9); Exhibit 6 at pp. 3).

d. To the extent not already included in the above requests, all documents, records, or information provided to the Select Committee by the White House Office of Counsel to the President, including Jonathan C. Su, that reference or relate to Mr. Navarro. (Exhibit 4 at ¶ C(10); Exhibit 6 at pp. 3).

e. To the extent not already included in the above requests, any documents, records, or information referencing communications between former President Donald J. Trump or his counsel, Justin Clark and/or Alex Cannon, and White House Office of Counsel to President Joseph R. Biden, including Jonathan C. Su, that reference or relate to Mr. Navarro. (Exhibit 4 at ¶ C(11); Exhibit 6 at pp. 3).

f. Any communications and/or other evidence related to the application to Mr. Navarro or any other senior advisor to former President Donald J. Trump of the opinions of the Office of Legal Counsel of the Department of Justice including, but not limited to, Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101 (1984); Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. *5 (July 15, 2014); Assertion of Executive Privilege With Respect to Clemency Decision, 23 Op. O.L.C. 1 (1999); Immunity of the Former Counsel to the President From Compelled Congressional Testimony, 31 Op. O.L.C. 191, 192 (2007); Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. at *5 (July 15, 2014); and Testimonial Immunity Before Congress of the Former Counsel to the President, 43 Op. O.L.C. __ (May 20, 2019). (Exhibit 4 at ¶ C(12); Exhibit 6 at pp. 3-4).

g. All correspondence between the House Select Committee on the Coronavirus Crisis (and/or any other House Committee or Subcommittee) and Mr. Navarro in which Mr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(16); Exhibit 6 at p. 4).

h. All correspondence between Representative James E. Clyburn, Chairman of the House Select Committee on the Coronavirus Crisis and Mr. Navarro in which Mr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(17); Exhibit 6 at pp. 3-4).

     i.  All documents, including communications, in which Representative James E. Clyburn, Chairman of the House Select Committee on the Coronavirus Crisis, or other members of that Committee discussed, indicated that Mr. Navarro had claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(18); Exhibit 6 at p. 4).

3.  All Reports of investigation (ROIs) related to or concerning the Select Committee, including but not limited to any ROIs related to Steve Bannon, Mark Meadows, and Dan Scavino. Exhibit 4 at ¶ D; Exhibit 6 at pp. 4-5).

4.  All documents that are favorable to the defense or that would tend to exculpate Mr. Navarro with respect to the charges in the Indictment or that are relevant to the issue of sentencing pursuant to the United States Constitution and relevant case law interpreting its protections, including *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giles v. Maryland*, 386 U.S. 66 (1967), the Due Process Protections Act, Rule 5 of the Federal Rules of Criminal Procedure, and Rule 3.8 of the District of Columbia Rules of Professional Conduct, including but not limited to the following:

     a.  All documents and other evidence establishing that the Select Committee was properly established pursuant to House Resolution 503. See Indictment at 1 ¶ 1. (Exhibit 4 at ¶ G(1); Exhibit 6 at p. 5).

     b.  All documents and other evidence establishing that "[o]n February 9, 2022, the Select Committee served NAVARRO with a subpoena for documents and testimony relating to its inquiry." Indictment at 3 ¶ 7. (Exhibit 4 at ¶ G(2); Exhibit 6 at p. 5).

     c.  All documents and other evidence establishing that "the subpoena required NAVARRO to appear and produce documents" and/or "to appear for a deposition" including, but not limited to, all documents and other evidence establishing that the subpoena was, or was reasonably known to be, lawfully issued and otherwise enforceable. Indictment at 3 ¶ 9. (Exhibit 4 at ¶ G(3); Exhibit 6 at p. 5).

     d.  All documents and other evidence establishing that "[t]he Select Committee's subpoena commanded NAVARRO to appear on February 23, 2022, at 10:00 a.m., at an office in the U.S. Capitol Complex," including, but not limited to, documents sufficient to identify the office where Mr. Navarro was allegedly commanded to appear as well as all documents sufficient to support the allegation that such office was part of the U.S. Capitol Complex. *See* Indictment at 3 ¶ 10. (Exhibit 4 at ¶ G(4); Exhibit 6 at p. 5).

     e.  All documents and other evidence sufficient to establish that the categories of "documents and communications" delineated within the Select Committee's

subpoena were "relevant" to the Select Committee's investigation. *See* Indictment at 3 ¶ 11. (Exhibit 4 at ¶ G(5); Exhibit 6 at p. 5).

f. All documents and other evidence sufficient to establish that the investigation of the Select Committee's investigation was "authorized." Indictment at 3 ¶ 11. (Exhibit 4 at ¶ G(6); Exhibit 6 at p. 5).

g. All documents and other evidence sufficient to establish the enforceability of the "instructions for compliance and with document demand" referenced in the Indictment. Id. at 4 ¶ 12. (Exhibit 4 at ¶ G(7); Exhibit 6 at p. 6).

