**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| ) | |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule 12(b)(3)(A) and (3)(B) of the Federal Rules of Criminal Procedure, respectfully moves this Court for an Order dismissing the indictment. In support thereof, Dr. Navarro states as follows:

### I. INTRODUCTION

Dr. Peter Navarro served as a Senior Adviser to President Donald J. Trump during the former President's entire term in office, from January 2017 through January 2022. His positions in the Trump Administration included Deputy Assistant, and then Assistant, to the President, Director of Trade and Manufacturing Policy, Director of the White House National Trade Council (and then the Office of Trade and Manufacturing Policy), and Defense Production Act policy coordinator during the COVID-19 pandemic. Through the performance of these and other duties, Dr. Navarro was one of a small group of senior advisors "who customarily meet with the President on a regular or frequent basis [and] should be deemed absolutely immune from testimonial compulsion by congressional committee"[1]/

---

[1]/ *Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege* at 5 (May 23, 1977). The Department of Justice Office of Legal Counsel ("OLC") has recognized for the last eight presidential administrations that senior advisors to a President are "absolutely immune" from congressional process. *See Memorandum For Pat A. Cipollone Counsel To The President,* 43 Op. O.L.C. __ (May 20, 2019).

Nonetheless, and in direct contradiction of decades of Department of Justice policy and precedent, on June 2, 2022, the government charged Dr. Navarro with criminal Contempt of Congress in violation of 18 U.S.C. § 192 based on his non-compliance with a subpoena issued by the Select Committee[2]/ for the production of documents and deposition testimony. For the reasons stated herein, Dr. Navarro moves this Court for entry of an order dismissing the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(A) (due to defects in instituting the prosecution) and Fed. R. Crim. P. 12(b)(3)(B) (defects in the indictment).[3]/

## II. PROCEDURAL BACKGROUND

### A. This Prosecution Is A Significant Departure From Long- Standing Department Of Justice Policy And Precedent.

The prosecution of Dr. Navarro is far more than a simple misdemeanor prosecution: it stems from the intersection of congressional investigative power attempted to be enforced against this defendant, and the doctrine of Executive Privilege asserted by Presidents since the founding of the Republic and validated for over five decades by the Department of Justice Office of Legal Counsel (OLC) opinions from 1984 to the present. While the criminal contempt statute, 2 U.S.C. § 192, was invoked hundreds of times by both the House and Senate against private parties during the McCarthy era, *see* Carl Beck, *Contempt of Congress: A Study of the Prosecutions Initiated by The Committee on House Un-American Activities*, 1945-1957 (The Hauser Press, New Orleans

---

[2]/ The United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee")

[3]/ On August 4, 2022, Dr. Navarro filed a Motion to Compel Discovery from the government (Dkt. 31). The motion is currently pending before the Court and as noted during a status hearing on August 11, 2022, Dr. Navarro reserves the right to amend this Motion to Dismiss based on addition discovery the Court may order the government to provide him.

1959) at 241-243, the vast majority of those cases resulted in dismissal, acquittal or reversal on appeal. *Id.* at 186.

More significantly, in the post-McCarthy era and since the 1982 certification for contempt of then EPA Administrator Anne Gorsuch (Burford) for refusing to turn over documents subpoenaed by a committee relating to administration of the Superfund Act, (1) no high-ranking cabinet or White House official has been subjected to a lawsuit brought under the statute. And, *a fortiori*, (2) prior to the present case no senior advisor to a President has *ever* been criminally prosecuted for non-compliance with a congressional subpoena.[4]

From that time forward, in an unbroken line of OLC opinions in both Republican and Democratic administrations spanning more than five decades, the Department of Justice has steadfastly and consistently declined to use the statute against senior advisers to the President, concluding that they are immune from congressional process as "alter egos" of the President. In the Department's view, prosecution under the statute for these officials would place a "heavy burden" upon the assertion of Executive Privilege. United States' Mot. Summ. J. 36 n. \*\*. *United States v United States House of Representatives*, No. 82-cv-3583. Following this Court's admonition in 1983 that "Compromise and cooperation, rather than confrontation, should be the aim of the parties," *United States v. United States House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983), no other White House aide acting under a Presidential assertion of privilege has been prosecuted under the statute despite numerous interbranch conflicts as between the executive and the legislature involving both testimony and documents. *See Comm. on the Judiciary, United States House of Representatives v Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *House Comm. On*

---

[4] Arguably, the sole exception is *United States v. Stephen Bannon*. But the circumstances of *Bannon* are very different from the present case involving Dr. Navarro, who served as a Senior Advisor to President Trump for all four years of his term in office.

*Oversight v. Holder*, 979 F. Supp. 2d 1 (2013). In fact, it is because of the Department's practical nullification of the statute as applied to senior advisers to the President that the House has attempted to utilize civil suits to enforce its subpoenas. *See e.g., House Comm. on the Judiciary v McGhan,* 973 F. 3d 121 (D. C. Cir. 2020).

The present case is a substantial departure from the Department's long-established recognition that a senior aide to President is "absolutely immune" from compulsion to respond to a congressional subpoena.[5]/ DOJ has taken that questionable departure even farther by now, for the first time in our nation's history, instituting a criminal prosecution of Dr. Navarro for acting in accordance with the direction of former President Trump and despite decades of established Department precedent. Rather than pursue civil remedies to sort through the implications of the former President's privilege assertions so as to obtain Dr. Navarro's documents and/or testimony, the Department has chosen to punish his, "obedience to an assertion of Executive Privilege by the President from whom [his] governmental authority derives." As the Department of Justice has previously advised, a subpoenaed senior adviser to the president:

> is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. *It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute*, at least where there is an alternative means for vindicating congressional investigative interests and forgetting the legal issues into court.

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* __ Op. O.L.C. __ n. 39 (May 30, 1984) (emphasis added) *citing* former Solicitor General Rex Lee in *Executive Privilege, Congressional Subpoena Power, and Judicial*

---

[5]/ This immunity continues even *after* the tenure of a particular advisor to the President because, absent a guarantee of lasting confidentiality, a "President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duty depends." *Nixon v. Admin'r of Gen Servs.*, 433 U.S. 425, 449 (1977).]

*Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. Rev. 231, 259 (emphasis added).[6]/

**B.  The Prosecution Of Dr. Navarro Is Improperly Based On His Obedience To President Trump's Invocation Of Executive Privilege.**

To that end, former President Trump has perhaps no more clearly instructed Dr. Navarro to assert the President's applicable privileges than any other senior presidential adviser subpoenaed by Congress. In November 2021, the House Select Committee on the Coronavirus Crisis ("COVID Subcommittee") issued a subpoena to Dr. Navarro for documents and testimony. Then, on November 20, 2021, former President Trump issued a press release advising that, "I'm telling Peter Navarro to protect Executive Privilege and not let these unhinged Democrats discredit our great accomplishments." Press Release, Donald J. Trump (Nov. 20, 2021).[7]/ Accordingly, Dr. Navarro responded by letter of December 7, 2021, to Chairman James E. Clyburn stating that he was "unable to respond to the subpoena based on former President Trump's invocation of Executive Privilege with respect to the very topic covered by the subpoena." Dr. Navarro described the instructions as "a direct order" from the President. Although Chairman Clyburn told Dr. Navarro that he had "no valid basis for refusing to comply with the subpoena" he and the COVID Subcommittee seemingly dropped the matter.[8]/ The COVID Subcommittee's apparent acceptance

---

[6]/ The Department should be judicially estopped from pursuing this prosecution in contravention of the constitutional principles it has followed for decades. This Motion asks the Court to enforce the fundamental precepts of fairness that the Department now, for some reason, has chosen to ignore.

