**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Defendant, Peter K. Navarro, is charged with two counts of contempt of Congress for his total defiance of a subpoena issued to him by the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee") which required him to produce documents and provide testimony relating to his and others' efforts to prevent the peaceful transfer of power between presidential administrations. Now, facing the consequences of his complete disregard for the rule of law, he asks this Court to dismiss the Indictment. To support his motion for dismissal, the Defendant relies on his false claim to the Committee that executive privilege had been invoked in response to its subpoena, an erroneous understanding of the law of contempt, and rank speculation about government misconduct. The Defendant's efforts to dismiss the Indictment are meritless and this Court should deny the Defendant's motion.

## I.      FACTUAL BACKGROUND

On June 30, 2021, the U.S. House established the Committee to investigate the facts, circumstances, and causes of the January 6, 2021, attack on the U.S. Capitol. Indictment, ECF No. 1, ¶¶ 1-3. The resolution establishing the Committee also tasked it with, at the conclusion of its investigation, making recommendations for corrective measures to protect the United States' democracy against future domestic attacks. *Id.* ¶ 4.

As part of its investigation, the Committee identified the Defendant as someone with information relevant to its inquiry.  Accordingly, on February 9, 2022, a Committee staff member emailed the Defendant and asked if the Defendant would accept service of a subpoena from the Committee by email.  Ex. 1 at US-000498.[1]  The Defendant responded within three minutes and stated only, "yes. no counsel. Executive privilege."  *Id*.  Later that day, the staff member emailed the Defendant the subpoena at issue in this case.  Indictment ¶ 7; Ex. 1 at US-000497.  The subpoena required the Defendant to appear on February 23, 2022, and produce various documents relating to the Defendant's role in the lead-up to and events of January 6 and to appear on March 2, 2022, for deposition testimony.  *Id*. ¶ 9, *see also* Ex. 2 (Subpoena and attachments).  In a cover letter accompanying the subpoena, the Committee gave the Defendant some examples of why the Committee believed the Defendant had relevant information, including that it had been reported that the Defendant had worked with various individuals to change the outcome of the 2020 presidential election and that the Defendant had publicly repeated discredited claims of election fraud.  Indictment ¶ 8.

Between the time the subpoena was served and the deadline for the document production on February 23, 2022, the Defendant did not communicate with the Committee in any way, and he did not produce a single document by the deadline.  *Id*. ¶ 15.

On February 24, 2022, the Committee emailed the Defendant and confirmed he was in default of the subpoena's document demand.  *Id*. ¶ 16; *see also* Ex. 1 at US-000497.  In the same email, the Committee also confirmed the Defendant still was required to appear for his deposition

---

[1] Although the Court is limited to deciding the Indictment's sufficiency based on the allegations within the Indictment's four corners, the Government provides additional information regarding the Defendant's communications with the Committee to provide this Court with the relevant factual record relating to the Defendant's claims of executive privilege.

and instructed the Defendant to contact the Committee to confirm the details.  *Id*.  The Defendant responded three days later and stated that former President Donald J. Trump had "invoked Executive Privilege in this matter" and that he would not, therefore, comply.  Indictment ¶ 17; Ex. 3 at US-000506.  In response to the Defendant's email, the Committee rejected the Defendant's wholesale refusal to comply on the basis of executive privilege, instructed him to appear for his deposition as required and, to the extent the Defendant believed there were privileged matters, to invoke privilege on a question-by-question basis.  Indictment ¶ 18; Ex. 3 at US-000505-06.

On February 28, 2022, the Defendant again refused to comply, asserting the "privilege is not mine to waive."  Indictment ¶ 19; Ex. 4 at US-000500-01.  Later that same day, the White House Counsel's Office sent the Defendant a letter, notifying him that President Joseph R. Biden had "determined that an assertion of executive privilege is not in the national interest, and therefore is not justified, with respect to the particular subjects within the purview of the Select Committee."  Ex. 5 at US-000945.  After listing several of the subjects over which President Biden had decided not to invoke privilege, the letter continued:

> President Biden accordingly has decided not to assert executive privileged as your [sic] testimony regarding those subjects, or any documents you may possess that bear on them.  For the same reasons underlying his decision on executive privilege, President Biden has determined that he will not assert immunity to preclude you from testifying before the Select Committee.

*Id*.

Despite the letter from President Biden and an additional admonition to comply from the Committee on March 1, 2022, Indictment ¶ 20; Ex. 4 at US-000500, the Defendant did not appear as required for his deposition on March 2. Indictment ¶ 21.  At no time did the Defendant provide the Committee with any evidence supporting his assertion that the former President had invoked executive privilege over the information the Committee's subpoena sought from the Defendant.

For the Defendant's deliberate refusal to comply, a grand jury sitting in the District of Columbia returned the pending Indictment. The Indictment charges the Defendant with two counts of contempt of Congress. Count One charges the Defendant with refusing to provide documents and Count Two charges him with refusing to appear for testimony. *Id.* ¶¶ 22-23, 24-25.

## II.   EXECUTIVE PRIVILEGE DID NOT EXCUSE THE DEFENDANT'S NONCOMPLIANCE WITH THE COMMITTEE'S SUBPOENA.

The Defendant claims that the Indictment must be dismissed because "when a former president invokes Executive Privilege as to a senior presidential advisor, the advisor cannot thereafter be prosecuted." ECF No. 34 at 17. The Government does not dispute, and agrees, that executive privilege can provide a defense to contempt of Congress in certain circumstances, as might any constitutional privilege. *See Watkins v. United States,* 354 U.S. 178 at 195-97 (1957) (noting that constitutional privileges place limits on Congress's ability to compel testimony); *Barenblatt v. United States*, 360 U.S. 109 at 112 (1959) ("[T]he Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action"). Moreover, whether executive privilege does, in fact, provide a complete defense is a legal question properly resolved at the pretrial stage.[2] *Cf. United States v. Covington*, 395 U.S. 57, 59-60 (1969) (finding that, where the Fifth Amendment privilege against self-incrimination excused an individual from complying with a federal marijuana tax

---

[2] The Government notes that, while a valid assertion of executive privilege may provide a defense, a subpoenaed witness's mistaken belief that executive privilege was asserted or excused compliance is not. *United States v. Sinclair*, 279 U.S. 263, 299 (1929) ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel. The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt . . . The refusal to answer was deliberate . . . His mistaken view of the law is no defense.").

payment law, the question of whether the privilege actually excused compliance and therefore provided a basis for dismissal of criminal charges for not paying the tax was a question of law for the court to decide pretrial under Fed R. Crim. P. 12); *United States v. Bulger*, 816 F.3d 137, 146-48 (1st Cir. 2016) (finding the judge was the proper factfinder to determine if the defendant had been given immunity from prosecution by the government in a pretrial decision).  Executive privilege does not, however, provide a defense here, because there is no evidence it was ever invoked, in any way, with respect to the subpoena the Committee issued to the Defendant.

