# The Washington Post
*Democracy Dies in Darkness*

# Opinion: In abandoning executive privilege, Biden rejects 200 years of history

By George J. Terwilliger III

November 13, 2021 at 3:30 p.m. EST

*George J. Terwilliger III is a partner at McGuireWoods LLP in Washington and previously served as deputy attorney general.*

As counsel for former White House chief of staff Mark Meadows, I was surprised and disappointed to receive a letter Thursday informing me that the Biden administration will be the first in history not to resist a congressional subpoena for testimony from a senior White House aide.

That move follows weeks of fruitless negotiation with the House Select committee on Jan. 6 in which we sought a compromise to satisfy the committee's demands for information from Meadows. Congress's refusal to work out an accommodation and the Biden administration's acquiescence fly in the face of 200 years of history — a history of dealing with these disputes by finding a middle ground.

Under Supreme Court precedent, President Donald Trump also has a voice to be heard on claims of executive privilege arising from his tenure, and he has instructed Meadows to maintain the privilege. My client thus finds himself caught between two rocks (Congress and the Biden administration) and a hard place (instructions from the president he served.)

Moreover, he knows from experience how critical it is for senior aides to be able to communicate freely with the president — and how dangerous a precedent he would set for presidents of both parties were he to appear and answer questions without limitation.

There are two separate but equally vital components to this issue. The first is the long-standing recognition that senior presidential aides, present and past, cannot be compelled to appear before Congress. The second is the issue of executive privilege, and the importance of protecting communications among presidential advisers and with the president himself.

The history of executive privilege began with President George Washington, who in 1796 refused to comply with a House request for information about his treaty negotiations with Britain, explaining that "the boundaries fixed by the Constitution between the different departments should be preserved."

In more recent times, the Justice Department has maintained, through administrations of both parties, that the most senior presidential aides — even former aides and aides to presidents no longer in office — cannot be compelled to provide testimony before Congress.

These authoritative legal opinions explain that protecting senior aides from compelled testimony is vitally important because it helps to ensure, both now and in the future, that the president can benefit from the most candid advice. In a 1999 opinion issued by the Justice Department's Office of Legal Counsel, Attorney General Janet Reno likened such compulsion "to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."

Both the executive branch *and* the judiciary have long recognized the related protections of executive privilege. These protections are also grounded in the separation of powers and help to preserve the critical balance among the branches.

While executive privilege disputes between Congress and the executive occur often, the need for judicial involvement has been rare, until recently. As Chief Justice John G. Roberts Jr. recently indicated in the dispute over Trump's tax returns, the federal courts have a strong preference for allowing the other two branches to reach accommodation when conflicts arise from executive privilege claims. Most unfortunately, Biden's decision to abandon executive privilege in this instance has eradicated any incentive for Congress to pursue accommodation.

The Biden administration has tried to justify this unprecedented step by categorizing the events of Jan. 6 as "unique and extraordinary circumstances." But as a standard to compel wholesale abandonment of executive privilege, that assessment draws an arbitrary and dangerous line — one that can and will be invoked in the future when the political shoe is on the other foot.

How should this all be resolved? Ideally, all involved would take a deep breath and reconsider ending the tradition of accommodation between the executive and Congress. They would look for other ways to resolve the conflict. Perhaps yet, a politically independent Justice Department will try to do so.

Solutions might include, as we proposed to the committee, withdrawal of the subpoena and agreement on written questions, the answers to which could be parsed as to whether privileged or not, a far better means of addressing privilege issues than the back and forth inherent in a compelled and likely hostile deposition. But if no compromise can be had, it cannot be that my client should have to end the conflict unilaterally — either by risking contempt or by surrendering privilege and agreeing to testify without restriction.

Thus, the only path to resolution may run through the courts. I gave up a long time ago predicting what courts will rule. I am confident, though, that the courts will see a lot more at stake here than seems apparent to the House Select committee or the White House thus far.