**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES  OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 22-cr-200 (APM)** |
| **PETER NAVARRO** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**MEMORANDUM OPINION AND ORDER**

**I.**

Defendant Peter K. Navarro was a close advisor to former President Donald J. Trump. On February 9, 2022, the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee" or "Committee") issued a subpoena to Defendant that called on him to produce records by February 23, 2022, and to appear for a deposition on March 2, 2022.  Defendant allegedly did neither.  Thereafter, a grand jury indicted him on two counts of contempt of Congress in violation of 2 U.S.C. § 192 for refusing to comply with the Select Committee subpoena.

Defendant contends that his prosecution is unprecedented.  For more than five decades, he says, the United States Department of Justice (the "Department") has declined to prosecute close aides to the President for contempt of Congress.  According to him, the Department has taken the position that even *former* senior aides to a *former* President are "immune" from congressional process.  He argues that such immunity exists to protect and preserve privileged communications between the President and senior advisors, and that prosecutions would "chill" such communications and place a heavy burden on carrying out executive functions.

Defendant moves to compel discovery to understand "the Department's clear and seemingly inexplicable departure from this settled policy." Def.'s Mot. for Leave to File Under Seal Def.'s Mot. to Compel Disc., ECF No. 30, Def.'s Mot. to Compel Disc., ECF No. 30-2 (sealed) [hereinafter Def.'s Mot.], at 4. He demands three categories of records. Each would allow him "to ascertain whether: (1) selective or disparate treatment of his case from other similarly situated high ranking White House officials has occurred; (2) the Grand Jury process was abused through undue political interference from the current White House in contravention of defendant's right to the appearance of impartiality in the prosecution of his case; and (3) the procedures employed to obtain the indictment contravened his right to due process." *Id.*

For the reasons that follow, the court holds that Defendant has failed to meet his heavy burden as to any of the three categories of records he seeks. His motion is denied.

## II.

The court starts with Defendant's request for documents that would demonstrate he is the subject of selective prosecution. To make his case, Defendant points to two other senior advisors to President Trump, former Chief of Staff Mark Meadows and former Deputy Chief of Staff Dan Scavino. Both men, like him, declined to comply with a Select Committee subpoena for records and testimony. *Id.* at 31–32. Likewise, the Select Committee referred both to the Department for prosecution for contempt of Congress, and a grand jury heard evidence relating to their alleged refusals to comply. *See id.* at 32. Yet the Department prosecuted neither of them. *Id.* Defendant says "[h]e can think of no other reason" for his different treatment than "unlawful and discriminatory reasons involving his public expression of political beliefs." *Id.* at 33. The reason for his prosecution then is that he has spoken out, while Meadows and Scavino have not.[1]

---

[1] At the time of the oral argument, Defendant had not come forward with any evidence that Meadows and Scavino have been silent about their views of the government, or even the Select Committee, since receiving their subpoenas.

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  A forbidden reason can include prosecution of a defendant based on his "political beliefs." *Branch Ministries, Inc. v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C. 1999).

A selective prosecution claim is made up of two elements.  First, the defendant must show the decision to prosecute "had a discriminatory effect." *Armstrong*, 517 U.S. at 465.  Second, the defendant must establish that the decision "was motivated by a discriminatory purpose." *Id*.  The Supreme Court has emphasized that a defendant asserting selective prosecution must meet a "demanding" standard. *Id*. at 463.  "[T]he presumption of regularity applies to prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (internal quotation marks and alterations omitted).

