**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT'S OPPOSITION TO THE
GOVERNMENT'S  OMNIBUS MOTION IN LIMINE**

The Government does not want this Court to address the issue central to this action: what privileges and immunities does a former president have with respect to the advice provided by his former senior advisers? Rather, the Government frames the issue as whether 2 U.S.C. § 192 imposes automatic criminal sanctions for senior presidential advisers served with a congressional subpoena and instructed not to testify. The Government claims in its Omnibus Motion in Limine ("OMIL")[1]/ that it does. Contrary to the Government's ambition, the question of what privileges and immunities are enjoyed by a former president cannot be avoided because the Government now contends that Dr. Navarro has the burden of proving sufficient invocation of that privilege by the former president. There can be no real doubt that had the Government, or the Select Committee before it, sought former President's position, he would have unequivocally advised that he desired Dr. Navarro to assert all privileges and immunities afforded to a former president. Despite the

---

[1]/ Dr. Navarro hereby incorporates by reference the arguments and authority he presented to the Court on this issue in the Motion to Dismiss filed on August 17, 2022 (ECF 34) and in his Reply to the Government's Opposition to that Motion (ECF 52). He notes that at the time of this filing, the parties have not yet had the benefit of oral argument on that motion, which was postponed from September 22, 2022, or the Court's decision. To the extent that future rulings by the Court on his Motion to Dismiss impact his arguments here, Dr. Navarro requests an opportunity to supplement his opposition to the Government's OMIL.

Government's efforts to characterize this case as a run-of-the-mill enforcement of a congressional subpoena, it is, at its core, an interbranch dispute between the Executive and Legislative branches of government. Dr. Navarro is being prosecuted, not because of conduct of his own, but because of his "obedience to an assertion of executive privilege by the President from whom his governmental authority derives."[2]/

In fairness, despite the indictment's failure to mention the same, it is now the Government's position that former President Trump never instructed Dr. Navarro to invoke executive privilege. As such, under *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), Dr. Navarro's reasons for failing to appear before the Select Committee are irrelevant. But *Licavoli* does not address the privileges and immunities afforded senior presidential advisers whose failure to appear in response to a congressional subpoena, the Department of Justice has previously asserted, is lawful. *See e.g., Committee on the Judiciary v. Harriet Miers et al,* 558 F. Supp. 2d 53, 63-64 (D.D.C. 2008) ("[B]ecause Ms. Miers and Mr. Bolton were acting pursuant to direct orders of the President, 'the Department has determined that noncompliance … with the Judiciary committee subpoenas *did not constitute a crime …'"*). *See also* Complaint at 7-8, *United States v. United States House of Representatives*, No. 82-3583 (D.D.C. 1983) (seeking a declaratory judgment that then EPA Administrator Anne Gorsuch (Buford)'s failure to testify in response to an otherwise lawful congressional subpoena was "lawful").

Thus, unlike the procedural posture presented in *Licavoli*, this case implicates constitutional principles of separation of powers and invocations of executive privilege. Dr.

---

[2]/ Solicitor General Rex Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and The Relationships*, 1978 B.Y.U. L. Rev. 231, 259 cited by Theodore B. Olson, Assistant Attorney General for the Office of Legal Counsel, in *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege,* 8 Op. O.L.C. 101 (1984)

Navarro accordingly requests that this Court dismiss this case in accordance with the Department of Justice's position for the last 60 years or, alternatively, allow him to defend himself at trial by offering evidence to the jury about the legitimate reasons for which he declined to comply with the Select Committee's subpoena.

  **I.**  **Before this Case, and for More Than 60 Years, the Justice Department has Held that the Criminal Contempt of Congress Statute *Does Not Apply* to Senior Presidential Advisors Who, Like Dr. Navarro, Assert Claims of Executive Privilege at the Direction of the President**

  Since 1956, the Department of Justice's Office of Legal Counsel ("OLC"), which the D.C. Circuit Court has described as "the most significant centralized source of legal advice within the Executive Branch," *Citizens for Responsibility and Ethics in Washington v. United States Department of Justice,* 846 F.3d 1235, 1238 (2017), has repeatedly concluded under administrations of both political parties that 2 U.S.C. § 192, the criminal contempt of Congress statute, does not apply to senior presidential advisors, like Dr. Navarro, who assert claims of executive privilege at the direction of the President.[3]/ The Department based its "long established" legal position on: (1) the fact that the legislative history[4]/ of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and

---

[3]/ *See e.g., Hearings Before a Subcommittee of the House Committee on Government Operations,* 84th Cong., 2d Sess. 2933 (1956); *Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House of Staff"* (Feb. 5, 1971); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege,* 8 Op. O.L.C. _ (1984); *Testimonial Immunity Before Congress pf the Assistant to the President and Senior Counselor to the President,* 43 OP. O.L.C. 1 (July 12, 2019); and *Memorandum For Pat A. Cipollone, Re: Testimonial Immunity Before Congress of the Former Counsel to the President.* 43 Op. O.L.C. __ (May 20, 2019)

[4]/ "Neither the legislative history nor the historical implementation of the contempt statute supports the proposition that Congress intended the statute to apply to executive officials who carry out Presidential assertion of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege,* 8 Op. O.L.C. 101, 129 (1984*); see also Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges,* 19 Op. O.L.C. 350, 356 (1995)

