**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|   |   |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | )    **Case No. 22-cr-200 (APM)** |
| **PETER NAVARRO** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

_____

## MEMORANDUM OPINION AND ORDER

Defendant Peter K. Navarro stands accused of two counts of Contempt of Congress in violation of 2 U.S.C. § 192. The charges stem from his alleged refusal to produce documents and to appear for testimony in response to a subpoena issued by the now-defunct U.S. House of Representative's Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("Select Committee"). Defendant moves to dismiss the charges against him. Additionally, the government moves to preclude Defendant from raising certain defenses and introducing certain exhibits at trial.

For the reasons that follow, Defendant's motion to dismiss is denied and the government's motion _in limine_ is granted in part.

## I.

Defendant served as a senior advisor to President Donald J. Trump during all four years of his term of office. Def.'s Mot. to Dismiss the Indictment, ECF No. 35-2 [hereinafter Def.'s Mot.], at 1. He served in various capacities: Deputy Assistant, and later Assistant, to the President; Director of Trade and Manufacturing Policy; Director of the White House National Trade Council; and Defense Production Act policy coordinator during the COVID-19 pandemic. _Id._

On February 9, 2022, the Select Committee served Defendant with a subpoena for records and testimony.  Indictment, ECF No. 1 [hereinafter Indictment], ¶ 7.  The subpoena required Defendant to produce documents to the Select Committee on February 23, 2022, and to appear for a deposition on March 2, 2022.  *Id.* ¶ 9.  Defendant did not produce any records to the Select Committee on or before the return date.  *Id.* ¶ 15.  The next day, February 24, 2022, the Select Committee contacted Defendant by email to remind him of the missed deadline for producing records and of his upcoming deposition.  *Id.* ¶ 16.  Three days later, on February 27, 2022, Defendant responded by stating in part: "President Trump has invoked Executive Privilege in this matter . . . .  Accordingly, my hands are tied."  *Id.* ¶ 17.  The Committee wrote back the same day, rejecting Defendant's "stated reason for noncompliance with the subpoena and directing [him] to appear for his deposition as required."  *Id.* ¶ 18.

The next day, Defendant again said that he would not appear on the grounds of executive privilege.  *Id.* ¶ 19.  He wrote the "privilege is not mine to waive" and that it would be "incumbent on the Committee to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."  *Id.*  Later that same day, Defendant received a letter from the White House Counsel's Office, advising him that President Joseph R. Biden had "determined that an assertion of executive privilege is not in the national interest, and therefore is not justified, with respect to particular subjects within the purview of the Select Committee."  United States' Opp'n to Def.'s Mot., ECF No. 44 [hereinafter U.S. Opp'n], Ex. 5, ECF No. 44-5, at 2.  On March 1, 2022, the Select Committee "again rejected [Defendant's] stated reason for noncompliance with the subpoena and informed [him] again that he could assert any objections he may have on the record, on a question-by-question basis."  Indictment ¶ 20.  Defendant did not appear for his scheduled deposition on March 2, 2022.  *Id.* ¶ 21.

On June 2, 2022, a grand jury returned an indictment against Defendant, charging him with two counts of Contempt of Congress in violation of 2 U.S.C. § 192.  *Id.* ¶ 22–25.  Count One concerns his refusal to produce documents and Count Two relates to his failure to appear for testimony.

## II.

Defendant moves to dismiss the indictment.  *See* FED. R. CRIM. P. 12.  He first contends that "[a] prosecution for Contempt of Congress following a legitimate assertion of Executive Privilege precluding [Defendant's] appearance before the Select Committee . . . necessarily violates the doctrine of Separation of Powers and is unconstitutional."  Def.'s Mot. at 11–12.  That argument rests primarily on a series of opinions from the Department of Justice's Office of Legal Counsel ("OLC"), which he says stand for the proposition that senior counselors to the President are absolutely immune from compelled congressional process and therefore cannot be prosecuted for noncompliance.  *See id.* at 12, 14–17.  It matters not, Defendant continues, that he was not a senior advisor to a *sitting* President at the time he received the subpoena.  *See id.* at 12.  A former President has the right to assert executive privilege, which cannot be unilaterally undone by the sitting President.  *See id.* at 13.  President Biden's determination not to assert executive privilege therefore does not defeat his claim of immunity.

The court need not wade into these judicially uncharted constitutional waters because Defendant's testimonial immunity defense rests on an unsupported factual premise: that President Trump invoked executive privilege with regard to the Select Committee's subpoena.  Defendant has failed to come forward with any evidence to support the claimed assertion of privilege.  And,

because the claimed assertion of executive privilege is unproven, Defendant cannot avoid prosecution for contempt.[1]

### A.

The court has found no case that speaks to the manner in which a President must invoke executive privilege in response to a congressional subpoena to a former aide.  In other settings, however, the D.C. Circuit consistently has referred to a "formal claim of privilege."  In *Nixon v. Sirica*, for instance, the court disagreed with President Nixon's assertion that "whenever, in response to a grand jury subpoena, [a President] interposes a formal claim of privilege, that claim without more disables the courts from inquiring by any means into whether the privilege is applicable to the subpoenaed evidence."  487 F.2d 700, 713 (D.C. Cir. 1973).  In *Dellums v. Powell*, a civil case in which the plaintiffs sought certain White House recordings, the D.C. Circuit again rejected President Nixon's "contention that a formal claim of privilege on the generalized interest of presidential confidentiality, without more, works as an absolute bar to discovery of presidential conversations in civil litigation, regardless of the relevancy or necessity of the information sought."  561 F.2d 242, 245–46 (D.C. Cir. 1977).  And, in a case in which a plaintiff sought access to a government report, the D.C. Circuit said that for "the Government" "[t]o interpose an objection to disclosure based on Executive privilege '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual

---

[1] Defendant does not dispute that it is the court's responsibility pretrial to determine whether a valid invocation of privilege immunizes a person from prosecution. *See United States v. Bulger*, 816 F.3d 137, 146 (1st Cir. 2016) ("[O]ur across-the-board research suggests that resolving a defendant's claim that he is immune from prosecution pretrial, as opposed to at trial, is more the norm than the exception.") (citing cases); FED. R. CRIM. P. 12(b)(1) and (2) advisory committee's notes to 1944 adoption (identifying "immunity" as a defense or objection "capable of determination without a trial of the general issue").  The court accepts as true the facts alleged in the indictment and makes additional factual findings, as needed, as part of its analysis. *See* FED. R. CRIM. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").

personal consideration by that officer.'"  *McClelland v. Andrus*, 606 F.2d 1278, 1290 n.59 (D.C. Cir. 1979) (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)).[2]

As the party asserting immunity from congressional process, the court thinks it is proper to place the initial evidentiary burden on Defendant to come forth with *some* evidence to show that President Trump made a "formal claim of privilege" after "personal consideration" with respect to the Select Committee subpoena.  *Cf. Trump v. Thompson*, 20 F.4th 10, 40 (D.C. Cir. 2021) (placing the burden on the former President to overcome the sitting President's decision not to assert executive privilege with respect to records demanded by the Select Committee); *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (holding that the government bears the burden of proving executive privilege applies to communications involving "dual hat" presidential advisors).  But Defendant comes forward with no such evidence.

