**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### DEFENDANT'S RESPONSE TO THE GOVERNMENT'S BRIEF

The government's Brief (March 14, 2023) (ECF No. 79) is noteworthy primarily for what it does not answer.  Can a former senior Presidential adviser be prosecuted for contempt of Congress for asserting a former President's privilege to withhold information from a congressional committee?  Never before has a senior Presidential adviser been charged with contempt of congress pursuant to 18 U.S.C. § 192, because the position of the Department of Justice has long been that, "[t]he balancing required by the separation of powers demonstrates that the contempt of Congress statute *cannot be constitutionally applied* to an executive branch official. . . ."  *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 at 139 (May 30, 1984) ("Olson Memo") (emphasis added).  The Olson Memo further advises:  "We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, *would surely conclude* that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege *is not consistent with the Constitution.*"  *Id.* at 141 (emphasis added).  That was forty (40) years ago.

Relevant here, the "context" considered by the Olson Memo involved an assertion of executive privilege by an incumbent President.  The question now presented by the Court is

1

whether the same constitutional bar to prosecution applies to the invocation of privilege by a former President – a question the government fails to answer.  Instead, the government asserts, because Congress *would have overcome* former President Trump's assertion of executive privilege as to Dr. Navarro, he may now be prosecuted under the contempt of congress statute. Brief at 12-13 (March 14, 2023) (ECF No. 79).  However, whether the Presidential privilege may be overcome is a different question than whether a close Presidential adviser may be prosecuted for contempt of Congress for acting to assert a President's privilege to withhold information from a congressional committee.[1]  This conclusion is supported by an unbroken line of OLC opinions from both Republican and Democratic administrations spanning more than five (5) decades, the Department of Justice has steadfastly and consistently declined to use the statute against senior advisers to the President based upon the constitutional considerations giving rise to this precedent.  Alternatively, the government submits, prosecution is permissible because only the incumbent President can determine whether a former President's privilege bars

---

[1] The identification of sensitive information deemed subject to executive privilege by the President, "gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf." *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019). Thus, assuming, *arguendo*, the invocation of presidential privilege by former President Trump as to Dr. Navarro's appearance before the Select Committee, Dr. Navarro was duty-bound to comply with former President Trump's directive.  To that end, as the Supreme Court has recognized: "it is the province and duty of this Court 'to say what the law is' with respect to the claim of [executive] privilege.'" *Nixon*, 418 U.S. at 705 (quoting *Marbury v. Madison*, 5 U.S. 1 (Cranch) 137, 177 (1803)).  *See also Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973) ("That the privilege is being asserted by the President against a grand jury does not make the task of resolving the conflicting claims any less judicial in nature. Throughout our history, there have frequently been conflicts between independent organs of the federal government, as well as between the state and federal governments. When such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them – one Supreme Court.").  Even assuming, *arguendo*, that the Select Committee were to obtain a court order overcoming former President Trump's assertion of presidential privilege, similar to the framework outlined by the Court in *Comm. on the Judiciary v. Miers*, Dr. Navarro's failure to comply with a court order could subject him to the entirely different charge of contempt of court.  *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-76 (D.D.C. 2008) ("When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the 'contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even,  we believe, a referral to a grand jury of the facts relating to the alleged contempt.'  Instead, 'Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a *civil action* for enforcement of a congressional subpoena.'" (quoting Olson Memo at 137, 142) (emphasis added)).

prosecution – a rationale inherently in conflict with the analysis provided by the Department forty (40) years ago.[2]

"Because '[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately,' the privilege 'safeguards the public interest in candid, confidential deliberations within the Executive Branch.'" *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quoting *Nixon v. GSA*, 433 U.S. 447; *United States v. Nixon*, 418 U.S. 683, 708 (1974).  Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the President powers ranging from command of the military, U.S. Const. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2, *id.* § 3, to name a few.  Decision making in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the President and his trusted advisers.  As such, both the Constitution and common law recognize