h. All documents and other evidence sufficient to establish that, "[t]he subpoena also commanded that NAVARRO appear . . . and 'testify at a deposition.'" Indictment at 4 ¶ 13. (Exhibit 4 at ¶ G(8); Exhibit 6 at p. 6).

i. All documents and other evidence sufficient to establish that Mr. Navarro was put on notice of the place he was to appear for a deposition pursuant to the Select Committee's subpoena, including, but not limited to, documents sufficient to establish whether Mr. Navarro was to appear personally "or by videoconference." See Indictment at 4 ¶ 13. (Exhibit 4 at ¶ G(9); Exhibit 6 at p. 6).

j. All documents and other evidence sufficient to establish that the Select Committee subpoena was lawfully issued and otherwise enforceable such that it "required" anything by Mr. Navarro. See Indictment at 4-5 ¶ 14. (Exhibit 4 at ¶ G(10); Exhibit 6 at p. 6).

k. All documents and other evidence sufficient to establish that Mr. Navarro had any obligation to "certify that he had conducted a diligent search for responsive records" as alleged by the Indictment. Id. at 4-5 ¶ 15. (Exhibit 4 at ¶ G(11); Exhibit 6 at p. 6).

l. All documents and other evidence sufficient to establish that Mr. Navarro was required to "appear" to "assert any executive privilege objections on a question-by-question basis." Indictment at 5, ¶ 18. (Exhibit 4 at ¶ G(12); Exhibit 6 at p. 6).

m. All documents and other evidence sufficient to establish that "[o]n March 2, 2022, at 10:00 a.m., NAVARRO did not appear before the Select Committee to testify," including, but not limited to, all documents sufficient to establish that Mr. Navarro was legally required to appear. Indictment at 21 ¶ 21. (Exhibit 4 at ¶ G(13); Exhibit 6 at p. 6).

n. All documents and other evidence sufficient to establish that Mr. Navarro was "summoned as a witness," that the Select Committee had any lawful "authority" to

summon Mr. Navarro, and/or that the "papers" Mr. Navarro had been summoned to produce related to a "matter under inquiry" by the Select Committee." Indictment at 6 ¶ 23. (Exhibit 4 at ¶ G(14); Exhibit 6 at p. 6).

o.  All documents and other evidence sufficient to establish that Mr. Navarro "refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way" with the Select Committee subpoena. Indictment at 6 ¶ 23. (Exhibit 4 at ¶ G(15); Exhibit 6 at p. 6).

p.  To the extent not already provided by a prior request, all documents and other evidence sufficient to establish that Mr. Navarro was "summoned as a witness," that the Select Committee had any lawful "authority" to summon Mr. Navarro, and/or that the testimony compelled was "upon a matter under inquiry" before the Select Committee. Indictment at 7 ¶ 25. (Exhibit 4 at ¶ G(16); Exhibit 6 at p. 7).

q.  All documents and other evidence sufficient to establish that Mr. Navarro "did willfully make default" and/or "refused to appear to give testimony" and/or that any such testimony was "required" by the Select Committee subpoena. Indictment at 7 ¶ 25. (Exhibit 4 at ¶ G(17); Exhibit 6 at p. 8).

5.  The early production of any statements of prospective Government witnesses that are in the Government's possession and that relate to the subject matter concerning which the witness will testify, so that any issues involving disclosure may be resolved in advance, counsel will have adequate time to review the material, and there will be no delay in court proceedings while counsel reviews the same. *See Jencks v. United States*, 353 U.S. 657 (1957). (Exhibit 4 at ¶ I); Exhibit 6 at p. 8).

6.  The following specific additional requests listed in Defendant's letter to the Government dated July 20, 2022 (Exhibit 6 at pp. 7-8):





j.  All warrants and subpoenas used by the Government to obtain information in this case.



l.  All correspondence between the Justice Department and Jonathan Su and/or anyone else with the White House Counsel's Office.


Dated: August 4, 2022                          Respectfully Submitted,

                                               E&W Law, LLC

                                               _____/s/ John S. Irving_____
                                               John S. Irving (D.C. Bar No. 460068)
                                               1455 Pennsylvania Avenue, N.W., Suite 400
                                               Washington, D.C. 20004
                                               Telephone: (301) 807-5670
                                               Email: john.irving@earthandwatergroup.com


                                               SECIL LAW PLLC

                                               _____/s/ John P. Rowley, III_____
                                               John P. Rowley, III  (D.C. Bar No. 392629)
                                               1701 Pennsylvania Ave., N.W., Suite 200
                                               Washington, D.C. 20006
                                               Telephone: (703) 417-8652
                                               Email: jrowley@secillaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>CERTIFICATE OF SERVICE</u>

On August 4, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the government and Chambers.

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)