[7]/ *Available at* https://twitter.com/realLizUSA/status/1462157208699953156?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1462157208699953156%7Ctwgr%5Ea798e29eb7c9f63e09c7d67f7b82d1dcda054a4c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.businessinsider.com%2Fdonald-trump-tells-peter-navarro-to-defy-house-covid-19-probe-2021-11 (last visited Aug. 17, 2022).

[8]/ Indeed, the COVID Subcommittee did not raise the matter again until *seven months* later, on July 27, 2022. Coincidentally, or not, after remaining silent for some seven months, the COVID Subcommittee contacted Dr. Navarro on July 27, 2022, via his counsel, within hours after the undersigned counsel emailed a Rule 16 letter to the government in the present case requesting all correspondence between the COVID Subcommittee and Dr. Navarro.

of Dr. Navarro's invocation of Executive Privilege on behalf of President Trump confirmed for

him that Congress did not dispute that he was "immune" from the congressional subpoena. He

accordingly responded in similar manner when, several months later, the Select Committee served

him with another subpoena.

On February 9, 2022, Select Committee staff emailed Dr. Navarro, asking if he would

accept service of its subpoena and whether he had an attorney. Dr. Navarro replied: "yes. No

counsel. Executive privilege." House Report 117-284 (March 29, 2022) ("House Report") at 3.

Later that day, Dr. Navarro released a public statement which said in pertinent part that,

> President Trump has invoked Executive Privilege; and [it] is not my privilege to
> waive. [The Select Committee] should negotiate any waiver of the privilege with
> the President and his attorneys directly, not through me.

House Report at 3.

On February 24, 2022, Select Committee staff again contacted Dr. Navarro about the

subpoena. He responded on February 27, 2022, stating, in part, that "President Trump has invoked

Executive Privilege in this matter … Accordingly, my hands are tied." Indictment ¶ 17. The next

day, on February 28, Dr. Navarro reiterated by email to the Select Committee that he was unable

to comply with the subpoena because the "privilege is not mine to waive" and it is "incumbent on

the Select Committee to directly negotiate with President Trump and his attorneys" regarding the

matter. Indictment ¶ 18.

Inexplicably, neither the Select Committee nor its staff ever contacted President Trump or

his attorneys to attempt to resolve the privilege issues, a long-standing practice[9] strongly

---

[9] *See Trump v. Mazars*, LLP, 591 U.S. __, 140 S.Ct. 2019 (2020)(". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

encouraged by the Supreme Court. Instead, the Select Committee moved forward with a recommendation that the House of Representatives hold Dr. Navarro in contempt of Congress, which it did and then referred Dr. Navarro to the Department of Justice for Criminal Prosecution.[10]/

On June 2, 2022, a federal grand jury returned an indictment against Dr. Navarro charging him with two misdemeanor counts for Contempt of Congress (Papers and Testimony) in violation of 2 U.S.C. §192,[11]/ and alleging that he failed to comply with the Select Committee's subpoena.

Dr. Navarro has been unfairly caught in a dispute between the executive and legislative branches of our government and placed on the horns of a dilemma: follow the explicit instructions from the President he served as a senior advisor for four years, or risk being held in Contempt of Congress and criminally prosecuted by the Department of Justice. This is a Hobson's Choice and, as the D.C. Circuit noted in *Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962): "Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights." *Id.* at 276.

### C. The Government's Presentation To The Grand Jury Underscores The Unusual Way the Department Has Approached this Prosecution.

To date, the Government has disclosed ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[10]/ The discovery provided thus far by the Government indicates that the Select Committee counsel who was the point of contact with Dr. Navarro did not communicate Dr. Navarro's assertion of Executive Privilege to Chairman Thompson or his designee. Counsel acknowledged that he did not know of any attempt by the Select Committee to negotiate the privilege issue with President Trump or his lawyers and he seems to have concluded on his own accord that Dr. Navarro did not have the right to invoke the privilege on behalf of the former President.  FBI Interview of Dan George (June 3, 2022)(US-000435).

[11]/ Each of the two counts is punishable by a fine of not more than $1,000 nor less than $100 and imprisonment for not less than one month nor more than twelve months. 2 U.S.C. §192.

[REDACTED]

**III.  STANDARD OF REVIEW**

A party may raise by pretrial motion any defense, objection, or request that the court can

determine without a trial on the merits. Fed. R. Crim. P. 12(b)(1). A criminal defendant may move

to dismiss an indictment based on a "defect in the indictment," including for "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii) & (v). A motion to dismiss "allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015).

When considering a motion to dismiss, a court will assume the truth of the factual allegations that are pled in the indictment. *See Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *United States v. Ballestas,* 795 F.3d 138 (DC Cir. 2015). Defects that are subject to attack include the failure of an indictment to charge an offense, including constitutional challenges to the statute creating the offense. *United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds,* 898 F.3d 36 (D.C. Cir. 2018); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973). Dismissal of the indictment is the appropriate remedy where errors in the grand jury process rise to the level of constitutional violations, *i.e.,* where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254 (1988) *citing Vasquez v. Hillery*, 474 U.S. 254, 260-264 (1986)(racial discrimination in selection of grand jurors); *Ballard v. United States*, 329 U.S. 187 (1946)(women excluded from the grand jury).

Grand jury errors that do not rise to the level of constitutional violations are reviewed by a harmless error analysis under Fed. R. Crim. P. 52(a), where "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations. *Bank of Nova Scotia,* 487 U.S. at 254 (harmless error where Sixth Amendment violations (interviews of bank employees without counsel) occurred after

the indictment, and other violations (*e.g.*, calling witnesses for the sole purpose of having them invoke the Fifth Amendment, prosecutors arguing with an expert witness during a recess after the witness gave testimony adverse to the government, conferring immunity without a court order, and causing an IRS agent to mischaracterize prior testimony) did not amount to a "significant infringement on the grand jury's ability to exercise independent judgment.") (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)(O'Connor, J. concurring) (harmless error where the government violated Fed. R. Crim. P. 6(d) by having two agents testify at the same time before a grand jury, but defendant's challenge came after his conviction by a trial jury)).

## IV. ARGUMENT

### A.  The Indictment Violates the United States Constitution

"Historically, disputes over congressional demands for presidential documents" have not involved the courts but, instead, "have been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Thompson*, 20 F. 4th 10, 25 (D.C. Cir. 2021) (quoting *Mazars USA LLP*, __ U.S. __, 140 S. Ct. at 2019, 2029 (2020). Indeed, the last irreconcilable dispute between the legislative and the Executive branches of our government over the compulsory testimony of a senior presidential adviser occurred forty (40) years ago with the contempt referral of President Reagan's senior presidential advisor, EPA Administrator Anne Gorsuch (Buford). Despite protracted negotiations the executive and legislative branches were unable to reach an agreement and the Department of Justice, on behalf of the executive branch, brought suit against Congress seeking a declaratory judgment concluding that then Administrator Gorsuch's non-compliance with an otherwise validly issued Congressional subpoena was "lawful." Second Amended Complaint at 10, *United States v. United States House of Representatives*, No. 82-cv-3583 (attached hereto as Exhibit 1). As applied to a senior executive branch Official, the Department of Justice asserted, 18 U.S.C. § 192 was unconstitutional insofar

as it required the deprivation of liberty for an official who at all times acted consistent with the

directive of the President. The Department of Justice described that conflict:

> The Executive Branch has both the constitutional and a common law privilege to
> ensure the confidentiality of its law enforcement files and its deliberative process.
> Producing to the Subcommittee the documents [requested] would contravene those
> privileges. Accordingly, even if the Subpoena were deemed to require
> Administrator Gorsuch to produce those documents, her refusal to do so was lawful
> in all respects.