> **A.     The Defendant Has Failed to Demonstrate that Executive Privilege Was Invoked with Respect to the Defendant's Subpoena.**

In his communications with the Committee, the Defendant acknowledged that executive privilege was not his to waive.  *See* Indictment ¶ 19.  Just as the privilege is not his to waive, it is also not his to invoke.  *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (noting that the privilege resides with the current President and that former presidents have been recognized to "retain for some period of time a right to assert executive privilege over documents generated during their administrations" (internal citation omitted)); *Trump v. Thompson*, 573 F. Supp. 3d 1, 14 (D.D.C. 2201) (Executive privilege "can neither be claimed nor waived by a private party" (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953) (addressing the state secrets privilege))).  Even assuming the former President could invoke the privilege in this circumstance—something this Court does not have to decide under the facts of this case—the Defendant has failed to show that the former President even attempted to do so.  The only evidence of a president—former or current—making an executive privilege determination with respect to the Committee's subpoena to the Defendant is the White House's letter to the Defendant on February 28, 2022, notifying him that President Biden was not invoking privilege.  Executive privilege is not a privilege that simply applies absent invocation—it must be asserted.  *See Trump*, 573 F. Supp. 3d at 16-17 (D.D.C.

2021), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) ("[H]istory is replete with examples of past Presidents declining to assert the privilege. . . . President Biden's decision not to assert executive privilege . . . is consistent with historical practice and his constitutional power."); *United States v. Nixon*, 418 U.S. 683, 713 (1974) (finding potential presidential communications became presumptively privileged "[u]pon receiving a claim of privilege from the Chief Executive"). Accordingly, having failed to demonstrate that executive privilege was invoked, the Defendant cannot rely on it as a defense to either of the pending charges.

The Defendant nevertheless claims that a November 20, 2021, press release by the former President, issued well over two months before the Committee even contacted the Defendant, constituted an invocation of executive privilege over the information sought by the Committee's not-yet-issued subpoena.  ECF No. 34 at 5.  But the Defendant acknowledges that the former President issued the November 20 press release shortly after the Defendant was subpoenaed on November 18, 2021, by the U.S. House Committee on Oversight and Reform's Select Subcommittee on the Coronavirus Crisis ("the Coronavirus Subcommittee") to provide records and testimony relating to the coronavirus pandemic.  As is clear from the Coronavirus Subcommittee subpoena, Ex. 6,[3] which the Defendant does not provide with his motion to dismiss, the information sought by that subpoena had nothing to do with the information sought by the Committee's subpoena here.  Ex. 2.

The Defendant does not explain how any invocation of executive privilege, to the extent the press release constitutes one, relating to information regarding the response to the coronavirus

---

[3] The Government found the subpoena on the Coronavirus Subcommittee's website when responding to the Defendant's motion to dismiss.  *See* Subpoena to Peter K. Navarro from U.S. House Committee on Oversight and Reform, Select Subcommittee on the Coronavirus Crisis, *available at* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Subpoena %20to%20Navarro.pdf (last accessed Aug. 30, 2022).

pandemic could possibly be read as an invocation with respect to information relating to the January 6, 2021, attack on the Capitol to stop the peaceful transfer of power.  Instead, in his motion, the Defendant selectively quotes from the press release to suggest that the former President made some kind of prospective, blanket assertion of privilege over all information that might ever be sought from the Defendant relating to the time period of the Trump administration, regardless of topic.  *See* ECF No. 34 at 5 (quoting as evidence of the relevant assertion of privilege for this case only the portion of the press release stating, "I'm telling Peter Navarro to protect Executive Privilege and not let these unhinged Democrats discredit our great accomplishments.").  The Defendant's attempt to contort the press release into a valid assertion of executive privilege relevant to this case fails.

As an initial matter, there is no basis in law to find that such a broad, undefined assertion, had it been made, constitutes a valid assertion allowing non-disclosure in perpetuity, regardless of the information requested.  Such a finding would run counter to the Supreme Court's admonition that "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" *Cheney v. U.S. Dist. Ct. for Dist. of Colum.*, 542 U.S. 367, 389 (2004) (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)); *see also Reynolds*, 345 U.S. at 7-8 ("There must be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.").  Even where the presidential communications privilege is at issue, a presumptive privilege falling under the umbrella of executive privilege, the relevant president has always invoked the privilege with respect to the specific communications sought before courts proceeded to decide whether the privilege provided a basis for non-disclosure.  *See Nixon v. Sirica*, 487 F.2d 700, 716-17 (D.C. Cir. 1973); *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 727, 730-31 (D.C. Cir. 1974) (noting that then-

President Richard Nixon, in response to a congressional subpoena, had identified specific categories of information sought by the subpoena over which he was not asserting executive privilege and specific categories over which he was asserting).  And, in ultimately finding an invocation of privilege to be effective against disclosure, courts have required particularized assertions.  *See, e.g.*, *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) ("We think it abundantly clear . . . that any claim of privilege, whether of executive or Presidential privilege . . . , must be made with particularity.") (reviewing executive privilege claim in civil litigation); *Senate Select Committee*, 498 F.2d at 731 (D.C. Cir. 1974) (noting that, once the presidential communications privilege is invoked and the relevant committee shows sufficient need, the president would need to make particularized claims).

In any event, the entire November 20, 2021, press release, issued two days after the Defendant was served with the Coronavirus Subcommittee's subpoena, makes clear that the former President did not purport to make the broad, unbounded assertion of privilege the Defendant suggests—in fact, the statement does not purport to assert executive privilege with respect to any information beyond that sought by the Coronavirus Subcommittee.  The text of the entire press release identified by the Defendant reads as follows:

> The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020.  It is a Witch Hunt that's been going on for years.  Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign?  I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments.  The Witch Hunt must end!

Ex. 7.

Even the Defendant understood the narrow scope of the former President's purported November 20, 2021, privilege assertion at the time the press release was issued.  On December 7, 2021, the Defendant sent a letter to the Coronavirus Subcommittee in which he stated:

> I write in response to the subpoena, dated November 18, 2021 (the "Subpoena") issued to me by the Committee on Oversight and Reform, Subcommittee on the Coronavirus Crisis (the "Subcommittee").

> At this time, I am unable to respond to the Subpoena based on former President Trump's invocation of executive privilege *with respect to the very topic covered by the Subpoena*.  Specifically, *in response to the Subpoena*, on November 20, 2021, President Trump stated, "I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments."

> *Not only is this a direct, proper, and explicit invocation of executive privilege provided by a President of the United States as it relates to an important policy matter* during his tenure in office.  It is a direct order that I should not comply.

Ex. 8 (emphasis added).[4]  Indeed, it appears that, consistent with his communications to the Coronavirus Subcommittee, in his communications with the Committee, the Defendant recognized that an assertion of executive privilege must relate to some specific information, as he falsely asserted to the Committee that the former President has asserted executive privilege "in this matter."  Indictment ¶ 17.  As is apparent from the total absence of evidence, the former President did not.