Defendant is not at the stage of having to *prove* selective prosecution; he is seeking discovery to support the claim.  To obtain discovery, a defendant must make at least a "colorable claim" of selective prosecution. *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982).  This requires a defendant to come forward with "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468.  This standard is more stringent than the Rule 16 materiality standard for ordinary discovery. *See United States v.*

---

Mot. Hr'g Tr., ECF No. 50 [hereinafter Hr'g Tr.], at 35:23–37:5 (Defendant's counsel unable to provide the court with any assurance that Meadows and Scavino have not publicly expressed their views about the Select Committee).  A week later, Defendant filed a supplemental brief, in which he represented that the only public statement regarding the Select Committee he had been able to locate made by Meadows or Scavino was an opinion piece published in *The Washington Post* by Meadows's counsel.  Def.'s Suppl. to Def.'s Mot. to Compel Disc. Regarding Possible Selective Prosecution, ECF No. 53, at 5–6.  The court need not decide whether Defendant has sufficiently shown himself to be in a class of one, because he has otherwise failed to carry his burden of showing a colorable claim of selective prosecution.

*Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000).  It is a "significant" and "rigorous" standard, which "itself [is] a significant barrier to the litigation of insubstantial claims."  *Armstrong*, 517 U.S. at 464, 468.

As discussed below, the court finds that Defendant has not made a "colorable claim" as to either element of the selection prosecution defense.

**A.**

To demonstrate a "discriminatory effect," a defendant must show that "similarly situated individuals" were not prosecuted.  *Armstrong*, 517 U.S. at 465.  "When a person's circumstances present no distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant."  *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (internal quotation marks omitted).  Legitimate prosecutorial factors include "relative culpability, the strength of the case against particular defendants, willingness to cooperate, and the potential impact of a prosecution on related investigations."  *United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009).

Defendant has failed to establish that he is similarly situated to Meadows and Scavino for two primary reasons.  First, both Meadows and Scavino received correspondence from President Trump directing them not to respond to the Select Committee's subpoena.  Mot. Hr'g Tr., ECF No. 50 [hereinafter Hr'g Tr.], at 46:5–7 (government counsel noting the "different way in which Mr. Meadows, Mr. Navarro, Mr. Scavino, claimed that executive privilege was invoked").  In nearly identical letters dated October 6, 2021, President Trump's counsel, Justin Clark, "instruct[ed]" Meadows and Scavino "to the fullest extent permitted by law" to: (1) "where appropriate, invoke any immunities and privileges [you] may have from compelled testimony in response to the Subpoena"; (2) "not produce any documents concerning [your] official duties in

4

response to the Subpoena"; and (3) "not provide any testimony concerning [your] official duties in response to the Subpoena."  H.R. REP. NO. 117-284 [hereinafter Navarro/Scavino Report], at 124; H.R. REP. NO. 117-216 [hereinafter Meadows Report], at 58.  Both men presented their letters to the Select Committee.  *See* Navarro/Scavino Report at 124; Meadows Report at 58.

Defendant, on the other hand, received no written or oral direction from the former President to invoke any privileges or immunities with respect to the Select Committee subpoena.[2] Navarro/Scavino Report at 3–4 (describing Defendant's communications with the Select Committee).  Instead, without offering evidentiary support, he told the Select Committee that "President Trump has invoked [e]xecutive [p]rivilege in this matter."  *Id.* at 3.  The fact that Defendant received no specific instruction to invoke executive privilege, while Meadows and Scavino did, is a material difference and a legitimate prosecutorial factor that distinguishes Defendant from those men.  Such factual distinctions matter.  *See, e.g.*, *Judd*, 579 F. Supp. 3d at 7 (holding that a material difference between the January 6 rioters and the Portland, Oregon rioters was that the latter attacked "at night, meaning that they raged against a largely vacant courthouse"); *Khanu*, 664 F. Supp. 2d at 32 (accepting as a distinguishing feature that the indicted defendant "was more involved and took a leadership role in the conspiracy").