(2) the  consequence that if the statute were to be construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the doctrine of separation of powers.[5]/ *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege,* 8 Op. O.L.C. 101 (1984) (Theodore B. Olson, Assistant Attorney General for the Department's Office of Legal Counsel).[6]/

Courts in this District have stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving disputes between branches of government. For example, in *United States v. United States House of Representatives,* 556 F. Supp 150 (D.D.C. 1983), this Court stated that "[t]he difficulties apparent in prosecuting Administrator Gorsuch for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement. … The court, therefore, finds that to entertain this declaratory judgment action would be an improper exercise of the discretion granted by the Declaratory Judgment Act." (*See* Defendant's Motion to Dismiss, at 15-16). *See also Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2030 (2020).

And, in an earlier decision by the U.S. Court of Appeals for the District of Columbia in *Tobin v. United States*, 306 F. 2d 270, 276 (1962), the Court reversed a contempt of Congress

---

[5]/ "Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order to the President to exercise of responsibility that he found necessary to the performance of his constitutional duty." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege,* 8 Op. O.L.C. 101, 136 (1984)

[6]/ Dr. Navarro has thoroughly briefed this issue in his Motion to Dismiss and, for the sake of brevity, will not do so again here. Suffice it to say for present purposes that he relied on the Department's oft-stated position that a senior presidential advisor who declines to comply with a Congressional subpoena upon orders of a President *does not commit a crime. See e.g., Committee on the Judiciary v. Harriet Miers et al,* 558 F. Supp. 2d 53 (D.D.C. 2008).

conviction on the grounds that the congressional subpoena had gone beyond the investigative authority delegated to the committee and it noted in *dicta* that there are inherent constitutional issues implicated in pursuing criminal contempt of Congress charges against a public official.

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights. Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interests of two sovereigns.

Although neither the Supreme Court nor the D.C. Circuit has had an opportunity to consider whether Congress may subject a President's immediate advisers to compulsory testimonial process, the considerations that led the Supreme Court to extend to congressional aides the same immunity afforded Members of Congress under the Speech and Debate Clause, U.S. Const., art. I, § 6, cl. 1, likely portends a similar result for presidential advisors. In *Gravel v. United States*, 408 U.S. 606, 616-17 (1972), the Court reasoned that:

> It is literally impossible, in view of the complexities of the modern legislative process… For Members of Congress to perform their legislative task without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause – to prevent intimidation of legislators by the Executive and … A possibly hostile judiciary … -- will inevitably be diminished and frustrated.

The logic of the Supreme Court in *Gravel* supports the same conclusion for presidential senior advisors such as Dr. Navarro. A President's senior advisors must share his absolute immunity from compelled congressional testimony or, at least not be subject to criminal prosecution, because they are his "alter ego's" with responsibility to perform numerous responsibilities on behalf of his office.[7]/ Accordingly, Dr. Navarro's refusal to comply with Select

---

[7]/ The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions

Committee's subpoena is "not a crime". *See e.g., Committee on the Judiciary v. Harriet Miers et al,* 558 F. Supp. 2d 53, 63-64 (D.D.C. 2008) ("[B]ecause Ms. Miers and Mr. Bolton were acting pursuant to direct orders of the President, 'the Department has determined that noncompliance … with the Judiciary committee subpoenas *did not constitute a crime* ...'").

Accordingly, the Government's contention that Dr. Navarro must prove that former President Trump properly invoked executive privilege expressly contradicts longstanding precedent persuasively concluding that a senior presidential adviser's failure to comply with an otherwise lawful congressional subpoena is presumptively lawful.

**II.      If this Court Determines that Dr. Navarro is Subject to the Criminal Contempt of Congress Statute, He Should Be Allowed to Offer Evidence of His Reasons for Declining to Comply with the Select Committee's Subpoena**

In the alternative, it is against the foregoing background that the Department has reversed course[8]/ and now argues that *Licavoli v. United States,* 294 F.2d 207 (D.C. Cir. 1961), requires this Court to impose criminal sanctions on Dr. Navarro for complying with President Trump's instruction that he "protect the privilege". In the event that this Court were to agree with the Government's newfound position, *Licavoli* does not define the "willfulness" standard[9]/ to be

_____

upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Services,* 433 U.S. 425, 449 (1977).

[8]/ The Department's abrupt departure from the way it has historically interpreted and applied the statute violates Dr. Navarro's Fifth Amendment right to due process. That right includes "fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). "The ... principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia,* 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss,* 347 U.S. 612 (1954)).

[9]/ Neither *Licavoli,* nor any of the other authority cited by the Government in its OMIL, involved facts or constitutional issues remotely similar to this case: *Licavoli* (Senate racketeering investigation); *United States v. Bryan,* 339 U.S. 323 (1950) (Committee on Un-American Activities), *United States v. Fleischman,* 339 U.S. 349 (1950) (Committee on Un-American Activities), *Yellin v. United States,* 374 U.S. 109 (1963) (Committee on Un-American Activities); *Watkins v. United States,* 354 U.S. 178 (1957) (Committee on

applied in a case involving assertions of executive privilege and the jury must be allowed to consider the reasons Dr. Navarro had for declining to comply with the Select Committee's subpoena.