The parties agree that President Trump never personally conveyed to the Select Committee that he had directed Defendant not to appear based on executive privilege.  *See* Def.'s Mot. at 6–7; U.S. Opp'n at 2–3.  Defendant instead claims that he and the President had a "conversation" in which the President *privately* instructed him to assert privilege, and he then invoked on the President's behalf before the Select Committee.  *See* Mot. to Dismiss and Mot. in Lim. Hr'g Tr.,

---

[2] The court disagrees with the government that President Trump was required, at least initially, to make "particularized assertions" of privilege.  U.S. Opp'n at 8.  A "generalized claim of confidentiality," at least initially, would have been enough.  That is what the D.C. Circuit said in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974).  There, a special Senate investigative committee issued a subpoena to President Nixon for certain tape recordings.  *See id.* at 726.  Explaining its decision in *Nixon v. Sirica*, the court said that *Nixon* "requires a showing of the order made by the grand jury before a generalized claim of confidentiality [of presidential communications] can be said to fail, and before the President's obligation to respond to the subpoena is carried forward into an obligation to submit subpoenaed materials to the Court, together with particularized claims that the Court will weigh against whatever public interests disclosure might serve."  *Id.* at 730–31.  In other words, under the "decisional structure" established in *Nixon*, "a strong showing of need by another institution of government" must be made upon a "generalized claim" of privilege, and only then must the privilege holder make "particularized" assertions of privilege to enable a court to resolve competing considerations.  *Id.* at 730.  *See also Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 388 (2004) (rejecting the proposition that the Executive Branch "'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections" in response to a broad discovery demand in a civil case).

ECF No. 64 [hereinafter MTD/MIL Hr'g Tr.], at 19.  But Defendant offers no proof to support that assertion—he has offered neither a sworn affidavit nor testimony from him or the former President. His contention rests only on his counsel's representations, which are not evidence.  *See id.*  Without actual proof, the court cannot find that there was a formal invocation of privilege by the former President.  *Cf. Reynolds*, 345 U.S. at 7 (stating that "the privilege which protects military and state secrets" "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party"); *Dellums*, 561 F.2d at 248 (stating, in dicta, "[a]nalytically, there is much to be said for the proposition that . . . the presidential privilege must be claimed by the president or an official authorized to speak for the president"); *see* MTD/MIL Hr'g Tr. at 18–20 (defense counsel conceding that "[i]t is entirely ineffective for a former senior advisor to invoke privilege without an instruction to do it").

But even if the court were to accept that there was some "conversation" between Defendant and President Trump about executive privilege, that alone would not be enough to sustain Defendant's burden.  The court has not been told when that conversation occurred, its substance, or even whether it related to the Select Committee's subpoena.  Without such basic record facts, the court cannot determine whether President Trump made a "formal claim of privilege" after "personal consideration" with respect to the Select Committee's subpoena to Defendant. *McClelland*, 606 F.2d at 1290 n. 59.

This absence of evidence is notable for two reasons.  The first is that President Trump gave clear, written instructions to two other senior advisors who received subpoenas from the Select Committee, but not to Defendant.  Both former Chief of Staff Mark Meadows and former Deputy Chief of Staff Daniel Scavino received correspondence from President Trump directing them not to respond to the Select Committee's subpoenas.  In nearly identical letters dated October 6, 2021,

President Trump's counsel, Justin Clark, "instruct[ed]" Meadows and Scavino "to the fullest extent permitted by law" to: (1) "where appropriate, invoke any immunities and privileges [you] may have from compelled testimony in response to the Subpoena"; (2) "not produce any documents concerning [your] official duties in response to the Subpoena"; and (3) "not to provide any testimony concerning [your] official duties in response to the Subpoena." H.R. REP. NO. 117-284 [hereinafter Navarro/Scavino Report], at 124 (2022); H.R. REP. NO. 117-216 [hereinafter Meadows Report], at 58 (2022). Both men then presented their letters to the Select Committee. *See id.* Had the President issued a similar letter to Defendant, the record here would look very different.

Additionally, there is record evidence that President Trump directed Defendant to invoke executive privilege, but it relates to an entirely different subpoena. On November 18, 2021, the U.S. House Committee on Oversight and Reform's Select Committee on the Coronavirus Crisis subpoenaed Defendant for records and testimony. U.S. Opp'n, Ex. 6, ECF No. 44-6. Two days later, President Trump issued a public statement in which he said:

> The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020. It is a Witch Hunt that's been going on for years. Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign? I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments. The Witch Hunts must end!

U.S. Opp'n, Ex. 7, ECF No. 44-7. Thus, the only record evidence of Defendant having received an instruction from President Trump to invoke privilege came in response to a subpoena issued by a *different* congressional committee about a *different* subject more than two months before the

Select Committee issued its subpoena.  Defendant cannot rely on that instruction to avoid prosecution here.

Still, Defendant insists that the timing of the November 2021 public statement is not dispositive.  He says the public statement "remained President Trump's standing order to [him] with respect to the Select Committee's subpoena irrespective of any instruction to the contrary by President Biden's White House Counsel's Office."  Def.'s Reply to the Gov't's Opp'n, ECF No. 52 [hereinafter Def.'s Reply], at 7.  Defendant offers no authority for the proposition that a President can issue a "standing order" to invoke executive privilege, and the concept is contrary to precedent.  "Executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'"  *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 389 (2004) (citing *Reynolds*, 345 U.S. at 1)*.  It can be claimed only "after actual personal consideration by [the] officer" that controls the privilege.  *Reynolds*, 345 U.S. at 7, 8*.  A claimed "standing order" to assert executive privilege reflects neither the gravity of an invocation nor the required personal consideration of its merits.  This court will not be the first to recognize one.

## B.

Defendant also advances a different theory for dismissal pegged to President Trump's purported privilege invocation.  He contends that his refusal to comply with the Select Committee's subpoena must be excused because, once *he* asserted executive privilege, the Select Committee had "an obligation to go to the former President and assess whether there's been an invocation."  MTD/MIL Hr'g Tr. at 25.  It is not Defendant's privilege to waive, so the Committee had to make some inquiry of the former President to determine whether he formally invoked executive privilege.  And, because the Committee made no such effort, Defendant says, he cannot be prosecuted for contempt.  Def.'s Reply at 9–10 (arguing that the Committee's failure to engage

in "negotiation and accommodation" with President Trump forecloses Defendant's prosecution for contempt).

That contention, however, improperly places a burden on the Committee that belongs with the former President.  As the privilege holder, it was on President Trump to assert "a formal claim of privilege . . . after actual personal consideration."  *McClelland*, 606 F.2d at 1290 n.59 (internal quotation marks and citation omitted).  To be sure, the Supreme Court has emphasized that Congress and the President have maintained a "tradition of negotiation and compromise," without judicial involvement, to resolve disputes over Executive Branch records. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).  But that tradition presumes that the Executive Branch has in some way conveyed to Congress in the first instance that the Committee's demands are improper or unreasonable.  The Department of Justice's investigation identified no such communication here by President Trump, either to the Committee or to Defendant.  *See* MTD/MIL Hr'g Tr. at 44–47.  And Defendant, in the context of moving to dismiss the indictment, has offered no proof of President Trump's invocation.  The court cannot dismiss an indictment for contempt of Congress on the mere presumption that President Trump would have asserted executive privilege if only he had been asked.

In any event, Defendant is factually wrong that the Select Committee did not attempt to accommodate his assertion of executive privilege (as opposed to President Trump's).  According to the indictment, Defendant advised the Committee on February 27, 2022, that "President Trump has invoked Executive Privilege in this matter."  Indictment ¶ 17.  The Committee answered that "[t]here are topics, including those discussed in the [subpoena's cover letter], that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all. In any event, you must appear to assert any executive privilege objections on a question-by-

question basis during the deposition."  *Id.* ¶ 18 (alterations in original).  Defendant nevertheless

insisted that the "privilege is not mine to waive" and it is "incumbent on the Committee to directly

negotiate with President Trump and his attorneys regarding any and all things related to this

matter."  *Id.* ¶ 19.  The Committee once more responded that:

> there are topics that the Select Committee believes it can discuss
> with you without raising any executive privilege concerns at all,
> including, but not limited to, questions related to your public three-
> part report about purported fraud in the November 2020 election and
> the plan you described in your book called the 'Green Bay Sweep.'
> If there are specific questions that raise executive privilege
> concerns, you can assert your objections on the record and on a
> question-by-question basis.