---

[2] The government also argues that Dr. Navarro has failed to provide the government sufficient notice of his intent to assert the defense of entrapment by estoppel.  Yet, as the government acknowledges, Dr. Navarro notified the government of his intention to assert an entrapment by estoppel defense on August 17, 2022 (ECF No. 36), a fact both defense counsel and the Court overlooked at the January 27, 2023 pretrial conference.  Since that time, the government has advised that the Department's view is that only an incumbent President can invoke the presidential privilege to withhold information from a congressional committee.  Indeed, even government counsel acknowledges this novel position:  "In other words, the Government stated that it was the position of the Department of Justice that if there is a proper invocation of executive privilege by a *former* President with respect to a *former* senior adviser as to official matters, that the adviser's refusal to appear would not be subject to prosecution for contempt.  This was a mistake."  Brief at 7 (March 14, 2023) (ECF No. 79).  Dr. Navarro could not reasonably have anticipated that the government would abandon forty (40) years of precedent in adopting this novel view.  Nor is the government prejudiced by Dr. Navarro's assertion of the defense of entrapment by estoppel.  *See Holmes v. South Carolina*, 547 U.S. 319, (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  *See also United States v. Carpenter*, 2023 U.S. Dist. LEXIS 21774, at *2-3 (D.D.C. Feb. 9 2023) ("[T]he Constitution guarantees to criminal defendants the right to a meaningful opportunity to present a complete defense. . . This limits courts' ability to impose arbitrary rules of evidence, including those that exclude important defense evidence without serving any legitimate interests, or are otherwise disproportionate to the purposes they are designed to serve." (internal quotations omitted) (quoting *Holmes*, 547 U.S. at 324) (quoting *Crane*, 476 U.S. at 690).Ultimately, it will be Dr. Navarro's burden to prove facts sufficient to warrant such an instruction.

a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997).

"The canonical form of executive privilege . . . is the presidential communications privilege[,] [which] allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" *Thompson*, 20 F.4th at 25 (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997)).  Specifically, the presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885 (D.C. Cir. 2021), that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities . . . of his office . . . and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713).  The presidential communications privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely, "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege." *Protect Democracy Project*, 10 F.4th at 885-86 (quoting *In re Sealed Case*, 121 F.2d at 745-46).  The privilege seeks to ensure that, "[a] President and those who assist him [remain] free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."

*Nixon*, 418 U.S. at 708.  Yet, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."  *Id.* at 705.  This chilling effect is exacerbated where close Presidential advisers were to, "face criminal liability[] simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair [the President's] ability to enforce the law."  Olson Memo at 137.

Thus, to ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege serves as a shield to disclosure of those must trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, . . . in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process."  *Judicial Watch, Inc.*, 365 F.3d at 1115 (internal citations omitted).  That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."[3]  *Nixon*, 418 U.S. at 708.

---

[3] For the first time in this briefing, the government argues that any bar against the prosecution of close Presidential advisers for acting to assert a President's privilege to withhold information from a congressional committee has been waived by Dr. Navarro's purported failure to raise the same with the Select Committee.  Not only was Dr. Navarro's assertion of executive privilege clear and unambiguous, but Dr. Navarro cannot waive constitutional considerations that give rise to a bar against prosecution of close Presidential advisers.  Moreover, the policy expressed by the Court in *United States v. Bryan*, 339 U.S. 323, 330-34 (1950), is inapplicable here where Congress could not determine the applicability of the privilege invoked.  See also Marbury v. Madison 5 U.S. 137, 176-77 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. ... Certainly, all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.").  Nor does *Hutcheson v. United States*, 369 U.S. 599 (1962), enable prosecution over the constitutional concerns identified.  *See Id.* at 608-612 ("We agree, of course, that a congressional committee's right to inquire is 'subject to' all relevant 'limitations placed by the Constitution on governmental action,' including 'the relevant limitations of the Bill of Rights'. . . that such limitations go beyond the protection of the self-incrimination clause of the Fifth Amendment. . . and that nonreliance on one such limitation does not preclude reliance on another." (internal citations omitted)).