*Id.* at 9 ¶ 38. Executive Privilege preserves the fundamental principle of separation of powers,

"which is at the heart of our constitution." *Buckley v. Valeo*, 424 U.S. 1, 119 (1976) (*per curiam*).

The judiciary acts as an important safeguard as against the other branches where:

> An assumption by one branch of powers that are central or essential to the operation
> of a coordinate branch, provided also that the assumption disrupts the coordinate
> branch in the performance of its duties and is unnecessary to implement a legitimate
> policy of the Government.

*Chadha v. Immigration and Naturalization Service*, 634 F.2d 408, 425 (9th Cir. 1980). *See*

*Buckley*, 424 U.S. at 118-24 ("This Court has not hesitated to enforce the principle of separation

of powers embodied in the Constitution when its application has proved necessary for the decisions

of cases or controversies properly before it."); *United States v. Nixon*, 481 U.S. 683, 118-24 (1974);

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ("The President's power, if any, to

issue the order must stem either from an act of Congress or from the Constitution itself"); *Myers*

*v. United States*, 272 U.S. 52 (1926) ("All legislative powers herein granted shall be vested in a

congress of the United States." In that which grants the Executive power, the expressions are "The

executive power shall be vested in a President of the United States."). Judicial intervention in these

disputes was essential in order to maintain the delicate balance of powers among the branches

created by the Constitution.

A prosecution for Contempt of Congress following a legitimate assertion of Executive

Privilege precluding Dr. Navarro's appearance before the Select Committee, the prosecution of

Dr. Navarro for contempt of congress necessarily violates the doctrine of Separation of Powers and is unconstitutional. The question thus presented is whether a former President can assert Executive Privilege as to his Administration's former senior presidential advisers in response to an otherwise lawful congressional subpoena. The answer necessarily must be yes. As Justice Kavanaugh recently emphasized, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).

> If Presidents and their advisers that that their privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a potential opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of a continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681. Practically speaking, there can be no real question that were Donald J. Trump the incumbent president, the Department of Justice would similarly refuse to prosecute Dr. Navarro for Congressional contempt. *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, _ Op. O.L.C. _ (2019) ("The Assistant to the President and Senior Counselor to the President is absolutely immune from compelled congressional testimony in her capacity as senior adviser to the President [and] [t]he President may lawfully direct her not to appear [for her deposition] and she may not be penalized for following such a direction.") Nor can there be any real question that the prerogatives of former President Trump and incumbent President Biden diverge  - to whit, President Biden, through the Department of Justice, has now advised a court in this District that he alone has the authority to determine whether the Executive Privilege applies to the compelled testimony of a former close presidential aide.

Again, the question presented is therefore whether an incumbent president may unilaterally determine the application of Executive Privilege as to the senior presidential advisers of the incumbent President's predecessor and political rival. The answer is unequivocally no – to hold otherwise would contravene the purpose of Executive Privilege.

Although the government will undoubtedly cite a number of overly semantic arguments in an effort to avoid this Court reaching such a conclusion, these arguments not only place form over substance but have no real merit. Dr. Navarro has been caught between an inter-branch dispute where the incumbent President has chosen not to assert the privileges of his political adversary and in so doing the government – the Department of Justice – has forced this Court to decide whether an incumbent President has the sole authority to determine the application of testimonial immunity and Executive Privilege and to evaluate the impact on Separation of Powers as between our executive and legislative branches in an era where political divisiveness has never been greater.

### 1. The Power of Congress to Investigate is Not Absolute.

Congress does have the power to investigate. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927) ("[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."). The power is broad, but it is not without limitations. *Watkins v. United States*, 354 U.S. 178, 187 (1957). Accordingly, Congress and its duly authorized committees may issue a subpoena where the information sought "is related to, and in furtherance of, a legitimate task of Congress," *Watkins v. United States*, 354 U.S. 178, 187 (1957), and the subpoena serves a "valid legislative purpose." *Quinn v. United States*, 349 U.S. 155, 161 (1955). At the same time, because Congress's subpoena power "is justified as an adjunct to the legislative process, it is subject to several limitations," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020), limitations which stem directly from the Constitution. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). As the Supreme Court observed in *Barenblatt v. United States*, 360 U.S. 109

(1959): "Lacking the judicial power given to the Judiciary, it cannot inquire into matters that are exclusively the concern of the Judiciary. Neither can it supplant the Executive in what exclusively belongs to the Executive." *Id.* at 112 (emphasis added).

### 2.  The Department of Justice Has Long-Held that the President Can Invoke Testimonial Immunity to Preclude a Close Advisor from Testifying.

The constitutional rationale for prohibiting congressional subpoenas to senior advisers to the President is straightforward.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999). "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014).

This rationale suffers no diminution because the subpoena recipient was a close adviser to a former president. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192-93 (2007) ("Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."). Indeed, without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and

opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).

Thus, in 1982, the Department of Justice took the unprecedented step of initiating a civil action against the U.S. House of Representatives.  In its motion for summary judgment, the Department described the suit as follows: "This case is unique. There has rarely been a sharper confrontation between the Legislature and the Executive, and never one quite like this. Accordingly, while we are seeking what may appear to be extraordinary relief, that is because this is an extraordinary situation." Mot. Summary Judgment at 17, *United States v. United States House of Representatives*, No. 82-383 (attached hereto as Exhibit 2).  The Department went on to note that:

> Only the Judiciary can resolve the resulting constitutional controversy, which reached a total impasse when the House of Representatives took the unprecedented step of citing an Executive official for contempt of Congress solely for following the instructions of the President that certain documents not be disclosed in order to preserve the ability of the Executive Branch to faithfully to execute the law.

*Id.* at 24. And, the Department concluded, "the criminal prosecution of an Executive official for complying in good faith with the President's instructions to withhold documents *could well be unconstitutional in any event, since it imposes a heavy burden on the assertion of Executive Privilege.*" *Id.* at 36 n.2 (emphasis added) (citing *Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974). Thus, for decades, the Department of Justice had concluded that the criminal prosecution of a close presidential advisor such as Dr. Navarro presented an unconstitutional burden on the assertion of the Executive Privilege.

Ultimately, this Court dismissed the Department's lawsuit against Congress without addressing the constitutionality of 18 U.S.C. § 192 as applied to the close aide of a President who directed the aide not to comply with an otherwise valid Congressional subpoena:

The gravamen of [the Department of Justice's] complaint is that Executive Privilege is a valid defense to congressional demands for sensitive law enforcement information from the EPA. [The Department of Justice] ha[s], thus, raised this Executive Privilege defense as the basis for affirmative relief. Judicial resolution of this constitutional claim, however, will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress. The difficulties apparent in prosecuting Administrator Gorsuch for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement. Compromise and cooperation, rather than confrontation, should be the aim of the parties. The Court, therefore, finds that to entertain this declaratory judgement action would be an improper exercise of the discretion granted by the Declaratory Judgment Act. In light of this determination, the Court will not address the additional grounds for dismissal raised by the defendants.

*United States v. United States House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983). Here, the government – the Department of Justice – has taken a position contrary to decades of its own opinions on the subject. Of note, concomitantly with the initiation of litigation against the House, the Department's Office of Legal Counsel issued what is generally considered the founding authority supporting the Department's conclusion that senior presidential advisers are immune from testimonial compulsion from a Congressional committee. *See* Memorandum, Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 23, 1982) ("A Congressional demand for testimony from a close adviser to the President directly implicates a basic concern underlying the Executive Privilege, 'the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties." (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).