Moreover, it would be improper for the Court to apply the former President's purported invocation over the information sought by the Coronavirus Subcommittee to the different

---

[4] The Government found this letter when writing its response to the Defendant's motion to dismiss on the Coronavirus Crisis Subcommittee's website.  *See* Letter to Hon. James E. Clyburn, *available at* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Letter%20to%20Clyburn%20Committee%2012%207%2021.pdf (last accessed Aug. 30, 2022)*.*  Although the Defendant purports to quote from the letter in his motion, ECF No. 34 at 5, he does not appear to acknowledge or explain his sudden change in position with respect to the scope of the purported invocation in the former President's November 20 press release or to have provided the Government or this Court with the full text of the letter.

information sought by the Committee. Were it to do so, the Court, not the executive, would be deciding to invoke executive privilege in the face of an explicit refusal to do so by the sitting President and the apparent decision not to do so by the former President. The Supreme Court long ago recognized that executive privilege exists for the public interest, not for any one individual, by protecting the functioning of the Executive Branch. *E.g.*, *Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1977) ("GSA") ("[T]he privilege is not for the benefit of the President as an individual, but for the benefit of the Republic."). Given the purpose it serves, the Court has recognized that it is a president, by being in the best position to weigh the interests of the Executive Branch, who properly decides whether executive privilege should be invoked with respect to any particular information. *Id*. at 449 ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly."); *see also Thompson*, 20 F.4th at 33-34 (noting President Biden "has made the considered determination that an assertion of executive privilege is not in the best interests of the United States given the January 6th Committee's compelling need to investigate and remediate an unprecedent and violent attack on Congress itself"). This principle is no different when considered in the context of a former President. *See GSA*, 433 U.S. at 425 (finding a former President can retain some ability to invoke executive privilege under certain circumstances because the interests underlying the privilege survive that President's tenure). Neither this Court, nor the Defendant, can decide *sua sponte* that executive privilege should be asserted over the information sought by the Committee. Because executive privilege never was invoked, it cannot provide a defense to the pending charges.

Despite failing to provide any evidence that executive privilege was ever claimed by the privilege holder or the former President in relation to the subpoena he defied, the Defendant asserts

that "[t]he present case is a substantial departure from the Department's long-established recognition that a senior aide to President [sic] is 'absolutely immune' from compulsion to respond to a congressional subpoena."  ECF No. 34 at 4.  Throughout his motion, he repeatedly cites Department Office of Legal Counsel ("OLC") opinions that he claims support this notion.  The Defendant is wrong.

The Department has never found that any White House officials have "absolute immunity" to simply ignore congressional subpoenas wholesale, even if there were an invocation of executive privilege.  In fact, it has admonished the opposite.  *See, e.g.*, *Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *59 (Jan. 8, 2021) ("It has long been the Executive Branch's policy to 'comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." (citation omitted)).  Nor has OLC ever addressed an invocation by a former President over information sought from a former advisor.  *See* Statement of Interest of the United States, *Meadows v. Pelosi*, 21-cv-3217 (CJN), ECF No. 42, at 1-2 (July 15, 2022).

Moreover, OLC has consistently recognized that there are limits to executive privilege, *see, e.g.*, *Congressional Oversight of the White House* at *32 (describing the deliberative process, attorney-client communications and work-product, and presidential communications components of executive privilege as protecting from disclosure "internal communications and information concerning presidential and other executive branch decision-making"); *id*. at * 57 (noting that the various components of the privilege "vary in scope and the extent of protection from disclosure").  Implementing these principles, OLC has only found the contempt of Congress statute to be inapplicable to congressional document demands where there is a clear assertion of executive privilege over a particular, identified group of records and a clear direction from the President to

the official at issue to withhold them.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* [hereinafter *Prosecution for Contempt of Congress*], 8 Op. O.L.C. 101, 142 (1984) ("In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official.").  And OLC has been clear that whether executive privilege excuses a particular White House official from appearing for testimony is not to be presumed.  Instead whether an official qualifies is a fact-intensive inquiry undertaken by the Office of Legal Counsel with respect to the specific individual subpoenaed.  *Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *55 ("[I]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President.")

The Defendant claims he relied on OLC opinions, but he does not appear to have read them.  And, as discussed below, mistaken relance is not a defense to contempt.  His efforts to suggest to this Court that the Department is departing from its own policies by prosecuting an individual who falsely claimed a privilege to defy a valid congressional subpoena in violation of the law are meritless.  There was no invocation of executive privilege over the documents and testimony required by the subpoena the Committee issued to the Defendant.  The Defendant's attempt to hide behind a privilege that is not his should be rejected.

**B.     The Defendant's Erroneous Claim of Executive Privilege Does Not Provide a Basis for Dismissal Under the Rule of Lenity.**

The Defendant claims that if the Court determines executive privilege did not excuse the Defendant's compliance with the Committee's subpoena, then the Court should nevertheless dismiss the Indictment under the rule of lenity because, according to the Defendant, he did not have notice that executive privilege would not provide a defense. ECF No. 42-43. The rule of lenity does not support dismissal of the Indictment.

First, the Defendant's argument is based on his assertion that executive privilege was, in fact, asserted. ECF No. 34 at 42 ("[T]he novel question with which this Court is confronted, following the failure of the Legislative and Executive Branches to otherwise reach an agreement, is what effect does a former president's assertion of Executive Privilege have."). But, as described above, there is no evidence executive privilege ever was asserted—because it was not. The Defendant's assumption that the former President might come to his aid in defying the subpoena is no substitute for it. Thus, there is not even an erroneously believed invocation.

In any event, the Defendant's claims are based on a misapplication of the rule of lenity. The rule of lenity applies "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *Shular v. United States*, 140 S.Ct. 779, 787 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)). An ambiguous statute is one for which more than one meaning could be attributed to its statutory terms. Under those circumstances, the rule of lenity requires that the "tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008). Here, the Defendant does not explain how the contempt statute is ambiguous. He does not even identify which relevant terms in the statute he believes are subject to different interpretations that leave ambiguity or which of several interpretations he believes is the one that should be adopted.

At bottom, the Defendant's argument is nothing more than a claim that defendants in contempt cases should be treated differently based on the law or privilege on which they claim to have relied to refuse compliance. That is not how the criminal law works. *See Santos*, 553 U.S. at 522 (opinion of Scalia, J.) ("[T]he meaning of words in a statute cannot change with the statute's application.") (citing *Clark v. Martinez*, 543 U.S. 371, 378 (2005)); *cf. Ratzlaf v. United States* 510 U.S. 135, 143 (1994) ("We have even stronger cause to construe a single formulation, here § 5322(a), the same way each time it is called into play.") (rejecting argument that the penalty provision applicable to multiple offenses takes on a different meaning depending on the offense to which it is applied). It has been settled precedent for decades that erroneous reliance on the law does not provide a defense to contempt of Congress, because all that is required to meet the intent element is that the defendant act deliberately and intentionally. *See Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995) (finding the defendant in a contempt of Congress case "was bound rightly to construe the statute. His mistaken view of the law is no defense").[5] As long as the failure to comply was deliberate and intentional, the reasoning behind it does not matter. *E.g.*, *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947). That the Defendant chose to justify his deliberate defiance by citing one area of the law versus another does not render the statute ambiguous.