Second, both Meadows and Scavino, through their counsel, had extensive communications with the Select Committee about subpoena compliance.  Hr'g Tr. at 46:2–3 (government counsel stating that "there was a different level of engagement" among the three men with the Select Committee).  Meadows negotiated with the Select Committee for months in an effort to

---

[2] Defendant concedes that the only purported communication he ever received from the President about invoking privileges and immunities was a "public" statement to "protect executive privilege" with respect to a different subpoena that Defendant received from the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis.  Def.'s Mot. at 4; Hr'g Tr. at 39:14–40:17 (acknowledging that the only "instructions" he received from the President concerned a subpoena from the "the COVID-19 Subcommittee").

accommodate privilege objections.  Meadows Report at 12–19.  Although he never sat for a deposition, Meadows did ultimately produce 2,300 text messages and a privilege log showing he withheld an additional 1,000-plus text messages based on various privileges.  Meadows Report at 19.  Scavino's counsel also engaged with the Select Committee for months, detailed the grounds for Scavino's assertion of privilege, and lodged objections to the Committee's purpose, composition, and the pertinence of its inquiry.  Navarro/Scavino Report at 26–28, 79–161.  These interactions with the Select Committee stand in contrast to those of Defendant, who communicated with the Select Committee over a three-week period largely through terse emails and public statements.  *See id.* at 3–4; 51–63.  He made no apparent effort to accommodate the Select Committee, let alone produce records as Meadows did.  Instead, Defendant directed the Select Committee to negotiate directly with President Trump.  *Id.* at 63.  These are valid differences between Meadows, Scavino, and Defendant that could have led to their different treatment.

In sum, Defendant has failed to make "a credible showing of different treatment of similarly situated persons" because Meadows and Scavino are not similarly situated to him.  *Armstrong*, 517 U.S. at 470.

**B.**

Defendant likewise has failed to come forward with any evidence that his prosecution was motivated "because of" an arbitrary classification.  *Wayte v. United States*, 470 U.S. 598, 610 (1985).  As evidence of motive, Defendant first points to the *Select Committee's* likely reaction to his declinations and public statements, but the Select Committee does not make prosecutorial decisions, the Department does.  Nevertheless, Defendant says that his "public objections to the Select Committee's subpoena, and his reasons for noncompliance, *likely* angered the Committee and its members."  Def.'s Mot. at 34 (emphasis added).  He then says he "*does not know* whether

the Committee communicated that anger to the Department of Justice," "but the Department *seems to have* acted in a similar manner in response to Dr. Navarro's public expressions of dissent." *See id.* (emphasis added).  This is not evidence of discriminatory motive; it is speculation.

The only concrete evidence he points to of improper animus is the way he was treated at the time of his arrest.  Defendant complains that, as someone charged with a non-violent misdemeanor, he should have been given an opportunity to turn himself in.  *See id.* at 28.  Instead, according to Defendant, the FBI publicly arrested him in an airport and the U.S. Marshals Service processed him as if he were dangerous felon.  *Id.* at 27.  The court acknowledges that there are times where the government permits non-violent misdemeanants to self-surrender after being charged.  But the government has provided at least a plausible explanation for why it took a different course here.  United States' Opp'n to Def.'s Mot. to Comp., ECF No. 33 [hereinafter DOJ Opp'n], at 16–17 (explaining that only a few days before his indictment, when case agents attempted to interview and serve Defendant with a subpoena, he initially refused to open the door and later told the agents to "get the f*** out of here").  Courts generally should defer to law enforcement about the best way to bring a defendant before the court on a criminal charge.  Simply put, Defendant has come forward with insufficient evidence to establish a colorable claim of discriminatory motive.

### III.

Next, Defendant requests records to prove that the decision to charge him was tainted with "unlawful political interference," and he hopes to dismiss the indictment on that ground.  Def.'s Mot. at 26–30.  This is a novel theory to say the least.  Defendant cites no case for the proposition, for instance, that the Due Process Clause grants a "right to the appearance of impartiality in the

prosecution of [a] case." Def.'s Mot. at 4.[3]  Even if Defendant could show that his prosecution resulted from "unlawful political interference," it is far from clear what the court could do about it.  In any event, the question before the court is more limited: whether Defendant can seek discovery to advance this claim.  Like his claim of selective prosecution, the "defense here relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution," so to obtain discovery he must come forward with evidence tending to show the elements of his defense (whatever they may be).  *Rashed*, 234 F.3d at 1285. Again, Defendant comes nowhere close to satisfying this "rigorous standard."  *Id.* (internal quotation marks omitted).