The Government argues in its OMIL, as it did in opposition to Defendant's Motion to Dismiss, that to satisfy 2 U.S.C. § 192's *mens rea* requirement ("willfully makes default"), it need only prove that the Select Committee served a subpoena on Dr. Navarro, and that he failed to comply.[10]/ The Government supports its position by pointing to *Licavoli* and other case authority that were decided years ago during the Kennedy administration and earlier (*see* footnote 9, *supra*) and which, more importantly, did not involve the constitutional issues presented in this case.[11]/

The facts of *Licavoli* have little in common with the present case aside from the charged statutory provision. The defendant in *Licavoli,* a purported mobster whom the Senate Select Committee on Improper Activities in the Labor or Management Field called to testify about the "infiltration of racketeers into management and labor in the Chicago restaurant industry" refused to comply based on the advice of his counsel. The defendant's refusal was not, like the present

---

Un-American Activities) and *Sinclair v. United States,* 279 U.S. 263 (1929) (Senate investigation of fraud in oil and gas leases).

[10]/ The Government's rationale, if accepted by this Court, would eviscerate a President's executive privilege. The Senate and House have numerous standing committees that could issue subpoenas to force current or former presidential aides to disclose privileged communications with a President of the opposite party – or risk prosecution. If the aides refused to appear for deposition or answer all questions propounded by the Members of Congress or their staffs, they could be referred to the Department of Justice. A Department administered by the same party as Congress might well, as in the present case, attempt to put its political opponents in jail for refusing to comply. This is not what the Founders intended.

[11]/ It is no accident that during the 60+ years of OLC opinions analyzing the contempt of Congress statute, legal scholars such as Ted Olson never mentioned *Licavoli*, or the other cases relied on by the Government for the interpretation of 2 U.S.C. § 192 it now proposes. The reason of course, is that none of those cases involved a presidential aide's assertion of executive privilege or the important constitutional issues that are thereby implicated.

case, grounded in assertions of executive privilege or separation of powers challenges between the Executive and Legislative branches of government.[12]/

The Government also points to the Court's decision in *United States v. Bannon* as support for its contention that *Licavoli* controls here. Although the Court in *Bannon* determined that *Licavoli* was binding on the "willfulness" element of 2 U.S.C. § 192, it did so reluctantly and stated that "[i]f this were a matter of first impression, the Court might be inclined to agree with defendant and allow this [state of mind] evidence in." Case 1:21-cr-00670 (Nichols, J., 2022); ECF 49. Dr. Navarro respectfully submits that his assertion of executive privilege in a dispute between the Executive and Legislative branches of government takes this case outside the "willfulness" framework of *Licavoli*. Moreover, the procedural posture of Bannon's prosecution is factually distinguishable – at all times relevant to the subpoena giving rise to this action Dr. Navarro was a senior presidential adviser whereas Bannon had long since left the Trump administration. Put simply, the overly simplistic "strict liability" approach to guilt or innocence urged by the Government would adversely affect the fundamental fairness of the trial by depriving Dr. Navarro of the ability to mount a defense.

Therefore,  Dr. Navarro must be permitted to offer evidence at trial regarding his reasons for declining to comply with the Select Committee's subpoena. The U.S. Supreme Court and the D.C. Circuit have both recognized that the state of mind, *i.e., mens rea*, required to violate the law can differ depending on the type of conduct the statute was intended to address. On one end of the culpability "sliding scale" are public welfare offenses with a "knowingly" *mens rea* requirement

---

[12]/ Unlike attorney-client privilege, where a witness has a choice whether to follow the advice of his lawyer, Dr. Navarro had no such choice in light of President Trump's instruction that he protect executive privilege – which, as discussed in this response as well as Dr. Navarro's Motion to Dismiss, is precisely why the OLC concluded that a presidential advisor who follows a Presidents instructions to assert executive privilege is not within the scope of the statute.

that do not carry significant imprisonment, such as those involving the environment, food, and drugs. Those offenses typically require a low knowledge requirement – *i.e.,* that a defendant simply understood that he was committing the act constituting a violation, and not necessarily that he was violating the law. *See, e.g., United States v. Dotterweich,* 320 U.S. 277 (1943) (general intent violations of the Food, Drug, and Cosmetic Act); *United States v. Spatig*, 870 F.3d 1079 (9th Cir. 2017) (general intent violations involving hazardous waste).

Where a statute includes a "willful" intent element, the courts have generally interpreted that element to require that a defendant understood that his conduct was unlawful. *See Bryan v. United States*, 524 U.S. 184 (1998); *United States v. Burden*, 934 F.3d 675 (2019). At the high end of the spectrum are cases involving "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan* at 191. In those cases, courts have required an even higher standard, where defendants were actually aware of the statutory provision that they were violating. *See Cheek v. United States*, 498 U.S. 192, 201 (1991) (willful tax code violation required awareness of the specific provision being violated); *Ratzlaf v. United States*, 510 U.S. 135, 138, 149 (1994) (willful violation of money laundering cash structuring provision required specific understanding of that provision).