U.S. Opp'n, Ex. 4, ECF No. 44-4, at 1.  The Committee thus attempted to negotiate terms with

Defendant that would have allowed him not to reveal his communications with the former

President, yet he refused to appear.

No matter, Defendant counters.  Relying on an OLC opinion from July 12, 2019, he insists

that, as a senior advisor to the President, he was not required to appear before the Select Committee

even on non-official matters.  MTD/MIL Hr'g Tr. at 64 (asserting the "it can't be that the

determining factor [as to whether a senior advisor must appear] is whether the subpoena happens

to touch on subject matter that is outside of Dr. Navarro or any other recipient's official duties");

*Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to*

*the President*, 43 Op. O.L.C. __ (July 12, 2019) ("*Testimonial Immunity Before Congress*").  The

cited OLC opinion does not, however, stand for such a broad proposition.  The opinion concerned

a congressional subpoena to Kellyanne Conway, a senior advisor to President Trump, about her

alleged violations of the Hatch Act.  *Testimonial Immunity Before Congress*, 43 Op. O.L.C. at *1.

OLC reaffirmed its longstanding position that "Congress may not constitutionally compel the

President's senior advisers to testify *about their official duties*."  *Id.* at *2   (emphasis added).

Because "the subject of the subpoenaed testimony plainly concerns Ms. Conway's official duties," OLC concluded that she could not be compelled to appear for testimony. *Id.* at *3. The OLC opinion therefore does not suggest that a senior advisor to the President can resist a congressional subpoena on matters related to his unofficial acts.

Still, Defendant contends that the Select Committee should have known, notwithstanding his silence, that President Trump intended to assert privilege based on prior actions, thereby excusing Defendant's failure to appear. He points to President Trump's earlier invocation of executive privilege as to Meadows and Scavino, as well as the President's filing of a lawsuit to prevent the Archivist of the United States from producing records to the Select Committee. Def.'s Reply at 10; *Thompson*, 20 F.4th at 16–17. But, if anything, those facts support the opposite inference. It was reasonable for the Select Committee to conclude that President Trump had *not* invoked executive privilege with respect to Defendant precisely because he had expressly asserted claims of privilege as to other senior aides who received Committee subpoenas. *Compare* Navarro/Scavino Report at 14–15 ("Mr. Navarro has also offered no evidence that former-President Trump has asserted executive privilege . . . Mr. Navarro's assertion cannot be valid because the Select Committee has not been provided with any invocation of executive privilege—whether formal or informal—by the former President."), *with id.* at 29–30 (acknowledging that Scavino had produced a letter from the President's lawyer asserting executive and other privileges, though concluding this was not a "formal assertion of privilege"), *and* Meadows Report at 22–23 (same as to Meadows).

### C.

Defendant also urges the court to dismiss the indictment because he did not receive fair notice that § 192 reached his refusal to appear before the Select Committee. That argument is

premised on a series of OLC opinions, which he says provide that "a senior Presidential advisor who has been directed to invoke executive privilege on behalf of a President is absolutely immune from congressional process."   MTD/MIL Hr'g Tr. at 70; *see also* Def.'s Mot. 4–5.   But, as Defendant concedes, that argument turns on whether President Trump in fact invoked executive privilege.   MTD/MIL Hr'g Tr. at 70–71, 73 (agreeing that whether President Trump asserted privilege is "the linchpin on many of these arguments").   The record demonstrates no such invocation.

Finally, Defendant asks the court to dismiss the indictment under the "rule of lenity" because he "had no notice that the Government would require a special assertion of privilege by a former president and/or advocate for the novel position that an incumbent president can decide the extent and applicability of a former president's privilege."   Def.'s Reply at 10.   But that argument misconstrues the rule of lenity.   That rule is one of statutory interpretation that is invoked only when a court discerns that there is "grievous ambiguity or uncertainty" in a criminal statute. *Muscarello v. United States*, 524 U.S. 125, 139 (1998) (internal quotation marks and citation omitted).   Defendant identifies no such ambiguity in the text of 2 U.S.C. § 192.

### III.

Next, Defendant maintains that the indictment must be dismissed because his prosecution violates his right to due process of law.   This argument rests upon the Select Committee's purported failure to follow certain rules authorizing its formation.   According to Defendant, when "an indictment relies upon the failure of the House to adhere to its own rules, it violates the Due Process Clause of the Constitution and must be stricken."   Def.'s Mot. at 18.   Defendant identifies two specific rules violations.   First, he asserts that the Select Committee's composition did not conform to § 2(a) of House Resolution 503, the resolution that established the Committee.

H.R. Res. 503, 117th Cong. (2021).  House Resolution 503 § 2(a) states that "[t]he Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader."  Def.'s Mot. at 21 (emphasis in original).  But the Select Committee only had nine Members, and Defendant contends that use of the term "shall" means that the Committee had to have 13 Members.  *Id.* at 21–22.  A contempt charge, he says, cannot lie when the investigating committee is composed of fewer Members than required.  *Id.* at 21–24.  Second, he asserts that the Select Committee failed to comply with § 5(c)(6)(A) of House Resolution 503. That section provides that the "chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena," subject to certain other House rules.  *Id.* at 24–26 (emphasis in original).  Defendant argues that the Select Committee lacked a "ranking minority member" "necessary to issue a subpoena and/or conduct a deposition" and, for that additional reason, his prosecution for contempt violates his due process rights.  *Id.* at 20, 24–27, 41.

The government's response is both procedural and substantive.  First, it argues that, under Supreme Court and D.C. Circuit precedent, a defendant charged with contempt under § 192 can assert a rules violation as a defense only if the alleged violation is first brought before Congress. *See* U.S. Opp'n at 14–19.  Here, because Defendant did not raise either violation before the Select Committee, he cannot assert them as defenses to contempt.  *Id.*  Second, even if these defenses are preserved, the government says that there were no rules violations.  More specifically, it contends that the House has interpreted House Resolution 503 to allow the Select Committee to operate with less than 13 Members, and the Committee in fact had a ranking minority member, Congresswoman Liz Cheney.  *Id.* at 24.  The court cannot, the government argues, adopt an interpretation of the

rules that is at odds with the House's.  *See id.* at 23–25.  Because the court holds that Defendant waived his rules-violation defense, it need not address the merits of the alleged violations.[3]

### A.

Generally speaking, a defendant charged under § 192 cannot assert a rules violation as a defense to contempt, unless he first raises the violation with the congressional committee before which he appears.  That rule has its origins in the Supreme Court's decision in *United States v. Bryan*.  In *Bryan*, the defendant at trial asserted that she was not guilty of contempt for refusing to produce records called for by a subpoena because a quorum of the committee was not present on the subpoena return date.  339 U.S. 323, 326–38 (1950).  She maintained that she could not obstruct a committee that was itself "organizationally defective."  *Id.* at 328.  The Court did not, however, reach the merits of her contention because it held that the defendant had waived that defense by not raising it before the committee.  *Id.* at 332.  Observing that a "subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase," the Court explained that "if respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she state her reasons for noncompliance upon the return of the writ."  *Id.*  The Court continued, "[t]o deny the [c]ommittee

---

[3] The court notes that the government's merits argument is incorrect in an important respect.  It contends that the court cannot read House Resolution 503 in the way Defendant advocates because the House "has expressed its views [on adherence to its rules] implicitly through ratification of the Committee's actions," including the contempt resolutions, and directly through amicus briefs filed in this case and in *United States v. Bannon*.  *See* U.S. Opp'n at 23–24.  But that argument is wrong.  The Supreme Court has said that a defendant's "duty to answer must be judged as of the time of his refusal."  *United States v. Rumely*, 345 U.S. 41, 48 (1953).  And, in *Gojack v. United States*, the Court expressly held that the actions of a committee and the House itself in referring a case for contempt "cannot be taken as retroactive authorization of the investigation and definition of the delegated authority."  384 U.S. 702, 715 n.12 (1966).

the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Id.* at 333 (cleaned up).