Notably, as the Olson Memorandum clearly articulates, the constitutional bar to prosecutions of executive branch officials is necessary because otherwise, "the President [would be] deter[red] from asserting executive privilege," resulting in a "significant *in terrorem effect*" inconsistent with the "constitutionally prescribed separation of powers, [which] precludes Congress's use against the Executive of coercive measures that might be permissible with respect to private citizens."  Olson Memo at 137-138 (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807)).  Subsequently, the Department has opined that senior Presidential advisers are *immune* from compulsory subpoenas by Congress:  "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committees disliked, or embarrass and weaken the President for partisan gain."[4]  *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014) ("Thompson Memo").  "[A] presidential adviser's immunity is derivative of the President's."  *Id.*

Moreover, the Department has also opined that testimonial immunity applies equally to current and former close Presidential advisers: "Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled

---

[4] The government erroneously argues that a close Presidential adviser may be prosecuted for contempt of Congress where that adviser follows a President's privilege by withholding documents from a congressional committee.  Yet the only basis for the contempt referral as against Administrator Gorsuch was her refusal to produce documents responsive to congressional inquiry.  Nevertheless, the Department concluded that Administrator Gorsuch could not constitutionally be prosecuted for contempt of congress.  *See* Olson Memo at 105-107.  In an effort to minimize the applicability of the Olson Memo to Dr. Navarro, the government contends that the constitutional bar against prosecution of close Presidential advisers applies only where the adviser has, "withh[eld] specifically identified privileged documents from his or her subpoena response."  Brief at 18 (March 14, 2023) (ECF No. 79).  This novel interpretation of OLC memoranda cannot be reconciled with the constitutional considerations barring the prosecution of close Presidential advisers.

6

congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192-93 (2007) ("Bradbury Memo"). *See also Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C., at *2 (Jul. 12, 2019) (slip opinion) ("This Office recently addressed in detail the testimonial immunity of senior presidential advisers in an opinion concerning the former Counsel to the President.  Recognizing that the Executive Branch has invoked this immunity for nearly 50 years, we reaffirmed that Congress may not constitutionally compel the President's senior advisers to testify about their official duties." (internal quotations omitted)).  Without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *GSA*, 433 U.S. at 449.

Nor does the constitutional bar against the prosecution of close Presidential advisers for acting to assert a President's privilege to withhold information from a congressional committee depend upon the invocation of Privilege by the incumbent President.[5]  President Truman

---

[5] The government acknowledges the presidential communications privilege, "may be asserted by both current and former Presidents."  Brief at 15 (March 14, 2023) (ECF No. 79).  It then again asserts that former President Trump did *not* assert the privilege with respect to Dr. Navarro.  However, the Supreme Court has recognized that, "our precedent provides no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections." *Cheney v. United States Dist. Court*, 542 U.S. 367, 388 (2004).  And while this Court identified, "no case that speaks to the manner in which a President must invoke executive privilege in response to a congressional subpoena to a former aide," Order at 4-6 (Jan. 19, 2023) (ECF No. 68), the Court ultimately concluded that, "it is proper to place the initial evidentiary burden on [a] Defendant to come forth with some evidence to show that [a] President . . . made a 'formal claim of privilege' after 'personal consideration' of the [congressional] subpoena [at issue]." *Id.* at 5.  With respect, the Court's holding erroneously places the initial burden of demonstrating an assertion of executive privilege on a former senior Presidential adviser – an initial burden not supported by any prior precedent. "Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the 'hurly-burly, give-and-take of the political process between the legislative and the executive." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).  While the government alleges that testimonial immunity could not have applied to Dr. Navarro given the scope of the Select Committee's subpoena and Dr. Navarro's role in the White House, this assertion does not bear on the question of whether a close Presidential adviser may be prosecuted for contempt of congress for acting to assert a former President's privilege to withhold information from a

succinctly explained how important it was for immunity to continue after a President's term in

office nearly 70 years ago:

> '[I]f the doctrine of separation of powers and the independence of the
> Presidency is to have any validity at all, it must be equally applicable to a
> President after his term of office has expired when he is sought to be
> examined with respect to any acts occurring while he is President.  The
> doctrine would be shattered, and the President, contrary to our fundamental
> theory of constitutional government, would become a mere arm of the
> Legislative Branch of the Government if he would feel during his term of
> office that his every act might be subject to official inquiry and possible
> distortion for political purposes.'