Importantly, courts have previously recognized that the Executive Privilege shields senior presidential advisers from compelled testimony when properly invoked. In *Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), the D.C. Circuit concluded, "it is the responsibility of the courts to decide whether and to what extent Executive Privilege applies." *Id.* at 729. Until now, every assertion of Executive Privilege to shield senior presidential advisers

from congressional inquiry has been endorsed by the Department of Justice so as to avoid unconstitutional interference with the doctrine of separation of powers. *See Trump v. Mazars USA, LLP*, 140 S. Ct. at 2034 ("[C]ongressional subpoenas for the President's information unavoidably pit the political branches against one another."). Therefore, when a former president invokes Executive Privilege as to a senior presidential advisor, that advisor cannot thereafter be prosecuted for contempt of congress despite the prosecutorial prerogatives of the former president's political opponent.

### B.  The Indictment Must Be Dismissed Because The Select Committee Is Not Properly Constituted.

For nearly two-hundred-fifty years, the experiment of our democracy has persisted despite frequent challenges to the "genius" that is the doctrine of separation of powers inherent in our constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. 137 (1803). The prosecution of one for violation of 2 U.S.C. § 192 is unique in that Congress has delegated to the judiciary the authority to punish for contempt:

> The power of the Congress to punish for contempt of its authority is . . . rooted in history.  It has been acknowledged by [the Supreme Court] since 1821.  Until 1857, Congress was content to punish for contempt through its own process.  By the Act of January 24, 1857, as amended by the Act of January 24, 1862, Congress provided that, 'in addition to the pains and penalties now existing' (referring of course to the power of Congress itself to punish for contempt), 'contumacy in a witness called to testify is a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States.'  This legislation is now 2 U.S.C. § 192.  *By thus making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function.*

*Watkins v. United States*, 354 U.S. 178, 216-217 (1957) (Frankfurter, J., concurring) (citations omitted) (emphasis added).

Having delegated to the judiciary the task of enforcing the authority that "underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring), the House has "limited" its role in any subsequent prosecution. *Marbury v. Madison*, 5 U.S. 137, 176 (1803)("The powers of the legislature are defined, and limited; and those limits may not be mistaken, or forgotten, the constitution is written."). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution and any defendant in a prosecution for criminal contempt of congress is entitled to, "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 209. Thus, whereas here, an indictment relies upon the failure of the House to adhere to its own rules, it violates the Due Process Clause of the Constitution and must be stricken. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at *79-90 (N.D. Il. Mar. 5, 2013) (explaining in detail authority of federal courts to dismiss an indictment).

To that end, the judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949), including those rules conferring the lawful authorization of any inquiry, *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized."), is permissible where said rules are "sufficiently clear." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). *See Christoffel*, 338 at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have followed them."). *See also Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to

require that the Committee be equally as meticulous in obeying its own rules."). However, "[w]here . . . a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-1307.

Judge Kelly's finding in *Republican Nat'l Comm. v. Pelosi*, No. 22-cv-659, 2022 U.S. Dist. LEXIS 78501 (D.D.C. May 1, 2022), is not inapposite. There, Judge Kelly was asked by the Republican National Committee to nullify a subpoena issued to a vendor. Because, Judge Kelly concluded, "the Court must give great weight to the [House's] present construction of its own rules,' particularly when that construction has arrived before the 'events in controversy,' the Rulemaking Clause of Article I of the Constitution precluded him from adopting an interpretation of H. Res. 503 that contradicted the House's own interpretation. *Id.* at *42. Judge Kelly's rationale is inapplicable here, where the criminal nature of this action *requires* the Court to scrutinize whether the House followed its own rules. *See Yellin v. United States*, 374 U.S. at 124 ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously.  It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules.").

Put differently, as the Supreme Court has recognized, in "criminal prosecutions," "[d]ifferent problems [are] presented" than in "attempts by private parties to impede congressional action," which necessarily implicates the important doctrine of separation of powers. *Eastland*, 421 U.S. at 509 n.16. Thus, in criminal prosecutions, "[the court's] task [is] to perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions." *Id. See also Christoffel*, 338 U.S. at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has

established and whether they have been followed."). Where a House Rule is "sufficiently clear" such that the court, "can be confident of [its] interpretation," "the risk of the court introducing into the sphere of influence reserved to the legislative branch under the Constitution . . . is acceptably low." *Rostenkowski*, 59 F.3d at 1306.

Here, the Court may either conclude that the rules in question were unambiguous or "sufficiently clear" and, if so, find that they have been appropriately followed, *Christoffel*, 338 U.S. at 88-89, or find that that the rules are ambiguous such that they cannot give rise to a prosecution under § 192 for failing to meet the exacting standards of the Due Process Clause of the Constitution. *Watkins*, 354 U.S. at 209. *See Rostenkowski*, 59 F.3d at 1306-1307.[12]/

Accordingly, the indictment cannot stand based upon the House referral as to Dr. Navarro because: (i) H. Res. 503 requires the appointment of thirteen (13) Members to in order for the Select Committee to function, or is at least sufficiently ambiguous so as to preclude a contempt conviction based upon any assertion that the Resolution requires otherwise; or (ii) the Select Committee lacked a Ranking Member necessary to issue a subpoena and/or to conduct a deposition, or the House Rules are at least sufficiently ambiguous so as to preclude a contempt conviction based upon any assertion that a Ranking Member was unnecessary for the issuance of a subpoena and/or the taking a deposition pursuant to House Rules.

---

[12]/ Judge Nichols, therefore, understandably mistook the appropriate standard for challenging the sufficiency of an indictment under the Due Process Clause of the Constitution for the standard permitting "private parties to impede congressional action," which necessarily implicates the important doctrine of separation of powers. *Eastland*, 421 U.S. at 509 n.16. Dismissing the indictment as to Dr. Navarro does not, as Judge Nichols contemplated, mean that Congress would be precluding from enforcing any of the subpoenas issued by the Select Committee. It may preclude the government from depriving those found not to have properly complied with a Select Committee subpoena of their liberty, but the House of course may still seek enforcement of the Select Committee's subpoenas in a civil action. See *Comm. on the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755, 766 (D.C. Cir. 2020) ("[T]he OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas."). Alternatively, the House Speaker could appoint all thirteen (13) Members to the Select Committee as was dictated by the passage of House Resolution 503, amend Resolution 503 so as to specify whether the appointment of 13 Members is required and/or clarify what role the Ranking Member and/or the Vice Chair is to play in accordance with House Rules.

### 1. The Competence of the House Select Committee Requires the Appointment of Thirteen Members.

Here, the word "shall" in House Resolution 503 § 2(a) is not permissive; it does not mean "may." The House, through a vote of its Members in the House Chamber, established the Select Committee, dictated its composition, and described its purposes and functions. This Court has no obligation to defer to the post-hac rationalization of the House now that it has been delegated the task of enforcing the authority that "underlies the congressional power to punish for contempt." *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring). *See also Rostenkowski*, 59 F.3d at 1305 ("[I]t is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." (citing *Yellin*, 374 U.S. at 114 (1963)); *Yellin*, 374 at 114 ("It has long been settled . . . that rules of Congress and its committees are judicially cognizable."); *Eastland*, 421 U.S. at 509 n.16 ("Our task [is] to perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions."). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack*, 384 U.S. at 708.