## III.   THE DEFENDANT HAS WAIVED HIS OBJECTIONS TO THE SUBPOENA BASED ON THE COMMITTEE'S COMPOSITION, AND THEY PROVIDE NO BASIS FOR DISMISSAL

For the first time before this Court, the Defendant objects to the subpoena on which he defaulted, and seeks dismissal of the Indictment, on the basis that the Committee is not properly

---

[5] Although the *Sinclair* court was deciding the intent requirements for refusing to answer a question from a committee, the D.C. Circuit has found the same intent standard applies to a willful default. *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) .

constituted.  ECF No. 34 at 17-27.  In particular, the Defendant now objects to the fact that the Committee operates with fewer than 13 members, *id*. at 21-24, and that the most senior Republican Member of the Committee—Rep. Liz Cheney—uses the title "Vice Chair" rather than the term "Ranking Minority Member," *id*. at 24-27.  But because the Defendant failed to raise these objections to the Committee at the time of his noncompliance, he has waived the right to raise them before this Court, and they provide no basis for dismissal of the Indictment.  Even if the Defendant had not waived his objections, the rules the Defendant claims were violated were not and, in arguing otherwise, the Defendant encourages the Court to violate the Constitution's Rulemaking Clause by adopting an interpretation of the rules that are contrary to the House's own interpretation.  The Defendant's claims regarding his objections to the Committee's operating rules fail.

>   **A.    The Defendant Waived Objections To The Number of Members the Committee Needs to Operate And The Title Of Its Ranking Minority Member When He Failed to Raise Them Before the Committee.**

In the face of a congressional subpoena, a witness who fails to raise an evident objection or privilege before the issuing Committee waives his ability to later make that claim before a Court. The Supreme Court first made this clear in *United States v. Bryan,* 339 U.S. 323, 330-34 (1950). There, after being charged with contempt of Congress for refusing to provide documents in response to a congressional subpoena, the defendant claimed for the first time before the trial court that she could not be required to comply due to a "defect in composition" of the Committee.  *Id*. The Court found that by not raising the objection to the Committee's composition at the time of default, the defendant in that case had waived it as a defense.  *Id*. at 332-33 ("[I]f respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she

state her reasons for noncompliance upon the return of the writ. . . . To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of authority and an obstruction of its processes." (citation omitted)). The Court has affirmed this holding. S*ee Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (stating that a constitutional objection "must be adequately raised before the inquiring committee if [it]is to be fully preserved for review in this Court.  To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer." (internal citations omitted)); *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (finding that the defendant could not raise a defense that he did not possess subpoenaed records because he had never made the claim before the issuing committee).

On the other hand, a witness does not waive an objection based on a procedural defect that he did not and could not have known about at the time the subpoena was pending.  In *Yellin v. United States*, the Supreme Court considered the situation of a witness who, upon being subpoenaed by a congressional committee for public testimony, wrote to the committee to ask instead to testify in executive, or private, session.  374 U.S. 109, 111 (1963).  A committee staffer rejected the defendant's request.  *Id*.  But what the defendant did not know, and thus could not raise as an objection, was that the committee's members—rather than the staffer—had not considered the witness's request before it was rejected, as required in the committee's rules.  *Id*. at 120-123.  The Court held that the witness had not waived an objection or privilege that he could not have known about.  *Id*. at 122-123; *see also id*. 122 n.8 (collecting cases "in which a witness' defense has been rejected because he failed to make timely objection"); *Liveright v. United States*,

347 F.2d 473, 474-76 (D.C. Cir. 1965) (no waiver where defendant could not have been aware of improper issuance of his subpoena).

Both of the issues to which the Defendant now objects—the number of Members of Congress sitting on the Committee, and Rep. Cheney's title as Vice Chair instead of Ranking Minority Member—were apparent at the time that he received and defaulted on the subpoena, but the Defendant did not raise them. The Committee's authorizing resolution, on the deviation from which the Defendant claims his objections are based, was a public law and posted in its entirety on the Committee's website.[6] The resolution, passed on June 30, 2021, well before the Defendant was subpoenaed, states that the House Speaker "shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader," and that various Committee actions could be taken by the Committee's Chair, upon or after consultation with "the ranking minority member." H. Res. 503 §§ 2(a), 5(c)(6)(A).

Further, it was a matter of public record when the Defendant defaulted on his subpoena that the Committee operated with nine members and used the title of Vice Chair for Rep. Cheney, its ranking minority member.

With respect to the Defendant's objection regarding the number of Committee members, the fashion in which the Committee's nine Members were appointed was discussed on the House floor and covered in the news media, as the Defendant concedes. ECF No. 34 at 25 (citing to a July 21, 2021, Wall Street Journal editorial discussing the Committee's composition); *see also, e.g.*, Jacqueline Alemany and Tom Hamburger, *The January 6 committee: What it has done and where it is headed,* Wash. Post, January 4, 2022.[7] And the cover letter of the subpoena the

---

[6] "About," Select Committee to Investigate the January 6th Attack on the United States Capitol, https://january6th.house.gov/about (last accessed August 29, 2022).

[7] *Available at* https://www.washingtonpost.com/politics/2022/01/04/january-6-

Committee issued to the Defendant listed all of the Members of the Committee—9 of them, rather than 13.  Ex. 9.  The Defendant cannot claim he did not or could not know, at the time of his default, that the Committee had a different number of members than anticipated in its authorizing resolution.

Similarly, by the time the Defendant received his subpoena on February 9, 2022, Rep. Cheney had been operating using the title of "Vice Chair" for the Committee since September 2021; when Rep. Cheney accepted the title and role, the Committee announced it in a press release. *See* "Chairman Thompson Announces Representative Cheney Select Committee Vice Chair," Select Committee to Investigate the January 6th Attack on the United States Capitol.[8] Accordingly, even were the Defendant's procedural and semantic objections to the subpoena on these bases legitimate, he waived them when he failed to raise them to the Committee.

The Defendant claims—tellingly, without engaging at all with the binding legal precedent described above—that he has not waived his objections because "had [he] objected at the time of his deposition, his objections would have been ignored."  ECF No. 34 at 27.  But that is not a sound legal argument—it is a complaint that the law is what it is, and it is also a concession that the Defendant failed to raise these plainly apparent issues as a reason for his noncompliance with the subpoena.  Indeed, the Defendant did not raise them at the time because they were not in fact the reason he refused to comply—that reason, as has been made clear by the Defendant's briefing in this case, was the Defendant's desire to avoid compliance by hiding behind a false claim that executive privilege had been invoked.  *See Bryan*, 339 U.S. 333-334 ("[T]he fact that the alleged

committee-explainer/ (last accessed August 30, 2022).

[8] *Available at* https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (last accessed August 29, 2022).

defect upon which respondent now insists is, in her own estimation, an immaterial one, is clearly shown by her reliance before the Committee upon other grounds for failing to produce the records. She does not deny . . . that she would not have complied with the subpoenaed no matter how the Committee had been constituted at the time."). Accordingly, the Defendant has waived objections to the subpoena based on the number of Committee members or Rep. Cheney's title, and they provide no basis for dismissal of the indictment.

> ### B.  The Defendant's Objections Do Not Bear On An Element of the Offense And Do Not Pertain To Committee Rule Violations Denying Him Rights.