Defendant points to the following as proof of politically motivated animus: (1) the Department has abandoned its 50-year-long precedent of not prosecuting former presidential advisors for not complying with a congressional subpoena; (2) President Biden publicly expressed his belief that persons who defied the Select Committee's subpoena should be prosecuted; (3) Defendant was arrested in public instead of allowed to turn himself in; (4) an FBI agent testified before the grand jury that ███████████████████████████████████████ ████████████████████████, suggesting contacts between the Select Committee and the Department; and (5) a Deputy White House Counsel contacted Defendant unsolicited to advise him that President Biden had decided not to invoke executive privilege as to testimony and records sought by the Select Committee, suggesting improper contact between the White House and the

---

[3] The sole case on which Defendant relies, *SEC v. Wheeling-Pittsburgh Steel Corporation*, does not stand for that proposition.  Def.'s Mot. at 26.  He quotes from a footnote stating, "an agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge."  648 F.2d 118, 125 n.9 (1981).  But the court there was contrasting the concepts of "agency bad faith and the agency's acquiescence in abuse of its process leading to an abuse of the court's process." *Id.*  The case said nothing about whether a criminal defendant has any recourse if subjected to a politically motivated indictment.

Department.  Def.'s Mot. at 26–30.  This evidence, viewed collectively, falls well short of prying open the door to discovery.

Taking the "evidence" in reverse order, Defendant neglects to mention that both Meadows and Scavino received similar communications from the White House Counsel's Office regarding executive privilege, yet neither were prosecuted.  Meadows Report at 16, 88; Navarro/Scavino Report at 7.  If all three received the same communication but only one was charged, the contact between the White House and Defendant is not evidence of political motivation.  Second, the fact that an FBI agent testified before the grand jury about ████████████████████████████ ████████████████ does not establish the Committee's collusion with the Department.  The agent did nothing more than ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.  Def.'s Mot., Ex. 3, ECF No. 30-6, at 5–14. The agent's testimony provides no ground to believe there was any improper political influence by the Committee upon the Department.  Third, the court already has addressed the manner of Defendant's arrest.  Fourth, President Biden's statement makes no distinction about who to prosecute amongst those who defied Select Committee subpoenas; it cannot be that the President's public statement was so influential that it gave rise to Defendant's prosecution but not a prosecution of either Meadows and Scavino.  And, finally, even if the Department has departed from 50 years of precedent (which the Department denies), such exercise of prosecutorial discretion by itself is not proof of any undue political influence.  Defendant thus fails to make a colorable case of undue political interference.

**IV.**

Next, Defendant seeks discovery to show abuse of the grand jury process.  Def.'s Mot. at

35–38.  Defendant's theory appears to be that additional information about the grand jury process

"would provide [him] with the information necessary to evaluate whether to seek relief from the

Court."  *Id.* at 38.  Defendant has already received the witness testimony and exhibits presented to

the grand jury.  DOJ Opp'n at 20.  Defendant does not specify what more he wants.  Whatever he

seeks, however, he is not entitled to, perhaps with one exception.

Federal Rule of Criminal Procedure 6(e) "makes quite clear that disclosure of matters

occurring before the grand jury is the exception and not the rule" and "sets forth in precise terms

to whom, under what circumstances and on what conditions grand jury information may be

disclosed."  *Fund of Const. Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir.

1981).  Grand jury proceedings are "accorded a presumption of regularity, which generally may

be dispelled only upon particularized proof of irregularities in the grand jury process."  *United

States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring).  A defendant seeking

dismissal of an indictment based on misconduct before the grand jury "faces a very heavy burden."

*United States v. Trie*, 23 F. Supp. 2d 55, 61 (D.D.C. 1998).  "[D]ismissal of the indictment is

appropriate only 'if it is established that the violation substantially influenced the grand jury's

decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the

substantial influence of such violations."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256

(1988) (quoting *Mechanik*, 475 U.S. at 78 (1986) (O'Connor, J., concurring)).