Assuming that the Court determines that Dr. Navarro's conduct could potentially fall within the ambit of the contempt of Congress statute, the "willful" requirement must, at a minimum, be interpreted according to the "middle-ground" intent standard, which requires that the Government prove that he understood that his actions were unlawful, even if he was not aware of the particulars of the statutory provision violated. For example, in *Bryan*, the Supreme Court affirmed a conviction for willfully dealing firearms without a license where the defendant "used so-called 'straw purchasers' in Ohio to acquire pistols that he could not have purchased himself. *Id*. at 189. Determining that "the evidence was unquestionably adequate to prove that [the

defendant] was dealing in firearms, and that he knew that his conduct was unlawful," the Court held that the jury was properly instructed as follows, despite the government having presented no evidence that he was aware of the specific federal statute prohibiting that conduct:

> A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act with the intent to do something that the law forbids.

Following *Bryan,* the D.C. Circuit in *Burden* upheld a jury instruction defining the willfulness standard to require only proof that the defendant "acted with knowledge that the conduct was unlawful," and not that he "had read, was aware of, or had consulted the licensing provisions of the Arms Export Control Act" in a case involving the export of five assault-rifle magazines and a grenade-launcher mount to Thailand.[13]/ *Id*. at 680. Distinguishing the charged offense from "the extremely rare, highly technical statutes that the Supreme Court has found to require a heightened willfulness showing," the Court of Appeals agreed that "the district court correctly instructed that, if defendants knew exporting the charged items without a license was unlawful, they did not need specific knowledge of the [AECA's] Munition's List. *Id.* at 690.

There is also a distinction to be made between having the requisite willful *intent – i.e.*, the "bad purpose to disobey or disregard the law," as in *Bryan* -- and requiring the government to prove that a defendant acted with an evil *motive*. In *United States v. Washington*, 705 F.2d 489 (D.C. Cir. 1983), the Court affirmed the defendant's conviction for making false statements to secure passports. There, the district court rejected the defendant's argument that the government was required to prove that the criminal act was done with a "bad purpose". The court explained:

> Such evidence of motive, as the district court ruled, is not relevant to or probative on the issue of intent as that word is used in section 1542. This contention was

---

[13]/ The Court of Appeals vacated the district court's judgment and remanded the case due to a Confrontation Clause violation unrelated to the district court's jury instruction on "willfulness".

settled in *United States v. Pomponio*, 429 U.S. 10, 50 L. Ed. 2d 12, 97 S. Ct. 22 (1976), in which the Court held that the requirement of an evil motive suggested in *Screws v. United States*, 325 U.S. 91 (1945)] is met by proof merely of "a voluntary, intentional violation *of a known legal duty*." *Id.* at 12. Also to the point is *Browder v. United States*, 312 U.S. 335, 85 L. Ed. 862, 61 S. Ct. 599 (1941), which construed the words "knowingly" and "willfully" in section 1542 to mean '"deliberately and *with knowledge'*." *Id.* at 341. Proof of a good motive thus is not probative on the issue of such intent.

*Washington*, 705 F.2d at 493 (emphasis added). The court's distinction between intent and motive, and its interpretation of the term "willfully" to require knowledge of illegal conduct, is consistent with *Bryan* and *Burden* and provides a framework for applying the "willfully makes default" element in this case.

Assuming the Court determines that Dr. Navarro's refusal to comply with the Select Committee's subpoena is within the scope of 2 U.S.C. § 192, the Government should be required to prove beyond reasonable doubt that he knew that he was violating the law when he declined to comply with the Select Committee's subpoena.

### III.   Dr. Navarro Relied on a Valid Assertion of Executive Privilege in Declining to Comply with the Select Committee's Subpoena

In its OMIL, the Government repeatedly refers to this Court's September 12, 2022, Memorandum Opinion denying, in most respects, Defendant's Motion to Compel Discovery ("Order" at ECF No. 55), for the proposition that Dr. Navarro "received no written or oral direction from the former President to invoke any privileges or immunities with respect to the Select Committee subpoena" and "concedes that the only purported communication he ever received from the President … was a 'public statement' to 'protect executive privilege' with respect to a different subpoena" [] from the House COVID-19 Subcommittee." *See*, Order at p. 5, FN2; Opp. at pp. 3, 7-8. Dr. Navarro never intended to make any such concession.

In his Motion to Compel Discovery, Dr. Navarro recounted his repeated assertions of executive privilege on behalf of former President Trump to the Select Committee and requests that

the Committee negotiate a resolution with former President Trump and his attorneys. He explained "that President Trump had publicly directed him as a Senior Advisor to the President to 'protect executive privilege.'" *Id*. at 4.[14] In the hearing on that Motion, in a colloquy about selective prosecution, counsel for Dr. Navarro confirmed that he (counsel) was referring in his remarks to the public statement that the former President had issued with respect to the COVID-19 Subcommittee.[15] Counsel also explained that Dr. Navarro understood that the President's direction continued to apply with respect to the Select Committee. Hr'g Tr. At 39:14 – 41:5. That is consistent with Dr. Navarro's assertion in his Reply to the Government's Opposition to his Motion to Dismiss that President Trump's public directive to Dr. Navarro with respect to the COVID-19 Subcommittee "remained President Trump's standing order to Dr. Navarro with respect to the Select Committee's subpoena …" Reply to Opp. to Mot. To Dismiss, ECF No. 52 at p. 7.