The Supreme Court has repeatedly reaffirmed the waiver rule announced in *Bryan*. *See Hutcheson v. United States*, 369 U.S. 599, 611 (1962) (stating that a due process objection "must be adequately raised before the inquiring committee before [it] is to be fully preserved for review in this Court"); *Deutch v. United States*, 367 U.S. 456, 469 (1961) (stating the need for an "adequate" objection as to pertinency of questions); *McPhaul v. United States*, 364 U.S. 372, 379–80 (1960) (holding that the defendant could not assert as defenses that (1) he did not possess the subpoenaed records and (2) that the records requested were not pertinent to the committee's inquiry because he did not raise either before the subcommittee). And the D.C. Circuit has not hesitated to enforce the *Bryan* waiver rule. *See Shelton v. United States*, 404 F.2d 1292, 1300 (D.C. Cir. 1968) ("Contempt which might be avoided if valid and timely objection is made and denied is not avoided by refusing to produce what one lawfully could not be required to produce if such objection had been made and denied.") (citing *Bryan*, 339 U.S. at 333, and *McPhaul*, 364 U.S. at 379).

There is a "corollary" to the rule announced in *Bryan*. *Id.* "The rule that the defendant must make his objections to the procedures of a congressional committee when he appears before the committee does not apply unless the ground of objection was known to the witness at that time." *Id.*; *Liveright v. United States*, 347 F.2d 473, 475–76 (D.C. Cir. 1965) (describing the "*Bryan-McPhaul* rule" as applicable when "the witness had fully perceived [the objection] at the time he appeared" before the committee, but holding it did not apply where, "at the time of his appearance, [the witness] was [not] aware, or had any reason to be aware, of the improper issuance of his subpoena"). That corollary was established in *Yellin v. United States*, 374 U.S. 109 (1963).

15

There, the Court excused the defendant's failure to raise his objection to rules violations before the committee because the defendant "was unable, at the time of his hearing[,] to tell from the actions of the [c]ommittee that his rights had been violated." *Id.* at 122. "It was not until [the defendant's] trial, when his attorney for the first time had an opportunity for searching examination, that it became apparent the [c]ommittee was violating its rules." *Id.* at 123.

Defendant concedes that he did not raise before the Select Committee either of the rules violations he now asserts as a defense. *See* Def.'s Reply at 12–16. And, sensibly, he does not contend that the "corollary" to the *Bryan* rule applies: Defendant plainly would have known that the Committee had fewer than 13 Members and purportedly lacked a ranking minority Member.

He instead asserts that the *Bryan-McPhaul* waiver rule is inapplicable. *See id.* at 14–16. He points to a pre-*Bryan* Supreme Court case, *Christofell v. United States*, to support his contention that his rules-violations defense remains preserved. *See id.* at 12–17. In *Christofell*, the defendant was convicted of perjury before a congressional committee. 338 U.S. 84, 85 (1949). The perjury statute penalized knowing falsehoods "before a competent tribunal, officer, or person." *Id.* at 85 n.2. The Court reversed the conviction on the ground that the committee did not qualify as a "competent tribunal" under the perjury statute because, at the time of the defendant's alleged false testimony, the committee lacked a quorum in violation of House "rules and practice." *Id.* at 89–90. The Court so held even though the defendant did not object to the absence of a quorum before the committee. *See id.* at 88.

Defendant contends that it is "difficult to reconcile the Court's holdings in *Christoffel* and *Bryan*," and he suggests that the only way to do so "is to recognize the distinction between the substantive due process guarantees afforded every defendant, with those objections that are waivable if not otherwise asserted." Def.'s Reply at 13–14 (citations omitted). Defendant does

not really develop this argument much further in his motion to dismiss. In later briefing, however, Defendant spells out more precisely what he means. There, he argues that, because § 192 requires "proof that a defendant was summoned '*by the authority* of either House of Congress,'" it would violate his "substantive due process rights to alleviate the Government from its burden to prove [the 'authority'] element of the offense by finding that he waived those rights by not asserting them earlier." Def.'s Opp'n to Gov.'s Omnibus Mot. in Limine, ECF No. 59 [hereinafter Def.'s MIL Opp'n], at 15 (quoting 2 U.S.C. § 192); *see also* Def.'s Reply at 12–16; *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("It can hardly be disputed that a specific, properly authorized subject of inquiry is an essential element of the offense under § 192.").

The court agrees that a defendant does not waive a rules violation as a defense by not raising it before Congress when adherence to the rule is required to prove an element of the offense. *See Christoffel*, 338 U.S. at 89 ("We are measuring a conviction of crime by the statute which defined it."), 90 (holding that the rules violation denied the defendant the "fundamental right" that "he be convicted of crime only on proof of all the elements of the crime charged against him"). The government agrees, as well. *See* MTD/MIL Hr'g Tr. at 50.

**B.**

That begs the question whether Defendant's claimed rules violations go to an element of the offense of contempt. Specifically, whether the purported rules violations negated the "authority" of the Select Committee to have "summoned [Defendant] as a witness . . . to produce papers" and testify. 2 U.S.C. § 192; *see also Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) (holding that the defendant's "rights were abridged when the subpoena was

issued without Subcommittee authorization").  If it did, the defense is preserved; if it did not, it is waived.[4]

A close read of House Resolution 503 demonstrates that neither the numeric composition of the Committee nor the presence of a ranking Member bears on the Committee's "authority" to summon witnesses.  Under the section heading "Procedure," House Resolution 503 provided that the Committee would be governed by "Rule XI of the Rules of the House of Representatives," "except" as set forth in the Resolution.  H.R. Res. 503 § 5(c).  One of the Resolution's enumerated exceptions concerned the authority to issue subpoenas.  *Id.* § 5(c)(4).  House Rule XI, Clause 2(m), which states the default House rule for the issuance of subpoenas, provides that "a subpoena may be authorized and issued by a committee or subcommittee . . . only when authorized by the committee or subcommittee, a majority being present."  H.R. Rule XI, Clause 2(m)(3).  It further states that "[t]he power to authorize and issue subpoenas . . . may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe."  *Id.*  The House elected not to follow the default rule when it established the Select Committee.  Instead, it vested power to issue subpoenas in the chair: "The chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of the rule XI . . . , including for the purpose of taking