Bradbury Memo at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13,

1953, at 14).  Thus, it is beyond dispute that the important considerations which give rise to a

constitutionally based and presumptively valid privilege apply equally to incumbent as well as to

former Presidents.[6]  "A former President must be able to successfully invoke the Presidential

communications privilege for communications that occurred during his Presidency, even if the

current President does not support the privilege claim."  *Trump v. Thompson*, 142 S. Ct. 680, 680

(2022) (Kavanaugh, J., respecting denial of application for stay).  Nor can an incumbent

President override the privilege assertion of a former President.  As Justice Kavanaugh opined:

> If Presidents and their advisers thought that the privilege's protections
> would terminate at the end of the Presidency and that their privileged

---

congressional committee.  *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C., at *4 (July 12, 2019) (slip opinion) ("Congress frequently claims an interest in investigating allegations of official impropriety, yet the Executive Branch has never suggested such an interest negates testimonial immunity. To the contrary, the White House has repeatedly invoked immunity in such cases. . . Testimonial immunity would provide scant protection if it gave way whenever a congressional committee attempted to compel testimony based on claims of improper or unlawful activity by those advisers or other executive branch officials.").

[6] Contrary to the government's assertion, nowhere does the Olson Memo conclude that an assertion of executive privilege by a former president is not "presumptively valid."  Brief at 12 (March 14, 2023) (ECF No. 79).  Indeed, in its very next paragraph, the government acknowledges the Supreme Court's recognition that the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), had merely concluded that assuming the privilege applied, it would have been overcome in any event.  Brief at 13 (March 14, 2023) (ECF No. 79) (citing *Thompson*, 20 F.4th at 38 n.2; *Trump v. Thompson*, 142 S. Ct. 680 (2022)).  Moreover, the D.C. Circuit's consideration of the issue was limited to whether the National Archives and Records Administration could grant Congress access to otherwise restricted materials under 44 U.S.C. § 2205(2)(C) and 36 C.F.R. § 1270.44.  *See Thompson*, 20 F. 4th at 20.

> communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe.  Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681.

Once again, whether the Presidential privilege may be overcome is a different question than whether a close Presidential adviser may be prosecuted for contempt of Congress for acting to assert a President's privilege to withhold information from a congressional committee.  Thus, *Thompson* is not dispositive insofar as the issue there was:  "whether, despite the exceptional and imperative circumstances underlying the Committee's request and President Biden's decision, a federal court can, at the former President's behest, override President Biden's decision not to invoke privilege and prevent his release to Congress of documents in his possession that he deems to be needed for a critical legislative inquiry."  20 F.4th at 16.  Specifically, The Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-2209, specifically prescribes a process for former Presidents to shield from disclosure records from that President's Administration.  *Id.* at 28.  However, the Act also provides that an incumbent President can override an assertion of presidential privilege by a former President.  *Id.* at 28-32.  The PRA applies *only* to Presidential Records in the possession of the Archivist and therefore has no bearing on *any* testimony, whether congressional or otherwise, or records in the possession of a former close Presidential adviser.

**CONCLUSION**

Throughout this prosecution, the government has studiously avoided a central legal question:  what privileges and immunities does a former President have with respect to Congressional inquiry of his close advisers.  To answer the Court's question directly, a former

close Presidential adviser may not be prosecuted for contempt of Congress for acting to assert to assert a former President's privilege to withhold information from a congressional committee.