House Resolution 503 § 2(a) provides: "The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader." (Emphasis added). It is undisputed that the Speaker of the House failed to appoint 13 Members to the Select Committee and failure of the House Speaker to "appoint 13 Members to the Select Committee" deprives the Select Committee of its competence and no criminal prosecution arising from conduct (or lack thereof) before the Select Committee can lie. *United States v. Reinecke*, 524 F.2d 435, 440 n.15 (D.C. Cir. 1975) ("[T]he competence of the tribunal must be proved as an independent element of the crime. If the competence is not shown, the crime of perjury is not established regardless of whether the witness relied on the absence of a quorum."). *See Christoffel*,

338 U.S. at 90 ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."). That a congressional committee must adhere to applicable Rules in pursuit of the enforcement of its subpoenas has similarly resulted in convictions for contempt of congress being overturned. *See Yellin v. United States*, 374 U.S. 109 (1963). Indeed, the House Speaker herself has acknowledged the "unprecedented" approach to forming the Select Committee and it is therefore not at all extraordinary that the House failed to contemplate the possibility of less than thirteen (13) Members being appointed upon passage of Resolution 503. *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[13]/

Both Judge Kelly and Judge Nichols concluded that use of the word "shall" in H. Res. 503 does not preclude a finding that Congress could have – as it asserts, Amicus Curiae Brief of U.S. House Majority, *United States v. Bannon*, No. 21-cr-670 (May 24, 2022) (ECF No. 75) – intended the word to mean "may." *See English v. Trump*, 279 F. Supp. 3d 307, 323 (D.D.C. 2018), *cited in RNC v. Pelosi*, [insert cite] at \*44 ("[A]lthough 'shall' is usually understood as mandatory,' the word is 'a semantic mess' and is sometimes used 'to mean "should," "will," or even "may."'"); *Gutierrez De Martinez v. Lamagno*, 515 U.S. 417, 434 (1995), *cited in* Hr'g T. at 114:22-25, 115:1-3, *United States v. Bannon*, No. 21-cr-670 (June 15, 2022). In short, what both courts concluded was that use of the word "shall" does not preclude an interpretation that Congress did not intend to require that *all* thirteen Members be appointed to the Select Committee for it to be "lawfully authorized." *Gojack*, 384 U.S. at 708 ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized.").

---

[13]/ Available at https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

This conclusion, however, misstates the legal standard applicable to a criminal prosecution for Congressional contempt. "The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have been followed." *Christoffel*, 338 U.S. at 88-89. Where a House Rule is "sufficiently clear" such that the court, "can be confident of [its] interpretation," "the risk of the court introducing into the sphere of influence reserved to the legislative branch under the Constitution . . . is acceptably low." *Rostenkowski*, 59 F.3d at 1306. Where, however, "a court cannot be confident that its interpretation [of a Rule giving rise to criminal prosecution] is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306.

Moreover, as Judge Kelly observed, "that the resolution states Speaker Pelosi 'shall' appoint thirteen members to the Select Committee *is not conclusive* as to whether thirteen members are required for it to lawfully operate" and went on to describe the Select Committee's authorization as "this mess." *RNC v. Pelosi*, __ F.Supp.3d __, 2022 WL 1294509 *15 (2022) (emphasis added).  Similarly, Judge Nichols concluded:

> So the fact that House Resolution 503 uses the word 'shall' is not conclusive to proving that 13 members are required for the Select Committee to lawfully operate. And *given this potential ambiguity*, the Court agrees with Judge Kelly that it must give great weight to the interpretation of the House members charged with implementing the resolution and the House itself.

Hr'g T. at 115:4-10, *United States v. Bannon*, No. 21-cr-670 (June 15, 2022) (emphasis added). Thus, both Judge Kelly and Judge Nichols concluded the language of H. Res 503 § 2(a) was "not conclusive" or "ambiguous." As a result, in any criminal prosecution for Congressional contempt necessarily reliant on such ambiguous language and the resulting committee composition – "this

mess" as Judge Kelly described it – the Court "cannot be confident that its interpretation is correct. *Rostenkowski*, 59 F.3d at 1306-1307. As a result, the Court cannot simply defer to the interpretation by the House, but rather, any prosecution for Congressional contempt based upon such ambiguity would deprive Dr. Navarro of "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 209. Accordingly, this Court must dismiss the indictment as unconstitutional. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at \*79-90.

### 2. "Ranking Minority Member" is a Term Sufficiently Ambiguous so as to Render it Non-Justiciable.

With respect to the taking of depositions, House Resolution 503 provides, in pertinent part, that: "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8 . . . ." (Emphasis added). House Resolution 8 Section 3(b)(1), in turn, provides, in relevant part, that: "the chair of a standing committee . . ., *upon consultation with the ranking minority member of such committee*, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee." (Emphasis added). Finally, the regulations governing the taking of depositions as issued by the chair of the Committee on Rules reference the role to be played by the ranking minority member in such depositions no less than eight (8) separate times. 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) (117th Cong. Reguls. For Use of Dep. Auth.) ("Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken;" "Only members, committee staff designated by the chair or *ranking minority member*, an official reporter, the witness, and the witness's counsel are permitted to attend;" "If [designation of a deposition as part of a joint investigation between committees] is made, the chair

and *the ranking minority member* of the additional committee(s) may designate committee staff to attend pursuant to regulation 3;" "A deposition shall be conducted by any member or committee counsel designated by the chair or *ranking minority member* of the Committee that noticed the deposition;" "In each round [of deposition questioning], the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by *the ranking minority member* shall ask questions second;" "The chair and *the ranking minority member* shall be provided with a copy of the transcripts of the deposition at the same time;" "The chair and the *ranking minority member* shall consult regarding the release of deposition testimony, transcripts, or recording, and portions thereof." (emphasis added)).

It is again undisputed that the Select Committee has no "Ranking Member." The House has asserted that, "Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee." Amicus Curiae Brief of U.S. House Majority, *United States v. Bannon*, No. 21-cr-670 (May 24, 2022) (ECF No. 75). Yet nowhere in the House Rules, Resolution 503, or the House deposition regulations is the term "ranking minority member" defined. Even the Democratic caucus[14] and Republican conference rules[15] differ on the practical use of "ranking member." Speaker Pelosi herself has acknowledged the "unprecedented" nature of the Select Committee's formation. *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[16] Importantly, this distinction is not without a difference. Minority leadership on any

---

[14] House Democratic Caucus Rules Rule 21 (D)(1)(a) discusses selecting Ranking Member and Vice-Ranking member by election or secret ballot, with no reference to order of appointment to the Committee.

[15] House Republican Conference Rules Rule 14 (e) discusses term limits of Chairs or Ranking Members to no more than three terms with no reference to seniority or order of appointment to the Committee.

[16] *Available at* https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

given committee ensures that deponents are afforded oversight of adherence to congressional rules, precedents, and established decorum. *See* Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. No. 116-177, 117th Cong., 2d Sess., § 284 ("So far the maxim is certainly true and is founded in good sense that as it is always in the power of the majority, by their numbers, to stop any improper measures proposed on the part of their opponents, the only weapons by which the minority can defend themselves against similar attempts from those in power are the firms and rules of proceeding which have been adopted as they were found necessary, from time to time, and are become law of the House by a strict adherence to which the weaker party can only be protected from these irregularities which these forms were intended to check and which the wantonness of power is but too often apt to suggest to large and successful majorities.").