Even if the Defendant had not waived his objections to the Committee's composition, he misstates and overstates the nature and import of his eleventh-hour objections. The Defendant cites multiple inapposite cases to claim that his objections provide a basis to dismiss the Indictment under the Due Process Clause. ECF No. 34 at 18-20. The Defendant does not clearly identify why the Indictment would be deficient if the Committee had violated its rules. It appears the Defendant's claim is that an allegation for contempt only can be sustained if the Committee has followed all of its rules and that, because, according to the Defendant, the rules were violated here, the allegations of the Indictment cannot stand. But this claim is founded on a misstatement of the elements of the offense and an erroneous understanding of the Court's ability to interpret House rules differently from how the House interprets them.

> ### 1.  Compliance with a congressional committee's rules is not an element of the offense.

First, the Defendant's claim is based on the erroneous suggestion that rules compliance is an element of the offense that must be properly alleged and proven. *See* ECF No. 34 at 18 (claiming that "judicial scrutiny" is appropriate of "rules conferring lawful authorization of any inquiry"). This is incorrect. The Supreme Court in *Yellin* made clear that a rules violation could

be a defense to contempt of Congress "were [the defendant] able to prove his defense."  374 U.S.

109, 123 (1963).  The burden is on the Defendant to prove unwaived rules violations. On the other

hand,  if rules compliance were an essential element of the offense, the Government would bear

the burden of proving compliance and its failure to do so would be sufficient for acquittal.  *See*

*United States v. Bailey*, 209 F. Supp. 3d 55, 63 (D.D.C. 2016) (noting that "the burden of proof

rest[s] upon the Government to prove guilt to [the jury's] satisfaction beyond a reasonable doubt,

[and] that this burden extend[s] to each and all essential elements of the offense charged" (quoting

*Lawson v. United States*, 248 F.2d 654, 655 (D.C. Cir. 1957) (internal quotation marks omitted)

(alterations in original)).  The D.C. Circuit affirmed rules violations were only potential defenses

in *Liveright* noting that it had previously found a subcommittee's failure to comply with its

authorizing resolution's requirement that all members be consulted before issuance of a subpoena

could provide a "defense" to contempt and that this was consistent with Supreme Court precedent

finding that rules violations are not essential to the offense but potentially valid defenses. 347 F.2d

at 474-75, 475 n.5 (D.C. Cir. 1965) (citing *Bryan*, 339 U.S. 323 (1950); *Shelton v. United States*,

327 F.2d 601, 606 (D.C. Cir. 1963)).

The cases on which the Defendant relies and from which he selectively quotes to suggest

otherwise, ECF  34 at 18, do not help him.  *Christoffel v. United States* was a perjury case in which

the rules violation in question—a lack of committee quorum—was an element of the charged

offense.  69 S.Ct. 1447, 1449 (1949).  The Supreme Court has expressly found that *Christoffel* can

tell nothing about the rules requirements for a contempt of Congress case, stating in *Bryan*: "The

Christoffel case is inapposite.  For that decision, which involved a prosecution for perjury before

a congressional committee, rests in part upon the proposition that the applicable perjury statute

requires that a 'competent tribunal be present' when the false statement is made.  There is no such requirement in [the contempt of Congress statute]." *Bryan*, 339 U.S. at 329.

The Defendant is no more successful in his misplaced reliance on *Gojack v. United States*, a contempt of Congress case in which the Supreme Court reversed the defendant's conviction because it found that the inquiry in relation to which the relevant subcommittee had issued his subpoena had not been properly authorized.  384 U.S. 702, 708 (1996).  The Defendant cites *Gojack* for the proposition that an issue to be decided affirmatively in this case is whether the Committee followed "those rules conferring the lawful authorization of any inquiry."  ECF No. 34 at 18.  But the "authorization" element of contempt is not about a committee's operational rules. As *Gojack* and other cases make clear the "authority" element of the offense of contempt of Congress—the one that the Government will have to prove in the Defendant's trial—is a question of whether the Committee had the authority to investigate the particular subject matter to which the subpoena relates.  *See Gojack*, 384 U.S. at 708 ("[A] specific, properly authorized subject of inquiry is an essential element of the offense under Section 192.");  *Russell v. United States*, 369 U.S. 749, 771-72 (1962) (finding contempt of Congress indictments insufficient where they did not allege the subject matter which the relevant committee was investigating); *Barenblatt*, 360 U.S. at 116-23 (1959) (examining authorized subject matter of investigation to determine whether it was authorized to compel information sought); *United States v. Rumley*, 345 U.S. 41, 42-44 (1953) (determining whether committee was authorized to obtain information it sought by examining the authorizing resolution describing the subject matter of the authorized inquiry); Final Jury Instructions, *United States v. Bannon*, 21-CR-670 (CJN), ECF No. 129, at 27 (D.D.C. July 22, 2022) (instructing that the second element of the offense of contempt of Congress is "that the subpoena sought testimony or information pertinent to the investigation that the Select Committee

was authorized to conduct").   At trial in this case, the Government will prove the authority element—that is, the authorized scope of the Committee's investigation—through the Committee's authorizing resolution, which describes the specific purpose for which the Committee was created:  to investigate the facts and circumstances leading to the January 6, 2021, attack on the U.S. Capitol, and to generate recommendations to prevent any such event from occurring again. H. Res. 503.   Neither *Gojack* nor any other case stands for the proposition that the Defendant implies—that, in order for the Committee to be "lawfully authorized," the Government must prove that the Committee followed every procedural rule.

The Defendant also selectively quotes *Yellin* to support his erroneous claim that rules compliance is an essential element of the offense, ECF No. 34 at 18-19, but, as described above, the *Yellin* court only found the alleged rules violation to be a potential defense.

The Defendant's seeks to further support his due process claim with an erroneous suggestion that the purported rules violations to which he now objects go to protections he was owed as a subpoenaed witness because "[m]inority [party] leadership on any given committee ensures that deponents are afforded oversight of adherence to congressional rules, precedents, and established decorum."  ECF No. 34 at 25-26.   And, indeed, it is only violations of rules that create specific protections for witnesses before congressional committees that can be used as defenses at trial.   *See Yellin*, 374 U.S. at 123 (if defendant "had expressly rested his refusal to answer upon a violation of [the rule] and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his defense.  Otherwise, if Yellin could be convicted of contempt of Congress notwithstanding the violation . . . he would be deprived of the only remedy he has for protecting his reputation."); *Liveright*, 347 F.2d at 475 (D.C. Cir. 1965) (noting that where a rule "served to protect the right of all persons to be free from unnecessary invasions of their privacy," allowing a

defense to prosecution for contempt based on a violation of that rule gave effect to the concern that such procedures be followed before anyone was required to forfeit the right).  But neither objection the Defendant raises in his motion relate to any Committee rule that provides witnesses with procedural protections.  Neither House Resolution 503 nor any other Committee rule require 13 Committee members to be sitting to take any action with respect to the Defendant.  Moreover, there is no rule requiring certain titles to be used by the ranking minority member and the Defendant does not explain why Rep. Cheney's title of Vice Chair deprived him of any protections before the Committee.