Defendant points to various occurrences before the grand jury that he says are evidence of

misconduct.  First, he contends that there was no discussion "about significant flaws with respect

to the Select Committee's formation and authority, including the number of its members and the

10

requirement that there be a ranking minority member." Def.'s Mot. at 36. But the House already has determined the legality of the composition of the Committee, *see Republican Nat'l Comm. v. Pelosi*, No. 22-cv-659 (TJK), 2022 WL 1294509, at *15 (D.D.C. May 1, 2022), and Defendant offers no reason why his undeveloped theory should have been presented to the grand jury. It also would appear that Defendant has waived any such challenges to the Committee's composition, as he did not raise them first before the Committee itself. *See Liveright v. United States*, 347 F.2d 473, 475–76 (D.C. Cir. 1965).

Second, Defendant complains "there apparently was no discussion with the Grand Jury, let alone legal advice provided, about Dr. Navarro's reliance on the last 50 years of [Office of Legal Counsel ('OLC')] memoranda affirming executive privilege and testimonial immunity." Def.'s Mot. at 36–37. But Defendant himself has not pointed to *any evidence* that he actually relied on 50-years-worth of OLC opinions when he refused to comply. None of his communications with the Select Committee, for example, reference any OLC opinion or Department practice. *See* Navarro/Scavino Report at 2–5. So, it is unclear what evidence of reliance the government failed to present to the grand jury.

Third, Defendant demands information about how the grand jury was instructed about the "level of *mens rea* required" to violate the contempt statute. Def.'s Mot. at 37. Defendant appears to doubt the accuracy of the grand jury instructions; however, "the mere suspicion that the grand jury may not have been properly instructed with respect to [a] legal definition" does not entitle a Defendant to grand jury's instructions. *Trie*, 23 F. Supp. 2d at 62. And Defendant has offered no more than mere suspicion to support his request.

Fourth, Defendant seeks grand jury records to determine why he was indicted and Meadows and Scavino were not. Def.'s Mot. at 37. Defendant's curiosity is not enough. He offers

no legal support to access the grand jury's deliberations related to Meadows and Scavino, if such deliberations even took place.[4]

Finally, Defendant asks to see ████████████████████████████████████████ ████████████████████████. *Id.* at 37.  This is the only specific demand that Defendant makes.  If the United States is declining to disclose ████████, it shall explain its rationale to the court in a supplemental memorandum filed no later than September 20, 2022.

In the end, Defendant has provided no valid basis on which to order disclosure of additional grand jury materials.

## V.

Finally, Defendant seeks discovery on a matter that does not neatly fit into any of the three requested categories: "information concerning the composition of the Committee and its authority to issue subpoenas." *Id.* at 23.  As discussed earlier, Defendant believes that the Select Committee was unlawfully put together and that it did not follow the requisite procedures in issuing his subpoena.  *Id.* at 22–23.

Defendant may have waived these defenses, *see* p. 11 *supra*, but nevertheless, it is not clear what additional evidence he seeks.  Some information is available from the public record.  *See generally* Navarro/Scavino Report.  And Defendant concedes that the court cannot compel Congress to produce records.  *Id.* at 34; *see also United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) ("[I]t is settled that the government generally need not produce documents that are in the possession, custody, or control of a separate branch of government such as Congress.").  He makes a specific demand for all communications between the Select Committee and the

---

[4] Defendant cannot say whether the grand jury declined to return indictments against Meadows and Scavino or whether the Department elected not to seek indictments in the first place.  *See* Def.'s Mot. at 32.

Department, *id.* at 22, but the government already has produced such records, Hr'g Tr. at 4:4–6:3. So, the court is at a loss to know what more Defendant wants produced.

If Defendant believes there are specific records that the government has not yet disclosed, he can come back to the court. On the present record, however, there is nothing to compel relating to the Committee's composition and the exercise of its subpoena power.

## VI.

For the foregoing reasons, Defendant's motion to compel is denied. The United States shall make its submission to the court concerning the immunity order by September 20, 2022.

Dated:  September 12, 2022

_____
Amit P. Mehta
United States District Court Judge