---

[14] The complete reference is as follows: "On February 9, 2022, the Select Committee served Dr. Navarro with a subpoena calling for his production of documents and appearance for deposition (fn. 2 omitted). In response, on March 9, he notified the Select Committee - as he had advised the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis … in response to a subpoena it issued in November 2021 - that President Donald Trump had publicly directed him and his Senior Advisor to the President to "protect executive privilege." *Footnote 3* to the reference continued in pertinent part: "The Subcommittee did not pursue the matter, which confirmed to Dr. Navarro his understanding that, in the absence of agreement between the Executive and Legislative branches, he is not obligated to comply with the subpoena."

[15] COURT:   Am I correct in understanding that, to the extent there was a communication from the President, it was in connection with the subpoena from the COVID-19 Subcommittee that your colleague referred to earlier.
COUNSEL:  That's the public statement from the President, yes
\*       \*       \*
COURT:    Different committee, to the subpoena, right?
\*       \*       \*
COUNSEL:  Same understanding by Mr. Navarro that the President had told him.

Hr'g Tr. At 40:3 – 17.

It is absurd for the Government to argue, as it does, that President Trump did not instruct Dr. Navarro to assert executive privilege in response to the Select Committee's subpoena. (OMIL at 3). There is no authority requiring that the instruction be made by formal letter or other particularized form and the evidence shows that all of the former President's aides had been similarly instructed. The Committee could have confirmed the instruction with a simple phone call to President Trump or his attorneys – as Dr. Navarro repeatedly urged it to do. It did not do that (*see* FBI 302 of May 26, 2022; Interview of the Committee's Senior Committee Counsel, Dan George – "George never directly negotiated with the former President Trump or his lawyers … was unaware of anyone else from the Select Committee" who did.) because it already knew the answer. It is preposterous for the Government to now argue now that there is some uncertainty about the issue.

By focusing on President Trump's public statement directing him to assert executive privilege with respect to the COVID-19 Subcommittee, counsel did not intend to imply that Dr. Navarro had no additional communications with President Trump regarding the standing directive to "protect privilege," nor is what counsel intended to convey by his reference to President Trump's public statement in the Motion to Compel. At this stage in these proceedings, Dr. Navarro is under no obligation to disclose his defense strategy or offer testimony to that effect, and it would be premature to conclude that he "conceded" any fact in this matter.[16]

---

[16] If the Select Committee actually had any question about President Trump's direction to Dr. Navarro, it had an obligation to contact the former President, as Dr. Navarro repeatedly urged, and engage in the process of negotiation and accommodation, as the Supreme Court has repeatedly instructed. *See Cheney v. U.S. Dist. Ct. for Dist. Of Colum.*, 542 U.S. 367, 390; *Trump v. Mazars, LLP*, 140 S. Ct. 2019, 2031 (2020) (". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

IV.    **Dr. Navarro Did Not Waive Defenses Related to the Committee's Failure to Follow Its Own Rules**

The Government argues that Dr. Navarro waived any objection to the Select Committee's composition or the failure to appoint a ranking member as required by House Resolution 503.by failing to raise those objections in response to the Committee's subpoena. For the reasons more fully articulated in his Reply to the Government's Opposition to his Motion to Dismiss (ECF No. 52 at 12-16) and incorporated herein by reference, Dr. Navarro submits that the Government's reliance on *United States v. Bryan*, 339 U.S. 323 (1950) is misplaced. His objections to the House of Representatives failure to comply with its own resolution when it created the Committee implicates Dr. Navarro's rights to procedural due process  and have not been waived. *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

Clearly, a congressional committee's adherence to its own authorizing rules is a prerequisite to a criminal prosecution. *United States v. Reinecke*, 524 F. 2d 435, 436  (D.C. Cir. 1975) (To convict of perjury, Government must prove not only that defendant, while under oath, willfully made false statement concerning material matter, but also that tribunal to which statement was made was "competent"); *see also Yellin v. United States*, 374 U.S. 109 (1963) (conviction for contempt of congress must be reversed where the committee in question failed to adhere to its own rules); *Liveright v. United States*, 347 F.2d 473, 475-76 (D.C. Cir. 1965)(reversing conviction where committee had failed to comply with its authorizing resolution concerning the issuance of subpoenas). Contrary to the Government's assertion, however, *Bryan*, does *not* stand for the proposition that a defendant can waive his substantive due process rights by asserting them for the first time in the only forum where their efficacy can actually be resolved – an Article III Court.