---

[4] The court disagrees with the government's written contention that the "authority" element of the contempt of Congress statute "is not about a committee's operational rules," but is rather a "question of whether the Committee had the authority to investigate the particular subject matter to which the subpoena relates."  U.S. Opp'n at 21.  That narrow view of the "authority" element is contrary to both the Supreme Court's decision in *Gojack* and the D.C. Circuit's decision in *Shelton*.  In those cases, the courts reversed contempt convictions where rules were broken as to initiating the investigation (*Gojack*) and authorizing the defendant's subpoena (*Shelton*).  *See Gojack*, 384 U.S. at 704–05 & n.1 (reversing contempt conviction because "the subject of the inquiry was never specified or authorized by the [c]ommittee, as required by its own rules, nor was there a lawful delegation of authority to the Subcommittee to conduct the investigation," where the defendant had challenged "the jurisdiction of the [c]ommittee and Subcommittee" and "the authorization of each"); *Shelton*, 327 F.2d at 606–07 (reversing contempt conviction where the evidence established that the Subcommittee itself had not authorized the subpoena, as required by rule, but instead was done by Subcommittee counsel).  At oral argument, however, the government seemed to agree that the element of "authority" also encompasses the Select Committee's rules on subpoena issuance.  *See* MTD/MIL Hr'g Tr. at 52–53 (stating that if one of the Committee's "employees issued a subpoena and wrote it on a piece of paper and handed it to the defendant, that would not be a lawful process.  That would not be by authority of the Committee").

depositions." H.R. Res. 503 § 5(c)(4).  The Resolution further stated that "[s]ubpoenas authorized pursuant to this resolution may be signed by the chair of the Select Committee or a designee." *Id.* § 5(c)(7).  Nothing in House Resolution 503 required the Select Committee to be fully constituted before authorizing a subpoena.  Nor did it require approval or consultation with a ranking Member.  The House decided that the Committee's power to authorize and issue subpoenas rested with a single Member: the chair.  His approval was all that was required for the Committee to exercise the subpoena authority granted by the House.  Defendant's alleged rules violations therefore do not relate to the "authority" element that the government must prove at trial.  *Compare Gojack* and *Shelton*, *supra* note 4.  Accordingly, his failure to raise them before the Select Committee means he cannot rely on them as a defense in these proceedings.

Defendant also asserts two technical defects in the subpoena-issuance process that he says require dismissal: (1) the initial subpoena "omit[ed] any understandable description of where the deposition was to occur," and (2) the day before his scheduled deposition, Committee counsel sent him an email that changed the place of the deposition without "reissu[ing] the subpoena to move the location of the deposition."  Def.'s Mot. at 30–31.  Defendant raised neither of these concerns with the Select Committee, so he waived these claimed defects as defenses, too.  *See Bryan*, 339 U.S. at 333 (finding quorum objection waived where "[t]he defect in composition of the [c]ommittee, if any, was one which could easily have been remedied").

Finally, Defendant also implies that his waiver should be excused because it would have been futile for him to have raised the objections he does now.  Def.'s Mot. at 27 (arguing that, "had Dr. Navarro objected at the time of his deposition, his objections would have been ignored"). Neither the Supreme Court nor the D.C. Circuit has recognized a futility exception to the *Bryan-McPhaul* rule.  And, given the rationale of the rule, it is doubtful that higher courts would recognize

one.  *See Bryan*, 339 U.S. at 331 (stating that "persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery").  But even Defendant concedes that raising a timely objection might not have been futile.  As he admits, "the House Speaker could appoint all thirteen (13) Members to the Select Committee as was dictated by the passage of House Resolution 503, amend Resolution 503 so as to specify whether the appointment of 13 Members is required and/or clarify what role the Ranking Member and/or the Vice Chair is to play in accordance with House Rules."  Def.'s Mot. at 20 n.12.  Defendant's futility objection is itself futile.

**IV.**

Next, Defendant turns his attention to the element of pertinency.  He contends that "the indictment fails to establish that the information sought by the Select Committee was in fact pertinent to the matter under inquiry of the Select Committee."  Def.'s Mot. at 28.  More specifically, he asserts, the indictment "fail[s] to show how the information Dr. Navarro is believed to have relate[s] to any proffered 'valid legislative purpose' of the Select Committee."  *Id.* at 28–29.  He argues, for instance, that the indictment must establish the pertinency of each of the ten categories of records demanded of him.  *Id.* at 29.  The government responds that "the Indictment sufficiently alleges" pertinency and "Defendant's sufficiency arguments amount to an improper attempt to challenge, at [the motion to dismiss] stage, the sufficiency of the evidence that the Government will present at trial."  U.S. Opp'n at 28–29.

"Proof of pertinency is an affirmative element of the Government's case in any prosecution under 2 U.S.C. § 192."  *United States v. McSurely*, 473 F.2d 1178, 1203 (D.C. Cir. 1972).  The indictment itself must plead pertinency.  *Russell v. United States*, 369 U.S. 749, 755 (1962) ("It is

'incumbent upon the United States to plead and show that the question ([the defendant] refused to answer) pertained to some matter under investigation.'") (citation omitted).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

The indictment here satisfies these pleading requirements.  Paragraph 2 sets forth the subject matter of the Select Committee's inquiry: "To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex . . . and relating to the interference with the peaceful transfer of power." Indictment ¶ 2.  So, too, does paragraph 3.  *Id.* ¶ 3 (stating that one of the Committee's functions was to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol").  Paragraph 4 identifies some of the potential legislative outcomes, or "corrective measures," the Committee could recommend as a result of its work.  *Id.* ¶ 4.  Paragraph 8 quotes from the cover letter that accompanied the subpoena to Defendant.  *Id.* ¶ 8.  The cover letter explains that the Committee believed Defendant had relevant information to its inquiry, including that Defendant "reportedly worked with Steve Bannon and others to develop and implement a plan"—known as the "Green Bay Sweep"—"to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election." *Id.*  The Committee also noted that Defendant had publicly made claims about election fraud in multiple forums, including in his recently published book, interviews with reporters, and a podcast.  *Id.*  These allegations both identify the subject matter of the Select Committee's inquiry and the pertinency of Defendants'

records and testimony to that subject matter. The indictment therefore adequately apprises Defendant of the allegations relating to the element of pertinency.

Defendant seems to contend that, to establish pertinency, the indictment must explain how each of the ten categories of records sought from him might be used to further actual legislation. *See* Def.'s Mot. at 28–29 (referencing potential legislation identified in House Resolution 503). But Defendant defines the concept too narrowly. The requested information must be "pertinent to a subject matter properly under inquiry," not to a particular piece or category of legislation. *Rumely v. United States*, 197 F.2d 166, 177 (D.C. Cir. 1952), *aff'd*, 345 U.S. 41 (1953). The D.C. Circuit already has held that the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Thompson*, 20 F.4th at 41 (quoting *Mazars*, 140 S. Ct. at 2031–32). The only question therefore is whether the indictment sufficiently alleges that the information sought from Defendant was pertinent to the Select Committee's inquiry. For the reasons discussed, it does.

## V.

Defendant also asks this court to dismiss the indictment because of the government's purported failure to present exculpatory evidence to the grand jury. Def.'s Mot. at 40–42. Defendant concedes that "a prosecutor's failure to present exculpatory evidence to a grand jury generally does not require dismissal of an indictment," but argues that dismissal is nevertheless appropriate in this case. *Id.* at 40.

Grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring). A defendant seeking dismissal of an indictment based on misconduct before the grand jury "faces a very heavy burden."

*United States v. Trie*, 23 F. Supp. 2d 55, 61 (D.D.C. 1998).  "[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  "[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Id.* at 256 (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring)).

Defendant raises several points of objection to the grand jury proceedings.  First, Defendant argues that the grand jury "heard nothing about Dr. Navarro's reliance on over 50 years of Justice Department policy affirming that close presidential aides may not only assert Executive Privilege on a President's behalf, but are absolutely immune from complying with congressional process." Def.'s Mot. at 41.  But Defendant himself has not pointed to any evidence that he *actually* relied on 50-years-worth of OLC opinions when he refused to comply.  None of his communications with the Select Committee, for example, reference any OLC opinion or Department practice. *See* Navarro/Scavino Report at 2–5.  So, it is unclear what evidence of reliance the government failed to present to the grand jury.