Accordingly, whether the former President in fact directed Dr. Navarro to assert the presidential privilege on his behalf is a question of fact that has to be decided for the conviction of Dr. Navarro to occur.[7]

[SIGANTURE ON NEXT PAGE]

---

[7] The government has cited no authority for the *requirement* that the factual determination of whether former President Trump invoked his presidential privilege as to Dr. Navarro is to be made pretrial.  Brief at 18 (March 14, 2023) (ECF No. 79).  In *United States v. Bulger*, 816 F.3d 137 (1st Cir. 2016), merely held that it was not error for the trial court to have made a determination pretrial as to the defendant's claim of prosecutorial immunity.  *Id.* at 146-48.  Here, the parties agree that the trial court may make a factual determination – supported by findings on the record – with respect to former President Trump's invocation of his presidential privilege.  Where the parties disagree is on the question of whether a sufficient factual record has yet been developed.  *See United States v. Poindexter*, 698 F. Supp. 300, (D.D.C. 1988) (holding a "substantial preliminary inquiry" and citing "procedures approved by [the D.C. Circuit] for resolving issues of immunity pretrial: "A trial court faced with a pretrial motion to dismiss the indictment because of immunity granted by Federal or State Governments has basically four alternative procedures for determining whether or not the prosecution's evidence is tainted: (1) it can hold a pretrial evidentiary hearing . . ." (quoting *United States v. De Diego*, 511 F.2d 818, 823-24 (D.C. Cir. 1975)).  *See also McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019) (acknowledging the "legal duty on the part of the aide to invoke the privilege on the President's behalf").  The question here is whether it would be prudent for the trial court to "wade into these judicially uncharted waters" – waters that are politically charged – and determine the credibility of Dr. Navarro and/or former President Trump with respect to a presidential privilege invocation here.  To that end, Dr. Navarro reiterates his position that he had requested an evidentiary hearing on the question of former President Trump's invocation because that issue had not been raised – neither the Select Committee in their contemporaneous communications with Dr. Navarro, the Department in its presentation of evidence to the grand jury, or the Department in its indictment of Dr. Navarro for contempt of congress unequivocally asserted that former President Trump had failed to properly invoke executive privilege, let alone that Dr. Navarro should have known that the invocation was insufficient.  Given that a determination that no invocation of privilege will result in a trial by jury anyway, Dr. Navarro submits the prudent approach here is to let a jury decide all remaining questions of fact.

Finally, the fact that President Biden chose not to assert executive privilege does has no bearing on the Court's determination to allow a jury to decide whether former President Trump's presidential privilege was invoked.  The Court should decide as a matter of law whether President Biden's waiver of the presidential privilege with respect to Dr. Navarro enables the Department of Justice to prosecute a former close Presidential adviser for acting to assert a former President's privilege to withhold information from a congressional committee.  For the reasons herein, the trial court should find that an incumbent President may not unilaterally make such a determination.

Dated: April 18, 2023                    Respectfully Submitted,

                                         E&W Law, LLC

                                         _____/s/ John S. Irving_____
                                         John S. Irving (D.C. Bar No. 460068)
                                         1455 Pennsylvania Avenue, N.W., Suite 400
                                         Washington, D.C. 20004
                                         Telephone: (301) 807-5670
                                         Email: john.irving@earthandwatergroup.com


                                         SECIL LAW PLLC

                                         _____/s/ John P. Rowley, III_____
                                         John P. Rowley, III  (D.C. Bar No. 392629)
                                         1701 Pennsylvania Ave., N.W., Suite 200
                                         Washington, D.C. 20006
                                         Telephone: (703) 417-8652
                                         Email: jrowley@secillaw.com


                                         BRAND WOODWARD LAW, LP

                                         _____/s/ Stanley E. Woodward, Jr._____
                                         Stan M. Brand (D.C. Bar No. 213082)
                                         Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                                         1808 Park Road NW
                                         Washington, DC  20010
                                         202-996-7447 (telephone)
                                         202-996-0113 (facsimile)
                                         Stanley@BrandWoodwardLaw.com

                                         *Counsel to Dr. Peter K. Navarro*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## CERTIFICATE OF SERVICE

On April 18, 2023, the undersigned hereby certifies that a true and correct copy of

the foregoing was electronically filed and served via the CM/ECF system, which will

automatically send electronic notification of such filing to all registered parties.

Respectfully submitted,

_____/s/ Stanley E. Woodward, Jr._____
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC 20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Defendant Dr. Peter K. Navarro*