The Select Committee's authority is limited to its authorizing resolution and had the House desired the Select Committee's subpoena authority to function otherwise, the House should have explicitly so stated. The D.C. Circuit has similarly observed that House rules limiting authority serve an important purpose: "[B]y requiring all decisions to compel attendance of witnesses to be made by the Subcommittee, and not by an individual member thereof, the resolution served to protect the right of all persons to be free from unnecessary invasions of their privacy." *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965) (reversing conviction under 2 U.S.C. § 192 despite the deponent's failure to object to the propriety of the subpoena's authorization at the time of his deposition). Absent unambiguity, "judicial interpretation . . . runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution. *Rostenkowski*, 59 F.3d at 1307. Accordingly, any prosecution for Congressional contempt based upon the lack of a "ranking member" would necessarily deprive the Due Process protections to

which Dr. Navarro is entitled and the indictment must be dismissed as unconstitutional. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at \*79-90.

### 3.  Dr. Navarro Has Not Waived Any Objections.

Even were *Bryan* nevertheless applicable today, the Court's rationale stands for the exactly the opposite position proffered by the government. Here, the House has repeatedly insisted it need not have appointed thirteen members and it need not have a formally designated ranking member. Thus, had Dr. Navarro objected at the time of his deposition, his objections would have been ignored. We know this because when both Mark Meadows and Dan Scavino raised these objections the Select Committee rejected their concerns out-of-hand.

The information presently available to Dr. Navarro indicates that the actions by the Select Committee were not in accordance with the authority conferred by the U.S. House of Representatives in Rules and Resolutions. House Resolution 503, the Resolution that established the Select Committee, provides that "[t]he Speaker *shall* appoint 13 members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader. (Emphasis added). This was not done despite the mandatory language of the Resolution. Additionally, the Committee's legal authority to issue subpoenas and conduct depositions is limited by H. Res 503, and the general Rules of the House of Representatives, which are incorporated by reference into that Resolution. That authority limits certain actions concerning subpoenas and depositions by requiring consultation with, and notice to, the ranking minority member of the Select Committee.[17]/ *See e.g.,* Amicus Curia Brief filed on May 24, 2022, in *United States v. Bannon* by

---

[17]/ "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena." H. Res. 503, Sec. 5 Procedure (c)(6)(A) (emphasis added).

U.S. House of Representatives Minority Leader O. Kevin McCarthy and U.S. House of Representatives Minority Whip Stephen J. Scalise.

### C.  The Select Committee's Subpoena Fails to Satisfy the Rigors of Due Process.

*As noted,* Congress does have the power to investigate, *McGrain*, 273 U.S. at 174, but that power is not without limitation. *Watkins*, 354 U.S. at 187. In a prosecution for contempt of congress, "courts must accord . . . defendants every right which is guaranteed to defendants in all other criminal cases," "including knowledge of the subject to which the interrogation is deemed pertinent." *Id.* at 208-209.  In addition, in a prosecution for contempt of congress pursuant to 2 U.S.C. § 192, the government must also establish a nexus between the information sought and the otherwise pertinent inquiry of Congress. *See Deutch v. United States*, 367 U.S. 456, 467-469 (1961) ("As our cases make clear, two quite different issues regarding pertinency may be involved in a prosecution under 2 U. S. C. § 192. One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. . . .  The other and different pertinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact 'pertinent to the question under inquiry' by the committee. . . .  These two basically different issues must not be blurred by treating them as a single question of 'pertinency.'").

Here, the indictment fails to establish that the information sought by the Select Committee was in fact pertinent to the matter under inquiry of the Select Committee. Although the D.C. Circuit has concluded that the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had," *Thompson*, 20 F. 4th at 41 (citing examples), the Select Committee, and therefore the indictment, fail to show how the information Dr. Navarro is believed to have relate to any proffered "valid legislative purpose" of the Select

Committee. Dr. Navarro is not, for example, alleged to have "engage[d] in violence to prevent the work of governmental institutions." *Thompson*, 20 F. 4th at 42. Nor is Dr. Navarro alleged to have had any knowledge of the "security posture of the United States Capitol Complex." *Id.* at 42. Therefore, the only "valid legislative purpose" for which Dr. Navarro could arguably have been on notice is the possibility that Congress could, "amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election." *Id.* The indictment cherry-picks but one assertion of pertinency by the Select Committee: "we believe you have documents and information that are relevant to the Select Committee's investigation [based on] your book [and] your website."  Indictment at 3 ¶ 8 (June 6, 2022) (ECF No. 1). This assertion, however, ignores the broad categories – ten (10) in total – of information sought of Dr. Navarro for none of which did he have the requisite level of notice for how such information would necessarily have been "pertinent to the question under inquiry." *Deutch*, 267 U.S. at 467-469.

Because the indictment fails to allege that the Select Committee provided Dr. Navarro with the requisite knowledge of how the information it sought pertained to the legitimate legislative inquiry of the matters of inquiry being investigated by the Select Committee, it fails to allege an essential element of § 192 and must be dismissed. Fed. R. Crim. P. 12(b)(3)(A)(v).

### D.  The Indictment Must Be Dismissed Due To Fatal Constitutional And Procedural Defects

The indictment must be dismissed due to additional defects in instituting the prosecution pursuant to Fed. R. Crim. P. 12(b)(3)(A), as well as defects in the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B). Those additional grounds include the fact that the Select Committee's subpoena was flawed on its face and procedural flaws in the grand jury process. Dr. Navarro submits that there is a basis to believe that the prosecution was also the product of unlawful political interference and selective prosecution. Those topics feature prominently in Dr. Navarro's

Motion to Compel Discovery (Dkt. 31 filed on August 4, 2022), which remains pending before the Court.

The Select Committee's subpoena, issued on its behalf by Chairman Bennie Thompson, failed to properly specify the place for Dr. Navarro's deposition beyond indicating that it would be held (somewhere) at the "United States Capitol Building, Washington DC 20515 or by videoconference".[18] By omitting any understandable description of where the deposition was to occur, the Committee eliminated any possibility that Dr. Navarro's non-appearance can support a criminal prosecution for contempt. However, the Committee muddled the issue even further when, on March 1, 2022 – the day before the deposition was to occur – Committee Counsel Dan George, sent Dr. Navarro an email that changed the place of the deposition to the O'Neil House Office Building.[19]

House Resolution 503, which created the Select Committee, provides that Rule XI of the Rules of the House of Representatives shall apply to the Committee.[20] Paragraph (3)(A)(i) of Rule XI states in pertinent part as follows:

> Except as provided in subdivision (A)(ii) [Committee on Ethics], a subpoena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of an investigation or series of investigations or activities *only when authorized by the committee or subcommittee, a majority being present*. The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe. *Authorized subpoenas shall be signed by the chair of the committee or by a member designated by the committee*." (Emphasis added).

---

[18] The Capitol building has over 1.5 million square feet, more than 600 rooms, and miles of corridors. https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building.

[19] Mr. George's email said that: "We plan to proceed with the deposition at 10 AM in the O'Neil House Office Building at 200 C Street, SW, Washington, D.C. 20024. Please feel free to contact me when you arrive so someone can escort you to the conference room."

[20] SEC. 5 PROCEDURE … (c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee [except as provided].

The Select Committee, with "a majority [of the members] being present", did not reissue the subpoena to move the location of the deposition from the Capitol Building to the O'Neill House Office Building. Moreover, in making the change the Committee violated its own rule requiring only the Committee itself or the designee of the Chair may issue a subpoena. There is no evidence that a majority of the members of the Committee, or Chairman Thompson authorized Mr. George to change place of deposition specified by the subpoena.