### 2.       *The Court cannot interpret House rules in a manner different from the House.*

The Rulemaking Clause of the Constitution provides that "[e]ach House [of Congress] may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  To the extent that a House rule is ambiguous—that is, subject to more than one interpretation—there is risk in the Judicial Branch attempting to interpret it.  *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995) ("[J]udicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution . . .Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.").  Accordingly, where the House has made clear its interpretation of a rule, the Court should defer to that interpretation.  *United States v. Barker*, 921 F.3d 1130 ("Accordingly, we accept the House's interpretation of its own rules . . . , thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles.").

The House has made clear its view of both of the issues that the Defendant has raised. First, the House has expressed its view implicitly through ratification of the Committee's actions. Since the House created the Committee, the Committee has never operated in any other way than the one that it operated regarding the Defendant—that is, the Committee has always operated with nine members and with a ranking minority member who uses the title of Vice Chair.  In apparent approval of the Committee's procedures, the House voted on and approved contempt resolutions of the Defendant and several other individuals.  *See* H. Res. 851, H. Res. 730; *Repub. Nat'l Comm. ("RNC") v. Pelosi*, 22-CV-659 (TJK), 2022 WL 1294509 at *15 (D.D.C. May 1, 2022) ("[T]he House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee subpoenas.").

More to the point, however, in the face of similar claims to the Defendant's, the House of Representatives filed an amicus brief in *Bannon* in which it provided its explicit view of the two issues the Defendant now raises.  *See* Amicus Brief, *Bannon*, ECF No. 76-2; *see also Barker*, 921 F.3d at 1130-32 (relying on the House's court filings to determine its position on its rules).  With respect to the Defendant's claim about the title of the ranking minority member of the Committee, and any consultations required with that individual, the House stated Rep. Cheney "is, by definition, the senior ranking minority member of the Select Committee" and that House Resolution 503's "consultation requirement was satisfied by the Chair's consultation with Vice Chair Liz Cheney."  Amicus Brief, *Bannon*, at 15-16; *see also RNC*, 2022 WL 1294509 at *16 ("True, for whatever reason the Select Committee did not give [Rep. Cheney]—or anyone else— the formal title "ranking member."  But to the extent there is any uncertainty about whether she

fits the bill, on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes.").

Regarding the Defendant's claim about the number of Members of the Committee, the House stated that its interpretation of House Resolution 503 is that it "does not require that all thirteen Members be appointed in order for the Select Committee to function," nor does its provision for filling vacancies on the Committee provide a deadline for filling them. Amicus Brief, *Bannon*, at 10-11; *see also RNC*, 2022 WL 1294509 at *15 (rejecting RNC's argument that Committee lacked authorization because it had only nine members, stating that "for a few reasons, especially given the House's own reading of the authorizing resolution, the Court cannot agree"). In sum, the House of Representatives interprets its own resolution to allow for the Committee to operate with nine members, and for Rep. Cheney, the Committee's ranking minority member, to use the title of Vice Chair. The Court cannot reach a different interpretation.

## IV. THE DEFENDANT'S CLAIMS ABOUT THE PLACE THE DEFENDANT WAS REQUIRED TO APPEAR UNDER THE SUBPOENA PROVIDE NO BASIS FOR DISMISSING THE INDICTMENT.

The Defendant claims that the Indictment must be dismissed because the subpoena did not specify where in the U.S. Capitol the Defendant had to appear for his deposition and the location was changed. ECF No. 34 at 30. Neither claim supports a motion to dismiss the Indictment.

As an initial matter, the Defendant's assertions do not go to the subpoena's document demand. Accordingly, even if they had merit, they would provide no basis to dismiss Count One of the Indictment.

Moreover, any claim that the Defendant's failure to appear for the deposition was the result of supposedly vague instructions from the Committee or the subpoena about where to go, *see* ECF No. 34 at 30 ("By omitting any understandable description of where the deposition was to occur,

the Committee eliminated any possibility that Dr. Navarro's non-appearance can support a criminal prosecution for contempt."), is nothing more than a claim about whether the Government will be able to prove at trial the Indictment's allegation that the Defendant's default was willful, *see* Indictment ¶ 24-25.  Such factual disputes are for the jury, not for the Court at the motion to dismiss stage.  *See United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) ("When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations."); *United States v. Safavian*, 429 F. Supp. 2d 156, 158 (D.D.C. 2006) ("The government therefore 'is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29.'" (quoting *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005))).

The Defendant also argues that, when Committee staff identified the location for the deposition as the O'Neill House Office Building on March 1, 2022, it constituted a change to the subpoena that, according to the Defendant, had to be authorized by a majority of the Committee pursuant to clause 2(m)(3)(A)(i) of Rule XI of the Rules of House of Representatives.  ECF No. 34 at 30-31.  According to the Defendant, without evidence that it was so authorized, Count Two must be dismissed.  *Id*.  This claim also fails.

First, the Defendant misreads the rules governing the Committee.  House Resolution 503, which established the Committee, expressly states that the Chair of the Committee may authorize and issue subpoenas pursuant to clause 2(m).  H. Res. 503, Sec. 5(c)(4).  There is no requirement, therefore, that a majority of the Committee be involved in the issuance of subpoenas as the Defendant claims.  The subpoena, on its face, is authorized by the Chair of the Committee.  To the extent the Defendant objects to compliance with the subpoena because he wishes to challenge what

is apparent on its face, such is the location of the deposition, he has waived this claim because it was available to him at the time. *See supra* at Section III(A).

Second, the Defendant provides no basis for concluding that changing the location for his deposition from the U.S. Capitol to the O'Neil Office Building constituted a new subpoena requiring authorization from the Chair. There is no rule that the Government can find, and none that the Defendant cites, that requires a new subpoena be issued if the location of the deposition is altered. Moreover, even if such a rule existed, the Defendant points to an email he received on March 1, 2022, from a Committee staffer notifying him of the change of location as the evidence of the improper location change. Again, that information was known to the Defendant at the time he failed to appear and he did not object on that basis. He has, like his other objections, therefore, waived it as a defense in this case.

In addition, as described above, compliance with a committee's rules is not an essential element of the contempt offense that the Government must sufficiently plead and prove to meet its burden at trial. *Liveright*, 347 F.2d at 475 n.5. Instead, a failure to comply with a committee rule is available as a defense, if not waived, only if the defendant is able to prove the violation and his reliance on compliance with the rule at trial. *Yellin*, 374 U.S. at 123 (1963) (noting a defendant "would be entitled to acquittal" based on a rules violation "were he able to prove his defense"). Accordingly, even to the extent the Defendant had preserved the objection to the location change— whether by properly raising it before the Committee at the time he refused to comply or by it being a procedural violation about which he could not have known—whether it provides a defense is a question for the jury, not a basis to conclude the Indictment is deficient.

## V.   THE INDICTMENT SUFFICIENTLY PLEADS PERTINENCE, AND THE DEFENDANT CANNOT CHALLENGE THE SUFFICIENCY OF THE GOVERNMENT'S EVIDENCE AT THIS STAGE.