*Bryan* involved an objection at trial to the fact that the committee lacked a quorum when it attempted to ask its questions. Unlike here, that flaw could have easily been remedied by bringing more members to attend. The defects that Dr. Navarro complains of – the fact that the Select Committee did not have the requisite members or a ranking member to protect the rights of the minority and its failures to adhere to its own rules in the issuance of the subpoena – are fundamental structural failures that could not have been easily remedied, and that still have not been remedied despite having been the subject of objections by other individuals subpoenaed by the Select Committee before and after Dr. Navarro. While *Bryan* recognized that the contempt of Congress statute does not include the element of a "competent tribunal", as did the offense of perjury in *Christoffel v. United States*, 338 U.S. 84 (1949), the statute does require proof that a defendant was summoned "*by the authority* of either House of Congress." 2 U.S.C. § 192 (emphasis added).[17]/ It would violate Dr. Navarro's substantive due process rights to alleviate the Government from its burden to prove that element of the offense by finding that he waived those rights by not asserting them earlier.

To the extent *Bryan* remains the law following *Yellin*, at most the Court's decision stands for the proposition that non-procedural due process rights may be waived if not asserted at the time for appearance pursuant to the subpoena in question prior to any prosecution for contempt of Congress.[18]/ Here, Dr. Navarro challenges the failures of the House of Representatives and the Select Committee's failure to follow their own rules as well as their pertinence – challenges that

---

[17]/The Government's reliance on *Hutcheson v. United States*, 369 U.S. 599 (1962), is similarly distinguishable. There, the defendant, "with counsel at his side, unequivocally and repeatedly disclaimed any reliance on the Fifth Amendment privilege" – a right that he later claimed barred the inquiry at hand. *Id.* at 609-611. Here, the Government does not point to any such unequivocal waiver.

directly implicate his procedural due process rights and thus challenges that may be lodged with this Court. That is an independent basis for the Court's dismissal of the indictment.

## V.      Dr. Navarro is Entitled to Present a Defense of Entrapment by Estoppel and Public Authority

The Government argues that Dr. Navarro should be precluded from offering evidence or argument at trial regarding an entrapment-by-estoppel or public-authority defense because, in essence, he cannot demonstrate that he acted in reasonable reliance on a valid directive by the government. To the contrary, and for the reasons discussed below, Dr. Navarro is entitled to present his defense that he acted upon a valid directive by former President Trump not to comply with the Select Committee's subpoena consistent with decades of OLC interpretations of the "absolute immunity" recognized by the Department for senior presidential advisors who invoke executive privilege.

The state of the law regarding distinctions between entrapment-by-estoppel and the defense of public authority have been described by at least one U.S. Court of Appeals as "muddled". *See United States v. Baptista-Rodriguez*, 17 F.3d 1354 (11th Cir. 1994). Courts will attempt to reconcile principles of fairness and due process with the legal principle that a mistake of law is usually not a defense to a criminal prosecution. The defense of public authority and its variations are exceptions to that general principle, where fairness and due process prevent the prosecution of a defendant who relied on a government official's instruction or interpretation of the law.

One adaptation of this concept is where a defendant asserts a mistake of *fact – i.e.*, his honest but mistaken belief that he performed the charged offense in cooperation with the government – that negates specific criminal intent. In that situation, mistake of fact is an attack on the Government's ability to prove the intent. See *Baptista-Rodriguez*, 17 F.3d at 1363-68; *United*

*States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995).[19]/ Where, as here, the Government is required to demonstrate that Dr. Navarro "willfully" violated the law, it has the burden to prove that specific intent, and a defendant is entitled to present evidence to show that he lacked that specific intent. For example, the district court in *United States v. Alvarado*, 808 F.3d 474, 486 (11th Cir. 2015), which is cited in the Government's OMIL, declined to instruct the jury on the public authority defense after the defendant failed to present any qualifying evidence – but the court did instruct the jury that it could consider whether the defendant acted with an "innocent intent".

The other two versions of this concept – the defense of public authority and entrapment by estoppel – are affirmative defenses. In the defense of public authority, the defendant committed a criminal act, but did so in reasonable reliance upon a grant of authority from a government official. Entrapment by estoppel occurs when a government official commits an error and, in reliance thereon, the defendant violates the law.

> The difference between the entrapment by estoppel defense and the public authority defense is not great.  In the first, a government official commits an error and the defendant relies on it and thereby violates the law. . . .  In the second, a government official makes some statement or performs some act and the defendant relies on it, possibly mistakenly, and commits an offense in so doing.

*United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) (internal citations omitted).

Several cases focus on whether the government official must actually have the authority to direct the defendant to engage in the conduct at issue, or whether apparent authority suffices, *i.e.*, that the defendant reasonably believed that the official had that authority. The D.C. Circuit reversed convictions based on apparent authority in the 1976 Watergate case of *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) ) (reasonable reliance on an invalid search warrant). *See*

---

[19]/ *See also* the Justice Department's former *Criminal Resource Manual* at § 2055, an archived copy of which is available at https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense.

*also Alvarado*, 808 F.3d at 485 (The entrapment-by-estoppel defense differs from the public authority defense in that the latter requires that the government official who sanctions the illegal activity have actual authority to approve the defendant's criminal activity, whereas the entrapment-by-estoppel defense only requires that the official have apparent authority); *United States v. Juan*, 776 F.2d 256 (11th Cir. 1985); *United States v. Clegg*, 846 F.2d 1121 (9th Cir. 1988); *United States v. Mason*, 902 F.2d 1434 (9th Cir. 1990); *United States v. Hedges*, 912 F.2d 1397 (11th Cir. 1990); *United States v. Burrows*, 36 F.3d 875 (9th Cir. 1994); *United States v. Abcasis*, 45 F.3d 39 (2d. Cir. 1995); *United States v. Baker*, 438 F.3d 749 (7th Cir. 2006); *United States v. Bear*, 439 F.3d 565 (9th Cir. 2006). *But see United States v. Duggan*, 743 F.2d 59 (2d. Cir. 1984); *United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004).