Second, Defendant takes issue with the fact that an FBI Special Agent testified that the Select Committee had the authority to issue subpoenas, without informing the grand jury "about significant flaws with respect to the Select Committee's formation and authority, including the number of its members and the requirement that there be a ranking minority member."  Def.'s Mot.

at 41.  But, as discussed, the alleged "flaws" do not relate to an element of the offense or a valid, preserved defense.

Third, Defendant argues that there was no "discussion or guidance provided to the grand jury about the level of *mens rea* required by the statute." *Id.* at 42.  However, "the mere suspicion that the grand jury may not have been properly instructed with respect to [a] legal definition" does not entitle a defendant to dismissal of the indictment. *Trie*, 23 F. Supp. 2d at 62.  And Defendant has offered no more than mere suspicion to support his request.  None of Defendant's contentions establish an error before the grand jury that requires dismissal.

## VI.

Defendant next argues that his prosecution "was the result of unlawful selective prosecution." Def. Mot. at 32.  Defendant points to two other senior advisors to President Trump—Meadows and Scavino—who, like him, declined to comply with a Select Committee subpoena for records and testimony but, unlike him, were not prosecuted for their non-compliance. *Id.* at 33–35 ("[The Department of Justice] elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.").  Defendant argues that he is "similarly situated" to Meadows and Scavino, that the "Department [of Justice] provided no reasons for its different treatment of Dr. Navarro," and that "there is no apparent distinction between the conduct of the three individuals in their refusal to comply with the deposition subpoena for reasons of privilege." *Id.* at 34–35.  According to Defendant, the only explanation for the difference in treatment could be "unlawful and discriminatory reasons involving his public expression of political beliefs." *Id.* at 35.  The court previously denied Defendant's demand for discovery to bolster his selective prosecution claim, Memo. Op. and Order, ECF No. 55; it now denies his motion to dismiss on that ground for similar reasons.

24

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  A forbidden reason can include prosecution of a defendant based on his "political beliefs."  *Branch Ministries, Inc. v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C. 1999).  A selective prosecution claim requires that the defendant prove two elements: (1) that the decision to prosecute "had a discriminatory effect," and (2) that the decision "was motivated by a discriminatory purpose."  *Armstrong*, 517 U.S. at 465.  The Supreme Court has emphasized that a defendant asserting selective prosecution must meet a "demanding" standard.  *Id.* at 463.  "[T]he presumption of regularity applies to prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (internal quotation marks and alterations omitted).

## A.

To demonstrate a "discriminatory effect," a defendant must show that "similarly situated individuals" were not prosecuted.  *Armstrong*, 517 U.S. at 465.  "When a person's circumstances present no distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant."  *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (internal quotation marks omitted).  Legitimate prosecutorial factors include "relative culpability, the strength of the case against particular defendants, willingness to cooperate, and the potential impact of a prosecution on related investigations."  *United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009).

Defendant has failed to establish that he is similarly situated to Meadows and Scavino for two primary reasons.  First, both Meadows and Scavino received correspondence from President

Trump directing them not to respond to the Select Committee's subpoena. *See* Mot. to Compel Hr'g Tr., ECF No. 50 [hereinafter MTC Hr'g Tr.], at 46 (government counsel noting the "different way in which Mr. Meadows, Mr. Navarro, [and] Mr. Scavino, claimed that executive privilege was invoked"); Navarro/Scavino Report at 124; Meadows Report at 58. Both men presented their letters to the Select Committee. *See* Navarro/Scavino Report at 124; Meadows Report at 58. Defendant, on the other hand, as discussed previously, has presented no evidence that he received any direction from the former President to invoke any privileges or immunities with respect to the Select Committee subpoena. Navarro/Scavino Report at 2–5 (describing Defendant's communications with the Select Committee). The fact that Defendant received no specific instruction to invoke executive privilege, while Meadows and Scavino did, is a material difference and a legitimate prosecutorial factor that distinguishes Defendant from those men. Such factual distinctions matter. *See, e.g.*, *Judd*, 579 F. Supp. 3d at 7 (holding that a material difference between the January 6 rioters and the Portland, Oregon rioters was that the latter attacked "at night, meaning that they raged against a largely vacant courthouse"); *Khanu*, 664 F. Supp. 2d at 32 (accepting as a distinguishing feature that the indicted defendant "was more involved and took a leadership role in the conspiracy").

Second, both Meadows and Scavino, through their counsel, had extensive communications with the Select Committee about subpoena compliance. *See* MTC Hr'g Tr. at 46 (government counsel stating that "there was a different level of engagement" among the three men with the Select Committee). Meadows negotiated with the Select Committee for months in an effort to accommodate privilege objections. *See* Meadows Report at 12–19. Although he never sat for a deposition, Meadows did ultimately produce 2,300 text messages and a privilege log showing he withheld an additional 1,000-plus text messages based on various privileges. *See id.* at 19.

Scavino's counsel also engaged with the Select Committee for months, detailed the grounds for Scavino's assertion of privilege, and lodged objections to the Committee's purpose, composition, and the pertinence of its inquiry.  *See* Navarro/Scavino Report at 25–28, 79–161.

These interactions with the Select Committee stand in contrast to those of Defendant, who communicated with the Select Committee over a three-week period largely through terse emails and public statements.  *See id.* at 2–5, 51–63.  He made no apparent effort to accommodate the Select Committee, let alone produce records as Meadows did.  Instead, Defendant directed the Select Committee to negotiate directly with President Trump.  *Id.* at 63.  These are valid differences between Meadows, Scavino, and Defendant that could have led to their different treatment.  In sum, Defendant has failed to make "a credible showing of different treatment of similarly situated persons" because Meadows and Scavino are not similarly situated to him.  *Armstrong*, 517 U.S. at 470.

## B.

Defendant also has failed to proffer any evidence that his prosecution was motivated "because of" an arbitrary classification—in other words, he provides no evidence of "discriminatory purpose."  *Wayte v. United States*, 470 U.S. 598, 608, 610 (1985).  Defendant concedes that he does not possess "direct evidence of the Department's motivation," but argues that "the circumstantial evidence that is available is sufficient to raise an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs."  Def.'s Mot. at 35.  Defendant argues that his "public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the [Select] Committee," and that, maybe, "the Committee communicated that anger to the Department of Justice before or after it made its

criminal referral." *Id.* at 36.   None of this is evidence of discriminatory motive—it is simply speculation.

Defendant also points to the circumstances of his arrest as evidence of "selective animus," which, he thinks, could be "the result of communications between the Department of Justice, the Select Committee, and/or the White House."  *Id.* at 37.  Defendant argues that individuals charged with non-violent offenses "normally" are allowed to "self-report to court after being charged," and the fact that he was publicly arrested at an airport is evidence of discriminatory motive.  *Id.*  This, too, is mere speculation.  The court acknowledges that there are times when the government permits non-violent misdemeanants to self-surrender after being charged.  But the government has provided at least a plausible explanation for why it took a different course here.  *See* United States' Opp'n to Def.'s Mot. to Comp., ECF No. 33, at 16–17 (explaining that only a few days before his indictment, when case agents attempted to interview and serve Defendant with a subpoena, he initially refused to open the door and later told the agents to "get the f*** out of here").  Courts generally defer to law enforcement about the best way to bring a defendant before the court on a criminal charge.  Simply put, Defendant's evidence of discriminatory motive is completely lacking.