In *Liveright v. United States*, 347 F.2d 473 (1965), the D.C. Circuit held that a subcommittee's failure to comply with its authorizing resolution is a valid defense to a prosecution for contempt of Congress under 2 U.S.C. § 192. The subpoena in *Liveright* was issued by subcommittee chairman without first consulting with the other members as required by the subcommittee's authorizing resolution. The failure to comply with subcommittee's resolution rendered the subpoena invalid and it could not provide the basis for a prosecution for criminal contempt of Congress. *Id.,* at 474-75. *See also, Shelton v. United States,* 327 F.2d 601,606 (1963) (holding that the subcommittee's authorizing resolution required that the subcommittee itself, and not in any individual member, held "the *power and the responsibility* of deciding who shall be called" by subpoena).

In his Motion to Compel Discovery, Dr. Navarro seeks additional information to be able to determine whether the Select Committee of its Chair authorized Mr. George to make a material change to the subpoena. Either way, whether it be because the original subpoena failed to specify a location for Dr. Navarro's deposition, or because Mr. George lacked the authority to change that location while again failing to specify a room number, the Special Committee's subpoena cannot provide a basis for a criminal prosecution as stated in Count Two of the indictment.

### E.  The Indictment Must be Dismissed Due to Selective Prosecution / Undue Political Influence

Dr. Navarro has sought additional discovery that would support an argument that the government's prosecution of him was the result of unlawful selective prosecution and undue political interference. Dr. Navarro submits the following facts in support of his argument that the indictment should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A) because selective prosecution and undue political interference are defects in instituting the prosecution, but he acknowledges the need for additional information and reserves the right to supplement his argument.

"A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* Improper arbitrary classifications include a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs"). The decision to prosecute may not be based upon the exercise of protected statutory and constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982).

A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different

treatment" to persons "similarly situated" to him. *Id.* at 470. When a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the defendant. *Branch Ministries,* 211 F. 3d at 145. *Second,* a defendant must show that the prosecutorial policy had "a discriminatory *purpose*." *Armstrong,* 517 U.S. at 465 (Emphasis provided).

Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong,* 517 U.S. at 467.

> If a defendant establishes a *prima facia* case of selective prosecution, the burden shifts to the Government to try to prove that the filing of charges did not arise from discriminatory motives. *Att'y Gen. v. Irish People, Inc.*, 684 F. 2d 928, 932 n. 11 (D.C. Cir. 1982). If the Government cannot satisfy that burden, a court will require discovery of the Government's decision or dismiss the charges against the defendant. *In re Aiken County,* 725 F. 3d 255, 264 n. 7 (D.C. Cir. 2013). (Kavanaugh, Circuit Judge, presiding).

Undue political interference is evidence of a discriminatory purpose. For example, "[A]n agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (3d Cir. 1981)).

### 1. The Discriminatory Effect of This Prosecution of Dr. Navarro

On December 14, 2021, the House of Representatives voted to refer former White House Chief of Staff Mark Meadows to the Department of Justice for prosecution based on his refusal to appear for deposition before the Select Committee and answer questions about the January 6th riot

at the U.S. Capitol.[21]/ Four months later, on April, 2022, the House referred Dan Scavino and Peter Navarro to the Department for prosecution for their refusal to comply with subpoenas from the Select Committee directing that they produce documents and appear for deposition.[22]/ The House of Representatives made its criminal referrals for all three men for essentially the same reason: they had asserted Executive Privilege on behalf of President Trump and refused on that basis to appear for deposition.[23]/

After the House referred the matters to the Department of Justice,



the public record shows that the Department made a clear distinction regarding the treatment afforded these similarly situated individuals. It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

_____

[21]/ Addressing the House decision to refer Mr. Meadows for prosecution, Select Committee Chairman, Bennie Thompson said, "This is about Mr. Meadows refusing to comply with the subpoena to discuss the records he himself turned over." https://www.nbcnews.com/ politics/congress/house-expected-vote-mark-meadows-criminal-contempt-referral-n1285908.

[22]/ Chairman Thompson explained the reason for the House's criminal referral, "Both of these men have refused to comply with the Select Committee's subpoenas in any way." https:// www.cnn.com/2022/04/06/politics/house-vote-contempt-referrals-scavino-navarro/index html.

[23]/ Mr. Meadows produced documents to the Committee but declined to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[24]/ 

On June 2, 2022, the grand jury returned its indictment against Dr. Navarro for Contempt of Congress. Two days later, on June 4, 2022, media sources reported that U.S. Attorney Matt Graves had notified Doug Letter, the House General Counsel, that the Justice Department had completed its review and had decided it "will not be initiating prosecutions for criminal contempt, as requested in the referral against Messrs. Meadows and Scavino."[25]/ The Department provided no reasons for its different treatment of Dr. Navarro and there is no apparent distinction between the conduct of the three individuals in their refusal to comply with the deposition subpoena for reasons of privilege.

Thus, even based on the limited record now available to Dr. Navarro, the Department's decision to prosecute Dr. Navarro, *but not* Messrs. Meadows and Scavino, had a discriminatory *effect* on him. All three men were similarly situated and referred to the Department by the Select Committee for their refusal to appear for deposition in response to subpoena.

### 2. The Discriminatory Purpose of This Prosecution of Dr. Navarro

In view of this disparity, Dr. Navarro believes that the Department of Justice's decision to file criminal charges against him while declining to prosecute Mr. Meadows and Mr. Scavino is based on unlawful and discriminatory reasons involving his public expression of political beliefs.[26]/ Dr. Navarro does not, of course, yet have access to direct evidence of the Department's motivation but the circumstantial evidence that is available is sufficient to raise an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

---

[25]/ *See e.g., https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html.*

[26]/ "In determining whether to commence or recommend prosecution or take action against a person, the attorney for the government should not be influenced by [t]he person's . . . political association, activities, or beliefs. . ." Justice Manual § 9-27.260.

### a.  Dr. Navarro's Expression of his Political Beliefs

Unlike Mr. Meadows and Mr. Scavino, who did not widely discuss their views about the Select Committee or the Department of Justice, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Government. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[27]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent. It is highly unusual, and perhaps unprecedented, for the Department to not allow a defendant charged with nonviolent misdemeanors to self-report to court for arraignment.

---

[27]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []. House Report at 3.

### b.  The Circumstances of Dr. Navarro's Arrest

The Government handled Dr. Navarro's arrest very differently from other cases. That, and the difference in treatment between Dr. Navarro and Messrs. Meadows and Scavino, satisfies *Armstrong's* requirement of a *prima facie* showing of both discriminatory effect and purpose.  The day after a federal grand jury in DC returned its indictment against him, FBI Special Agents arrested Dr. Navarro as he was boarding a flight for a business trip to Tennessee at Washington's Reagan National Airport. They waited to arrest him at the Airport even though they knew that he lived across the street from FBI Headquarters and had spoken with him as recently as two days earlier. With national media apparently alerted that morning to its intentions, the FBI agents arrested, handcuffed, and transported Dr. Navarro to the courthouse, where he was strip-searched, placed in a holding cell, and then in leg irons by the US Marshals Service for his initial appearance in Court.

The Government's refusal to allow Dr. Navarro to self-report to court after being charged with two non-violent misdemeanors is indeed unusual and demonstrates a selective animus towards him by the Government officials responsible for the decisions made in this case.[28]/ We do not know how much, if any, of this animus is the result of communications between the Department of Justice, the Select Committee, and/or the White House. However, it is undeniable that the Government handled the arrest of Dr. Navarro much differently than it normally does individuals charged with non-violent misdemeanor offenses.