The Defendant suggests that the Indictment is legally insufficient because it does not explain how the information the subpoena sought from the Defendant is pertinent to the Committee's investigation.  ECF No. 34 at 28.  The Defendant is correct that pertinence is an element of the charged offense.  *See Russell*, 369 U.S. 749, 755 (1962) ("[I]t is 'incumbent on the United States to plead and show that the question ([the Defendant] refused to answer) pertained to some matter under investigation.'"); *United States v. McSurely*, 473 F.2d 1178, 1203 (D.C. Cir. 1972) ("one of the necessary elements of [the Government's] case" is "pertinency of its demands to the valid subject of the legislative inquiry"); Final Jury Instructions, *Bannon*, at 27 (instructing jury that "[i]n order for you to find that the information was pertinent, the government must prove to you, beyond a reasonable doubt, that at the time the Select Committee issued the subpoena, the testimony or information sought could have related to the Select Committee's investigation in some way . . . It does not matter whether the information the Defendant allegedly had would have been pertinent to the authorized investigation.  All that matters is that it could have been pertinent at the time that the Select Committee sought the information.").  Contrary to the Defendant's claims, the Indictment sufficiently alleges this element.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  Here, the Indictment more than meets this standard with respect to the pertinency by providing detailed factual allegations.  First, the Indictment clearly sets forth that the Committee's authorized investigation was "to investigate and report upon the

facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack on the United States Capitol Complex." Indictment ¶ 2. It then alleges that "[o]n February 9, 2022, the Select Committee served [the Defendant] with a subpoena for documents and testimony relating to its inquiry," *id*. ¶ 7, and quotes from the cover letter the Committee sent to the Defendant which explained some of the reasoning as to why the Committee believed he had relevant information, *id*. ¶ 8. The paragraphs tracking the statutory language also allege that the Defendant was subpoenaed "to produce papers upon a matter under inquiry," *id*. ¶ 23, and "to give testimony upon a matter under inquiry," *id*. ¶ 25. Nothing more is required.

In the face of the detailed Indictment, the Defendant's sufficiency arguments amount to an improper attempt to challenge, at this stage, the sufficiency of the evidence that the Government will present at trial. *See, e.g.*, ECF No. 34 at 28 (arguing that the Indictment "fails to *establish*" pertinency (emphasis added)). But a motion to dismiss "is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000). The Defendant has provided no basis to conclude the Indictment insufficiently alleges pertinence.

## VI.   THE DEFENDANT FAILS TO MAKE THE HIGH EVIDENTIARY SHOWING NECESSARY TO ESTABLISH SELECTIVE PROSECUTION, AND HIS MOTION TO DISMISS ON THIS BASIS FAILS.

The Defendant claims that the indictment should be dismissed because his prosecution was the result of "unlawful selective prosecution and undue political interference." ECF No. 34 at 32. He bases this argument on mere speculation, rather than on facts, and thus fails to meet the high threshold necessary to prevail in such a claim.

"The standard applicable to a claim of selective prosecution 'is a demanding one,'" and the presumption of regularity underlying prosecutorial decisions can be overcome only by "clear

evidence to the contrary." *United States v. Rhodes*, No. 22-CR-15 (APM), 2022 WL 3042200, at *4 (D.D.C. Aug. 2, 2022) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).  To make such a showing, the Defendant must establish that the Government's actions "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465 (citation and internal quotation marks omitted).  The Defendant here has failed to provide "clear evidence" of either discriminatory effect or discriminatory purpose.  He has provided instead only his own speculative personal conclusions.  His claims of selective prosecution should be rejected.

First, the Defendant's claim of discriminatory effect fails because he provides no evidence that others outside the protected class of which the Defendant claims he is a part were similarly situated to him but were treated differently.  He must show that there were "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to" him as opposed to others similarly situated.  *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)); *see also United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009) (explaining that a similarly situated individual is "one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced" (citation and internal quotation marks omitted)).  The Defendant claims discriminatory effect because he was prosecuted for contempt of Congress and Mark Meadows and Dan Scavino were not.  ECF No. 34 at 33-34.  The Defendant's motion, however, relies only on a conclusory claim that he engaged in protected activity and Messrs. Meadows and Scavino did not to satisfy the requirement that he identify some individual in a protected class different form his own.  Moreover, the Defendant provides no evidence that there were "no distinguishable legitimate prosecutorial

factors" that might justify the Government's charging decisions with respect to Messrs. Meadows and Scavino. Indeed, the Defendant does not attempt to account for the differences between his situation and these other individuals', because if he were to do so he would not be able to establish discriminatory effect. *See* H. Rept. 117-216, at 12-19 (117th Cong.) (describing individual circumstances of Mr. Meadows's compliance with a Committee subpoena); H. Rept. 117-284, at 12-13, 25-28 (117th Cong.) (describing individual circumstances of Mr. Scavino's and the Defendant's compliance with Committee subpoenas). Based on this failure alone, the Defendant's selective prosecution claim is unsuccessful.

Second, the Defendant fails to provide any evidence whatsoever in support of his claim that the Government's actions were motivated by a discriminatory purpose. To satisfy this prong, the Defendant must show that the prosecution was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, or was designed to prevent or paralyze his exercise of constitutional rights." *United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982) (internal citations and quotation marks omitted). And he must show this deliberate selection was made by the prosecutorial authorities handling his case. *Khanu*, 664 F.Supp.2d at 34-35 (finding that defendant's claims of government-wide discrimination was "too far removed from the actual prosecuting authorities in this case to allow the Court to infer a discriminatory purpose."). For his evidence of discriminatory intent, the Defendant claims that he "believes" the Government brought this prosecution because of the Defendant's "public expression of political beliefs." ECF No. 34 at 35. But just repeating the purported protected class of which the Defendant claims he is a part does not provide any evidence of the prosecutors' intent. And the Defendant provides nothing more. Instead, he speculates that his "public objections to the Select Committee's subpoena . . . likely angered the Committee and its members," ECF No. 34 at

36; concedes that he "does not know whether the Committee communicated that anger" to the Government, *id.*; reiterates that he objects to the circumstances of his arrest, *id.* at 37; erroneously claims that the Government ignored "decades of its own legal precedent," *id.* at 38; hypothesizes that it was "possible" that the prosecutors were affected by a public statement by President Biden, *id.* at 38; and speculates that it is "possible" that the White House communicated with the some unidentified individual in the Department about OLC positions that do not exist, *id.* at 39-40.

None of the Defendant's speculative claims constitute "clear evidence" or withstand scrutiny.  The Defendant's claims about the motivations of the Committee are irrelevant because the Committee is not the prosecuting authority that the Defendant must show acted with a discriminatory purpose.  The Government has already explained in its Opposition to the Defendant's Motion to Compel, ECF No. 33, at 16-17, that the Defendant was arrested by the FBI in a discreet manner commensurate with the circumstances.  As described above, there are no Department policies allowing individuals to wholly ignore a congressional subpoena.  *See supra* at Section 11-12.  And, finally, the Defendant's rank speculation about communications among the Committee, President Biden, the White House, and some unidentified person in the Department does not present evidence—it presents fantasy.  The Defendant fails to furnish any evidence in support of his claim of discriminatory purpose, and he fails to meet the second prong of the selective prosecution test.

The Defendant has not met his demanding burden to establish selective prosecution and his claims for dismissal on this basis should be denied.