It is the Government's burden to demonstrate beyond a reasonable doubt that Dr. Navarro committed the charged offenses in the first place, which includes proving that he acted with the requisite "willfully" *mens rea*. Dr. Navarro is entitled to challenge that evidence and is not bound by the prerequisites described in the Government's motion with regard to the public authority defense and entrapment by estoppel. Alternatively, Dr. Navarro should be permitted to offer both affirmative defenses of public authority and entrapment by estoppel, as he has met the requisite showings. With respect to the public authority defense, Dr. Navarro has explained that he asserted executive privilege at the direction of former President Trump. To the extent that the law is unclear about the extent to which a former President has the authority to invoke executive privilege *vis a vis* an incumbent President, surely it was reasonable for Dr. Navarro to rely on President Trump's apparent authority.[20]/ With respect to entrapment by estoppel, Dr. Navarro's actions were

---

[20]/ The Government's reference to the Eleventh Circuit's opinion in *Alvarado* for the elements of the public authority defense, including that "the official must have actually had the authority to permit him to engage in the criminal conduct in question" is inconsistent with this Circuit's decision in *Barker*. At a minimum,

consistent with decades of OLC opinions holding that senior presidential advisers are absolutely immune from congressional process when they decline to comply with congressional process for reason of executive privilege. If the Justice Department wishes now to reverse many years of carefully considered precedent, it is entitled to do so going forward, but a former senior presidential adviser like Dr. Navarro is entitled to rely on the Government's position at the time of the alleged offense.[21]/

### VI.     Dr. Navarro is Entitled to Present Relevant Evidence in his Defense

The Government seeks to preclude Dr. Navarro from presenting evidence or argument at trial with respect to several additional issues, including his claims of selective prosecution, government misconduct, information that would result in the "politization of the trial," and certain exhibits. The Court is well-positioned to rule on these issues and instruct the jury accordingly at trial.

Dr. Navarro agrees that a claim of selective prosecution is an issue to be determined by the Court, and not a matter of fact for a jury. He likewise agrees that it would be improper to comment on any potential punishment that might result if he is convicted, and that partisan politics usually have no place in a criminal trial. That said, this case was not born in a bubble divorced from reality or politics, and Dr. Navarro must be permitted to present relevant and admissible evidence that would undermine the Government's ability to prove each and every element of the charged offenses beyond a reasonable doubt. *See United States v. Gaudin*, 515 U.S. 506 (1995).

---

we are aware of no authority in this circuit requiring that a government official reasonably relied upon had actual, as opposed to apparent, authority.

[21]/ The Government's reliance on *United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) is tenuous. That case involved a January 6th rioter seeking review of his incarceration pending trial, where the defendant claimed that he "likely [had] a viable defense" based on the Due Process Clause that he was following the instructions of President Trump. Noting that the parties had not fully briefed the issue, the district court engaged in "some exploration" of three pre-1974 Supreme Court cases that form the basis for the entrapment by estoppel defense.

The Government will present evidence in its case in chief that Dr. Navarro was a senior adviser to then President Trump, that the Select Committee Investigating the January 6th Attack on the Capitol (which took place in the jurors' own city) issued a subpoena to Dr. Navarro, and that he refused to comply. Dr. Navarro submits that the members of the jury already will have been emersed in the present-day political environment, and the general principle of protecting a jury from political considerations should not be misused to deprive Dr. Navarro of his constitutional right to present a complete defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Crane v. Kentucky*, 476 U.S. 683 (1986; *California v. Trombetta*, 467 U.S. 479, 485 (1984).

Dr. Navarro should not be precluded from introducing evidence, either affirmatively or through cross-examination of the Government's witnesses, about the fact that the Select Committee was not properly formed or authorized under the House's own rules and its own authorizing resolution, or that its subpoena to Dr. Navarro was improperly authorized. If that is what the Government means by "irrelevant political dynamics within the Committee" (OMIN at 13), barring Dr. Navarro from offering discussing that would be inappropriate. An element of the charged offense that the Government must prove is that Dr. Navarro was "summoned as a witness *by the authority* of either House of Congress". 2 U.S.C. § 192 (emphasis added). The Supreme Court has consistently found that an accused may not be convicted of a § 192 violation where a congressional committee has exceeded its authority. *See Yellin v. United States,* 374 U.S. 109 (1963) (Section 192 conviction reversed where committee did not follow rules regarding executive session); *Gojack*, 384 U.S. 702, 716 ("The legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense."); *see generally Christoffel v. United States*, 338 U.S. 84, 85-90 (1949) (perjury conviction reversed where committee did not follow rules regarding quorum).