## VII.

Next, Defendant seeks to dismiss the indictment on the grounds that the decision to charge him was tainted with "undue political interference."  Def.'s Mot at 38.  Defendant points to the following as proof of politically motivated animus: (1) President Biden publicly expressed his belief that persons who defied the Select Committee's subpoena should be prosecuted; (2) an FBI agent testified before the grand jury that the Special Committee was properly constituted and authorized to issue the subpoena, suggesting contacts between the Select Committee and the

Department; (3) a Deputy White House Counsel contacted Defendant unsolicited to advise him that President Biden had decided not to invoke executive privilege as to testimony and records sought by the Select Committee, suggesting improper contact between the White House and the Department; and (4) the Department abandoned its 50-year-long precedent of not prosecuting former presidential advisors for not complying with a congressional subpoena. *Id.* at 38–40.

Defendant's "evidence" fails to prove "undue political influence." First, President Biden's statement makes no distinction about who to prosecute amongst those who defied Select Committee subpoenas; it cannot be that the President's public statement was so influential that it gave rise to Defendant's prosecution but not a prosecution of Meadows and Scavino. Second, the fact that an FBI agent testified before the grand jury about the formation of the Select Committee and its subpoena authority does not establish the Committee's collusion with the Department. The agent did nothing more than confirm the contents of House Resolution 503, as well as the House Rule that grants subpoena authority to committees and subcommittees. Def.'s Mot for Leave to File Under Seal Def.'s Mot. to Comp. Disc., ECF No. 30, Ex. 3, ECF No. 30-6, at 5–14. Third, Defendant neglects to mention that both Meadows and Scavino received similar communications from the White House Counsel's Office regarding executive privilege, yet neither were prosecuted. Meadows Report at 16–17, 88; Navarro/Scavino Report at 7. And, finally, even if the Department has departed from 50 years of precedent (which the Department denies), such exercise of prosecutorial discretion by itself is not proof of any undue political influence. *Wayte*, 470 U.S. at 607 ("[T]he Government retains 'broad discretion' as to whom to prosecute.") (quoting *United States v. Goodwin*, 457 U.S. 368, 382 (1982)).

This court notes that, even if the Defendant did provide sufficient evidence of undue political influence, it is far from clear what the court could do about it. This is a novel theory, and

Defendant cites no authority supporting the proposition that an indictment can be dismissed as a result of alleged undue political influence.  Def.'s Mot. at 38-40.

## VIII.

The court now turns to the government's motion *in limine*.  The government asks the court to exercise its gate-keeping function to preclude Defendant from raising certain "unavailable defenses and irrelevant evidence and argument" at trial.  United States' Omnibus Mot. in Limine, ECF No. 58 [hereinafter U.S. MIL], at 1–2.  For the reasons that follow, the court grants the government's request to preclude Defendant from raising defenses relating to his good faith beliefs about the law; public authority; selective prosecution; government misconduct; and the Select Committee's composition.  The court reserves on the defense of entrapment by estoppel.

## A.

The government first asks that Defendant not be allowed to contend "that there was an invocation of executive privilege that excused his noncompliance with the subpoena."  *Id.* at 3. It argues that "no President—sitting or former—invoked executive privilege with respect to the subpoena that the Committee issued to the Defendant," and "defendant's mistaken belief that the law excused his compliance . . . is not a valid defense to contempt of Congress."  *Id.* at 3–4.  As support, the government points to *Licavoli v. United States*, a D.C. Circuit decision holding that "he who deliberately and intentionally fails to respond to a subpoena 'willfully makes default'" for purposes of § 192.  294 F.2d 207, 208 (D.C. Cir. 1961).  "The intent essential to constitute an offense" is "a deliberate, intentional failure [to respond], without more, in each case."  *Id.*

The government is correct that *Licavoli* forecloses a defense premised solely on Defendant's claimed belief that President Trump's invocation of executive privilege excused his

nonappearance before the Select Committee.[5]  In *Licavoli* the court rejected "good faith reliance upon advice of counsel" as a defense to contempt.  *Id.* at 207; *see also Sinclair v. United States*, 279 U.S. 263, 299 (1929) ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel.  The gist of the offense is refusal to answer pertinent questions.  No moral turpitude is involved.  Intentional violation is sufficient to constitute guilt."), *overruled in part on other grounds by United States v. Gaudin,* 515 U.S. 506 (1995).  Defendant similarly cannot argue that his failure to appear was unintentional or not deliberate because he believed in good faith that President Trump's purported invocation of executive privilege excused his appearance.  *Licavoli*, 294 U.S. at 208 ("Evil motive is not a necessary ingredient of willfulness under this clause of the statute.  A deliberate intention not to appear is sufficient."); *see also Bryan*, 339 U.S. at 330 ("[W]hen the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of willful default."); Motions Hearing Transcript, *United States v. Bannon*, No. 21-cr-670-CJN, ECF No. 183, at 115-116 ("[Defendant] cannot present evidence regarding [advice of counsel, OLC opinions, and DOJ writings] to demonstrate that he believed he was not required to comply with the Subpoena, since that question is irrelevant to whether [he] deliberately and intentionally failed to comply with the Subpoenas.  So too with his assertions of privilege.  As a general matter, none of that evidence can justify his failure to appear or produce documents under *Licavoli*.").

---

[5] The court discusses below whether Defendant could rely on an actual invocation of executive privilege by the former President under the entrapment-by-estoppel and public authority defenses.

Defendant argues that his case is unlike *Licavoli* because it "implicates constitutional principles of separation of powers and invocations of executive privilege," and therefore Defendant should be permitted "to defend himself at trial by offering evidence to the jury about the legitimate reasons for which he declined to comply with the Select Committee's subpoena." Def. MIL Opp'n at 2–3. Put more bluntly, he says "that his assertion of executive privilege in a dispute between the Executive and Legislative branches of government takes this case outside the 'willfulness' framework of *Licavoli*." *Id.* at 8.

Defendant apparently believes the law applies differently to him. Because he is a former aide to the President of the United States, he contends, a more stringent state-of-mind standard applies, meaning that the government must be held to a higher burden of proof to convict him as opposed to the average person, who does fall within the "framework of *Licavoli*." *See id.* at 9 (arguing that, to prove willfulness, the government must "prove that he understood that his actions were unlawful, even if he was not aware of the particulars of the statutory provision violated"). But, of course, the proof required to satisfy the state-of-mind element of a criminal statute does change simply because the defendant is a former Executive Branch official who has resisted a congressional subpoena. *Cf. United States v. Nixon*, 418 U.S. 683, 706 (1974) (stating that the doctrine of separation of powers cannot "sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances"). Like any other person charged with a violation of § 192, Defendant cannot assert as a defense that he refused to appear because he had a good faith belief that he was not legally required to do so.

**B.**

The government next asks the court to preclude Defendant from asserting the affirmative defense of entrapment by estoppel. U.S. MIL at 5–7. It argues that Defendant has not made "the

required showing for [the] defense, [and] should not be permitted to present evidence or argument regarding [it] at trial." *Id.* at 6. Specifically, the government contends, Defendant "did not receive any direction from the former President with respect to the [Select] Committee's subpoena," and even if he did, it would not support this defense because "at that time, the former President was a private citizen, not a government official responsible for interpreting, administering, or enforcing the law." *Id.* at 7. Defendant responds that he "is entitled to present his defense that he acted upon a valid directive by former President Trump not to comply with the Select Committee's subpoena" and that his "actions were consistent with decades of OLC opinions holding that senior presidential advisers are absolutely immune from congressional process when they decline to comply with congressional process for reason of executive privilege." Def.'s MIL Opp'n at 16, 18–19. The fact that former President Trump was a private citizen is irrelevant because, in Defendant's view, reliance on apparent authority is sufficient to make out the entrapment by estoppel offense. *Id.* at 17–18.