---

[28]/ Neither Mark Meadows, the former Chief of Staff to President Trump, nor Dan Scavino, former senior advisor to President Trump, appeared before the Select Committee in response to subpoena. Nonetheless, on June 4, 2022, the Department of Justice notified them that it had declined to prosecute for contempt of Congress. https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january6/index. html. The decision demonstrates an animus toward Dr. Navarro and raises questions about a selective prosecution of him motivated by improper purposes.

### c. Undue Political Influence and Ignoring Decades of Legal Precedent

Even with the information currently available, it is clear that the Justice Department ignored decades of its own legal precedent in order to bring the first criminal prosecution of Dr. Navarro under a statute that it has long held to be inapplicable to senior presidential advisers. That action, especially in light of evidence of undue political influence, provides further circumstantial evidence of the government's discriminatory purpose.

A possible reason for the Justice Department's decision to ignore years of established precedent is that President Biden, the chief law enforcement official to whom the Department reports, publicly and improperly stated that the Department should prosecute all individuals who defy congressional subpoenas issued by the Select Committee. As reported by *The Hill* on October 15, 2021, President Biden told reporters, "I hope that the committee goes after them and holds them accountable." Asked if they should be prosecuted, President Biden said, "I do, yes."

It was improper for President Biden to attempt to influence the Department of Justice's prosecutorial discretion regarding individuals who failed to comply with Select Committee subpoenas. It is entirely possible that political appointees or others at the Department interpreted President Biden's statement as a directive to prosecute. That may explain the Department's departure from the OLC's long-established position that a senior advisor to a President is "absolutely immune" from a subpoena issued by Congress. Moreover, aside from issues of testimonial immunity, the decision to *criminally* prosecute a senior advisor to a President for refusing to appear before congressional committee is without precedent and constitutes a major diversion from the way the Department of Justice has always handled such matters.

There are additional indications about the contacts between the Department of Justice and the Select Committee. One of the most important and unresolved issues in this case is whether the Select Committee was created in accordance with H. Res. 503 regarding the number of its members

and the appointment of a ranking member by the minority party. Despite the complexity of these issues and their relationship to historical congressional prerogatives and procedures, 

There is also evidence of improper communications between the White House and the Department of Justice. On February 28, 2022, Jonathan C. Su, Deputy Counsel to President Biden, sent a letter to Dr. Navarro "regarding the subpoena issued [by the Select Committee]." In the letter, Mr. Su expressly noted certain subjects under investigation by the Select Committee and advised Dr. Navarro that "President Biden … has decided not to assert Executive Privilege as to your testimony regarding those subjects, or any documents he might possess that bear on them."

Mr. Su's instructions to Dr. Navarro were unusual since he had no prior contact with Dr. Navarro about the subpoena or anything else. When interviewed by the FBI, Mr. Su stated that he first heard "in the media" that the Select Committee had issued a subpoena to Dr. Navarro. Interview of Jonathan C. Su (June 6, 2022) (US-000485). He said that after learning about the subpoena, he contacted Dr. Navarro by email to advise him of President Biden's position regarding privilege. Mr. Su further said that he knew Dr. Navarro's email address from separate, unrelated investigation regarding January 6th.

These communications suggest that Mr. Su, or someone else at President Biden's White House, communicated with the Select Committee concerning its investigation and the subpoena to Dr. Navarro. It is also possible that the White House communicated with the Department of Justice

regarding OLC's previously established position that a senior advisor to a President is absolutely immune from congressional process. It appears unlikely that on his own initiative Mr. Su would have contacted Dr. Navarro about President Biden's positions regarding Executive Privilege after learning of the subpoena "in the media" and without any other contact with the Committee or the Department. This possibility is made all the more likely given that Mr. Su had previously obtained Dr. Navarro's email address from someone connected to the Select Committee. Interview of Jonathan C. Su (June 6, 2022) (US-000485).

Dr. Navarro has sought additional information about the reasons for the Government's decision to ignore decades of its own policy and legal precedent, as well as about communications between the Justice Department, the White House, and the Select Committee. Dr. Navarro intends to supplement his argument after obtaining that information.

### F.  The Indictment Must be Dismissed Because of Fatal Procedural Flaws in the Grand Jury Process

Ignoring decades of prudential policy, as expressed in numerous Office of Legal Counsel opinions that hold that senior advisors to a President are immune from compelled process by the Congress, the Department elected to charge Dr. Navarro with *criminal* contempt of Congress. It did so after its *Chief* Executive publicly opined that those in Dr. Navarro's position should be prosecuted. It did so despite choosing *not to* prosecute those similarly situated with Dr. Navarro.

███████████████████████████████████

██████████████████████

While a prosecutor's failure to present exculpatory evidence to a grand jury generally does not require dismissal of an indictment, *United States v. Williams*, 504 U.S. 36 (1992), dismissal is appropriate where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of*

*Nova Scotia, supra,* 487 U.S. at 254. Dismissal of an indictment is also appropriate where a violation "substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.*

The evidence provided to the defense thus far indicates ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



\* \* \*

In summary, the novel question with which this Court is confronted, following the failure of the Legislative and Executive Branches to otherwise reach an agreement, is what effect does a former president's assertion of Executive Privilege have over the desire of Congress to exercise its investigative powers to explore the deliberative processes of that President. Were this Court, for the very first time in American History, to conclude that the assertion of Executive Privilege by a former President is not controlling, then the doctrine of lenity nevertheless should be invoked because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland v. United States*, 531 U.S. 12, 25 (2000). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985). Before depriving senior presidential aides of their liberty for following the directive of a former President asserting the

constitutional Executive Privilege intended by presidents – including dating back to George Washington – intending to protect the doctrine of separation of powers, such former, current, and future advisers must be put on due notice of the limitations of that privilege. *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("Due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."). Thus, this Court should require that Congress should have spoken in language that is clear and definite, and the government's interpretation of the effect of the assertion of Executive Privilege by a former President should be rejected in favor of the doctrine of lenity. *See Yates v. United States*, 574 U.S. 528, 548 (2015) (plurality opinion).

## IV.  CONCLUSION

Wherefore, for the reasons set forth above, Dr. Navarro respectfully requests an Order dismissing the indictment with prejudice.


Dated: August 17, 2022                    Respectfully Submitted,

                                          E&W Law, LLC

                                          _____/s/ John S. Irving_____
                                          John S. Irving (D.C. Bar No. 460068)
                                          1455 Pennsylvania Avenue, N.W., Suite 400
                                          Washington, D.C. 20004
                                          Telephone: (301) 807-5670
                                          Email: john.irving@earthandwatergroup.com


                                          SECIL LAW PLLC

                                          _____/s/ John P. Rowley, III_____
                                          John P. Rowley, III  (D.C. Bar No. 392629)
                                          1701 Pennsylvania Ave., N.W., Suite 200
                                          Washington, D.C. 20006
                                          Telephone: (703) 417-8652
                                          Email: jrowley@secillaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                   |     |                              |
| --------------------------------- | --- | ---------------------------- |
| **UNITED STATES OF AMERICA,**     | )   |                              |
|                                   | )   |                              |
|                                   | )   | **Criminal No. 1:23-cr-00200-APM** |
| **v.**                            | )   |                              |
|                                   | )   |                              |
| **PETER K. NAVARRO,**             | )   |                              |
|                                   | )   |                              |
| **Defendant.**                    | )   |                              |
|                                   | )   |                              |

**CERTIFICATE OF SERVICE**

On August 17, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the government and Chambers.


_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)