## VII.    THERE WERE NO ERRORS IN THE GRAND JURY PRESENTATION.

The Defendant claims the Indictment must be dismissed because what he asserts to be exculpatory evidence was not presented to the grand jury. ECF No. 34 at 41-42.  The Defendant

also suggests there must have been some error in any instructions given to the grand jury on the meaning of "willful" under the statute. *Id.* at 42. The Defendant has failed to establish that there was any error before the grand jury or that dismissal is appropriate.

"Grand jury proceedings are 'accorded a presumption of regularity, which generally may be dispelled only upon a particularized proof of irregularities in the grand jury process.'" *United States v. Saffarinia*, 424 F. Supp. 3d 46, 80 (D.D.C. 2020) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring)). "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Prejudicial errors are those that "substantially influenced the grand jury's decision to indict" or that raise "'grave doubt' that the decision to indict was free from the substantial influence" of the errors. *Id.* at 256 (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring)).

The Defendant also asserts that dismissal is appropriate where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing a presumption of prejudice." ECF No. 34 at 40 (quoting *Bank of Nova Scotia*, 487 U.S. at 257) (internal quotation marks omitted). But this standard has no application in this case. As an example of the cases in which this standard may apply, the Supreme Court in *Bank of Nova Scotia* cited instances in which grand juries were selected using racial or sex discrimination. 487 U.S. at 257 (citing *Vasquez v. Hillary*, 474 U.S. 254, 260-64 (1986); *Ballard v. United States*, 329 U.S. 187 (1946)). As the Supreme Court explained, such "isolated exceptions to the harmless-error rule" exist where the error is of "a constitutional magnitude" and "any inquiry into harmless error would have required unguided speculation." *Id.* The Defendant claims no similar type of error here.

Instead, the Defendant claims two, non-constitutional errors subject to harmless error review.  His claims fail, however, because what he claims to be error is not error at all.  First, the Defendant claims the Government erred by not presenting evidence to the grand jury of his claimed defenses that the Committee was not operating pursuant to its rules and that he relied on unidentified Department of Justice policy regarding executive privilege in refusing to comply.  ECF No. 34 at 41-42.  But, as the Defendant acknowledges, *id*. at 40, the Government is not required to present even "substantial exculpatory evidence" to the grand jury, *United States v. Williams*, 504 U.S. 36, 53 (1992).  And an indictment valid on its face cannot be challenged in a motion to dismiss based on claims relating to the sufficiency of the evidence presented to the grand jury.  *Costello v. United States*, 350 U.S. 359, 362-63 (1956).  Here, the Indictment is valid on its face.  It alleges each element of the offense, tracks the statutory language, and includes detailed factual allegations that support the charges.  *See United States v. Espy*, 23 F. Supp. 2d 1, 9-10 (D.D.C. 1998) (finding an indictment facially valid where it met Federal Rule of Criminal Procedure 7(c) pleading requirements and gave the defendant adequate notice of the acts it alleged he committed).  Not only can there be no error, therefore, in not presenting the Defendant's claimed defenses to the grand jury, but given the facially valid indictment, there is no basis to question the evidence presented in the first place.

Moreover, even if the Government had to present potential defenses to a grand jury, the claimed defenses the Defendant argues should have been presented are not defenses.  As described above, the Defendant has waived his claims regarding the operations of the Committee.  *Supra* at Section III(A).  In addition, the Defendant's purported mistaken reliance on inapposite Department policy on executive privilege provides no defense to his deliberate decision to refuse to comply with the subpoena.  A willful default is one that is deliberate and intentional.  *Licavoli*, 294 F.2d

at 209 (D.C. Cir. 1961) ("All that is needed . . . is a deliberate intention to do the act.").  The

Defendant's belief—even if held in good faith—that he could refuse to comply based on executive

privilege or the Department's interpretation of it does not provide a defense.  *See, e.g.*, *Yellin*, 374

U.S. at 123 (1963) ("Of course, should Yellin have refused to answer in the mistaken but good-

faith belief that his rights had been violated, his mistake of law would be no defense."); *Bryan*,

339 U.S. at 330 (finding the government had "made out a prima facie case of wilful default" where

"respondent had been validly served with a lawful subpoena directing her to produce records . . .

and that on the day set out in the subpoena she intentionally failed to comply"); *Licavoli*, 294 F.2d

at 209 ("In the case at bar there can be no serious dispute about the deliberate intention of Licavoli

not to appear before the Committee pursuant to its subpoena.  That he meant to stay away was

made abundantly clear.  That he did so upon the advice of a lawyer is no defense."); *Fields*, 164

F.2d at 100 (D.C. Cir. 1947) ("The word 'willful' does not mean that the failure or refusal to

comply with the order of the committee must necessarily be for an evil or a bad purpose.  The

reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal

was deliberate and intentional and was not a mere inadvertence or an accident.  We uphold that

differentiation in our view of the purpose of the statute."); Order, *Bannon*, 2022 WL 2900620,

ECF No. 49 (Apr. 6, 2022) (excluding evidence and argument of good-faith reliance defenses in

contempt of Congress case because only a deliberate and intentional failure to comply was required

under the intent element of the statute).  In any event, there is no evidence that, when he refused

to comply with the Committee's subpoena, the Defendant was acting in reliance on any

Department policy, even if there were on-point policy here.  It is not clear, therefore, what the

Defendant wishes to have been presented to the grand jury in the first place.

The Defendant also suggests that the Indictment must be dismissed because he does not know what instructions were provided to the grand jury on the intent element of the offense. ECF No. 34 at 42. He does not know what instructions were provided because he has not shown a particularized need for any instructions—on the intent element or any other, *see id.* (claiming he has moved for production of instructions on his claimed defenses and the intent element).[9] The Indictment sufficiently and properly alleges the essential elements of the offense. Any errors in the Government's instruction, even if they occurred, therefore, would be harmless and could not provide a basis for dismissal. *See Saffarinia*, 424 F. Supp. 3d at 81. The Defendant's speculation that the grand jury was improperly instructed cannot overcome the facially valid indictment to support either dismissal or discovery of the grand jury charge. *Id.*; *see also Espy*, 23 F. Supp. 2d at 9-10; *United States v. Trie*, 23 F. Supp. 2d 55, 61-62 (D.D.C. 1998).

## VIII.   CONCLUSION

None of the arguments that the Defendant makes in his Motion to Dismiss prevail. Executive privilege did not excuse his non-compliance with the Committee's subpoena. There was no purported assertion of the privilege in the first place. The Defendant's eleventh-hour objections to the Committee's rules cannot secure dismissal of the Indictment because he waived them by not raising them before the Committee at the time of his non-compliance. His claims about pertinence and the location for his deposition improperly ask the Court to assess the sufficiency of the Government's evidence. And, finally, the Defendant's speculative allegations of selective prosecution and grand jury abuse fail entirely to meet the high threshold showings for such claims. The Defendant's Motion to Dismiss should be denied.

---

[9] The Government has reviewed the Defendant's motion to compel and has been unable to identify where he makes this request.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Elizabeth Aloi*
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Elizabeth Aloi (D.C. 1015864)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7212 (Aloi)
        elizabeth.aloi@usdoj.gov