Similarly, Dr. Navarro is entitled to challenge the Government's allegation that he acted "willfully" by introducing evidence about former President Trump's directive that he assert executive privilege, and that Department has maintained for decades that President's senior advisors are immune from congressional process and cannot be prosecuted criminally for precisely what the Government accuses Dr. Navarro of doing here. As detailed further above, it is the Government's burden to demonstrate the "willfully" intent element of the offense, and Dr. Navarro is well within his rights to challenge evidence on that point by showing that he instead acted pursuant to President Trump's assertion of executive privilege, consistent with the Department's long-standing interpretation of the statute.

Further, Dr. Navarro is entitled to present an affirmative defense of entrapment by estoppel and reliance on public authority for the same reasons. Indeed, he is entitled to question whether he "made default" in the first place, where he repeatedly notified that Select Committee that President Trump had asserted executive privilege and requested that it negotiate the terms of his compliance directly with President Trump and his attorneys, consistent with the Supreme Court's admonitions. *United States v. United States House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983).

Dr. Navarro also reserves his right under the Sixth Amendment's Confrontation Clause to cross-examine government witnesses with respect to bias that would be relevant to their credibility. *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *United States v. Wilson*, 605 F.3d 985, 1003 (D.C. Cir. 2010). "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska*, 415 U.S. 308, 316 (1974). at 316 (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)). Bias evidence is always relevant under Federal Rule of Evidence 401 because "[a] successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 51

450 (1984) (holding that proffered testimony regarding prosecution witness's gang membership sufficed to show potential bias in defendant's favor, and such extrinsic evidence is admissible to show bias). The jury should also be permitted to hear about how the Government's investigation was conducted, and whether it was complete and reliable. *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995); *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000); *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997); *United States v. Hanna*, 55 F.3d 1456, 1460 (9th Cir. 1995).

The Government also seeks to preclude the defense from "proposed exhibits" that it claims are "irrelevant and inadmissible" OMIL at 13-14. It is referring to information that the defense produced pursuant to its obligations under Fed. R. Crim. P. 16. The defense has not yet identified its trial exhibits. Again, the Court is well-positioned to rule on those evidentiary issues at the appropriate time. While Dr. Navarro understands that presenting an email to one of President Trump's assistants on the same day he received the Select Committee's subpoena stating that President Trump "has invoked Executive Privilege" and asking her to "[p]lease share this with the Boss" presents hearsay issues, its admissibility would depend on the purpose and manner in which it is offered. If the recipient of that email (Elizabeth Harrington, former President Trump's spokesperson) were called to testify, either by the Government or the defense, Dr. Navarro should be permitted to ask her whether, in fact, she responded to the email as requested. Dr. Navarro submits that the Court should rule on the admissibility of the documents referenced in the Government's Motion, if and when they are proposed as exhibits by the defense, and as appropriate under the circumstances at trial.

Despite the unique nature of the charge and the fact that the statute explicitly notes that the charge a defendant can be deemed guilty of is a misdemeanor, Courts have long held that contempt of Congress defendants have the same rights as any other defendant facing a federal criminal charge. *See Russell v. United States*, 369 U.S. 749, 755 (1962) (interpreting 2 U.S.C. §

192 to require that federal courts must "accord a person prosecuted for this statutory offense every safeguard which the law accords in all other federal criminal cases.").  The exclusion of relevant evidence to a defense, especially at such an early juncture in the proceedings and as a result of an otherwise narrow ruling of the Court, would violate the longstanding Supreme Court precedent noting a guarantee that a criminal defendant can present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Holmes*, 547 U.S. at 325 (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998).  *Holmes* should provide us a general and broad shield against all the Government's claims that Dr. Navarro is not allowed to prevent certain defenses at trial.

## CONCLUSION

Wherefore, for the reasons set forth above, Dr. Navarro respectfully requests an Order dismissing the indictment with prejudice or, alternatively, denying the Government's Motions in Limine.

Dated: October 12, 2022                    Respectfully Submitted,

                                           E&W Law, LLC

                                           _____/s/ John S. Irving_____
                                           John S. Irving (D.C. Bar No. 460068)
                                           1455 Pennsylvania Avenue, N.W., Suite 400
                                           Washington, D.C. 20004
                                           Telephone: (301) 807-5670
                                           Email: john.irving@earthandwatergroup.com


                                           SECIL LAW PLLC

                                           _____/s/ John P. Rowley, III_____
                                           John P. Rowley, III  (D.C. Bar No. 392629)
                                           1701 Pennsylvania Ave., N.W., Suite 200
                                           Washington, D.C. 20006
                                           Telephone: (703) 417-8652
                                           Email: jrowley@secillaw.com


                                           BRAND WOODWARD LAW, LP

                                           _____/s/ Stanley E. Woodward, Jr._____
                                           Stan M. Brand (D.C. Bar No. 213082)
                                           Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                           1808 Park Road NW
                                           Washington, DC  20010
                                           202-996-7447 (telephone)
                                           202-996-0113 (facsimile)
                                           Stanley@BrandWoodwardLaw.com

                                           *Counsel to Dr. Peter K. Navarro*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

On October 12, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the government and Chambers.

     /s/ John S. Irving
John S. Irving (D.C. Bar No. 460068)