Entrapment by estoppel is "a complete defense to criminal liability" and is available when a criminal defendant "reasonably relied on statements made by a government official charged with interpreting, administering, or enforcing the law defining the offense and those statements actively misled the individual to believe that his or her conduct was legal." *United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) (internal quotation marks omitted). It is a "narrowly tailored defense, available in very limited circumstances." *Id.* at 30. To successfully assert an entrapment by estoppel defense, a defendant bears the burden of proving (1) "that a government agent actively misled him about the state of the law defining the offense," (2) "that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense," (3) "that the defendant actually relied on the agent's misleading pronouncement in committing the

offense," and (4) "that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* at 31 (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).

This court finds that, without a more precise factual proffer, the entrapment by estoppel defense is not available to Defendant.  At most, Defendant has proffered through counsel that he had a "conversation" with President Trump from which he "understood he was supposed to invoke executive privilege."  MTD/MIL Hr'g Tr. at 23.  He has said nothing more.  Therefore, even if Defendant could assert as the basis for the defense that he perceived President Trump as having apparent authority to instruct him not to appear before the Select Committee, the court cannot assess, at a minimum, whether President Trump "actively misled [him]  about the state of the law" or whether his reliance was reasonable.  *Chrestman*, 525 F. Supp. 3d at 31.

The same is true of his claimed reliance on OLC opinions as a basis for an entrapment by estoppel defense.  The government has conceded that OLC opinions could constitute legal authority for purposes of an entrapment-by-estoppel defense.  MTD/MIL Hr'g Tr. at 56; *see United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) ("[T]here can be no question that [the defendant] had a right to look to the Corps of Engineers' regulations for guidance . . . [because,] while not controlling upon the courts by reason of their authority, [the regulations] do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance.").  Other than referencing OLC opinions, however, Defendant has never represented that he actually relied on any particular OLC opinion before he refused to comply with the Select Committee's subpoena.  Thus, just as with his claimed reliance on President Trump's instruction, Defendant has not made a proffer of evidence from which the court can determine the validity of an entrapment-by-estoppel defense at this stage.

**C.**

The government requests that Defendant be precluded from raising a public authority defense, similarly arguing that the Defendant has not made "the required showing for [the] defense, [and] should not be permitted to present evidence or argument regarding [it] at trial."  US MIL at 6.  "The public authority defense is narrowly defined."  *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015).  A defendant "will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."  *Id.*  First, "a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct."  *Id.*  "Second, the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question."  *Id.*

The government argues that "former President Trump never gave [Defendant] a direction not to comply with the Committee's subpoena" and, "[i]n any event, the former President was not then a law enforcement officer with authority to permit the Defendant to engage in criminal conduct."  U.S. MIL at 8.  Defendant responds that "he asserted executive privilege at the direction of former President Trump," and even if the law was unclear on whether "a former President has the authority to invoke executive privilege *vis a vis* an incumbent President, surely it was reasonable for Dr. Navarro to rely on President Trump's apparent authority."  Def.'s MIL Opp'n at 18.

The public authority defense is unavailable to Defendant.  Even if President Trump did direct Defendant not to appear before the Select Committee, he was a private citizen at the time without "actual authority to approve the defendant's criminal activity."  *Alvarado*, 808 F.3d at 485.

Defendant's defiance based on the *apparent* authority of the former President is not enough to make out a public authority defense. *Id.* ("The entrapment-by-estoppel defense differs from the public authority defense in that the latter requires that the government official who sanctions the illegal activity have actual authority to approve the defendant's criminal activity, whereas the entrapment-by-estoppel defense only requires that the official have apparent authority."). For the stated reasons, the Defendant is foreclosed from raising the public authority defense at trial.

**D.**

Next, the government asks to foreclose Defendant from raising any "objections to the composition of the Committee that issued his subpoena" "because he failed to raise such objections before the Committee at the time of his non-compliance." U.S. MIL at 8–9. The court agrees. For the reasons stated in Section III, Defendant has waived all arguments concerning objections to the Select Committee's composition (or any other rules violations that do not go to the Select Committee's authority to subpoena him) and will not be permitted to raise them at trial.

**E.**

The government next requests that Defendant be barred from raising a selective prosecution defense. US MIL at 10–12. "[T]he issue of selective prosecution is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (internal citations omitted). Defendant "agrees that a claim of selective prosecution is an issue to be determined by the Court, and not a matter of fact for a jury." Def.'s MIL Opp'n at 19. Accordingly, the parties agree that Defendant cannot raise a defense of selective prosecution before the jury.

## IX.

The court now turns to a catch-all request.  The government urges the court to disallow Defendant from raising "irrelevant evidence" and "improper arguments" at trial because, in the government's view, the evidence and arguments in question "are irrelevant to guilt or innocence and thus also inadmissible at trial."  U.S. MIL at 1–2, 11.  Specifically, it asks to preclude Defendant from raising arguments regarding the following: (i) "that other individuals referred by [the Select Committee] were not ultimately charged," (ii) government misconduct (including, but not limited to, the circumstances of his arrest), (iii) "that he was prosecuted because of his speech or political beliefs,"  (iv) "that contempt of Congress prosecutions are infrequent," (v) "that his prosecution is unprecedented," (vi) the potential penalties of the charged offense, (vii) the misdemeanor nature of the offense, and (viii) abuse of the grand jury process.  *Id.* at 10–12.  The court agrees that these arguments are not relevant to any element of the charged offenses or any valid defense, and thus will not be permitted at trial.

The first five arguments listed above simply repackage Defendant's selective prosecution defense.  In essence, Defendant would be arguing that "contempt of Congress prosecutions are infrequent" making his prosecution "unprecedented."  He would further argue that the fact that he was charged when "other individuals referred by Congress were not ultimately charged"—coupled with the circumstances of his arrest—is evidence of government misconduct and proof that he was "prosecuted because of his speech or political beliefs."  These arguments are impermissible for the reasons stated in Section VI.

The government seeks to preclude Defendant from referencing potential penalties and from "suggesting to the jury that his crimes do not matter" because "they are misdemeanors."  *Id.* at 11.  Any reference to the potential penalties of the charged offense would be improper because the

"jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. . . . Information regarding the consequences of a verdict is therefore irrelevant to the jury's task." *Shannon v. United States*, 512 U.S. 573, 579 (1994).  The court has no reason to believe Defendant intends on suggesting to the jury that the misdemeanor nature of his crimes means they do not matter.  In any event, any suggestion to that effect would be improper. *See United States v. Wade*, 962 F.3d 1004, 1012 (7th Cir. 2020) (stating that "a defendant has no right to argue for the jury to disregard the law" and arguments aimed at suggesting to the jury that the "crime was not all that serious or harmful" are improper attempts at "jury nullification").

Finally, the court precludes Defendant from raising arguments related to alleged grand jury abuses, because such arguments are not relevant to the crimes charged.

## X.

Finally, the government asks the court to "carefully guard against politicization during trial," and to preclude "general commentary on the political affiliations of Members of Congress" and "arguments about the Congressional vote count on the Defendant's contempt resolution." U.S. MIL at 12.  It asks this court to exercise its "broad discretion to limit the Defendant's cross-examinations" with respect to these issues because they do not "go to the elements of the offenses charged, and serve only to invite the jury to make improper political considerations during their deliberations." *Id.*  The government further urges the court to preclude Defendant from introducing certain exhibits at trial.  *Id.* at 13–16.  The court defers ruling on these requests at this juncture and will address them at the pretrial conference.

## XI.

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 34, is denied, and the government's Motion *in limine*, ECF No. 58, is granted in part.


Dated:  January 19, 2023

_____
Amit P. Mehta
United States District Court Judge