

- November 20, 2021 -

## Statement by Donald J. Trump, 45th President of the United States of America

The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020. It is a Witch Hunt that's been going on for years. Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign? I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments. The Witch Hunts must end!

From: lizshew<lizshew@protonmail.com>
Date: On Fri, Nov 19, 2021 at 8:32 AM
Subject: Fw: Statement on Executive Privilege - Coronavirus Committee
To: Taylor Budowich <taylor.budowich@45office.com>,Margo Martin
<margo.martin@45office.com>,Susie Wiles <susanswiles@msn.com>,Alex Cannon
<acannon@donaldtrump.com>,Justin Clark <justin.clark@electionlawllc.com>
Cc:
POTUS wants to exert executive privilege over this subpoena (attached) from the Democrats coronavirus
committee and issue a public statement. He asked me to draft one up for release today and wanted me
to include references to more people dying this year than last, and to Hillary.

Alex/Justin can you review, add edits for whatever language is necessary? Then POTUS needs to read
and OK.

The Communist Democrats are engaging in yet another witch hunt, this time going after my
Administration's unprecedented and incredible coronavirus response, despite the fact that,
sadly, more Americans have died this year from Covid than all of 2020 combined.

It's a witch hunt that's been going on for years. Why don't they investigate Crooked Hillary,
when so much has now been proven about her and her campaign's lies and dealings with
Russia to smear me and spy on my campaign?

I am exerting Executive Privilege over the House Committee on Oversight and Reform's latest
fishing expedition of my advisor in the Office of Trade and Manufacturing Policy. The witch
hunts must end!

Sent with ProtonMail Secure Email.

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Peter K. Navarro

You are hereby commanded to be and appear before the

Committee on Oversight and Reform

Select Subcommittee on the Coronavirus Crisis

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 2157 Rayburn House Office Building, Washington, D.C. 20515
>
> Date: 12/8/2021    Time: 12:00 p.m. ET (noon)

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2157 Rayburn House Office Building, Washington, D.C. 20515
>
> Date: 12/15/2021    Time: 9:00 a.m. ET

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____    Time: _____

*To*  any authorized staff member of The U.S. Marshals Service   to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 18 day of November , 2021.

_____
Chairman or Authorized Member

Attest: _____
*Clerk*

# PROOF OF SERVICE

---

Subpoena for   Peter K. Navarro

Address   801 Pennsylvania Ave NW, Apt 1021, Washington, DC 20004

before the  Committee on Oversight and Reform   ▼

Select Subcommittee on the Coronavirus Crisis   ▼

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

## SCHEDULE

**In accordance with the attached schedule instructions you, Peter K. Navarro, are required to produce all records and information described below:**

1. All documents and communications in your possession, custody, or control related to your involvement in the federal government's response to the coronavirus, including but not limited to communications with any official, employee, or volunteer in the White House, federal agencies, contractors, or others related to your duties at the White House Office of Trade and Manufacturing Policy or as an advisor to President Trump.

2. Documents sufficient to identify each official, employee, or volunteer in the White House or any federal agency who used a non-government-issued or personal account for official business related to the federal government's response to the coronavirus, including any non-government-issued or personal email address(es), cell phone number(s), username(s), or contact information for other messaging account(s) or application(s) used by these individuals for official business.

3. Documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act with respect to any documents or communications that you sent or received using a non-government-issued or personal account related to the federal government's response to the coronavirus.

## Schedule Instructions

1.       In complying with this Subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also required to produce documents that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party. No records, documents, data or information called for by this request shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee. Documents responsive to the subpoena shall not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

2.       In the event that any entity, organization, or individual denoted in the subpoena has been, or is currently, known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

3.       Each document produced shall be produced in a form that renders the document capable of being copied.

4.       When you produce documents, you shall identify the paragraph or clause in the Committee's subpoena to which the documents respond.

5.       Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this subpoena was issued.  To the extent that documents were not stored with file labels, dividers, or identifying markers, they shall be organized into separate folders by subject matter prior to production.

6.       Each folder and box shall be numbered, and a description of the contents of each folder and box, including the paragraph or clause of the subpoena to which the documents are responsive, shall be provided in an accompanying index.

7.       It is not a proper basis to refuse to produce a document that any other person or entity also possesses a nonidentical or identical copy of the same document.

8.       If any of the subpoenaed information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer backup tape), you shall consult with Committee staff to determine the appropriate format in which to produce the information. Documents produced in electronic format shall be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in (5) and (6) above.  Documents produced in an electronic format shall also be produced in a searchable format.

9.      In the event that a responsive document is withheld on the basis of any privilege, provide the following information concerning each such withheld document:  (a) the reason the document is not being produced; (b) the type of document; (c) the general subject matter; (d) the date, author, and addressee; and (e) the relationship of the author and addressee to each other.  This subpoena does not require you to produce a document as to which the President has invoked executive privilege.  However, any withheld document as to which the President has invoked executive privilege must be completely identified on the privilege log required by this paragraph.

10.     If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, you shall identify the document (stating its date, author, subject, and recipients) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

11.     If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, you shall produce all documents which would be responsive as if the date or other descriptive detail were correct.

12.     This subpoena is continuing in nature and applies to any newly discovered document.   Any document not produced because it has not been located or discovered by the return date shall be produced immediately upon location or discovery subsequent thereto.

13.     All documents shall be bates-stamped sequentially and produced sequentially.

14.     Two sets of documents shall be delivered, one set to the majority staff and one set to the minority staff.  The majority set shall be delivered to the majority staff in Room 2157 of the Rayburn House Office Building, and the minority set shall be delivered to the minority staff in Room B350A of the Rayburn House Office Building. You shall consult with Committee staff regarding the method of delivery prior to sending any materials.

15.     Upon completion of the document production, you shall submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession,  custody, or control which reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee or identified in a privilege log provided to the Committee.

### Schedule Definitions

1.      The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense

reports, books, manuals, instructions, financial reports, working papers, records notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto).  The term also means any graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotape, recordings and motion pictures), electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, memory sticks, and recordings), and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "documents in your possession, custody, or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that you have placed in the temporary possession, custody, or control of any third party.

3. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, telexes, discussions, releases, personal delivery, or otherwise.

4. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of the subpoena any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

5. The terms "person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities,

and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

6.     The terms "referring" or "relating," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

# Elections, LLC

**Attorneys at Law**
**Justin R. Clark**
**E** Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Dan Scavino
Dan.Scavino@45Office.com

Dear Mr. Scavino:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to you (the "Subpoena"). The Subpoena requests that you produce documents by October 7, 2021, and appear for a deposition on October 15, 2021.  While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges.  President Trump is prepared to defend these fundamental privileges in court.  Furthermore, President Trump believes that you are immune from compelled congressional testimony on matters related to your official responsibilities.  *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs you to: (a) where appropriate, invoke any immunities and privileges you may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning your official duties in response to the Subpoena; and (c) not provide any testimony concerning your official duties in response to the Subpoena.

Thank you for your attention to this matter.  Please do not hesitate to contact me, or have your counsel contact me, if you have any questions or would like to discuss.


Sincerely,


Justin Clark
*Counsel to President Trump*

# ELECTIONS, LLC

**Attorneys at Law**
**Justin R. Clark**

October 6, 2021

Mr. Scott Gast
Compass Legal Services

Dear Mr. Gast:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Mark R. Meadows (the "Subpoena"). The Subpoena requests that Mr. Meadows produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court. Furthermore, President Trump believes that Mr. Meadows is immune from compelled congressional testimony on matters related to his official responsibilities. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Meadows to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning his official duties in response to the Subpoena; and (c) not provide any testimony concerning his official duties in response to the Subpoena.

Page 2

Thank you for your attention to this matter.  Please do not hesitate to contact me if you have any questions or would like to discuss.


Sincerely,


Justin Clark
*Counsel to President Trump*



**PLAYLIST**

n p r                                                                    DONATE

---

SUBSCRIBE TO THE NPR POLITICS PODCAST

POLITICS

# Jan. 6 Panel Subpoenas Former Trump Officials Including Mark Meadows, Steve Bannon

Updated September 24, 2021 · 10:28 PM ET

  CLAUDIA GRISALES



*Former White House chief of staff Mark Meadows is one of four former advisers to former President Donald Trump who were issued subpoenas Thursday by the House select committee investigating the Jan. 6 insurrection at the U.S. Capitol.*

*Andrew Caballero-Reynolds/AFP via Getty Images*

The Democratic-led House select committee investigating the Jan. 6 attack on the U.S. Capitol has issued subpoenas to four former Trump administration officials, including former White House chief of staff Mark Meadows and strategist Steve Bannon.

Subpoenas were also issued Thursday evening to Dan Scavino, a former Trump White House deputy chief of staff for communications, and Kashyap Patel, who was chief of staff to then-acting Defense Secretary Christopher Miller.

The subpoenas — the first the panel has issued — compel the four to produce sought-after documents relevant to the deadly attack by Oct. 7 and then sit for a deposition the following week, either on Oct. 14 or 15.

Congressional subpoenas cannot be dismissed outright, but their issuance could lead to extended legal battles if the four former Trump officials decide to fight the effort.

The panel said the four have knowledge of important details related to the siege.



**POLITICS**

House Panel Investigating The Capitol Attack Orders 35 Companies To Preserve Records

"The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations," the committee's chair, Rep. Bennie Thompson, D-Miss., said in a statement.

In individually addressed letters, Thompson details further why the recipients are believed to have key information for the panel.

Thompson tells Meadows, for instance: "You were the President's Chief of Staff and have critical information regarding many elements of our inquiry. It appears you were with or in the vicinity of President Trump on January 6, had communications with the President and others on January 6 regarding events at the Capitol, and are a witness regarding activities of that day."

**Sponsor Message**

The letter says Meadows also engaged in multiple attempts to contest the presidential election that Trump lost. It says that according to documents obtained from the Justice Department, Meadows was in direct communications with top officials at the agency to probe election fraud in several states weeks after the election. It also says the panel understands that Meadows was directly in contact with state officials to urge such probes as well.

In his letter to Bannon, Thompson raises details regarding the strategist's conversations with Trump in the weeks leading up to Jan. 6 and a meeting with Trump allies the night before at the Willard Hotel, which is about a block from the White House.

Thompson says in additional letters that the panel is seeking information from Patel regarding his knowledge of security preparations ahead of the attack and from Scavino about his efforts to amplify the Jan. 6 event with Trump.

Republicans have painted the committee, which is mostly made up of Democrats, as nothing more than a partisan exercise.

In a statement, Trump called the panel the " 'Unselect Committee' of highly partisan politicians," adding, "We will fight the Subpoenas on Executive Privilege and other grounds, for the good of our Country, while we wait to find out whether or not Subpoenas will be sent out to Antifa and BLM for the death and destruction they have caused in tearing apart our Democrat-run cities throughout America."

**Sponsor Message**



Executive privilege is a right traditionally asserted by a White House to keep deliberations confidential.

The current White House indicated Friday that President Biden would not use executive privilege on requests from congressional investigators seeking information about Trump's activities on Jan. 6. But then later an official clarified that the Biden administration "will determine any future questions of executive privilege involving documents and testimony on a case-by-case basis."

The subpoena requests come about three weeks after the committee issued orders to 35 social media and communications companies to preserve records tied to Trump officials and Jan. 6. Before then, the panel asked eight federal agencies to turn over relevant documents while also seeking details on disinformation spread ahead of Jan. 6 from 15 social media companies.

# Sign Up For The NPR Politics Newsletter

From the White House to your home — political news and analysis that matter, sent weekly.

What's your email?

SUBSCRIBE

73

## SUBPOENA

### BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE
### CONGRESS OF THE UNITED STATES OF AMERICA

Daniel J. Scavino, Jr.

To _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of production: ███████████████████████ | |
| Date: October 21, 2021 | Time: 10:00 a.m. |

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of testimony: ███████████████████ | |
| Date: October 28, 2021 | Time: 10:00 a.m. |

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of testimony: _____ | |
| Date: _____ | Time: _____ |

To _any authorized staff member or the United States Marshals Service_____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 6th     day of October _____, 20 21 .

_Bennie Thompson_

Chairman or Authorized Member

Attest _____

Clerk

74

**PROOF OF SERVICE**

Subpoena for Daniel J. Scavino, Jr.

Address  The Mar-a-Lago Club, █████████████

███████

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name) ████████████████

Title ████████████  U.S. Marshal

Manner of service   Personally served Susan Wiles,
Chief of Staff to the 45th office (Post-Presidency Office)

Date   10/08/2021

Signature of Server ████████████████

Address ████████████████████████

75

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

**One Hundred Seventeenth Congress**

**Select Committee to Investigate the January 6th Attack on the United States Capitol**

October 6, 2021

Mr. Daniel J. Scavino, Jr.



Dear Mr. Scavino:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by October 21, 2021, and to appear for a deposition on October 28, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021, and the messages, videos, and internet communications that were disseminated to the public concerning the election, the transition in administrations, and the constitutional and statutory processes that effect that transition.

The Select Committee has reason to believe that you have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021, and relevant to former President Trump's activities and communications in the period leading up to and on January 6. For example, the Select Committee has reason to believe that you have knowledge regarding the communications strategy of the former President and his supporters leading up to the events on January 6. As the Deputy Chief of Staff for Communications, reporting indicates that you were with the former President on January 5, when he and others were considering how to convince Members of Congress not to certify the election for Joe Biden.[1] Your public Twitter account makes clear that you were tweeting messages from the White House on January 6, 2021.[2] And prior to January 6, 2021, you promoted, through your Twitter messaging, the January 6 March for Trump, which encouraged people to "be a part of history."[3] Your long service with the former President—spanning more than a decade and which included service as his digital strategy director, overseeing his social media presence, including on Twitter— suggest that you have knowledge concerning communications involving the 2020 presidential election and rallies and activities supporting and including the former President on January 6.

---

[1] BOB WOODWARD & ROBERT COSTA, PERIL at 231 (2021).
[2] *E.g.,* Dan Scavino[American flag][eagle] (@DanScavino), Twitter (Jan. 6, 2021, 11:12 AM, from The White House), https://twitter.com/DanScavino/status/1346584866994598785?s=20; Dan Scavino[American flag][eagle] (@DanScavino), Twitter (Jan. 6, 2021, 10:50 AM, from The White House), https://twitter.com/danscavino/status/1346846609905163857lang=en.
[3] Dan Scavino[American flag][eagle] (@DanScavino), Twitter (Jan. 2, 2021, 9:04 PM), https://twitter.com/DanScavino/status/1345551501440245762?s=20.

76

Mr. Daniel J. Scavino, Jr.
Page 2

It also appears that you were with or in the vicinity of former President Trump on January 6 and are a witness regarding his activities that day. You may also have materials relevant to his videotaping and tweeting messages on January 6. Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached. Please contact staff for the Select Committee at █████████ to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

77

Mr. Daniel J. Scavino, Jr.
Page 3

## SCHEDULE

In accordance with the attached Definitions and Instructions, you, Mr. Daniel J. Scavino, Jr., are hereby required to produce all documents and communications in your possession, custody, or control control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal or campaign accounts, and/or on personal or campaign applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.

1.  The January 6, 2021, rally on the mall and Capitol grounds in Washington, D.C., in support of President Donald J. Trump and opposition to certification of the results of the 2020 presidential election, including any permitting, planning, objectives, financing, and conduct, as well as any communications to or from any person or group involved in organizing or planning for the January 6, 2021, rally.

2.  Then-President Trump's participation in the January 6, 2021, rally, including any communications with President Trump or any paid or unpaid attorney, advisor, assistant, or aide to President Trump relating to the nature, context, or content of President Trump's intended or actual remarks to those attending the January 6, 2021, rally.

3.  Communications referring or relating to the nature, planning, conduct, message, purpose, objective, promotion of, or participation in the January 6, 2021, rally that were between or among any person who, during the Administration of former President Trump, worked in the White House complex, including any employee or detailee.

4.  Your communications with President Donald J. Trump concerning delaying or preventing the certification of the election of Joe Biden as President or relating to the rallies of January 5 or January 6, 2021.

5.  Plans to communicate, or actual communications, relating to alleged fraud or other election irregularities in connection with the 2020 presidential election.

6.  Communications with any non-governmental entity, organization, or individual relating to the January 6, 2021, rally, including any statements or other materials you or members of your office provided to any such entity, organization, or individual in connection with the planning, objectives, organization, message of, sponsorship and participation in the January 6, 2021, rally.

7.  All communications regarding President Trump's meetings and communications that day.

8.  Communications with any individual or organization, within or outside the government, referring or related to the activities and events at the January 6, 2021, rally, including messaging or characterization of those activities and events following the January 6, 2021, rally.

9.  Any communications with, including any materials or statements you provided directly or indirectly to, any Member of Congress or the staff of any Member of Congress referring or related to the planning, objectives, organization, message, sponsorship, or participation in the January 6, 2021, rally.

78

Mr. Daniel J. Scavino, Jr.
Page 4

10. Anyone with whom you communicated by any means regarding any aspect of the planning, objectives, conduct, message of, promotion of, or participation in the January 6, 2021, rally.

11. From November 3, 2020, through January 6, 2021, any efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count, including all tweets or posts on Parler urging attendance at the January 6 rally.

12. The role of the Vice President as the Presiding Officer in the certification of the votes of the electoral college.

13. All briefings or information from the United States Secret Service regarding participants at the January 6 rally on the Ellipse or the march to Capitol Hill, and all information relating to any plans or statements by President Trump that he would attend or participate in the events on Capitol Hill on January 6.

14. All communications with the Trump family on January 6, 2021.

15. All materials relating to former President Trump's videotaped messages on January 6 or regarding January 6, including all unused takes or recordings made that day.



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

September 23, 2021

Mr. Kashyap P. Patel



Dear Mr. Patel:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by October 7, 2021, and to appear for a deposition on October 14, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. This inquiry includes examination of how the federal government prepared for and responded to the events of January 6, 2021, as well as actions taken on January 6 by various government officials.

At the time of the attack, you served as chief of staff to Acting Secretary of Defense Christopher Miller, a position President Trump appointed you to on November 10, the day after he replaced then-Secretary of Defense Mark Esper.[1] Prior to your appointment, you served as Deputy Assistant to the President and Senior Director for Counterterrorism at the National Security Council.[2] Based on documents obtained by the Select Committee and published accounts, there is substantial reason to believe that you have additional documents and information relevant to understanding the role played by the Department of Defense ("DoD") and the White House in preparing for and responding to the attack on the U.S. Capitol, as well as documents and information related to your personal involvement in planning for events on January 6 and the peaceful transfer of power.

According to documents provided by DoD, you were involved in discussions with senior DoD officials regarding planning for security at the Capitol on January 6, 2021, and responding to events that followed the attack.[3] In addition, you were quoted by a reporter as saying that you were talking to the President's chief of staff, Mark Meadows, "nonstop that day."[4] Accordingly, the Select Committee seeks both documents and your

---

[1] Helene Cooper, Eric Schmitt, & Maggie Haberman, *Trump Fires Mark Esper, Defense Secretary Who Opposed Use of Troops on U.S. Streets,* N.Y TIMES (Nov. 9, 2020), https://www.nytimes.com/2020/11/09/us/politics/esper-defense-secretary.html; U.S. DEPARTMENT OF DEFENSE, *DOD Statement on Personnel Changes at the Pentagon* (Nov. 10, 2020), https://www.defense.gov/Newsroom/Releases/Release/Article/2411893/dod-statement-on-personnel-changes-at-the-pentagon/.

[2] U.S. DEP'T OF DEFENSE, *Kashyap P. Patel, Esq., Former Chief of Staff to the Secretary of Defense,* https://www.defense.gov/About/Biographies/Biography/Article/2418491/kashyap-p-patel/.

[3] Documents on file with the Committee.

[4] Adam Ciralsky, *"The President Threw Us Under the Bus": Embedding with Pentagon Leadership in Trump's Chaotic Last Week,* VANITY FAIR (Jan. 22, 2021), https://www.vanityfair.com/news/2021/01/embedding-with-pentagon-leadership-in-trumps-chaotic-last-week.

Mr. Kashyap P. Patel
Page 2

deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry. It is also alleged that you were considered for other positions during the last two months of the Trump Administration, and you may have knowledge of other planning or activities relevant to the Committee's inquiry.

A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

September 23, 2021

The Honorable Mark R. Meadows

███████████████
████████████████████
██████████████████
███████████

Dear Mr. Meadows:

    Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by October 7, 2021, and to appear for a deposition on October 15, 2021.

    The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

    The investigation has revealed credible evidence of your involvement in events within the scope of the Select Committee's inquiry. You were the President's Chief of Staff and have critical information regarding many elements of our inquiry. It appears that you were with or in the vicinity of President Trump on January 6, had communications with the President and others on January 6 regarding events at the Capitol, and are a witness regarding activities of that day. Moreover, it has been reported that you were engaged in multiple elements of the planning and preparation of efforts to contest the presidential election and delay the counting of electoral votes. In addition, according to documents provided by the Department of Justice, while you were the President's Chief of Staff, you directly communicated with the highest officials at the Department of Justice requesting investigations into election fraud matters in several states.[1] We understand that in the weeks after the November 2020 election, you contacted several state officials to encourage investigation of allegations of election fraud, even after such allegations had been dismissed by state and federal courts, and after the Electoral College had met and voted on December 14, 2020.[2] Moreover, at least one press report indicates you were in communication with organizers of the January 6 rally, including Amy Kremer of Women for America First.[3]

---

[1] Documents on file with the Committee.

[2] Linda So, *Trump's Chief of Staff Could Face Scrutiny in Georgia Criminal Probe* (Reuters, March 19, 2021); Documents on file with the Committee.

[3] Joshua Kaplan & Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PROPUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

The Honorable Mark R. Meadows
Page 2

Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Stephen K. Bannon
c/o Robert Costello, Esq., Davidson, Huthcher and Citron, LLP

*To* _____

> You are hereby commanded to be and appear before the
>
> Select Committee to Investigate the January 6th Attack on the United States Capitol
>
> _____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>
> Date: October 7, 2021                    Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>
> Date: October 14, 2021                    Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____                    Time: _____

*To* any authorized staff member or the United States Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 23ᵈ day of *September*, 2021.

*Chairman or Authorized Member*

Attest _____

*Clerk*

# PROOF OF SERVICE

Subpoena for Stephen K. Bannon
    c/o Robert Costello, Esq., Davidson, Huthcher and Citron, LLP

Address █████████████

████████████

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*



Served by (print name) ████████████

Title ████████████

Manner of service ████████████

Date    9|23|21

Signature of Server ████████

Address ████████████

**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

### One Hundred Seventeenth Congress

### Select Committee to Investigate the January 6th Attack on the United States Capitol

September 23, 2021

Mr. Stephen K. Bannon
c/o Mr. Robert J. Costello

Dear Mr. Bannon:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena compelling you to produce the documents set forth in the accompanying schedule by October 7, 2021, and to appear for a deposition on October 14, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. This inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The Select Committee has reason to believe that you have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021. For example, you have been identified as present at the Willard Hotel on January 5, 2021, during an effort to persuade Members of Congress to block the certification of the election the next day, and in relation to other activities on January 6.[1] You are also described as communicating with then-President Trump on December 30, 2020, and potentially other occasions, urging him to plan for and focus his efforts on January 6.[2] Moreover, you are quoted as stating, on January 5, 2021, that "[a]ll hell is going to break loose tomorrow."[3] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and multiple other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,



Bennie G. Thompson
Chairman

---

[1] *E.g.*, BOB WOODWARD & ROBERT COSTA, PERIL at 233 (2021).
[2] *Id.* at 207.

Rob Kuznia, Curt Devine, & Drew Griffin, *How Trump Allies Stoked the Flames Ahead of Capitol Riot*, CNN (Jan. 18, 2021), https://www.cnn.com/2021/01/18/politics/trump-bannon-stone-giuliani-capitol-riot-invs/index.html.

Mr. Stephen K. Bannon
Page 2

## SCHEDULE

In accordance with the attached Definitions and Instructions, you, Stephen K. Bannon, are hereby required to produce all documents and communications in your possession, custody, and control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal or campaign accounts, and/or on personal or campaign applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.:

1. The January 6, 2021, rally on the mall and Capitol grounds in Washington, D.C., in support of President Donald J. Trump and opposition to certification of the results of the 2020 presidential election, including any permitting, planning, objectives, financing, and conduct, as well as any communications to or from any person or group involved in organizing or planning for the January 6, 2021, rally.

2. Then-President Trump's participation in the January 6, 2021, rally, including any communications with President Trump or any paid or unpaid attorney, advisor, aide, or assistant to President Trump relating to the nature, context, or content of President Trump's intended or actual remarks to those attending the January 6, 2021, rally.

3. Communications referring or relating to the nature, planning, conduct, message, context, or participation in the January 6, 2021, rally between or among any person who, during the administration of President Donald J. Trump, worked in the White House complex, including any employee or detailee.

4. Documents or other materials referring or relating to the financing or fundraising to assist any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the January 6, 2021, rally.

5. "The 'War Room' podcast," insofar as at any time you communicated through it statements referring or relating to efforts to contest the election results, including planning for the January 6, 2021, rally, including all statements concerning its planning, objectives, purpose, organization, message, or sponsorship.

6. The organization or group named "March for Trump" and its activities relating to the January 6, 2021, rally, including any communications you had with any officer or member of "March for Trump" relating in any way to the planning, objectives, organization, message, sponsorship, and participation in the January 6, 2021, rally.

7. Your presence, purpose, statements, and activities at a meeting at the Willard Hotel on January 5, 2021, or the presence, purpose, statements, or activities of others in attendance, related to that meeting.

8. Your communications with President Donald J. Trump concerning events on January 6, 2021, including but not limited to communications on December 30, 2020.

9. Your communications with President Donald J. Trump between November 3 and January 20, 2021, concerning efforts to contest the election results or delay or impede the electoral count.

10. Anyone with whom you communicated by any means with respect to any aspect of the planning, objectives, conduct, or participation in the January 6, 2021, rally, including but not limited to Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

Mr. Stephen K. Bannon
Page 3

11. Anyone with whom you communicated by any means with respect to efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count, including but not limited to communications with Boris Epshteyn, Kashyap Patel, and Ezra Cohen-Watnick.

12. All public relations, advertising, or other communications efforts to persuade Americans that the election was stolen or to attend the rally on January 6.

13. The role of the Vice President as the Presiding Officer in the certification of the votes of the electoral college.

14. Any communication with any employees of President Trump's 2020 presidential campaign, the Republican National Committee, or any Trump Administration personnel including appointees, employees, and interns, about any of the foregoing topics.

15. Any communication regarding any of the foregoing topics with Proud Boys, Oath Keepers, Three Percenters, and Alex Jones.

16. Any communications with Representative Scott Perry and/or other Members of Congress about any of the foregoing topics.

17. Any communications with Rudolph Giuliani, John Eastman, Michael Flynn, Jenna Ellis, or Sydney Powell about any of the foregoing topics.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.   If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.   All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH,
    PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME,
    SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE,
    ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE,
    FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED,
    DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER,
    NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.     The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.     The term "including" shall be construed broadly to mean "including, but not limited to."

5.     The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.     The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.     The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.     The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.     The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committees in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

**To:**      SSCC Clerks[SSCC_Clerks@housemail.house.gov]
**From:**    pknavarro[pknavarro@protonmail.com]
**Sent:**    Thur 11/18/2021 3:13:13 PM (UTC-05:00)
**Subject:** Re: Subpoena to Peter K. Navarro Issued by Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis

received

Sent with ProtonMail Secure Email.

------- Original Message -------
On Thursday, November 18th, 2021 at 2:26 PM, SSCC Clerks <SSCC_Clerks@housemail.house.gov> wrote:

> Hello,
>
>
> Please see the attached subpoena to Peter K. Navarro.  Please acknowledge receipt of this email and confirm that you accept electronic service.  To the extent that you do not timely agree to accept electronic service, the U.S. Marshals will personally serve you with the subpoena.
>
>
>
> Thank you,
>
>
> *Yusra Abdelmeguid*
>
> Clerk & Staff Assistant
>
> Select Subcommittee on the Coronavirus Crisis
>
> Committee on Oversight and Reform| Democratic Staff
>
> U.S. House of Representatives | Washington, DC 20515
>
> (202) 748-0978
>
> yusra.abdelmeguid2@mail.house.gov

**To:**      lizshew[lizshew@protonmail.com]
**From:**   pknavarro[pknavarro@protonmail.com]
**Sent:**    Thur 11/18/2021 4:17:27 PM (UTC-05:00)
**Subject:** Fw: Subpoena to Peter K. Navarro Issued by Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis
[Subpoena to Navarro.pdf](Subpoena to Navarro.pdf)

Need to assert exec privilege and issue statement to stop witchhunts.

Sent with [ProtonMail](ProtonMail) Secure Email.

------- Original Message -------
On Thursday, November 18th, 2021 at 2:26 PM, SSCC Clerks <SSCC_Clerks@housemail.house.gov> wrote:

    Hello,


    Please see the attached subpoena to Peter K. Navarro.  Please acknowledge receipt of this email and confirm that you accept electronic service.  To the extent that you do not timely agree to accept electronic service, the U.S. Marshals will personally serve you with the subpoena.



    Thank you,


    ***Yusra Abdelmeguid***

    Clerk & Staff Assistant

    Select Subcommittee on the Coronavirus Crisis

    Committee on Oversight and Reform| Democratic Staff

    U.S. House of Representatives | Washington, DC 20515

    (202) 748-0978

    [yusra.abdelmeguid2@mail.house.gov](mailto:yusra.abdelmeguid2@mail.house.gov)

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*   Peter K. Navarro

You are hereby commanded to be and appear before the

Committee on Oversight and Reform

Select Subcommittee on the Coronavirus Crisis

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 2157 Rayburn House Office Building, Washington, D.C. 20515

Date: 12/8/2021                 Time: 12:00 p.m. ET (noon)

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 2157 Rayburn House Office Building, Washington, D.C. 20515

Date: 12/15/2021                 Time: 9:00 a.m. ET

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                 Time: _____

*To*  any authorized staff member of the U.S. Marshals Service _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 18 day of November , 2021.

*Chairman or Authorized Member*

Attest: _____

*Clerk*

Peter K. Navarro

801 Pennsylvania Ave NW, Apt 1021, Washington, DC 20004

## SCHEDULE

**In accordance with the attached schedule instructions you, Peter K. Navarro, are required to produce all records and information described below:**

1. All documents and communications in your possession, custody, or control related to your involvement in the federal government's response to the coronavirus, including but not limited to communications with any official, employee, or volunteer in the White House, federal agencies, contractors, or others related to your duties at the White House Office of Trade and Manufacturing Policy or as an advisor to President Trump.

2. Documents sufficient to identify each official, employee, or volunteer in the White House or any federal agency who used a non-government-issued or personal account for official business related to the federal government's response to the coronavirus, including any non-government-issued or personal email address(es), cell phone number(s), username(s), or contact information for other messaging account(s) or application(s) used by these individuals for official business.

3. Documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act with respect to any documents or communications that you sent or received using a non-government-issued or personal account related to the federal government's response to the coronavirus.

## Schedule Instructions

1.      In complying with this Subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also required to produce documents that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party. No records, documents, data or information called for by this request shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee. Documents responsive to the subpoena shall not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

2.      In the event that any entity, organization, or individual denoted in the subpoena has been, or is currently, known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

3.      Each document produced shall be produced in a form that renders the document capable of being copied.

4.      When you produce documents, you shall identify the paragraph or clause in the Committee's subpoena to which the documents respond.

5.      Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this subpoena was issued.  To the extent that documents were not stored with file labels, dividers, or identifying markers, they shall be organized into separate folders by subject matter prior to production.

6.      Each folder and box shall be numbered, and a description of the contents of each folder and box, including the paragraph or clause of the subpoena to which the documents are responsive, shall be provided in an accompanying index.

7.      It is not a proper basis to refuse to produce a document that any other person or entity also possesses a nonidentical or identical copy of the same document.

8.      If any of the subpoenaed information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer backup tape), you shall consult with Committee staff to determine the appropriate format in which to produce the information. Documents produced in electronic format shall be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in (5) and (6) above.  Documents produced in an electronic format shall also be produced in a searchable format.

9.      In the event that a responsive document is withheld on the basis of any privilege, provide the following information concerning each such withheld document:  (a) the reason the document is not being produced; (b) the type of document; (c) the general subject matter; (d) the date, author, and addressee; and (e) the relationship of the author and addressee to each other.  This subpoena does not require you to produce a document as to which the President has invoked executive privilege.  However, any withheld document as to which the President has invoked executive privilege must be completely identified on the privilege log required by this paragraph.

10.     If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, you shall identify the document (stating its date, author, subject, and recipients) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

11.     If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, you shall produce all documents which would be responsive as if the date or other descriptive detail were correct.

12.     This subpoena is continuing in nature and applies to any newly discovered document.   Any document not produced because it has not been located or discovered by the return date shall be produced immediately upon location or discovery subsequent thereto.

13.     All documents shall be bates-stamped sequentially and produced sequentially.

14.     Two sets of documents shall be delivered, one set to the majority staff and one set to the minority staff.  The majority set shall be delivered to the majority staff in Room 2157 of the Rayburn House Office Building, and the minority set shall be delivered to the minority staff in Room B350A of the Rayburn House Office Building. You shall consult with Committee staff regarding the method of delivery prior to sending any materials.

15.     Upon completion of the document production, you shall submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession,  custody, or control which reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee or identified in a privilege log provided to the Committee.

## Schedule Definitions

1.      The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense

reports, books, manuals, instructions, financial reports, working papers, records notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto). The term also means any graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotape, recordings and motion pictures), electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, memory sticks, and recordings), and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "documents in your possession, custody, or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that you have placed in the temporary possession, custody, or control of any third party.

3.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, telexes, discussions, releases, personal delivery, or otherwise.

4.     The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of the subpoena any information which might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neuter genders.

5.     The terms "person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities,

and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

6.    The terms "referring" or "relating," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

| | |
|---|---|
| **To:** | pknavarro[pknavarro@protonmail.com] |
| **From:** | lizshew[lizshew@protonmail.com] |
| **Sent:** | Fri 11/19/2021 10:55:09 AM (UTC-05:00) |
| **Subject:** | Fw: [EXTERNAL]Statement on Executive Privilege - Coronavirus Committee |

Sent from ProtonMail mobile

-------- Original Message --------
On Nov 19, 2021, 10:32 AM, Alex Cannon < acannon@donaldtrump.com> wrote:

I just spoke with him. No public statement on this. We will send a privilege instruction letter to Peter's counsel.

Liz - Do you have his counsel's contact information?

Get Outlook for iOS

---

**From:** lizshew <lizshew@protonmail.com>
**Sent:** Friday, November 19, 2021 8:32:50 AM
**To:** Taylor Budowich <taylor.budowich@45office.com>; Margo Martin <margo.martin@45office.com>; Susie Wiles <susanswiles@msn.com>; Alex Cannon <acannon@donaldtrump.com>; Justin Clark <justin.clark@electionlawllc.com>
**Subject:** [EXTERNAL]Statement on Executive Privilege - Coronavirus Committee

POTUS wants to exert executive privilege over this subpoena (attached) from the Democrats coronavirus committee and issue a public statement. He asked me to draft one up for release today and wanted me to include references to more people dying this year than last, and to Hillary.

Alex/Justin can you review, add edits for whatever language is necessary? Then POTUS needs to read and OK.

The Communist Democrats are engaging in yet another witch hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than all of 2020 combined.
It's a witch hunt that's been going on for years. Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign?

I am exerting Executive Privilege over the House Committee on Oversight and Reform's latest fishing expedition of my advisor in the Office of Trade and Manufacturing Policy. The witch hunts must end!

Sent with ProtonMail Secure Email.

CONFIDENTIALITY NOTICE: This message (including any attachments) may contain confidential, proprietary, privileged, and/or private information. This information is intended to be for the use of the individual(s) designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution, or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited. Copyright and any other intellectual property rights are the sole property of Donald J. Trump for

**To:** pknavarro[pknavarro@protonmail.com]
**From:** Boris Epshteyn[bepshteyh@gmail.com]
**Sent:** Fri 11/19/2021 8:54:10 PM (UTC-05:00)
**Subject:** Re: Subpoena to Peter K. Navarro Issued by Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis

Got it.

--
Please Note: The information in this email is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Although this email and any attachments are believed to be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use.

> On Nov 19, 2021, at 8:26 PM, pknavarro <pknavarro@protonmail.com> wrote:
>
>
>
> Sent with ProtonMail Secure Email.
>
> ------- Original Message -------
> On Thursday, November 18th, 2021 at 2:26 PM, SSCC Clerks <SSCC_Clerks@housemail.house.gov> wrote:
>
>> Hello,
>>
>> Please see the attached subpoena to Peter K. Navarro.  Please acknowledge receipt of this email and confirm that you accept electronic service.  To the extent that you do not timely agree to accept electronic service, the U.S. Marshals will personally serve you with the subpoena.
>>
>>
>>
>> Thank you,
>>
>>
>> *Yusra Abdelmeguid*
>>
>> Clerk & Staff Assistant
>>
>> Select Subcommittee on the Coronavirus Crisis
>>
>> Committee on Oversight and Reform| Democratic Staff
>>
>> U.S. House of Representatives | Washington, DC 20515
>>
>> (202) 748-0978
>>
>> yusra.abdelmeguid2@mail.house.gov

<Subpoena to Navarro.pdf>

December 7, 2021

Hon. James E. Clyburn, Chair
Committee on Oversight and Reform
Subcommittee on the Coronavirus Crisis
2157 Rayburn House Office Building
Washington, DC 20515

Dear Representative Rayburn:

I write in response to the subpoena, dated November 18, 2021 (the "Subpoena") issued to me by the Committee on Oversight and Reform, Subcommittee on the Coronavirus Crisis (the "Sub-Committee").

At this time, I am unable to respond to the Subpoena, based on former President Trump's invocation of executive privilege with respect to the very topic covered by the Subpoena. Specifically, in response to the Subpoena, on November 20, 2021, President Trump stated "I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments."

Not only is this is a direct, proper, and explicit invocation of the executive privilege provided by a President of the United States as it relates to an important policy matter during his tenure in office. It is a direct order that I should not comply with the Subpoena based on the aforementioned Subpoena.

Therefore, until such time as the scope of the privilege is negotiated or negotiated, this matter is out of my hands and something that the Sub-Committee should discuss with President Trump's counsel.

With respect to the specific documents requested in the Subpoena, I submit the following response:

**1. All documents and communications in your possession, custody, or control related to your involvement in the federal government's response to the coronavirus, including but not limited to communications with any official, employee, or volunteer in the White House, federal agencies, contractors, or others related to your duties at the White House Office of Trade and Manufacturing Policy or as an advisor to President Trump.**

**Response:** In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter, as detailed *supra*. Accordingly, I cannot respond to this request at this time. Moreover, I do not have access to documents and communications sent to and from my government-issued account related to the subject matter contained in this request.

**2. Documents sufficient to identify each official, employee, or volunteer in the White House or any federal agency who used a non-government-issued or personal account for official business related to the federal government's response to the coronavirus, including any non-government-issued or personal email address(es), cell phone number(s), username(s), or contact information for other messaging account(s) or application(s) used by these individuals for official business.**

**Response:** In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter.  Accordingly, I cannot respond to this request, as written.  Moreover, notwithstanding the foregoing assertion of executive privilege, I do not have knowledge of each official, employee, or volunteer at the White House or any federal agency who used a non-government-issued or personal account to conduct business related to the response to the Coronavirus, to extent there are any such individuals.

**3. Documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act with respect to any documents or communications that you sent or received using a non-government-issued or personal account related to the federal government's                  response                  to                  the                  coronavirus.**

**Response: :** In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter.  Accordingly, I cannot respond to this request, as written. I further object to this request because it is vague and presupposes that there are documents in existence that set forth the steps I took to comply with the Presidential Records Act with respect to documents and communications set forth in the request.

* * *

I submit this response to this Subpoena with reservations of all rights, including my right for assert attorney-client and Fifth Amendment privileges.  I reserve the right to amend, supplement and revise my responses to the Subpoena.

Submitted,

Peter Navarro

JAMES E. CLYBURN
CHAIRMAN

MAXINE WATERS
CAROLYN B. MALONEY
NYDIA M. VELÁZQUEZ
BILL FOSTER
JAMIE RASKIN
RAJA KRISHNAMOORTHI

ONE HUNDRED SEVENTEENTH CONGRESS

STEVE SCALISE
RANKING MEMBER

JIM JORDAN
MARK E. GREEN, M.D.
NICOLE MALLIOTAKIS
MARIANNETTE MILLER-MEEKS, M.D.

# Congress of the United States

## House of Representatives

SELECT SUBCOMMITTEE ON THE CORONAVIRUS CRISIS

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Phone   (202) 225–4400
https://coronavirus.house.gov

December 11, 2021

Mr. Peter K. Navarro
Washington, DC

Dear Mr. Navarro:

I am in receipt of your December 7, 2021 letter stating that you do not intend to comply with the subpoena issued to you by the Select Subcommittee on the Coronavirus Crisis on November 18, 2021.  This subpoena was issued after you failed to cooperate voluntarily with the Select Subcommittee's ongoing investigations into the federal government's coronavirus response, in which you were deeply involved.[1]  Your letter states that you are "unable to respond to the Subpoena based on former President Trump's invocation of executive privilege with respect to the very topic covered by the Subpoena," which you describe as "a direct order" not to comply with the subpoena.[2]  As explained below, your letter presents no valid basis for refusing to comply with the subpoena.  Your refusal to comply is particularly indefensible given that you disclosed many details about your work in the White House, including details of conversations with the former President about the pandemic response, in your recent book and related press tour.[3]  The Select Subcommittee therefore expects you to promptly produce all responsive records and information in your possession and appear for a deposition on December 15, as the subpoena requires.

Your blanket refusal to comply with the subpoena in its entirety is improper.  Courts have clearly held that White House advisers, such as yourself, cannot avoid compelled congressional

---

[1] Subpoena from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to Peter K. Navarro (Nov. 18, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Subpoena%20to%20Navarro.pdf).

[2] Letter from Peter Navarro to Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis (Dec. 7, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Letter%20to%20Clyburn%20Committee%2012%207%2021.pdf).

[3] *See, e.g.*, Peter Navarro, *In Trump Time:  A Journal of America's Plague Year* (2021); *Virtual Discussion with Peter Navarro*, The Claremont Institute (Nov. 1, 2021); *Peter Navarro Says Fauci Deserves "an Orange Jumpsuit,"* Fox Across America (Nov. 4, 2021) (online at https://omny.fm/shows/fox-across-america-podcast/fox-across-america-11-4-2021); *Former Assistant to President Trump, Peter Navarro, Talks About His New Book "In Trump Time:  A Journal of America's Plague Year,"* Chicago's Morning Answer (Nov. 11, 2021) (https://morninganswerchicago.com/2021/11/11/peter-navarro-talks-about-his-new-book-in-trump-time-a-journal-of-americas-plague-year).

Mr. Peter K. Navarro
Page 2

process.[4]  The records and information that you possess are critical to the Select Subcommittee's investigations.  As I explained in my September 14, 2021 letter requesting your voluntary cooperation with the Select Subcommittee's investigation:

> [Y]ou played a central role in key aspects of the prior Administration's pandemic response, including efforts to obtain PPE and other medical supplies necessary to stop the spread of the coronavirus and protect American lives.  The Select Subcommittee's investigations previously uncovered evidence that you privately warned then-President Trump on March 1, 2020, that the country was facing "a very serious public health emergency," and that the Administration's progress on critical elements of the nation's response—from strengthening supply chains to increasing testing and treatment options—"is NOT fast enough."  Rather than heed this warning and implement a coordinated national strategy to alleviate critical supply shortages, the Administration pursued a haphazard and ineffective approach to procurement in which senior White House officials—including you—steered contracts to particular companies without adequate diligence or competition.[5]

Your refusal to comply with the Select Subcommittee's subpoena appears to be predicated on a press release from former President Donald Trump, which stated in its entirety:

> The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020.  It is a Witch Hunt that's been going on for years.  Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign?  I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments.  The Witch Hunts must end![6]

This press release does not provide a valid basis to refuse to comply with the Select Subcommittee's subpoena.  As the former president, Mr. Trump does not have ultimate authority to assert executive privilege over the records and information you possess.[7]  While the former

---

[4] *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 166, 202 – 14 (D.D.C. 2019); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105 – 06 (D.D.C. 2008).

[5] Letter from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to Peter K. Navarro (Sept. 14, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2021-09-14.Clyburn%20to%20Peter%20Navarro%20re%20Production%20Request.pdf).

[6] Liz Harrington (@realLizUSA), Twitter (Nov. 20, 2021) (online at https://twitter.com/realLizUSA/status/1462157208699953156).

[7] *See, e.g.*, *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988) ("[T]he incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege. . . ."); *Trump v. Thompson,* No. 1:21-cv-02769, slip op. at 37 – 38 (D.C. Cir. Dec. 9, 2021) ("[A]s the incumbent, President Biden is the principal holder and keeper of executive privilege, and he speaks authoritatively for the interests of the

Mr. Peter K. Navarro
Page 3

president's statement raises a number of grievances about his political opponents, it does not specify whether his instruction pertains to the Select Subcommittee's subpoena or another matter, nor does it identify any particular scope or subject matter. Please also note that the applicable Committee on Oversight and Reform rule provides: "The only assertions of executive privilege that the Chair of the Committee will consider are those made in writing by an executive branch official authorized to assert the privilege."[8]  The Select Subcommittee has not received notice of any such assertion from the former president or his counsel in connection with the subpoena.

Your letter states that you are "rely[ing] on President Trump's assertion of executive privilege with respect to [your] communications with him on this matter."[9]  As an initial matter, your communications with former President Trump are not necessarily protected from compelled disclosure.  It is well recognized that executive privilege does not cloak all communications with the former president or his senior advisers in privilege, but rather the communications must implicate the types of "quintessential and non-delegable presidential power" that has been found to be protected under the law.  Furthermore, executive privilege, including the presidential communications privilege, is a qualified privilege that can be overcome by Congress's showing of need for the information and the inability to obtain the information elsewhere.[10]  In any event, the Select Subcommittee's subpoena compels you to produce all records and information related to your involvement in the federal government's response to the coronavirus—not just those that may implicate your "communications with" former President Trump.[11]

It is abundantly clear that you possess information responsive to the subpoena that is not covered by any colorable claims of executive privilege.  Information obtained by the Select Subcommittee indicates that you were deeply involved in efforts to obtain supplies from private companies in response to the pandemic in the spring of 2020.  For example, you exchanged emails with an executive from AirBoss Defense Group related to a $96 million contract for powered respirators that the company received from the Department of Homeland Security in April 2020.  In another instance, you sent an email to the CEO of Phlow Corporation—which soon thereafter received a federal contract for up to $812 million—instructing your team to get the first-time government contractor "greenlit as soon as humanly possible" and to "move this

---

Executive Branch. . . . [I]t is only President Biden who can make a fully informed and circumspect assessment of all the competing needs and interests of the Executive Branch.").

[8] Committee on Oversight and Reform rule 16(c)(3).  The Select Subcommittee on the Coronavirus Crisis applies the rules of the Committee on Oversight and Reform.  *See* H. Res. 935, sec. 4(a), 116th Cong. (2020); H. Res. 8, sec. 4(f).

[9] Letter from Peter Navarro to Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis (Dec. 7, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Letter%20to%20Clyburn%20Committee%2012%207%2021.pdf).

[10] *See, e.g.*, *In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997).

[11] Subpoena from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to Peter K. Navarro (Nov. 18, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Subpoena%20to%20Navarro.pdf).

Mr. Peter K. Navarro
Page 4

puppy in Trump time."[12]  A report by a Special Committee of the Eastman Kodak Company's
(Kodak) Board of Directors indicates that you also participated in telephone conversations with
Kodak's leadership about the company partnering with the federal government in responding to
the coronavirus crisis—after which Kodak was promised a $765 million federal loan.[13]  These
and other third-party communications that may remain in your possession cannot reasonably be
cloaked under the veil of privilege.

        Your refusal to comply with the subpoena is insupportable in light of your prior public
disclosures of your conversations with senior Administration officials and your work on the
federal government's pandemic response.  Your recent book provides abundant detail about your
time working in the White House, including details of meetings in the Oval Office and
conversations with the former President himself.  For example, the book discusses:

- Multiple conversations with the former President, such as a January 26, 2020
  discussion in which you quoted President Trump as asking you to get the
  White House Coronavirus Task Force to support a proposed travel ban from China.
  You wrote:  "Said the Boss, 'I'm taking down all flights coming into the US from
  China.  It'll rattle the markets and Biden and the Left will hit me hard.  But this virus
  looks like it might be bad, and we need to do it.  So get that Task Force behind me.
  Be tough.  You're my tough guy.'"[14]

- Numerous meetings with senior Trump Administration officials, including a
  January 27, 2020 meeting in the Situation Room where then-acting White House
  Chief of Staff Mick Mulvaney and other officials deliberated over whether to enact
  the proposed travel ban, and an April 4, 2020 meeting with then-Vice President
  Pence, Jared Kushner, and other officials about the use of hydroxychloroquine.[15]

---

[12] Letter from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to David S.
Ferriero, Archivist of the United States, National Archives and Records Administration (Mar. 30, 2021) (online at
https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2021-03-
30.Select%20Sub%20to%20Ferriero%20re%20NARA%20Supply%20Chain%20.pdf).

[13] Report to the Special Committee of the Board of Directors of Eastman Kodak Company Regarding the
Events Surrounding the U.S. International Development Finance Corporation Letter of Interest Announcement,
Akin Gump Strauss Hauer & Feld LLP, at 12 (Sept. 15, 2020) (online at www.kodak.com/content/products-
brochures/Company/Report-to-the-Special-Committee-09.15.2020.pdf).

[14] Peter Navarro, *In Trump Time:  A Journal of America's Plague Year*, at 31 (2021).

[15] *See, e.g.*, *id.* at 33 – 37, 96 – 98.

Mr. Peter K. Navarro
Page 5

Considering your disclosure of these conversations and other topics in your book, interviews, and other public fora,[16] the Select Subcommittee believes that any privilege that may have attached to these subjects has been waived.[17]

As explained in my September 14, 2021 letter to you, records previously obtained by the Select Subcommittee indicate that you used a private, encrypted email communications system called ProtonMail to conduct official business while working at the White House.[18]  These records suggest that other White House officials may have similarly conducted official business using ProtonMail or other private communications platforms.  Item two of the Select Subcommittee's subpoena schedule directs you to produce documents sufficient to identify individuals who used a non-governmental or personal account for official business related to the coronavirus, while item three seeks documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act.[19]  Your letter suggests that you have not taken any steps to identify documents responsive to these requests that remain in your possession— reflecting the absence of any meaningful review on your part to determine whether any privilege may apply to the documents you are refusing to provide to the Select Subcommittee.

For these reasons, the Select Subcommittee expects that you will immediately comply with the subpoena and produce all responsive records and information identified in the subpoena schedule without delay.  To the extent certain aspects of your records or communications raise claims of executive privilege, you must describe the contents of those records or communications in a privilege log that identifies each such document on the particularized basis required by the Select Subcommittee's schedule instructions and applicable rules.[20]  The Select Subcommittee also expects that you will appear at the time and place designated in the subpoena for a deposition and respond fully to questions from the Select Subcommittee.  If there are particular questions posed during the deposition that you believe raise issues of privilege, you or your

---

[16] *See, e.g.*, *Virtual Discussion with Peter Navarro*, The Claremont Institute (Nov. 1, 2021); *Peter Navarro Says Fauci Deserves "an Orange Jumpsuit,"* Fox Across America (Nov. 4, 2021) (online at https://omny.fm/shows/fox-across-america-podcast/fox-across-america-11-4-2021); *Former Assistant to President Trump, Peter Navarro, Talks About His New Book "In Trump Time:  A Journal of America's Plague Year,"* Chicago's Morning Answer (Nov. 11, 2021) (https://morninganswerchicago.com/2021/11/11/peter-navarro-talks-about-his-new-book-in-trump-time-a-journal-of-americas-plague-year).

[17] *See generally Trump v. Thompson,* No. 1:21-cv-02769, slip op. at 24 (D.C. Cir. Dec. 9, 2021) ("Despite its unquestioned significance, executive privilege also can be waived."); *In re Sealed Case (Espy)*, 121 F.3d 729, 741 (D.C. Cir. 1997) (recognizing that executive privilege may be subject to waiver); *see, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 – 16 (2d Cir. 2014).

[18] Letter from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to Peter K. Navarro (Sept. 14, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2021-09-14.Clyburn%20to%20Peter%20Navarro%20re%20Production%20Request.pdf).

[19] *See* Subpoena from Chairman James E. Clyburn, Select Subcommittee on the Coronavirus Crisis, to Peter K. Navarro (Nov. 18, 2021) (online at https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Subpoena%20to%20Navarro.pdf).

[20] *See id.*; Committee on Oversight and Reform rule 16.

Mr. Peter K. Navarro
Page 6

counsel should state the specific privilege assertion on the record for the Select Subcommittee's
consideration.[21]

      Please be advised that if you do not appear for the deposition as scheduled and produce
all responsive documents in your possession by December 15, 2021, the Select Subcommittee
will interpret your actions as willful noncompliance with the subpoena.

      Sincerely,

James E. Clyburn
Chairman

cc:    The Honorable Steve Scalise, Ranking Member

---

[21] *See* Committee on Oversight and Reform rule 16(c)(1).

JAMES E. CLYBURN
CHAIRMAN

MAXINE WATERS
CAROLYN B. MALONEY
NYDIA M. VELÁZQUEZ
BILL FOSTER
JAMIE RASKIN
RAJA KRISHNAMOORTHI

STEVE SCALISE
RANKING MEMBER

JIM JORDAN
MARK E. GREEN, M.D.
NICOLE MALLIOTAKIS
MARIANNETTE MILLER-MEEKS, M.D.

ONE HUNDRED SEVENTEENTH CONGRESS

## Congress of the United States

### House of Representatives

SELECT SUBCOMMITTEE ON THE CORONAVIRUS CRISIS

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Phone   (202) 225–4400
https://coronavirus.house.gov

# *Reminder*
# Deposition Notice

December 13, 2021

TO:          Members of the Select Subcommittee on the Coronavirus Crisis

FROM:     James E. Clyburn, Chairman

SUBJECT:   Deposition of Mr. Peter Navarro

As a reminder and as per the Memorandum sent out on November 18, 2021, informing Members of the Select Subcommittee on the Coronavirus Crisis that a subpoena was issued to Peter Navarro, a deposition of Mr. Navarro is scheduled for December 15, 2021.  As set out in the accompanying subpoena to Mr. Navarro, please see the below confirming the time and location.

DATE:      Wednesday, December 15, 2021

TIME:      9:00 a.m.

PLACE:     2157 Rayburn House Office Building

**To:**       lizshew[lizshew@protonmail.com]
**From:**     pknavarro[pknavarro@protonmail.com]
**Sent:**     Tue 12/14/2021 4:37:56 PM (UTC-05:00)
**Subject:**  FYI for you and the Boss and his lawyers
Letter to Clyburn 12.14.21.pdf

Hi Liz,
This is my response to the Committee. Holding fast.
Navarro

Sent with ProtonMail Secure Email.

1

December 15, 2021


James E. Clyburn, Chair
Committee on Oversight and Reform
Subcommittee on the Coronavirus Crisis
2157 Rayburn House Office Building
Washington, DC 20515


Dear Mr. Clyburn:

I am in receipt of your threatening letter of December 11, 2021. It comes on the heels of an unnecessary early morning visit by one of your gendarmes to deliver a subpoena which I already acknowledged the receipt of to your assistant Beth Mueller.  She assured me that acknowledgment of receipt of the subpoena would obviate the need for any show of force. Yet bang on my door your jackboot did in the early hours of the morning.  Clearly, the game afoot here is to try to intimidate me.

In reviewing your letter, I was surprised at the shoddiness of the legal work.  Most notably, you brazenly ignore considerable legal precedent and facts demonstrating why executive privilege is applicable in this instance.

While I have no intention of doing your legal work for you, you may want to review at least Nixon v. Adm'r of Gen Services, 433 U.S. 425, 448-49 (1977), *Loving v. DOD*, 550 F.3d 32 (D.C. Cir. 2008); *Comm. On the Judiciary v. McGahn,* 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019); *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (en banc); *Dep't of Interior v. Klamath Water Users Protective Ass'n.*, 532 U.S. 1, 8-9 (2001); and *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) just to name several.  You may want to do this before you push this case on a path to the Supreme Court.

In the meantime, the abiding facts of the case are quite simple. President Donald John Trump, my Commander in Chief, has invoked Executive Privilege with respect to any interactions with your Subcommittee; and the law is very clear on this. This is not my privilege to waive. Only President Trump can waive the privilege.

Based on foregoing legal precedent and President Trump's invocation of executive privilege, I therefore cannot produce the communications sought by the Subcommittee in the Subpoena.

Clearly, the best and proper course of action for your Subcommittee is to negotiate any waiver of the privilege with the president and his attorneys directly, not through me. The law is clear that this is not my privilege to waive. Only the president can waive privilege. Therefore, I refer you directly to the president's attorneys.

Until the scope and extent of the privilege is either negotiated by President Trump's attorneys or adjudicated by a Court of law (free of partisan leanings), I cannot produce documents responsive to the subpoena or otherwise appear for the Subcommittee's deposition.

In this regard, the recent decision of the Democrat-stacked appeals court regarding the January 6 Committee that a sitting president can revoke the privilege of a former president is about the most stupid and dangerous court ruling I have ever seen. Talk about an open invitation to the politicization of executive privilege. That, too, is a Supreme Court decision waiting to happen.

Let me also restate something I noted in my original letter: I have no intention of allowing you or your Subcommittee to drain me financially by forcing me to hire a high-priced Washington lawyer. I am a man of modest means on the edge of retirement and have no intention of burning cash on this matter.

Likewise with respect to your shoddy legal work, I was surprised to see you cite *Harlow V. Fitzgerald* as the centerpiece for your claim that I should bend to your will. This case is clearly and readily distinguishable from the instant case and even the greenest law clerk would know this.

The citing of this case also implies that you intend to pursue to some type of criminal charges against me related to the White House handling of the pandemic.  This is all the more reason why I will not be coerced into sitting for a deposition before your Star Chamber.

Finally, as I document in my new book *In Trump Time*, my actions during my government service no doubt led to the saving of hundreds of thousands, and perhaps millions, of American lives. That you would try to use me as a pawn in your cynical witch hunt game to blame the Trump administration for mismanagement of the pandemic – even as you imply possible criminal charges against me – frankly disturbs me and should disturb the American people.

Let me remind you here, and as I document in *In Trump Time*, when I was arguing on behalf of the ban on travel from Communist China in January of 2020 and writing a dozen memos jumpstarting our pandemic efforts in February of 2020, you, Tony Fauci, and other Democrats like Bill de Blasio and Andrew Cuomo of New York, and Nancy Pelosi of California were totally oblivious to the dangers of the pandemic and were urging people to go out dancing in the streets.

Let me also remind the American people here that it is you, sir, who is arguably the person most responsible for the feckless fool with obviously diminished mental capacity now sitting behind the Resolute desk in the White House.   Your endorsement of Joe Biden during the Democratic primary in South Carolina is generally regarded as  the turning point in the career of a man who should otherwise have been relegated to the dustbin of history along with his venal son Hunter Biden, who is a congressional investigation waiting to happen.

Because of your political efforts, the Biden regime has now spawned a stagflationary crisis the likes of which we have not seen since the 1970s. Our supply chains are in shambles. China and Russia are both getting ready to expand their territorial reach. Over 2 million illegal aliens are flooding over our border in this year alone; and it will be black and brown Americans who will bear the economic burden of this invasion through higher unemployment and depressed wages.

Here is something to consider: When the Republicans take over in 2022, and if the Pelosi Congress is successful in establishing the precedent of weaponizing the investigatory powers of the Congress for partisan ends, what exactly do you think is going to happen to every single Democrat official surrounding Joe Biden in the White House? It won't be you threatening subpoenas and jail. It will be somebody like Steve Scalise – and all he will say to you when you complain is "I warned you not to go there."

The second fact I would remind you of sir is that more people have now died from Communist China's virus on the watch of Joe Biden and Anthony Fauci than during the last year of the Trump administration. And we've seen this high death toll despite the fact that the Trump administration handed over a suite of vaccines that I personally jumpstarted in a February 9, 2020, memo.

Perhaps your Subcommittee should shift its focus to why Anthony Fauci and Francis Collins used American taxpayer money to fund dangerous gain-of-function experiments at a bioweapons lab in Wuhan, China where the pandemic no doubt originated.

Or perhaps you might want to investigate why hydroxychloroquine was sabotaged as a useful therapeutic by people like the current FDA Commissioner Janet Woodcock and again Tony Fauci. If hydroxychloroquine had been widely available to the American public since the dawn of the pandemic, over 400,000 Americans would be alive today instead of being buried in the ground – and it's not too late to use this life-saving medicine. The science is now abundantly clear on that. How about investigating that?

In closing, I remain intrigued by your claim that current or former White House officials have been successfully compelled to testify before Congress despite the implication of executive privilege. In consideration of this claim, I note that the rank of Assistant to the President is the highest rank within the White House. Pursuant to your claim, I respectfully ask the committee to *promptly provide the following information*:

1. Please name any Assistants to the President who have been subpoenaed by the U.S. Congress, provide the dates of those subpoenas, the general topic upon which they were asked to testify, whether it was a criminal investigation, whether executive privilege was invoked by the relevant president, and whether the privilege claim was ignored by the Assistant to the President.

2. Have you subpoenaed any other Assistants to the President at the Trump White House to testify or to provide documents. If so, who and which of these individuals have voluntarily complied? For example, is Jared Kushner, who public press reports suggest played a key role in ventilators, on your target list or list of cooperating witnesses?

In closing, I once again reiterate that the privilege is not mine to give away; and I direct you to President Trump's attorneys to litigate this.

I likewise reiterate – this was a point curiously absent from your threatening letter – much of what you have requested can be sourced directly from White House records if President Trump waives the privilege. It is not mine to waive.


Regards,

*Peter Navarro*

Peter K. Navarro

December 15, 2021


James E. Clyburn, Chair
Committee on Oversight and Reform
Subcommittee on the Coronavirus Crisis
2157 Rayburn House Office Building
Washington, DC 20515


Dear Mr. Clyburn:

I am in receipt of your threatening letter of December 11, 2021. It comes on the heels of an unnecessary early morning visit by one of your gendarmes to deliver a subpoena which I already acknowledged the receipt of to your assistant Beth Mueller. She assured me that acknowledgment of receipt of the subpoena would obviate the need for any show of force. Yet bang on my door your jackboot did in the early hours of the morning. Clearly, the game afoot here is to try to intimidate me.

In reviewing your letter, I was surprised at the shoddiness of the legal work. Most notably, you brazenly ignore considerable legal precedent and facts demonstrating why executive privilege is applicable in this instance.

While I have no intention of doing your legal work for you, you may want to review at least Nixon v. Adm'r of Gen Services, 433 U.S. 425, 448-49 (1977), *Loving v. DOD*, 550 F.3d 32 (D.C. Cir. 2008); *Comm. On the Judiciary v. McGahn,* 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019); *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (en banc); *Dep't of Interior v. Klamath Water Users Protective Ass'n.*, 532 U.S. 1, 8-9 (2001); and *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) just to name several. You may want to do this before you push this case on a path to the Supreme Court.

In the meantime, the abiding facts of the case are quite simple. President Donald John Trump, my Commander in Chief, has invoked Executive Privilege with respect to any interactions with your Subcommittee; and the law is very clear on this. This is not my privilege to waive. Only President Trump can waive the privilege.

Based on foregoing legal precedent and President Trump's invocation of executive privilege, I therefore cannot produce the communications sought by the Subcommittee in the Subpoena.

<u>Clearly, the best and proper course of action for your Subcommittee is to negotiate any waiver of the privilege with the president and his attorneys directly, not through me. The law is clear that this is not my privilege to waive. Only the president can waive privilege. Therefore, I refer you directly to the president's attorneys.</u>

Until the scope and extent of the privilege is either negotiated by President Trump's attorneys or adjudicated by a Court of law (free of partisan leanings), I cannot produce documents responsive to the subpoena or otherwise appear for the Subcommittee's deposition.

In this regard, the recent decision of the Democrat-stacked appeals court regarding the January 6 Committee that a sitting president can revoke the privilege of a former president is about the most stupid and dangerous court ruling I have ever seen. Talk about an open invitation to the politicization of executive privilege. That, too, is a Supreme Court decision waiting to happen.

Let me also restate something I noted in my original letter: I have no intention of allowing you or your Subcommittee to drain me financially by forcing me to hire a high-priced Washington lawyer. I am a man of modest means on the edge of retirement and have no intention of burning cash on this matter.

Likewise with respect to your shoddy legal work, I was surprised to see you cite *Harlow V. Fitzgerald* as the centerpiece for your claim that I should bend to your will. This case is clearly and readily distinguishable from the instant case and even the greenest law clerk would know this.

The citing of this case also implies that you intend to pursue to some type of criminal charges against me related to the White House handling of the pandemic.  This is all the more reason why I will not be coerced into sitting for a deposition before your Star Chamber.

Finally, as I document in my new book *In Trump Time*, my actions during my government service no doubt led to the saving of hundreds of thousands, and perhaps millions, of American lives. That you would try to use me as a pawn in your cynical witch hunt game to blame the Trump administration for mismanagement of the pandemic – even as you imply possible criminal charges against me – frankly disturbs me and should disturb the American people.

Let me remind you here, and as I document in *In Trump Time*, when I was arguing on behalf of the ban on travel from Communist China in January of 2020 and writing a dozen memos jumpstarting our pandemic efforts in February of 2020, you, Tony Fauci, and other Democrats like Bill de Blasio and Andrew Cuomo of New York, and Nancy Pelosi of California were totally oblivious to the dangers of the pandemic and were urging people to go out dancing in the streets.

Let me also remind the American people here that it is you, sir, who is arguably the person most responsible for the feckless fool with obviously diminished mental capacity now sitting behind the Resolute desk in the White House.   Your endorsement of Joe Biden during the Democratic primary in South Carolina is generally regarded as  the turning point in the career of a man who should otherwise have been relegated to the dustbin of history along with his venal son Hunter Biden, who is a congressional investigation waiting to happen.

Because of your political efforts, the Biden regime has now spawned a stagflationary crisis the likes of which we have not seen since the 1970s. Our supply chains are in shambles. China and Russia are both getting ready to expand their territorial reach. Over 2 million illegal aliens are flooding over our border in this year alone; and it will be black and brown Americans who will bear the economic burden of this invasion through higher unemployment and depressed wages.

Here is something to consider: When the Republicans take over in 2022, and if the Pelosi Congress is successful in establishing the precedent of weaponizing the investigatory powers of the Congress for partisan ends, what exactly do you think is going to happen to every single Democrat official surrounding Joe Biden in the White House? It won't be you threatening subpoenas and jail. It will be somebody like Steve Scalise – and all he will say to you when you complain is "I warned you not to go there."

The second fact I would remind you of sir is that more people have now died from Communist China's virus on the watch of Joe Biden and Anthony Fauci than during the last year of the Trump administration. And we've seen this high death toll despite the fact that the Trump administration handed over a suite of vaccines that I personally jumpstarted in a February 9, 2020, memo.

Perhaps your Subcommittee should shift its focus to why Anthony Fauci and Francis Collins used American taxpayer money to fund dangerous gain-of-function experiments at a bioweapons lab in Wuhan, China where the pandemic no doubt originated.

Or perhaps you might want to investigate why hydroxychloroquine was sabotaged as a useful therapeutic by people like the current FDA Commissioner Janet Woodcock and again Tony Fauci. If hydroxychloroquine had been widely available to the American public since the dawn of the pandemic, over 400,000 Americans would be alive today instead of being buried in the ground – and it's not too late to use this life-saving medicine. The science is now abundantly clear on that. How about investigating that?

In closing, I remain intrigued by your claim that current or former White House officials have been successfully compelled to testify before Congress despite the implication of executive privilege. In consideration of this claim, I note that the rank of Assistant to the President is the highest rank within the White House. Pursuant to your claim, I respectfully ask the committee to *promptly provide the following information*:

1. Please name any Assistants to the President who have been subpoenaed by the U.S. Congress, provide the dates of those subpoenas, the general topic upon which they were asked to testify, whether it was a criminal investigation, whether executive privilege was invoked by the relevant president, and whether the privilege claim was ignored by the Assistant to the President.

2. Have you subpoenaed any other Assistants to the President at the Trump White House to testify or to provide documents. If so, who and which of these individuals have voluntarily complied? For example, is Jared Kushner, who public press reports suggest played a key role in ventilators, on your target list or list of cooperating witnesses?

In closing, I once again reiterate that the privilege is not mine to give away; and I direct you to President Trump's attorneys to litigate this.

I likewise reiterate – this was a point curiously absent from your threatening letter – much of what you have requested can be sourced directly from White House records if President Trump waives the privilege. It is not mine to waive.


Regards,

*Peter Navarro*

Peter K. Navarro

**To:**       pknavarro[pknavarro@protonmail.com]; pknavarro2[pknavarro2@protonmail.com]
**From:**     JoannaMiller6261[JoannaMiller6261@protonmail.com]
**Sent:**     Mon 5/23/2022 7:15:23 AM (UTC-04:00)
**Subject:**  Looks good - finishing formatting of hyperlinks
JOANNA_00 Final Navarro Suit 5.17.22 3.0 blackline.docx

Peter,

Went through line-by-line on this lawsuit, made a few more very minor grammar edits, and everything looks great! Christina has no more comments.

I am going through now finalizing the formatting of your links in end notes - if I don't finish by 9 AM, I will send back around 6 pm today. Won't take me long!

Best,
 Joanna

Sent with ProtonMail secure email.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| PETER NAVARRO, | ) | |
| 425 8TH St. NW Unit 649 | ) | |
| Washington, DC, 20004 | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| NANCY PELOSI, in her official | ) | |
| capacity as Speaker of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| BENNIE G. THOMPSON, in his official | ) | |
| capacity as Chair of the Select Committee | ) to | |
| Investigate the January 6th Attack on the | ) | |
| United States Capitol; | ) | |
| | ) | |
| ELIZABETH L. CHENEY, in her official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| ADAM B. SCHIFF, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| JAMIE B. RASKIN, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| SUSAN E. LOFGREN, in her official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| ELAINE G. LURIA, in her official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| PETER R. AGUILAR, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |

STEPHANIE MURPHY, in her official )
capacity as a member of the United States )
House of Representatives; )

)

ADAM D. KINZINGER, in his official )
capacity as a member of the United States )
House of Representatives; )

)

SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH )
ATTACK ON THE UNITED STATES )
CAPITOL;) )

UNITED STATES HOUSE OF

REPRESENTATIVES )

*Defendants.* )

)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    I, the Plaintiff, Dr. Peter Navarro, am a private citizen who previously served as

a senior White House advisor during the four years of Donald John Trump's presidency.  I

bring this complaint *pro se*, request a jury trial, and seek declaratory and injunctive relief to:

(1) declare that the Select Committee To Investigate the January 6th Attack on the United

States Capital (Committee) is neither duly authorized nor properly constituted and therefore its

legislative acts, including its subpoena issued to me and Committee Report 117-284 of the 2nd

session of the 117th Congress are therefore ultra vires, unlawful, and unenforceable; (2)

declare that the Committee's subpoena, the Committee's Report 117-284, and House

Resolution 1037 117th Congress (2021-2022) all represent <u>legislative acts</u> that violate the

1

principle of separation of powers in their unlawful simultaneous pursuit of a judicial function under the flag, and behind the shield, of a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable; (3) declare that the Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable; (4) enjoin the U.S. Attorney for the District of Columbia from proceeding against me "in the manner and form provided by law" as  H.Res. 1037 recommends; (5) declare that the subpoena issued to me improperly compels testimony of a senior executive official; and (6) declare that President Joe Biden does not have the legal authority to waive the executive privilege or testimonial immunity invoked by his predecessor in this civil case.

2.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not, however, a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Congress (2021)[1] and with its own authorizing resolution, House Resolution 503 117th Cong. Therefore, the subpoena it has issued to me is invalid and unenforceable.

3.     For a Congressional Committee to duly issue valid and enforceable subpoenas during an investigation — and by extension, seek criminal contempt charges against those who fail to comply with such subpoenas — that investigation must have a valid "legislative function."[2]  The *Comm. On Ways & Means v. U.S. Dep't of Treasury*  notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021).  [emphasis added][3]

4.     *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."   *United States v. Brown, 381 U.S. 437, 448 (1965)*.    The Committee's subpoena and the Committee's Report to Congress 117-284 recommending that I be held in contempt of Congress along with H. Res. 1037 all represent "legislative acts."

5.     While the unwillingness of the courts to look beyond "facially valid" congressional investigations may have been correct law within the context of the balance of power within the three branches of government in prior times, over time, the setting of this low "facially valid" bar has been an open invitation for legislators to simultaneously pursue an unconstitutional judicial function under the false flag, and behind the shield of, their legislative function.    It should be clear here that a pursuit of a facially valid legislative function does not preclude the unconstitutional and unlawful simultaneous pursuit of judicial function.

6.     The result of the courts' silence in this matter is now clear: Repeated abuses by Congress in using its investigatory powers to simultaneously serve both facially valid legislative and unconstitutional judicial functions have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance of powers – and the separation thereof — between the legislative, judicial, and executive branches of our government.   In this case, the legislative history of the Committee and its members broadly viewed over a more than five-year period reveals an undeniable and overwhelming pattern of the weaponization of Congress' investigatory powers to pursue a judicial, and by implication, a political function.

3

7.     In this case, the legislative acts of the Committee and its members together with H.Res 1037 constitute an unlawful exercise of the judicial function over and above the Committee's "facially valid" legislative function, thereby violate the principle of the separation of powers, and cannot advance a legal contempt of Congress charge against me through the United States Attorney's office.

8.     The Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 constitute legislative acts that violate the constitutional proscription against bills of attainder, and each should be invalidated and declared unenforceable.  These legislative acts violate the Constitutional proscription against bills of attainder because: (1) they seek to determine guilt and inflict punishment on me in the forms of shame, humiliation, banishment, ostracization, incitement of public hate, possible imprisonment, and the confiscation of my property, all without adequate provision of the protections of a judicial trial, and (2) the Committee, contrary to the court's guidance, failed to pursue less burdensome alternatives to achieve its alleged "legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). The set of deprivations which the Committee and its members and which the Democrat-controlled House have inflicted and seek to inflict on me are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).  At my age of seventy-two, with the average life expectancy in America for males at seventy-six, a one-year prison term would constitute over 25% of my remaining expected life while a $100,000 fine would be equivalent to a significant fraction of my wealth for retirement.

9.     Rather than pursuing the less burdensome alternatives of negotiating a waiver of

executive privilege and testimonial immunity from President Trump and his attorneys or a civil suit as *Nixon v. Administrator of General Services* and *Committee on Judiciary v. Miers* guides, the Committee and Congress with its passage of H.Res. 1037 have pursued the most burdensome and punitive alternative with a potential criminal prosecution in their naked effort to threaten and coerce me into turning my back on my duty to my country and appearing before their kangaroo court. By the Committee's refusal to negotiate directly with President Trump and his attorneys on the issue of executive privilege and testimonial immunity – the least burdensome alternative – and by failing to pursue the second least burdensome alternative of a civil suit, my due process has been violated, the legislative acts of the Committee and House of Representatives against me have been exposed as bills of attainder, and these legislative acts of the Committee and Congress in this case must be invalidated. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). *Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).*

10.     There is no settled law to support the absurd, fanciful, and extremely dangerous proposition that an incumbent president can waive the executive privilege invoked by his predecessor or waive the testimonial immunity of the senior advisers serving under that predecessor.

11.     Executive privilege is an institution dating back to the days of George Washington that has been deemed critical to effective presidential decision-making; executive privilege, together with testimonial immunity for senior White House advisers provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

5

12.    I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension for which there is no settled law.  Allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the false flag of the national interest – represents the most extreme and dangerous form of qualifying the privilege and the testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn deal a mortal blow to the critical functions that executive privilege and testimonial immunity are supposed to serve in our Republic. These functions are to: (1) help ensure the separation of powers; and (2) provide for optimum candor in presidential decision-making.  Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.

13.    The Committee's members along with House Speaker Nancy Pelosi over a more than five year period have been engaged in a "repeatable strategic game" of "gotcha" and punishment that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic ping pong game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office or serve in government.

14.    The time is ripe for the court to address this controversy and the question of whether an incumbent president can strip his predecessor of executive privilege and

6

testimonial immunity.  Here, if the Committee and Joe Biden manage to pull this deadly game off now and effectively establish the principle in settled law that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.

15.    Congress cannot lawfully hold me in contempt of Congress for failure to comply with a subpoena that compels me to testify before the Committee because, under long-standing Department of Justice Office of Legal Counsel (OLC) policy, I have absolute testimonial immunity as a senior White House official. As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.'  Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

16.    If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.

17.    If testimonial immunity exists as an institution to provide for unconstrained

candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve.  Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.

18.    I come to this case far exceeding ""the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  I will demonstrate substantial injury through punishment from Speaker Pelosi, the Committee, and Democrat-controlled House of Representatives responsible for passage of H.Res. 1037 along with possible imminent, existential injury through punishment and the threat of punishment from the U.S. Attorney of the District of Columbia. Only a set of favorable rulings by this court will clearly redress these injuries and prevent further injury.

## PARTIES

1.    Plaintiff  Peter Navarro served as a senior White House adviser during all four years of the Trump administration.  He is currently a professor *emeritus* at the University of California-Irvine.

2.    Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

3.      Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair.  Thompson also introduced H. Res. 1037 – 117th Congress (2021-2022) with zero cosponsors.

4.      Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

5.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

6.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

7.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

8.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

9.      Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

10.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.     Defendant Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

13.     Defendant House of Representatives passed H. Res. 1037 by the yeas and nays 220-203 along party lines (with two Republican votes) on April 6, 2022.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

2.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House.

3.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Committee and introduced H. Res. 1037.

4.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam

D. Kinzinger because they serve as members of the Committee that issued the Navarro subpoena from Washington, D.C.

5.    This Court has personal jurisdiction over the Committee because it is located and operates in Washington, D.C.

6.    Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, DC.

## RELEVANT FACTS

1.    On August 3, 2020, the Democrat-funded Transition Integrity Project publicly released a detailed plan to skew the 2020 presidential election in favor of Joe Biden using a combination of lawfare and grassroots tactics. Their overarching purpose was to stuff the ballot box in key battleground states with absentee ballots, many of which would, under the lax, and often illegal, rules they sought to impose, would be illegal votes, and therefore unlawful to count.[4]

2.    In a *Time* magazine cover story, journalist Molly Ball published an article after the election entitled "The Secret History of the Shadow Campaign That Saved the 2020 Election" which confirmed many of the strategies and tactics the Democrats had used to tilt the election in favor of Joe Biden as had been set forth in the TIP plan. Notes Ball: "Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding."[5]

3.    In the wake of the November 3, 2020 election, numerous analyses emerged revealing the elaborate strategies and tactics the Democrats had indeed used to skew the election and that the Transition Integrity Project had foreshadowed.  This set of analyses included the Plaintiff's "Navarro Report;"[6] and as noted in that report:

*On January 13, 2021, the Democrat-controlled House of Representatives passed House Resolution 24 "impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors." A primary justification for this overwhelmingly partisan impeachment is that "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."*

*If it can be demonstrated that President Trump had a good faith belief that the November 3, 2020 Presidential election results were, indeed, the poisonous fruit of widespread fraud and election irregularities, POTUS45 must not only be found Not Guilty. The U.S. Senate must also call for a prompt investigation of these alleged irregularities.*

*The three volumes of the Navarro Report provide just such a demonstration. These three volumes have been consolidated herein into a single document explicitly designed as a useful evidentiary handbook and reference guide for the upcoming Senate impeachment trial.*

*Evidence used in the preparation of the Navarro Report includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.*

*Volume One finds significant election irregularities across six key battleground states – Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These irregularities range from outright voter fraud, ballot mishandling, and contestable process fouls to Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.*

*Volume Two examines a two-pronged Grand "Stuff the Ballot Box" Strategy used by the Democrat Party and its political operatives to flood the*

> *battleground states with enough illegal absentee and mail-in ballots to turn a decisive Trump victory into a narrow, and arguably illegitimate, Biden "win." To strategically game the Presidential election, the Democrats and their operatives were found to have at times bent or broken both election rules and laws.*
>
> *Volume Three provides the most up-to-date statistical "receipts" with respect to the potential number of illegal votes cast in each battleground state. Volume III thereby provides investigators with a well-documented tally of potentially illegal votes on a state-by-state and category-by-category basis. A key finding is that the number of potentially illegal votes dwarfs the very thin alleged Biden "victory" margins across all six battleground states.*

4.      Public opinion polls today indicate that a significant fraction of the American electorate believes the 2020 presidential election was rigged or stolen.[7]

5.      There is no definitive proof offered by the Committee or available in the public square that the November 3, 2020 presidential election was a fair election unmarred by election irregularities.

6.      In the Committee's letter of February 9, 2022 transmitting a subpoena electronically to me, the Committee accuses me of making "many claims of fraud in the election" but also insists that these claims have been discredited by "public reporting, by state officials, and courts."[8] Yet, the only "proof" the Committee's Chair Bennie Thompson offers is a laughable footnote citing an article in the long-discredited Forbes magazine – Forbes is owned by Chinese investors and has been turned largely into a propaganda organ for the Chinese Communist Party.[9]

7.      On January 6, 2020, a large group of Trump supporters gathered in Washington

13

in the American tradition of peaceful protest to support the president in his peaceful bid to get a legal counting of the vote. At this point in time, President Trump had a strong presumption that the election was likely rigged and stolen from him based on the data and analyses available to him, including the "Navarro Report."

8.      Among a large crowd of Trump supporters, there were small pockets of extremists likely seeking to instigate violence that could be blamed on President Trump. These extremists ranged from members of the Marxist group Black Lives Matter and the anarchist Antifa group to far right militia groups.[10]

9.      There is likewise evidence that among the crowd were individuals serving as informants to the FBI who may have possibly instigated the violence.[11]

10.      The Committee was formed against the backdrop of this January 6 history. In justifying its investigation, the Committee and its members refer repeatedly to the role of President Trump and his advisors, including the Plaintiff, in instigating an unlawful insurrection and promoting an unlawful attempt to overturn the 2020 election while insisting that the election was fair – again, despite no definitive evidence proving the election was fair.[12]

11.      For the four years of the Trump administration, I, the Plaintiff, served as a senior White House adviser to President Donald J. Trump.  While I would carry several titles during my term of service – Director of the National Trade Council, Director of the Office of Trade and Manufacturing Policy, Defense Production Act Policy Coordinator – my duties and responsibilities in the White House as an Assistant to the President during the relevant times here spanned a far broader spectrum of economic, trade, border security, and national security issues.

12.     During my service, President Trump would regularly seek my candid advice on matters that might seem far outside my "official" duties; and a narrow construction of my role in the White House as the Committee has done based merely on my titles fundamentally misunderstands how the Trump White House worked.

13.     In the aftermath of the November 3rd, 2020 election, I began an investigation that would quickly lead to deep national and economic security concerns about election integrity. In a series of previously referenced analyses titled collectively "The Navarro Report," I identified not just an abundance of fraud and election irregularities.   I exposed how the Democrat Party and its operatives effectively made what should have been a landslide win by President Trump into an election close enough to steal.

14.     Given the economic and national security ramifications of a possibly stolen election, I worked diligently in my official capacity as a government official within the White House and as a senior White House adviser to help the president and other senior advisers navigate what appeared to me to be the most sophisticated assault on American democracy ever perpetrated.

15.     In the days leading up to January 6, and as reported in my book *In Trump Time: My Journal of America's Plague Year* referenced by the Committee,[13] I described a legal and constitutional strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887.[14]   The goal was to delay certification of the election for at least another several weeks "while Congress and the various state legislatures involved investigate[d] all of the fraud and election irregularities" that would be raised that day on Capitol Hill.

16.     As noted in *In Trump Time,* the goal of this strategy was "*not* to get the election

overturned" as the Committee would insist. Rather, the goal was "to subject the ballots – the *legal* votes of American citizens along what we believed to be a flood of ballots – to careful scrutiny and investigation."

17.    Finally, as noted in *In Trump Time,* because implementation of the Green Bay Sweep strategy required "only peace and calm on Capitol Hill," the last thing President Trump and I wanted was "to hand Congress an excuse to abort the operation" with an outbreak of violence and chaos and the last people "who wanted to see violence erupt that January 6 day on Capitol Hill" included both myself and President Trump (along with Stephen K. Bannon).

18.    To date, the Committee has offered no significant or conclusive proof that the November 3 election was fair or that the Navarro Report was in any way inaccurate or misleading.  Nor has the Committee offered any significant or conclusive proof that either I or President Trump or any of the senior advisors sought to <u>illegally</u> overturn the election.

19.    To recap, the Committee asserts without facts and evidence that "many claims of purported fraud in the election...have been discredited in public reporting, by state officials, and courts." This is but one of many pieces of evidence that the Committee is operating upon under the flawed assumption that the 2020 presidential election was fair and without reasonable controversy. From this flawed assumption, this kangaroo court of a Committee is pursuing a judicial function in seeking to punish President Trump and any of his senior advisors who publicly reject the unproven claim that the election was indeed fair.

20.    Against this stark backdrop of lack of evidence for its allegations, the Committee continues to subject President Trump and senior advisors such as myself to the punishment of shame, humiliation, banishment, ostracization, and the incitement of public hatred by portraying us as insurrectionists rather than as patriots seeking to get the bottom of what looks

to be, just as with the Nixon-Kennedy 1960 election, a likely stolen election.[15]

21.    The Committee's efforts are also geared at inflicting equally traditional forms of punishment such as imprisonment and the confiscation of the property of Trump's most senior advisors who dare to defy the Committee's unlawful subpoenas and investigation using the U.S. Attorney and the vast resources of a Democrat-controlled Department of Justice as its cudgels.  In seeking to build a criminal case against President Trump and his most senior advisors for their alleged roles in seeking to overturn a fair election, the Committee is clearly venturing far beyond its facially valid legislative function into the realm of the unconstitutional pursuit of a judicial *cum* political function.

22.    On February 9, 2022, I received the Committee's subpoena in which I was "commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol" (Committee) and "to testify at a deposition touching matters of inquiry committed to said committee or subcommittee" on March 2, 2022 at 10:00 am and further to "not to depart without leave of said committee or subcommittee."[16]

23.    I was also commanded under this subpoena "to produce the things identified on the attached schedule."[17]  I found the breadth and invasiveness of this subpoena and its attachment to be breathtaking and a direct frontal assault on both executive privilege and testimonial immunity while it also gave the appearance of a criminal investigation, not a fact-finding mission.

24.    Upon receipt of this subpoena, as a former senior White House adviser to President Donald J. Trump clearly covered by testimonial immunity, I was faced with three broad choices:[18] (1) respect President Trump's invoking of executive privilege in the Committee's investigation and fail to comply with the subpoena; (2) unilaterally waive

President Trump's Executive Privilege and my own testimonial immunity by providing all of the requested documents and testifying before the Committee as commanded; or (3) preserve President Trump's executive privilege while at least superficially meeting the requirements of the subpoena by appearing before the Committee to testify but invoking my Fifth Amendment rights during such testimony.

25.     After considerable reflection and a broad overview of the law – both settled and unsettled – I chose Choice #1: fail to comply with the subpoena while preserving the executive privilege asserted by President Trump.  I was swayed both by my own personal experience within the White House as one of the president's most senior and trusted advisors and by the wisdom of *United States v. Nixon* that opines that "[a] President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon, 418 U.S. 638 at 708.*

26.     Further, as noted in *Trump v. Mazars, 140 S. Ct. 2019 at 2032*, executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends."  *Mazars, 140 S. Ct. at 2032* at 448–449.

27.     From this vantage point, I believed at the time of my receipt of the Committee's subpoena – and also keenly mindful of the absolute testimonial immunity historically granted to senior White House officials --  it was my duty to President Trump, the Constitution, and

the Republic that I had pledged to serve and defend to honor the executive privilege that President Trump had invoked.

28.     I made Choice #1 knowing that it would put me in an untenable position, and I did so despite the obvious risks to my freedom and my financial position that might come with a criminal contempt prosecution.[19]  That I might face criminal charges was no idle speculation as one such criminal prosecution was already in progress against another former Trump advisor Stephen K. Bannon and another criminal contempt charge was possibly pending against former Trump Chief of Staff Mark Meadows.  Yet, in making Choice #1, I believed that duty and honor must come first.

29.     Regarding Choice #2, comply with the Committee's subpoena, there is settled law that dictates the executive privilege in this matter was not mine to waive, e.g., the Supreme Court has held that executive privilege "can neither be claimed nor waived by a private party." *United States v. Reynolds, 345 U.S. 1, 7–8 (1953).*  If I were to ignore President Trump's invocation of privilege by opting for Choice #2, I would be engaging in an act contrary to settled law while violating due process.  This would be an act of betrayal both of the president I served and of my country.  I would be violating constitutional law by waiving the privilege myself and fully cooperating with the Committee.

30.     With Choice #2, to the extent that I was choosing it "to save my own skin," as the saying goes, I would be committing an act of cowardice under partisan Congressional fire – the exact opposite of the honorable and patriotic choice epitomized by Choice #1.  I note here in this regard that several high-ranking Trump White House officials, including President Trump's son-in-law Jared Kushner, chose to ignore the critical privilege and immunity issues at stake and testify before the Committee.  Predictably, their cowardly actions would be used

to criticize both my principled position as well as President Trump himself, as illustrated in this news coverage of a comment from the Committee's Chair Bennie Thompson: "A person close to the Trump family told CNN the former President's children never saw a reason not to cooperate with the committee because none of them felt appearing before the panel put them at any risk.[20]...In his interview with CNN, Thompson questioned why the former President did not object to his family members testifying while key White House aides are now being held in contempt of Congress by the House after refusing to testify, saying they had been instructed by the President to claim executive privilege over their conversations. "'Now we have four individuals who are being held in contempt of Congress because they were directed by the President not to come. So they are under the bus, but his children are not. They came," Thompson said. "Now to me, that's Donald Trump that we are discovering. It's 'do as I say, but not do as I do.' Do you understand? I say don't go and testify, but when my children or my in-laws are involved, you can go testify.'"[21]

31.   As for Choice #3, complying with the subpoena but invoking my Fifth Amendment rights, I believed that by doing so I would be undermining executive privilege in a way every bit as dishonorable as Choice #2. To wit: I would be invoking the Fifth Amendment rather than staunchly defending Executive Privilege.

32.   With Choice #3, I also was keenly aware of the reputational harm that would come because far too many Americans wrongly associate guilt with invoking the Fifth Amendment.   As just one data point, a Morning Consult poll of 1993 registered voters conducted May 10-14, 2018 found that 36% of respondents believed that invoking the Fifth Amendment "usually implies the person is guilty."[22]   Here, Justice Felix Frankfurter has famously criticized those who believe the Fifth Amendment implies guilt: "Such a view does

scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. " Of course, no such admonition by Frankfurter would have been necessary if the problem didn't exist. *United States v. Chase*, 281 F.2d 225, 228 (7th Cir. 1960).

33.     In this case, Justice Frankfurter might just as well have been criticizing the Chair of the Committee Bennie Thompson for unlawfully judging – and publicly branding -- anyone who invoked the Fifth Amendment during testimony before his Committee as guilty indeed. In a public statement on December 2nd, 2021 illustrating the unconstitutional punitive nature of a Committee that is supposed to be pursuing a non-punitive legislative agenda and exposing the "judge, jury, and executioner" judicial function mindset of the Committee, Thompson baldly asserted that those who appear before his Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, Real Clear Politics, Dec. 2, 2021.[23]

34.     Having worked hard my entire life to live honorably with a reputation for honesty, I was not inclined to invoke the Fifth Amendment in a demonstration of gamesmanship to avoid a contempt charge. Nor was I going to be tainted with the charge of "guilty until testifying" in the ugly game Thompson and the Committee were obviously playing.

35.     Finally, I note that I was aware at this time of a critical decision I would have to make that if I were to bend to the Committee's coercive will. To wit, I would not only be undermining the institution of executive privilege and its critical role in the separation of

powers.  I would be weakening the companion institution of testimonial immunity for senior White House advisers.

36.     While there has been at least some case law arguing for a qualified rather than absolute executive privilege – the law remains unsettled – history and the law on testimonial immunity has leaned far closer to the absolute end of the spectrum.  For example, the Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

37.     Having made Choice #1 to honor the executive privilege invoked by President Trump (and cognizant of the sanctity of absolute testimonial immunity), I responded to the subpoena I had received in an email dated February 27, 2022 addressed to  Senior Investigative Counsel for the  Committee, Dan George as follows: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.  Your best course of action is to directly negotiate with President Trump and his attorneys regarding any

and all things related to this matter."

38.    Note that I clearly assert in this email that the privilege is not my to waive, and I clearly indicate the Committee should "directly negotiate with President Trump and his attorneys."

39.    The court can also see in my response that I am anticipating a possible assault on President Trump's privilege by Joe Biden by clearly indicating that the privilege is not Biden's to waive either.  In fact, the very next day, on February 28, 2022 I received a letter by email from Deputy Counsel to the President Jonathan Su of the White House Legal Counsel's office advising me that President Biden "has decided not to assert executive privilege" as regards to either my "testimony" or "documents" commanded by the Committee."[24]

40.    Even a cursory view of the case law, Executive Orders, and OLC opinions indicates that Su's bold assertion that Joe Biden has the legal authority to waive the privilege of his immediate predecessor and the immunity of that's predecessor's senior advisers within a matter of mere months of the transition of power is anything but settled law.

41.    Upon receipt of the Su letter, I immediately wondered whether the Committee had had somehow signaled to Su and the White House to take this action as a way of further coercing me into bending to their will.    Here, it has been said that there are no conspiracies, but there are also no coincidences while Occam's Razor teaches us that the simplest explanation is also the most likely.  In this instance, the simplest explanation for the Su/Biden correspondence is not that it was a coincidence but rather that the Committee either tacitly or explicitly colluded with the White House to elicit this correspondence in a blatant attempt to do an end run around due process and the law.  If Joe Biden could strip Donald Trump of executive privilege and me of testimonial immunity, then neither I nor any Trump senior

White House adviser would have an excuse not to appear before the Committee – or so their illegal and indefensible position would become.

42.     My second thought upon receiving the Su letter was that no court of law would find it reasonable to allow an incumbent president to strip his predecessor of executive privilege within months of taking office no matter what fig leaf of a broader national interest the incumbent might seek to cover its assault in.  The chilling effect of such an action, if upheld by the courts, would be tantamount to destroying executive privilege and testimonial immunity as we know them as no future White House senior advisor or president would have confidence in the privilege.

43.     To make this point early, and it shall be made often, whatever vague "extraordinary" "national interest" the Su letter cites in support of its half-baked assertions, these concerns pale in comparison to the transformation of executive privilege and testimonial immunity into partisan ping pong balls that provide no real assurances to future White House advisers or presidents of the kind of confidentiality necessary to make sound decisions.

44.     Within the context of strategic game theory, if the assault on Executive Privilege and testimonial immunity by the Committee and the White House in this case are allowed by this court, it will spell the end of both Executive Privilege and testimonial immunity as this Republic has known them because we will quickly bear witness to a "repeatable game" in which whichever party controls <u>both</u> the House of Representatives and White House, that party will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.  Of course, this will all be done under the false flags of national emergency and national security.

45.     If, in this case, the Committee and Joe Biden are able to effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will lead the charge.

46.     On February 28th, after receiving Mr. Su's correspondence and additional correspondence from Mr. George, I reaffirmed to Mr. George that: "President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."

47.     I would further subsequently note in a press release on March 26, 2021 that I would honor whatever decision President Trump made in the matter and assist the Committee in expediting the matter to the Supreme Court to settle the law on this controversy: "This is an unprecedented partisan assault on executive privilege. The committee knows full well that President Trump has invoked executive privilege and it is not my privilege to waive.  If President Trump waives  the privilege, I would be happy to testify. It is premature for the  committee to pursue criminal charges against an individual of the highest rank within the White House for whom executive privilege undeniably applies.   Until this matter has been settled at the Supreme Court, where it is inevitably headed, the Committee should cease its tactics of harassment and intimidation. I would be happy to cooperate with the committee in expediting a review of this matter by the Supreme Court and look forward to arguing the case."[25]

48.     After a more careful reading of the Su letter, it is clear, if not altogether obvious, that the Biden White House does not directly seek to waive President Trump's privilege in the

matter.  All Mr. Su is informing me of is that President Biden "has decided not to assert executive privilege."  To believe that this waives the privilege invoked by President Trump, one must make the leap that the decision by Biden not to invoke privilege is equivalent to waiving the privilege invoked by Trump.  This is not at all clear from the Su letter.  In fact, Su may be purposely opaque knowing the quicksand of unsettled law he has waded into.  And it may be useful to note as well that Su makes no reference to any case law that would indicate Biden is seeking to hijack the Trump privilege.  Yet, the Committee would be more than eager to make this leap.

49.     On March 28, 2022, the Committee voted unanimously (9-0) to recommend that I, along with former Trump senior White House adviser Dan Scavino, be held in contempt of Congress.

50.     On April 4, the House Rules Committee voted along party lines, 9 Democrats for to 4 Republicans against, to advance the contempt charge against me.[26]

51.     On April 6, the House of Representatives passed H.Res. 1037 virtually along party lines by a vote of 220-203, with only two Republicans voting in the affirmative.[27]  This Resolution recommends  to the United States Attorney for the District of Columbia  that the Plaintive "be proceeded against in the manner and form provided by law"  for criminal contempt of Congress, whereby this contempt charge  carries with it a prison term of up to one year  and the confiscation of the Plaintiff's  of up to $100,000.

52.     The Supreme Court has long recognized that due process protections apply to all congressional investigations.  *Watkins v. United States*, 354 U.S. 178,188 (1957); *Quinn v. United States*, 349 U.S. 155,161 (1955).   The Committee had its own duty to honor due process and attempt such negotiations with President Trump in good faith – and thereby avoid

obvious bill of attainder complications.   Negotiations was the least burdensome (punitive) alternative at the Committee's disposal while a civil suit was the next least burdensome alternative.   Instead, the Committee pursued the most burdensome (punitive) alternative of a criminal contempt of Congress charge.

## My Subpoena Was Not Issued by a Duly Authorized and Properly Constituted Committee and is Unenforceable

1.      Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Cong. (2021)[28] and its own authorizing resolution, House Resolution 503 117th Cong. (2021).[29]

2.      Section 3(b)(1) of H.Res. 8 provides: "During the One Hundred Seventeenth Congress, the chair of a standing committee…upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."   [emphasis added]   By H.Res 8, consultation with the ranking minority member is therefore a necessary condition for the issuance of any subpoena by the Committee.

3.      Section 5 (c) (6)(A) of H. Res. 503 states: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." By H.Res 1037, consultation with the ranking minority member is likewise a necessary condition for the issuance of any subpoena by the Committee.

4.      Section 2(a) of H. Res. 503 states that "The Speaker shall appoint 13 Members to the Committee, 5 of whom shall be appointed after consultation with the minority leader."

5.      Presumably, the minority leader would propose five members of his own party under Section 2(a) of H. Res. 503 so that the partisan balance would reflect an albeit still partisanly skewed 13-5, near three-to-one Democrat majority on the Committee.

6.      Upon passage of H.R. 503, Speaker Pelosi appointed Bennie Thompson to serve as Chair of the Select Committee along with six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.[30]

7.      Following the instructions of H.R. 503, House Minority Leader Kevin McCarthy recommended Rep. Jim Banks of Indiana, to serve as minority ranking member of the Committee.[31]   However, Pelosi refused to seat Banks; and the Committee has no ranking minority member despite the requirement of H.Res. 503 that it should and the requirements imposed by H.Res 8 for the issuance of valid subpoenas.

8.      Minority Leader McCarthy also recommended to Pelosi the appointment of four additional  Republican members to serve as minority members on the Select Committee – Illinois' Rodney Davis: Ohio's Jim Jordan,  North Dakota's Kelly Armstrong, and Texas' Troy Nehls.  None were appointed by Pelosi.

9.      If Pelosi had simply appointed the members recommended by McCarthy along with Banks as ranking minority member, this would have met the requirements of H.Res. 503 to have a 13-member commission with five minority representatives and a ranking minority member.[32]   Instead, without the consultation of McCarthy, again in contradiction to H.Res.

503, Pelosi appointed Illinois' Adam Kinzinger and Wyoming Liz Cheney—two Republicans with clear animus against President Trump.

10.     The Committee's failure to comport with Section 2(a) of H.Res. 503 is evident in: (1) the failure of House Speaker Nancy Pelosi to appoint the proper number of members (9 instead of 13); (2) an even more skewed 7-2 ratio of Democrats to Republicans instead of the 8-5 ratio called for by H.Res. 503; (3) the failure of Pelosi to consult with Minority Leader Kevin McCarthy prior to the seating of the two titular Republicans on the Committee, neither of which were proposed by McCarthy; (4) the absence of a ranking minority member; and (5) the rejection by Pelosi of all five members, including a ranking minority member, proposed by McCarthy.

11.     The Committee's failure to comport with Section 3(b)(1) of H. Res. 8 as well as Section 2(a) of H. Res. 503 is evident in the fact that of those nine members Speaker Pelosi appointed to the Committee, none were appointed after consultation with the ranking minority member as required by the authorizing resolutions.

12.     Since Speaker Pelosi allowed no ranking minority member on the Committee there is no ranking minority member to "consult" with and therefore the Chair may not "order the taking of depositions" "pursuant to subpoena."

13.     Absent a ranking minority member, the Committee has no legal authority to duly issue, much less legally enforce subpoenas and advance resolutions finding private citizens in contempt of Congress for refusal to comply with the illegal subpoenas issued by the Select Committee.

14.     The absence of a ranking minority member on the Committee alone is sufficient for this court to rule that all of the Committee's subpoenas are invalid.   Chairman Thompson

derives the authority to issue subpoenas from both H.Res. 8 and H.Res. 503 Section 5(C)(6)(A) of the Committee's authorizing statute, but these authorities are qualified, not absolute. The Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Committee.

15.     As the Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena to me. The subpoena thus runs afoul of the Committee's authorizing resolution as well as H.Res. 8, making it invalid and unenforceable; and my failure to comply with the Committee's subpoena cannot be grounds in H. Res. 1037 for holding me in contempt of Congress.

16.     In a public statement, Pelosi acknowledged she had taken an "unprecedented decision"[33] in establishing what amounts to nothing more than a highly partisan and score-settling kangaroo court of a Committee with a fig leaf of Republican membership, no ranking minority member, and four empty seats in clear violation of the specifications of H.R. 503 for a duly authorized and properly constituted committee.

17.     Congress' failure to act in accordance with its own rules is judicially cognizable. *Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

18.     In this case, former senior White House officials, including myself, have been held in contempt of Congress on the basis of invalid and unenforceable subpoenas from a Committee that is neither duly authorized nor properly constituted yet we face possible imprisonment of up to one year and a significant confiscation of personal property in the forms of up to $100,000 in fines and the substantial cost burden of legal representation.

**The Legislative Acts of the Committee and H.Res 1037 Violate the Principle of Separation of Powers Because They Also Seek To Fulfill a Judicial Function**

1.      A key controversy before this court in this case for which there is no settled law is this: If a Congressional entity such as the Committee is pursuing an investigation under the Constitutional flag, and behind the shield of, what appears to be a facially valid legislative function, is it also then free to use that investigation and its subpoena powers to simultaneously pursue an illegitimate judicial function that violates the principle of separation of powers?    Here, it should be obvious that the presence of a facially valid legislative function does <u>not</u> rule out the presence of a punitive judicial function – the pursuit of these legitimate legislative and illegal judicial functions can occur simultaneously.

2.      The Constitution contains no provision explicitly declaring that the powers of the three branches of the federal government shall be separated yet the principle of separation of powers is implicit in its construction: Article I vests all legislative powers in the Congress; Article II vests executive power in the president, and Article III vests judicial power in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

3.      Congress has no enumerated constitutional power to conduct investigations or issue subpoenas.    For a Congressional Committee to duly issue valid and enforceable subpoenas in the course of an investigation – and by extension, seek contempt charges against those who fail to comply with such subpoenas -- that investigation must have a valid and <u>non-punitive</u> "legislative function."[34]

4.      Congress' power to investigate is limited because it is "justified <u>solely</u> as an adjunct to the legislative process."[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).   (emphasis

added).

5.      A hallmark of the judicial function is the power to punish.  "The power to punish is inherent in the courts." *United States v. Landes*, 97 F.2d 378, 381 (2d Cir. 1938).

6.      To ensure the principle of separation of powers, Congress has no judicial power and therefore does not have the power to investigate in pursuit of a judicial function and "inflict punishment." *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

7.      The Committee and its members have "no Congressional power to expose for the sake of exposure" *Watkins v. United States*, 354 U.S. 178, 200 (1957).   Exposing for the sake of exposure represents an unlawful exercise of judicial power and seeks to perform a judicial function because, in causing such results as shame, banishment, humiliation, or ostracization, such exposure administers various forms of punishment.  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).  Justice Black notes "There is nothing strange or novel about this kind of punishment. It is in fact one of the oldest forms of governmental punishment known to mankind; branding, the pillory, ostracism and subjection to public hatred being but a few examples of it. Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment. *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959)  [emphasis added]

8.      The courts have never firmly addressed the controversy of whether a Congressional investigation should be invalidated if that investigation represents a simultaneous exercise of both a facially valid legislative function and an unconstitutional and unlawful judicial function. Yet, as the frequency and intensity of overtly partisan and weaponized Congressional investigations have accelerated in the vacuum of settled law in this matter, it is a question and controversy that begs for this court's wisdom. To borrow a phrase

from *Trump v. Mazars*, this case, the hallmark of which is Speaker Pelosi's frank admission of the overtly partisan construction of an "unprecedented" Committee, "represents a significant departure from historical practice." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2031 (2020). Accordingly, this case and controversy by Pelosi's own words invites the court to settle the law and thereby set precedent.

9.      Historically, the courts have been reluctant to dive into the deep end of this separation of powers pool in their relatively few rulings on the subpoena power of Congress. For example, the *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021).  [emphasis added][36]

10.      The reluctance of the courts to pierce the veil of a facially valid legislative function and find a companion unconstitutional judicial function has been attributed in part to the 'hurly burly' nature of politics.  As *Trump v. Mazurs* notes: "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020)

11.      The unwillingness of the Courts to look beyond facially valid congressional investigations may have been tolerable within the context of the balance of power within the

three branches of government in prior times.  However, over time, the setting of this low, facially valid legislative function bar to the exclusion of the possibility that a judicial function is simultaneously and unconstitutionally being pursued has been an open invitation for legislators to pursue just such a judicial function under the false flag, and behind the shield of, their legislative function.

12.    The result of the court's silence in this matter is now clear: Repeated abuses by partisans and political score settlers like those on the Committee have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance and separation of powers between the legislative, judicial, and executive branches of our government.

13.    In considering whether to address this controversy in this case, the court should indeed take Speaker Pelosi at her word when she describes the formation of the Committee as "unprecedented."  It is indeed unprecedented for Congress to form a rabidly partisan and score-settling congressional committee that has no minority ranking member and fails to abide by its own authorizing resolution.  It is equally unprecedented to allow this Committee to wield such powerful investigatory powers in pursuit of a judicial function behind the flag and shield of a facially valid legislative function.

14.    While the courts have been loathe to address the controversy before us, they have not been entirely silent on the matter.  For example, *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951) opens the door to new precedent when it opines "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."  In *Tenney v. Brandhove*, such usurpation was not "obvious."  However, as shall be demonstrated with a

34

review of the legislative history of the Committee and its members below, this is a case where such an usurpation is overwhelmingly and painfully obvious.[37]

15.    With regard to the importance of "legislative history," the courts have deemed the "legislative history" of any given investigation to be a critical factor in assessing the validity of a Committee's investigatory powers.  In *Barenblatt v. United States*, for example, the court references "[i]n the light of the Committee's history" to rule "legislative authority" "unassailable".[38]   The case likewise refers to the "persuasive gloss of legislative history"[39] and also uses the phrase "In light of the legislative history."  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

16.    Building on *Barenblatt*, *Nixon v. Administrator of General Services* establishes a "legislative history" test to probe for the unconstitutional presence of the judicial function. It urges us to ask in that case whether the "legislative history" indicates if "the Act before us is regulatory [legislative] and not punitive in character?" 408 F. Supp., at 373 *Nixon v. Administrator of General Services, 433 U.S. 425, 478 (1977).*

17.    In this case, the legislative history of the Committee and its members reveals an overwhelmingly "obvious" pattern of the weaponization of Congress' investigatory powers to pursue a punishing judicial, and by implication, a political function.  As Justice Black might say today "It seems to me that the proof that the ... Committee is here undertaking a purely judicial function is overwhelming" *Barenblatt v. United States*, 360 U.S. 109, 154 (1959).

18.    The "overwhelming" and "obvious" proof in this case is embodied a legislative history dating back more than five years that demonstrates the repeated attempts of the Speaker of the House and the members of the Committee to publicly shame, humiliate, banish, ostracize, and possibly even imprison President Trump by trying him in their various kangaroo

courts and legislative acts.  Through such exposure for the sake of exposure, they have incited
public hatred and thereby punished Trump by harming his re-election chances in 2020 even as
they have sought repeatedly to remove him outright from office and prevent him from either
legally or practically from ever occupying the Oval Office again by running in, and winning,
the 2024 election.  This sordid record of the Committee and its members has been nothing
more and nothing less than the pursuit of a judicial function behind the mask and shield of a
facially valid legislative function.  As *McGrain v. Daugherty* once warned in another context
"[t]he committee has assumed all of the functions of prosecutor, judge and jury with
apparently none of the customary rules governing evidence and procedure. " *McGrain v.
Daugherty*, 273 U.S. 135, 145 (1927).

19.    The <u>legislative history of the Committee itself</u> reveals its clear partisan and score-
settling intent to punish and humiliate President Trump in the course of its investigation and in
pursuit of a judicial function.

20.    On May 14, 2021, Democrat Congressman Bennie Thompson introduced H.R.
3233, a *bicameral* bill to establish a ten-member commission to investigate the January 6th
assault on the Capitol requiring approval of both the House and Senate.[40]   This commission,
by legislative design, would have struck a very clear bipartisan 5-5 balance.  It was to consist
of five members appointed by Democrats, five members appointed by Republicans, a
Democrat Chair and a Republican Vice-Chair.[41]

21.    While H.R. 3233 passed the House on May 19, 2021 by a 252 – 175 vote , it
failed in the Senate when a cloture motion failed by a vote of 54 yeas to 35 nays.[42]   In
response, on June 28, 2021, Speaker Pelosi took the Senate out of the equation – and therefore a
<u>bicameral </u>approach to the proposed investigation – by next introducing a simple House

Resolution requiring only the approval of the House she controlled.

22.     Pelosi's Democrat-controlled House passed H. Res. 503 on May 21, 2021 on a virtually party-line 222-190 vote.[43] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois – both with scores to settle against Donald Trump – voted in favor of H. Res. 503.   Each would wind up on the Committee as the only two titular Republicans.

23.     H. Res. 503 offers a very sharp <u>partisan</u>, one-legislative-chamber contrast to the bipartisan, bicameral construction of H.R. 3233. As has been demonstrated, instead of a <u>commission</u> evenly split between Democrats and Republicans,   H. Res. 503 specifies the creation of a highly partisan and score-settling <u>Committee</u> intent on punishing and humiliating President Trump, inciting public hatred, and ensuring he never becomes president again through the exercise of an illegitimate and unconstitutional judicial function.

24.     Just as this Committee has a sordid legislative history offering obvious and overwhelming proof that it "is undertaking a purely judicial function," *Barenblatt v. United States*, 360 U.S. 109, 154 (1959), so, too, does <u>the far broader legislative history</u> of the Committee <u>members</u> reveal a clear intent to simultaneously pursue a judicial *cum* political function rather than a purely legislative function.  This legislative history spanning a period of more than five years reveals at least seven additional legislative acts along with a "Russia Hoax" perpetrated by Committee members seeking to shame, humiliate, and banish President Trump from office while inciting public hatred of Trump and, by implication, Trump's advisers.  These seven legislative acts include:

      a.  H.Res. 1987, introduced on April 6, 2017 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch an Oversight

Commission on Presidential Capacity to determine whether the President is mentally or physically unable to discharge the powers and duties of office.[44]  Its clear target was Trump, and the clear goal was to remove him from office;

b. H.Res. 496, introduced on August 18, 2017, "censures and condemns President Trump for his inadequate response to the violence in Charlottesville, Virginia, on August 12, 2017, for his failure to condemn the White supremacist groups responsible for actions of domestic terrorism, for asserting that "both sides" were to blame and excusing the violent behavior of participants in the Unite the Right rally, and for employing people with ties to White supremacist movements in the White House. [45]  It also urges President Trump to fire all White House advisors who have urged him to cater to the White supremacist movement;"[46]

c. H.Res. 660, introduced on October 29, 2019 as part of the first impeachment trial of President Trump,[47] directed "certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes;"[48]

d. H.Res. 755, introduced on December 10, 2019, impeaches President Donald J. Trump for high crimes and misdemeanors.  The resolution sets forth two articles of impeachment of the President: (1) abuse of power by soliciting the interference of Ukraine in the 2020 U.S. presidential election, and (2) obstruction of Congress by directing defiance of certain subpoenas issued by the House of Representatives;[49]

e.  H.Res. 8548, introduced on October 9, 2020 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch a Commission on Presidential Capacity to Discharge the Powers and Duties of the Office to determine whether the President is mentally or physically unable to discharge the powers and duties of office;[50]

f.  H.Res.24, introduced on January 11, 2021, impeaches President Donald John Trump for high crimes and misdemeanors.  It sets forth an article of impeachment stating that President Trump incited an insurrection against the government of the United States;[51] and

g.  H. Res. 21, introduced on January 11, 2021 by Committee member Jamie Raskin, calls upon Vice President Michael R. Pence (1) to immediately use his powers under section 4 of the Twenty-fifth Amendment to convene and mobilize the principal officers of the executive departments to declare that the President is unable to successfully discharge the duties and powers of his office, and (2) to transmit to the President pro tempore of the Senate and the Speaker of the House notice that he will be immediately assuming the powers and duties of the office as Acting President.[52]

25.   As to how each of the members of the Committee participated in one or more of these legislative acts (and otherwise demonstrated anti-Trump behavior), the Chair of the Committee, Bennie Thompson, voted "yes" on H. Res. 660,[53] he cosponsored H. Res. 496[54] condemning and censuring President Donald Trump, voted yes on both impeachment trials[55] and did not show up at President Trump's inauguration in 2016.[56] Indicating his desire to punish the president with his removal from office, Thompson has described President Trump

as "racist and unfit to serve."[57]

26.     Committee member Jamie Raskin cosponsored both H. Res. 660[58] and H. Res. 496,[59] voted "yes" on both impeachment trials, [60] and was the lead House Impeachment Manager for the second impeachment trial.[61]  Raskin also authored H. Res. 21,[62] H.Res 1987,[63] and H.Res. 8548.[64] In 2018, Raskin set up a panel of mental health experts to publicly discuss the president's mental fitness,[65] has referred to Trump as "a barbarian,"[66] consistently questioned Trump's mental capacity,[67] repeatedly pushed the phony Russia hoax,[68] and, revealing his clear intent to use Congress' investigatory powers for a judicial function, publicly stated that "We have to come up with a legislative mechanism for calling a president to account if he decides to turn the White House into a for-profit enterprise. We cannot allow that precedent to stand."[69]

27.     Committee member Adam Schiff voted "yes" on H.Res. 660,[70] was the lead investigator for the first Trump impeachment trial of President Trump,[71] and voted yes for both impeachments.[72] He also cosponsored H. Res. 21.[73]

28.     Committee member Zoe Lofgren voted "yes" on H. Res. 660,[74] cosponsored H. Res. 24,[75] and H.R. 1987, [76] and voted "yes" on both impeachment trials. [77]  In 2017, Lofgren served as a member of the Democracy Reform Taskforce that claimed President Trump had "shown blatant disregard for the laws and norms in place to prevent public corruption."[78] Lofgren also boycotted the inauguration of President Trump in 2017.[79]  In revealing her desire for Congress to wield more judicial power, she opined that Congress needs "more enforcement authority."[80] She also introduced a resolution urging a "medical and psychiatric evaluation of US President Donald Trump."[81] Illustrating her desire to publicly humiliate and shame the president and incite public hatred, Lofgren stated that "POTUS is an ignorant bigot trying to

delegitimize duly elected Members of Congress based on ethnicity and gender. President Trump shames our country."[82] That Lofgren wants to use the investigatory and impeachment powers of Congress to serve a judicial function and thereby, in the ultimate punishment, end the political career of President Trump is evident in her saying that it "was both constitutional and necessary to impeach and convict former President Trump...and to disqualify him from holding future office.[83]

29.    Committee member Elaine Luria voted "yes" on H.Res. 660,[84]  cosponsored H.Res. 24,[85] voted "yes" on both Trump impeachments, [86] and boycotted Trump's 2020 State of the Union address.[87]  That she has not hesitated to sit as both judge and jury of President Trump in her quest to inflict punishment upon the president is evident in remarks about Trump such as ""It is clear to me that he has betrayed the public trust and abandoned his obligations to the Constitution by elevating his own interests over the national interest. Allegations of this gross misconduct meet the threshold of high crimes and misdemeanors set by the Constitution."[88]

30.    Committee member Pete Aguilar likewise voted "yes" on both impeachments[89] and cosponsored H.Res. 24[90] which initiated the second impeachment.  He also voted "yes" on H.Res. 660. [91]  In acting as judge and jury in the second impeachment trial, Aguilar insisted as if it were fact that "The fact is that President Trump attempted to use the power of his office to coerce a foreign government to interfere in an American election."[92]  This was not a fact at all; it was merely an accusation designed to punish and humiliate.

31.    Committee member Stephanie Murphy voted "yes" on H.Res. 660[93] and both impeachments[94] while cosponsoring H.Res. 24. [95]  In a May 22, 2019 letter "My Thoughts on Impeachment," Murphy clearly expresses her intention to use the investigatory powers of

Congress in a judicial function to coerce and punish not just President Trump but "anyone in his administration" that dares to defy a congressional subpoena: "Should President Trump or anyone in his Administration ignore a final federal court order to turn over information that Congress has requested, I would consider it a threat to our careful system of checks and balances and would therefore support an impeachment inquiry on that individual—the first step in the impeachment process and one that better empowers congressional investigators to attain documents and testimony."[96] [emphasis added]

32.    Key Committee members were also instrumental in perpetrating a now deeply discredited "Russia Hoax."[97]  This was the spurious and now discredited claim that the 2016 Trump Campaign colluded with Russia to defeat Hillary Clinton and that Russia preferred Trump over Clinton because Russian intelligence operatives had damning evidence they could use to blackmail Trump once he ascended to the Oval Office.[98]

33.    The alleged "facts" of the Russia Hoax turned out to be a fiction ginned up by Democrat operatives paid by the Clinton campaign. These operatives, most prominently former British intelligence officer Christopher Steele, created a phony "Steele Dossier"[99] that created the false Russia Hoax narrative. The FBI would then use this dossier to bogusly obtain Foreign Intelligence Surveillance Warrants (FISA) warrants to spy on members of the Trump campaign.  As events unfolded, the whole hoax itself would be given institutional credence by a series of false statements.[100]

34.    Committee member Adam Schiff was the *de facto* leader in Congress pushing the Russia hoax and a primary source of false statements, to the point of being caught repeatedly in lies during his public appearances.[101]  Upon becoming House Intelligence Committee Chairman in 2019, Schiff hired investigators and other

personnel to launch the Russia Hoax investigation, and later expanded a probe into President Trump "beyond Russia" to investigate Trump's connections to other foreign countries.[102]

35.    The Chair of the Committee, Bennie Thompson created a task force in 2017 as part of the perpetuation of the Russia hoax.[103]

36.    This lengthy legislative history likewise illustrates how Speaker Pelosi has sought to weaponize the investigatory powers of Congress in pursuit of a judicial function aimed at the punishment of Donald Trump and senior advisers such as myself.  Pelosi called for an FBI probe in February 2017 into President Trump's alleged financial and personal ties to the Russian government as part of the perpetuation of the Russia hoax and called for a second investigation in October 2017.[104]  She endorsed the push to censure President Trump after events in Charlottesville.[105]  She voted yes to impeach President Trump twice and oversaw the second impeachment trial. In 2020, Pelosi backed H. R. 8548[106] and is the chief architect of and catalyst for her own "unprecedented" Committee now seeking to punish and humiliate President Trump and incite public hatred against Trump, and by implication, Trump advisers such as myself.[107]

37.    As perhaps the most graphic illustration of how Pelosi and committees such as the Committee in this case are pursuing a highly punitive judicial *cum* political function, Pelosi was caught in a private meeting saying that "I do not want to see him impeached, I want to see him in prison."[108]  She has described the President, himself, as "a hoax."[109] [emphasis added]

38.    From this broad, dynamic review of the legislative history, it should be clear that for more than five years, the American Republic has been cursed with various Democrat

kangaroo courts and legislative acts in pursuit of a judicial *cum* political function often with the same Democrat kangaroos running those courts and sponsoring those acts.

39.    In this case, Speaker Pelosi, along with all seven Democrat members of the Committee, have yet again established a kangaroo court that has empowered them to act as judge, jury, and executioner through a judicial function replete with (1) multiple forms of punishment aimed at shaming, humiliating, banishing, ostracizing, and inciting public hatred; (2) the removal of President Trump from office; and (3)  the punishing, including possible imprisonment, of his most trusted senior advisors.   This is all being done through the unconstitutional weaponization of Congress' subpoena power and resultant punishment, coercion, and threats.

40.    The two Republican members of the Committee have a similar, albeit shorter, legislative history that reveals the score-settling nature of their assaults on President Trump and his advisors through the weaponization of the Committee's investigatory powers. Both Liz Cheney and Adam Kinzinger voted "yes" on the second impeachment trial of Donald Trump while Kinzinger repeatedly sided with the Democrats on the Russia hoax.  Kinzinger also publicly issued a statement asking President Trump to delete his Twitter account in December 2020 after President Trump was calling for investigations into the 2020 election.

41.    For his anti-Trump activities, Kinzinger was forced out of running for reelection by the subsequent backlash, holds Trump responsible and clearly has a score to settle with Trump.   In addition, Kinzinger is also considering a run for president so the elimination of the frontrunner Trump in the 2024 election through punishment and humiliation would be in Kinzinger's self-interest.[110]

42.     Liz Cheney is a long-term foe of President Trump because of Trump's perennial criticism of Cheney's father; Vice President Dick Cheney.  According to Trump, Vice President Cheney played a major role in prosecuting the "endless wars" of Afghanistan and Iraq, wars that killed hundreds of thousands of people and drained trillions of dollars of treasure from our Republic.[111]

43.     That Cheney, along with the Chair Bennie Thompson, seek to use the Committee's subpoena power in a judicial function in violation of the principle of separation of powers is evident in their public statements that the purpose of their investigation is to ensure "those responsible are held accountable,"[112] to "tell the complete story of the unprecedented and extraordinary events of January 6th,"[113] and to "get answers for the American people about what happened on January 6th."[114] The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice-Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

44.     This lengthy legislative history spanning a period of nearly five years reveals obvious, overwhelming, and indisputable proof that Speaker Pelosi and members of the Committee have a well-established pattern of seeking to weaponize the investigatory powers of Congress behind the mask and shield of facially valid legislative acts while simultaneously pursuing punitive, unconstitutional judicial agendas.  In this case, the clear arc of the Committee's investigation has to been to build a criminal case against President Trump while four of the president's most senior advisers have been held in contempt and face possible

prison terms and fines.

45.    Given that this Committee and its members been so clearly flushed out in the open in its pursuit of a judicial function by their legislative history, it is incumbent upon this court to address the controversy presented in this case.  To put this in a more textured, policy-analytic way, a clear controversy to be settled in this case by this court is whether there is a threshold above which the simultaneous exercise of a judicial function is sufficient to render illegal any legislative acts taken under the flag, and behind the shield of, the facially valid legislative function. Considering the facts presented in this case, no reasonable court would deny the need for such a threshold balancing test.  Nor, upon review of an abundance of evidence of a judicial *cum* political function of the Committee, would a reasonable court deny that in this case, that threshold has been more than exceeded.

46.    It is incumbent upon this court therefore to take Speaker Pelosi at her word. To recap, Pelosi has described the formation of this kangaroo court of a Committee as "unprecedented";[115] and it is indeed unprecedented for a rabidly partisan and score-settling congressional Committee that lacks no ranking minority member and fails to abide even by its own authorizing resolution to wield such powerful investigatory powers in pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  With her "unprecedented" pronouncement, Pelosi thereby has invited this court to establish new precedent in a new time where the weaponization of Congress' investigatory powers for judicial ends threatens to become  the new norm , thereby upsetting  balance of power among the three major branches of government.

47.    As a private citizen and a former senior advisor to President Trump, I stand as collateral damage from the unlawful and unconstitutional efforts of Speaker Pelosi and the

Committee members to incite public hatred, punish through shame, humiliation, ostracization, and banishment, and perhaps even imprison Donald Trump and many of those like me associated closely with him.

48. I am seventy-two years old. I have spent my entire career in some form of public service – from the Peace Corps and more than twenty-five years as a professor at the University of California to my years in the White House. Through my White House service, I can lay claim to saving thousands of American lives during the pandemic, helping President Trump create millions of jobs, and addressing numerous national and economic security issues related to the economic aggression of Communist China. At this stage in my career, I should be allowed to retire with all of the thanks and honors and dignity and grace normally afforded people with such a resume. Instead, I have been hauled before the Committee's kangaroo court, subjected to public hatred, and been forced to endure all the other punishments they can muster with their false accusations and threats of criminal prosecution. Only by squarely addressing the controversies in this case and by granting the declaratory and injunctive relief that I seek will this punishment cease and be redressed.

## The Committee's Subpoena and Report 117-284 and H.Res. 1037 Violate the Constitutional Proscription Against Bills of Attainder

1. Article I, Section 9, Clause 3 of the Constitution states that "No Bill of Attainder … Law shall be passed."

2. *Nixon v. Administrator of General Services* defines a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." See *United States* v. *Brown*, 381 U.S. 437, 445, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315-316 (1946); *Ex*

*parte Garland*, 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri*, 4 Wall. 277, 323 (1867).  *Nixon v. Administrator of General Services*, 433 U.S. 425, 468-69 (1977).

3.  *United States* v. *Lovett* notes the need for a <u>liberal interpretation</u> of what constitutes a bill of attainder: "(a) The Bill of Attainder Clause , Art. I, § 9, cl. 3, was intended to implement the separation of powers among the three branches of the Government by guarding against the legislative exercise of judicial power . Pp. 441-446.  (b) The Bill of Attainder Clause is to be <u>liberally construed</u> in the light of its purpose to prevent legislative punishment of designated persons or groups. *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *United States* v. *Lovett*, <u>328 U.S. 303</u>. Pp. 447-449."  [emphasis added]

4.  *United States v. Brown* makes clear that "[l]egislative acts, <u>no matter what their form,</u> that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."  *United States v. Brown, 381 U.S. 437, 448 (1965).* [emphasis added]

5.  The Committee's subpoena and along with the Committee's Report 117-284 and H. Res. 1037 all represent forms of "legislative acts" under settled law. *United States v. Brown*, 381 U.S. 437, 448 (1965).  Each of these legislative acts identifies me as a named individual; and each violates the Constitutional proscription against bills of attainder.

6.  Historically,   common   bill   of   attainder   punishments   have   included "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Bellsouth Corporation v. F.C.C*, 162 F.3d 678, 685 (D.C. Cir. 1998).[116]  In this case, I

face possible imprisonment of up to one year – more than one-fourth of my remaining expected life as well as the confiscation of up to $100,000 of my retirement savings, a significant share of those savings.

7.   In this case, a Democrat-controlled House of Representatives has voted overwhelmingly along party lines[117] on the basis of the Committee's subpoena and the Committee's Report 117-284 to hold me in contempt of Congress without the benefit of addressing Congress on this Resolution and without the benefit of a judicial trial.  Furthermore, this legislative act has been taken based on an invalid and unenforceable subpoena that violates the principle of separation of powers and thereby falsely associates me with unpatriotic and treasonous efforts to overturn what Committee members insist was a fair election despite abundant evidence to the contrary, thereby inciting public hatred of me. Through these legislative acts, the Democrat-controlled House has thereby subjected me to the punishments of shame, humiliation, ridicule, banishment, public hatred, and ostracization at great reputational cost.

8.   If the U.S. Attorney for the District of Columbia chooses to act on H.Res. 1037 and charge me with contempt of Congress – as has already been done in a similar case involving a former Trump senior adviser[118] – I face significant additional punitive consequences in the forms of both imprisonment for up to one year and the punitive confiscation of my property, i.e., up to a $100,000 fine.

9.   Even prior to, or absent any, any move to imprison and fine me by the U.S. Attorney, H.Res. 1037 is a punitive act of economic coercion and psychological terror designed to bully me into bending to the will of an illegally constituted Committee in unconstitutional pursuit of a judicial function.

10. H.Res. 1037, in and of itself, represents economic coercion and a de facto confiscation of my personal property because in order to defend myself against this bill of attainder, I must either spend what may well add up to more than $100,000 on legal representation. Alternatively, as I have chosen, I must do the legal work *pro se* and thereby pay the substantial opportunity costs of the time I must use by writing this brief and representing myself.

11. In addition, the stigma and public hatred that has come from a contempt charge implying a treasonous attempt to overthrow an allegedly fair election has turned me into a pariah in many academic and corporate quarters and thereby cost me remunerative opportunities ranging from teaching, lecturing, and public speaking to appearing on otherwise Republican-friendly networks like Fox News, e.g., Fox has adopted a cancel culture policy of refusing to put pro-Trump people like me on the air  who question the results of the November 3 and are associated, falsely or otherwise, with the events of January 6.   The loss of these remunerative opportunities has significant financial implications as teaching stipends and speaking fees have historically been important sources of my income stream while appearances on networks like Fox help promote the books and articles I write and thereby generate sales and royalties.   Most broadly, the harm to my reputation has been incalculable.

12. It is well worth noting that a common political tactic used on both sides of the aisle is to engage in "lawfare" to tie up the time and resources of political rivals and possibly put them in jail.   In this case, the Committee is simultaneously pursuing a judicial, rather than a purely legislative, function and brazenly violating the Bill of Attainder Clause in its efforts to ensnare Donald Trump and his most senior advisers in their tar pit of false

allegations, endless litigation, possible imprisonment, and the de facto confiscation of my personal property by necessitating expenditures on legal representation or incurring the opportunity costs of representing myself.

13. H.Res. 1037 as a legislative act represents a punitive psychological terror as well.  At 72 years old, a one-year prison sentence would indeed take more than a quarter of my remaining expected life – the average expected life of a male in America is 76 years[119] -- while a $100,000 fine would confiscate a significant slice of my retirement nest egg.  I do not look forward either to a prison cell or to having to choose between food or medicine as far too many American senior citizens must do just because an uber-partisan and score-settling kangaroo court decided to slap me with a bill of attainder and drain my pockets.

14. The set of deprivations that I face from the legislative acts of the Committee and H.Res. 1037 are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9.  *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).

15. In reviewing whether the legislative acts of the Committee and H.Res. 1037 constitute bills of attainder,  *Nixon v. Administrator of General Services* provides this court with a number of possible tests, including most pertinently: (1) "the law plainly must be held to be an act of nonpunitive legislative policymaking" for it not to be considered a Bill of Attainder; (2) the "legislative history" must indicate that "the acts are "regulatory and not punitive in character?" 408 F. Supp., at 373;" and (3) any given legislative act must use the "less burdensome alternative" to achieve "its legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).

16. In the Nixon case, the Court found no evidence of a punitive component in the regulatory act in question and therefore no bill of attainer issue.[120] In this case, however, the Committee's subpoena, its recommendation to hold me in contempt of Congress, and the passage of H.Res. 1037 clearly fail Test One.  With all the threats of imprisonment and confiscation of my property along with the reputational harm, banishment, and ostracization these legislative acts carry, they each and together have an undeniable strong punitive objective.  That punitive objective is to bully and coerce me into violating what I believe to be my patriotic duty and obligation under the traditional institutions of executive privilege and testimonial immunity.  The presence of such a strong punitive objective, in turn, points to a clear violation of the bill of attainder clause according to Test One.

17. With Test Two, and as noted in *Doe v. Selective Service System,* the court in the Nixon case analyzed whether the law, viewed through the lens of its legislative history, reasonably could be said to "further nonpunitive legislative purposes" and concluded in the affirmative, thereby rejecting the bill of attainder claim by Nixon. *Doe v. Selective Service System*, 557 F. Supp. 937, 944 (D. Minn. 1983).

18. In this case, however, we clearly and firmly must reach the opposite conclusion as the legislative history of the Committee, together with the legislative history of Speaker Pelosi and the Committee members over a period spanning more than five years, points clearly to a punitive exercise of legislative power – and therefore the pursuit of a judicial function.

19. To recap, we reviewed the legislative history of the Committee, its members, and Speaker Pelosi at length in the previous section of this brief; and it provided this court

with an undeniable spectacle of a series of kangaroo legislative acts and kangaroo courts formed with many of the same "kangaroos" populating the Committee all seeking to punish President Trump and his advisers.   From this legislative history, we must conclude that Test Two in this case points clearly to bills of attainder in the legislative acts of the Committee and Democrat-controlled House that specifically identify me by name.

20. It is worth noting here that *U.S. v. Brown* calls for such a full and dynamic analysis of the relevant legislative history when parsing bill of attainder issues, which is why in this case, we must provide such a legislative history analysis <u>not just of the Committee but its individual members as well as Speaker Pelosi.</u>  Notes *U.S. v. Brown:*

*The Bill of Attainder Clause was not to be given a narrow historical reading ... but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups.  United States v. Brown, 381 U.S. 437, 442-43 (1965)*

*The proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature.  United States v. Brown, 381 U.S. 437, 442-43 (1965)*

*[T]he Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of*

*the judicial function, or more simply — trial by legislature.   United States v. Brown, 381 U.S. 437, 442 (1965)*

21. <u>It is Test Three offered in Nixon v. GSA that should remove any legal doubt that the legislative acts of the Committee and H.Res. 1037 represent bills of attainder</u>.  To recap, this test speaks to the need to "inquire into the existence of <u>less burdensome alternatives</u>" by which a "legislature could have achieved its legitimate nonpunitive objectives. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). [emphasis added]

22. Clearly, if the Committee in this case has failed to rely on "less burdensome alternatives" to achieve its alleged "legitimate nonpunitive objectives," that furthers the case that the legislative acts of both the Committee and House of Representatives to pursue contempt of Congress charges against me constitute bills of attainders.

23. In this case, there surely was, as a matter of both fairness and due process, <u>two</u> far less burdensome alternatives available to the Committee to achieve its putatively "legitimate nonpunitive objectives": (1) negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and/or testimonial immunity; and (2) a civil suit to enforce compliance with the subpoena rather using coercion and terror through a threatened criminal prosecution.

24. In my email response to the Committee on March 1, 2022, I indicated: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.  Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."  That was the

Committee's least burdensome alternative; yet, it appears to make no effort pursuit this alternative.

25. As a matter of due process and to avoid bill of attainder complications, the Committee could and should have pursued this far less burdensome alternative of negotiation than the one it chose.   Instead, either by coincidence or explicit or tacit collusion, the Committee made an end run around Trump's invocation of executive privilege and testimonial immunity through the attempted stripping of that privilege and immunity by the incumbent president Joe Biden.

26. To recap, this end run is evident in Deputy Counsel to the President Jonathan Su's letter to me of February 28, 2022.   Su notified me that "President Biden has determined that an assertion of executive privilege is not in the national interest" and that "[f]or the same reasons...President Biden...will not assert immunity to preclude you from testifying before the Select Committee."   Yet, as this brief will address further in the next section, in the absence of criminal conduct, there is no settled law in support of such a fanciful and absurd action by an incumbent president to strip either executive privilege or testimonial immunity from a predecessor and those senior advisers like me who may have served that predecessor.

27. As a matter of fairness and due process and in the clear absence of settled law in support of the dubious right of an incumbent president to strip a predecessor of both privilege and immunity, it was incumbent upon the Committee to pursue the least burdensome alternative by directly negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and related testimonial immunity.   This was particular true because I made it clear publicly that I would abide by any decision made

by President Trump in this matter: "If President Trump waives the privilege, I would be happy to testify."[121] Clearly, I am indicating to the Committee my full cooperation pending the outcome of their negotiation. Instead of pursuing such a negotiation, this kangaroo court of a Committee chose to dive right into the deep end of the pool of unsettled law on the rights of incumbent versus former presidents as regards the invoking or waiving of executive privilege and the related testimonial immunity of senior White House advisors.

28. If the right of an incumbent president to strip his immediate predecessor of executive privilege and testimonial immunity were settled law, the Committee might have a leg to stand on in defending itself against the "failure to pursue the less burdensome alternative" charge I make in this brief. But for the Committee to proceed with the far more burdensome alternative of holding me in criminal contempt of Congress against the backdrop of a far from resolved controversy for which there is no settled law smacks of a purely partisan and punitive measure and exercise of the judicial function and further solidifies the bill of attainder case.

29. I include further in this record that in my email response of March 1, 2022 to the Committee, I also point out the following: "In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact." Clearly, much of the documentary material that the Committee with its subpoena was insisting that I provide was in the hands of the government itself. One wonders if the Committee has sought to obtain this material as a "less burdensome alternative." If

so, the only remaining documentary material seemingly in play in their subpoena would be that of phone messages and email on my private accounts. Here, the less burdensome alternative would have been to simply subpoena such information from the service providers as they did with, for example, former Trump Chief of Staff Mark Meadows.[122] If the Committee did so, then they would have needed nothing from me and the contempt charge would have been all but moot.

30. To recap, negotiating directly with President Trump and his attorneys over a full or partial waiver in my case of executive privilege and/or testimonial immunity would clearly have been the least burdensome alternative the Committee could have pursued to achieve its alleged nonpunitive legislative end. Yet, <u>there was also a second least burdensome alternative available to the Committee and the House well short of a criminal prosecution</u>.

31. As the opinion of District Judge John D. Bates in *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008) makes clear, the second least burdensome alternative would have been to pursue a civil suit rather than a criminal prosecution. As OLC put it in a memorandum, a civil action would be superior because "Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, <u>not at inflicting punishment on an individual who failed to produce them</u>." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008). [emphasis added]

32. In *Committee on Judiciary v. Miers, "*[t]he Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, ask[ed] the Court to declare that

former White House Counsel Harriet Miers must comply with a subpoena and appear before the Committee to testify regarding an investigation into the forced resignation of nine United States Attorneys in late 2006, and that current White House Chief of Staff Joshua Bolten must produce a privilege log in response to a congressional subpoena. *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008).

33. *Miers* was a situation where Democrats controlled the House of Representatives as in this case but, unlike in this case, the Democrats faced an uncooperative Republican president and Attorney General.  This effectively foreclosed the far most burdensome alternative of the highly punitive criminal prosecution Democrats originally sought.

34. After the Democrat-controlled House passed a resolution recommending criminal contempt charges against both Miers and Bolten – as the House has done against me in this case – the Republican Attorney General declined to prosecute. At that point, illustrating the viability of the less burdensome civil suit option while acknowledging the partisan nature of the battle, the Judiciary Committee filed the suit against Miers. As noted in this lengthy passage from the *Miers* opinion:

> Frustrated by the Executive's actions, the full Committee met on July 25, 2007 and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for contempt of Congress for refusal to comply with subpoenas issued by the Committee." <u>See</u> 153 Cong. Rec. D1051-01 (2007). Chairman Conyers provided Mr. Fielding with a copy of the Committee's report in the hope that it might prompt the White House voluntarily to change its position. <u>See</u> Pl.'s Stmt. of Facts ¶ 52. He received no response. So, on November 5, 2007, the Committee filed its report with the full House of Representatives. <u>Id.</u> ¶ 54. Once again, Chairman Conyers wrote to

*Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute." Id. ¶ 55. This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse." Pl.'s Mot. Ex. 34. He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal. Id.*

*The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the Department has determined that non-compliance . . . with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee — invoking Resolution 980 — filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.*

*In support of the case before being "a justiciable controversy" and therefore a viable less burdensome alternative – not the reference to "not inflicting punishment" -- the opinion of District Judge John D. Bates cites "[t]wo significant OLC [Office of Legal Counsel] opinions issued during the Reagan administration" germane to this case.*

*In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce subpoenas issued to executive officials. See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion"). As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of*

Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court. When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and _could not constitutionally_ require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt." _Id._ at 142 (emphasis added). That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, _see_ id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal prosecution loomed over the President's close advisors, _see_ id. at 142. Significantly, OLC also determined that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." _Id._ at n. 42. Thus, neither criminal prosecution nor inherent contempt could be employed against a recalcitrant executive branch official, as OLC saw it.

Instead, "Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." _Id._ at 137. As OLC put it, a civil action would be superior because:

Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents_, not at inflicting punishment on an individual who failed to produce them._ Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate its legitimate desire to obtain documents if it could establish that its

*need for the records outweighed the Executive's interest in preserving confidentiality. Id. ...*

*A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper reached the same conclusion. See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion"). In that opinion, OLC restated its position that Congress may institute "a civil suit seeking declaratory enforcement of [a] subpoena." Id. at 83. Likewise, OLC indicated that although inherent contempt is theoretically available to Congress and could ultimately be challenged by the executive branch through a writ of habeas corpus brought by the detained official, "it seems most unlikely that Congress could dispatch the Sergeant at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege." Id. at 86.  Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008).*

35. In this case, the highly partisan Committee and Democrat-controlled Congress in all likelihood believe they have a friend in a Democrat Attorney General who will help them use the criminal prosecution alternative to apply maximum coercive pressure in support of their punitive ends.  Yet, this is clearly not the less burdensome alternative.

36. *Miers* makes clear that a civil suit in this case does indeed represent a justiciable controversy and a far less burdensome alternative than a criminal prosecution involving a contempt of Congress charge against me, with all its accompanying economic coercion, psychological terror, and other punishments. That the Committee and its members and the Democrat majority in the House instead pursued the single most burdensome option of criminal prosecution confirms the bill of attainder nature and punitive objective of their coercive tactics.  In this way, the Committee and its members

along with the Democrat-controlled House miserably fails Test Three of *Nixon v. Administrator of General Services* and thereby confirms their legislative acts represent bills of attainder.

37. In summary, H. Res. 1037 and the Committee's Report along with the subpoena issued by the Committee that constitutes the basis for its contempt charge, together and separately violate the Bills of Attainder Clause of the Constitution. H. Res. 1037 should thereby be ruled by this Court as an invalid legislative act, both the Committee subpoena and Committee Report should likewise be ruled illegal and unconstitutional, and the U.S. Attorney for the District of Columbia should be enjoined from any further action in this matter.

## An Incumbent President Cannot Waive the Executive Privilege of His Predecessor or Testimonial Immunity of Senior Advisers Not Serving that Incumbent

1. We come now to more squarely address the third major controversy in this case: What rights, if any, does an incumbent president have to strip away executive privilege from a predecessor or other former presidents and/or to waive testimonial immunity for the senior advisors of a predecessor or other former presidents? Because this controversy is so central to this case, because there is no settled law, and because it has such broader implications for the future viability of executive privilege and testimonial immunity as positive forces for effective presidential decision-making, it is a controversy ripe for judicial review.

2. That this controversy is even a controversy stunned me when I first heard of it. While I am not a lawyer, I'm not without legal expertise. One of my areas of expertise in economics for which I have a Ph.D. in is regulatory economics; and this sub-field requires a keen understanding of regulatory law. I am therefore not without experience in reading case

law and parsing legal arguments, and I have also published numerous articles in law journals.[123]  When I was made aware that the Committee was going to try to circumvent my duties and obligations under the executive privilege invoked by President Trump and deny me the protections of testimonial immunity by having President Biden strip Trump and myself of these bulwarks of presidential decision-making, I began reading what little case law there is about the viability of such a blatant end run around due process.  *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

3.     Upon review of this sparse and anything but settled law, I didn't know whether to laugh at the absurdity of the attempted legal end run of the Committee and White House or cry at how low the Democrats appeared to be willing to stoop that they would be willing to wreck both executive privilege and testimonial immunity as their means to achieve the end of Donald Trump and advisers like me.

4.     The tradition and institution of executive privilege dates back to the days of George Washington, who saw immediately the separation of powers dangers inherent in a legislative branch given free reign to meddle in the affairs of the executive branch.

5.     The *Legal Information Institute* defines executive privilege as "the power of the President and other officials in the executive branch to withhold certain forms of confidential communication from the courts and the legislative branch[124] while Senate.gov sees executive

privilege "as a collection of different rights, united by the general principle that the president and key advisers must be able to have internal discussions without fear of exposure."[125]

6.     *Ala. Educ. Ass'n v. Bentley* likewise notes: "Executive privilege "refers to a doctrine under which "documents from a former or an incumbent President [or, arguably, the chief executive of a state government] are presumptively privileged." *United States v. Poindexter,* 727 F. Supp. 1501, 1505 (D.D.C. 1989) (citing *United States v. Nixon,* 418 U.S. 683, 708-13 (1974)  *Ala. Educ. Ass'n v. Bentley*, Civil Action No. CV-11-S-761-NE, at *26 (N.D. Ala. Jan. 7, 2013).  However, this definition is too limiting as it excludes the private conversations between and among presidents and advisers for which there are no "documentary materials," as defined by the Presidential Records Act.[126]  [emphasis added]

7.     The common legal thread in each of these definitions is that that the institution of executive privilege is critical to effective presidential decision-making as executive privilege (along with the companion institution of testimonial immunity) provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

8.     As *United States v. Nixon* notes: "A President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately."  *Mazars, 140 S. Ct. at 2032* further notes that the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of

confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977)

9.     It follows from this principle that the more executive privilege (and testimonial immunity) are <u>qualified,</u> the less  candor there is likely to be in the conduct of official White House business and the less optimal presidential decision-making will likely be.  Yet settled law is sparse as regards how executive privilege should be qualified. This is partly a function of the relatively few cases that have addressed matters of executive privilege. As *Comm. on Judiciary v. McGahn* notes: "To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, 'there were [still] very few cases dealing with the investigative power.'" *Id.* at 194, <u>77 S.Ct. 1173</u>. *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 181 (D.D.C. 2019).

10.     As previously noted in *Trump v. Mazurs*, much of the time, disputes over executive privilege between the executive and legislative branches have been negotiated in the "hurly-burly" of the political arena and therefore case law on this subject is sparse:   "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).

11.     The few generally accepted principles considered to be settled law date back to

the *United States v. Nixon* a.k.a. the Watergate scandal and *Nixon v. Administrator of General Services*.

12.     The Watergate Scandal opened the door to the qualification of privilege <u>in the presence of criminal conduct</u>, e.g., the privilege is waived if the communications are criminal in nature.  Yet, this qualification would indeed quickly be "cabined" to the criminal sphere. *Committee on Judiciary v. Miers* notes: "*Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums* , <u>561   F.2d   at   245–46</u>." *Comm.   On   Judiciary   of   U.S.   House   of Representatives v. McGahn*, 951 F.3d 510, 540 n.11 (D.C. Cir. 2020)

13.     *United States v. Nixon* also helped confirm that "the Judiciary is the ultimate arbiter when it comes to claims of executive privilege" while "the *Miers* opinion stands for the proposition that   courts   have   federal   jurisdiction   over subpoena enforcement disputes between   the   Legislature   and   the   Executive   branch,   and   that   such disputes are justiciable…." *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 173 (D.D.C. 2019).

14.     Note that *Comm. on Judiciary v. McGahn* is a highly flawed opinion that was overturned on appeal.  Comm. On Judiciary of U.S. House of Representatives v. McGahn, 951 F.3d 510 (D.C. Cir. 2020).  Nothing in it qualifies as precedent.

15.     *Nixon v. Administrator of General Services* likewise makes clear that incumbent presidents are not the only ones who can claim executive privilege: "We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them." *Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977).  Yet this case also put forth the dubious proposition based on a District Court ruling – and again cast within the shadow of possible criminal activity -- that the claims

of a former president "carries much less weight than a claim asserted by the incumbent himself." *Id.*, at 345." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448 (1977).

16.    *United States v. Nixon* also helped set the precedent that the applicability of executive privilege should be decided on a case-by-case basis by weighing the need to protect confidentiality and preserve executive privilege against the need for the administration of justice.[127] Yet, as previously noted with the "cabined" reference, this principle itself was again limited by the context of the case itself with respect to the criminality involved.   "[T]he Supreme Court in <u>United States v. Nixon</u> explicitly <u>cabined</u> its opinion to the criminal arena. See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.")." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008). [emphasis added]

17.    Of course, it may be arguable that neither presidents nor their advisors should be shielded in ways that would allow criminal conduct to flourish. But it must be at this criminal water's edge where the qualification of executive privilege and testimonial immunity by both the Committee and the White House must stop if these two important bulwarks of effective presidential decision-making are to be maintained.  At this water's edge, there is not a scintilla of <u>settled</u> law over the controversy as to whether an incumbent president can waive the privilege of his or her predecessor and/or the testimonial immunity of that predecessor's senior advisers.  To recap, *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-

or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

18.     While the Committee and its lawyers are free to make whatever arguments they might want in support Joe Biden's actions in this case, the ideas that a sitting president can strip his predecessor or former presidents of executive privilege and the president's most senior advisors of testimonial immunity are both fanciful and absurd on their face. It is even more fanciful and absurd in this case when the sitting president, a Democrat, is seeking to strip the executive privilege of the man he allegedly beat in the 2020 presidential election, Republican Donald Trump, even as both Biden and the Democrat Party are doing everything within their substantial political powers not just to end the presidential career of Donald Trump but to bury any challenges to the fairness and integrity of a 2020 election that remains hotly disputed.

19.     Stripped of rhetoric, allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the alluring banner of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege and testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn executive privilege and testimonial immunity into partisan ping-pong balls and deal a mortal blow to the critical functions each are supposed to serve in our Republic: (1) help uphold the principle of separation of powers; and (2) provide for optimum candor in presidential decision-making.

20.    Even if such instances of an incumbent president waiving the privilege of his predecessor were seen as rare and occurring in only extreme circumstances as *Dellums v. Powell* alludes to, if this were settled law, it would be enough to mortally wound privilege as an essential ingredient of effective presidential decision-making. This is particularly so within the context of this case where it is clear that the Committee has, as previously noted, in all probability either explicitly or tacitly colluded with the incumbent president to have the Trump privilege waived so the Committee can then have its judicial function and bill of attainder ways with President Trump and his most senior advisors.  Here, *Dellums v. Powell* has it right when it opines: [T]hose on whom a President relies for advice <u>would be foolish indeed</u> to discuss the demands of executive decision-making with candor, when every proposal would be subject to public disclosure through civil discovery. *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).  [emphasis added]

21.    Here, however, *Dellums v. Powell* has it wrong when it argues that it is such a rare "infrequent" occurrence in which privilege and immunity might be waived that it would not materially affect the risk calculus of future senior White House advisers: "We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for <u>in the context of a criminal prosecution</u>." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977) [emphasis added] and "[T]he need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome." *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

22.    The clear problem with this "relatively infrequent occasions" argument in the context of this case is that the current situation clearly indicates <u>a long term "repeatable game"</u>

pattern of partisan abuse of the House's investigatory powers over more than five-year period rather than a "one and done" rare event based on extraordinary circumstances occurring in, as *Dellums v. Powell* qualifies it, the "context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977).   (To recap, this pattern of partisan abuse by the Committee and its members along with Speaker Pelosi was firmly established in a previous section of this brief.)

23.    From my perspective as a trained economist, and through the lens of strategic game theory, I see the punitive legislative acts and chronic pattern of partisan abuses associated with the Committee and its members over a more than five-year period indeed as a "repeatable game" of gotcha and punishment rather than a one-off rare event that that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.

24.    As partisans in the Congress wield their investigatory powers, they will enlist whatever friendly president might be in the White House to strip the executive privilege of former presidents and the testimonial immunity of former senior White House advisors; and it will all be done under the false flags of national emergency and national security. In this case, if the Committee and Joe Biden are able to pull this deadly game off and effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, I don't need to imagine

this repeat of the strategic game.  If I'm not dead or in prison, I will "tit for tat" lead the charge.

25.    In summary, if the goal is to preserve executive privilege and testimonial immunity to promote optimal presidential decision-making through maximum candor, than the idea that a former president's entitlement to such privilege is somehow of a "lesser weight" than a present president is indeed fanciful and absurd  Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.  Because this is so, the time is ripe for this court to address this controversy.  By ruling in my favor, the court will lift the burdensome punishments now being inflicted upon me and provide the appropriate relief.

26.    I note in closing that as I came to this particular controversy, it was settled law that executive privilege is not my privilege to waive. Absent a waiver of that privilege by President Trump, it was – and remains -- my duty not to comply with the Committee's subpoena.  Importantly, and I repeat, I have also made it clear publicly that I would abide by any decision made by President Trump in this matter.[128]

27.    Instead of negotiating directly with President Trump and his attorneys as settled law demanded, the Committee and its members used the Biden unsettled law waiver of privilege and immunity to try to effectively strip me of any legal right, duty, or constitutional obligation I might have had to fail to comply with their subpoena and, after I failed to comply with what I believed their unlawful subpoena, the Committee and Democrat-controlled House pursued the most burdensome and punitive alternative of a criminal contempt charge rather than the less burdensome options of negotiating the privilege with President Trump or filing a

civil suit.

28.     As a result, I was put in the untenable position in which the president I served under has invoked a privilege that a president that I did <u>not</u> serve under has appeared to waive. Given that it was my sworn duty to uphold the law and abide by the Constitution and that it remains my belief that there is no settled law to support the acts of the Biden White House and Committee and given that I believe the law strongly leans in my favor, I had – and have -- no other honorable choice than to fail to comply with the Committee's subpoena.  In the absence of even a scintilla of settled law in this matter, it would be both unlawful and dishonorable for me to consider President Trump's privilege and my own testimonial immunity waived just because Joe Biden says they are.

29.     I therefore ask this court to dive into the deep end of this pool and firmly address a controversy that is ripe for adjudication and thereby settle the law in this matter.

**The Plaintiff's Testimonial Immunity is Absolute and His Failure to Comply With a Congressional Subpoena Cannot Be the Legal Basis for a Contempt of Congress Charge.**

1.     Congress cannot lawfully hold the Plaintiff in contempt of Congress for failure to comply with a subpoena that compels him to testify before the Committee because, under long-standing Department of Justice policy, the Plaintiff has absolute testimonial immunity as a senior White House official and has a duty to his country and the executive branch not to comply with said subpoena.

2.     The right of a senior White House official to testimonial immunity is conceptual and legally distinct from executive privilege.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  Memorandum For Pat A. Cipollone

Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.  As OLC notes:

> *This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making... But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.*
>
> *Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege at 5 (May 23, 1977) ("Harmon Memorandum"); see also Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should*

*be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.*[129]

3.      If the testimonial immunity of senior White House officials is absolute and exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, then it can't be waived by the adviser and certainly not by an incumbent president seeking to unlawfully strip his predecessor of both executive privilege and the right to grant testimonial immunity.

4.      Only the courts have the power to waive testimonial immunity on a case by case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  Indeed, if the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decision-making.

5.      I propose the following test for this court to consider: Would a current White House adviser be significantly less likely to engage in the kind of candor necessary for effective presidential decision-making as recognized under *Nixon v. Administrator of General Services* if that adviser understands that any claim to testimonial immunity by that adviser may be waived by a president that adviser did not serve under?  If the answer is yes, then testimonial immunity must be considered absolute in this circumstance or, alternatively, waived only on a case by case basis by the courts with extreme caution.

6.      I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and for which there is no

settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of the testimonial immunity afforded to that predecessor's senior White House advisors in the absence of possible criminal conduct – regardless of whether this is done under the flag of the national interest – is arguably the most extreme and dangerous form of qualifying testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that testimonial immunity are supposed to serve in our Republic.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a.  A declaratory judgment that the Committee is neither duly authorized nor properly constituted and therefore its legislative acts, including the subpoena issued to the Plaintiff and Committee Report 117-284, are therefore ultra vires, unlawful, and unenforceable;

b.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that, as revealed by the legislative history, violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable;

c.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable;

d.  An injunction against the U.S. Attorney for the District of Columbia enjoining him from proceeding against the Plaintiff "in the manner and form provided by law" as H.Res. 1037 recommends;

e.  A declaratory judgment that the Committee subpoena issued to the Plaintiff improperly compels testimony of a senior executive official; and

f.  A declaratory judgment against President Joe Biden that he does not have the legal authority to waive any executive privilege or testimonial immunity invoked by his predecessor in this case.

## ENDNOTES

[1] H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[2] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[3] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). As recently as

2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[4] Preventing-a-Disrupted-Presidential-Election-and.pdf (documentcloud.org)

[5] The Secret Bipartisan Campaign That Saved the 2020 Election | Time

[6] The Navarro Report – PETER NAVARRO

[7] https://www.surveymonkey.com/curiosity/axios-january-6-revisited/

https://www.ipsos.com/sites/default/files/ct/news/documents/2022-01/Topline-NPR-Ipsos-poll.pdf

[8] Electronic email from Bennie Thompson to Peter Navarro, February 9, 2022 transmitting subpoena

[9] 10 iconic American companies owned by Chinese investors (cnbc.com)

[10] https://www.thegatewaypundit.com/2022/01/jan-6-remembered-ignored-media-fbi-antifa-blm-activists-posting-photos-bragging-online-storming-us-capitol-jan-6/

[11] FBI had informant in crowd during Capitol riot: report | The Hill

[12] ""In short: [Dan Scavino and Peter Navarro] played key roles in the ex-President's efforts to overturn the results of the 2020 election…" (Thompson) https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

"He hasn't been shy about his role in efforts to overturn the results of the 2020 election and has even discussed the former President's support for those plans…" (Thompson) https://apnews.com/article/capitol-siege-steve-bannon-subpoenas-dan-scavino-peter-navarro-3247f6b7a644ff3e2c6f14d41f6cd0c8

[13] In Trump Time: My Journal of America's Plague Year: Navarro, Peter: 9781737478508: Books: Amazon.com.

[14] 3 U.S. Code § 15 - Counting electoral votes in Congress | U.S. Code | US Law | LII / Legal Information Institute (cornell.edu)

[15] https://chicago.suntimes.com/2020/12/16/22176920/jfk-stolen-1960-election-chicago-illinois

[16] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[17] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[18] A fourth choice would have been piecemeal negotiation over what the Committee wanted but after watching the spectacle with Meadows, I wanted no part of that.

[19] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HRPT-117-NA.pdf

25 The prison term for this offense makes it a Class A misdemeanor. 18 U.S.C. § 3559(a)(6). By that classification, the penalty for contempt § 192 increased from $1,000 to $100,000. 18 U.S.C. § 3571(b)(5).

[20] CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says | CNN Politics

[21] CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says - KVIA

[22] https://morningconsult.com/2018/05/16/voters-dont-necessarily-think-pleading-the-fifth-implies-guilt-but-it-varies-by-party/#:~:text=51%25%20of%20registered%20voters%20said,independents%20who%20said%20the%20same.

[23] https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html .

[24] Su Letter of Feb 28, 2022

[25] See, for example, Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies - The New York Times (nytimes.com).

[26] https://www.cbsnews.com/news/peter-navarro-dan-scavino-contempt-motion-advances-to-full-house/

[27] https://clerk.house.gov/Votes/2022118.

[28] H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress.

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[29] H.Res.503 - 117th Congress (2021-2022): Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol. | Congress.gov | Library of Congress

[30] https://www.npr.org/2021/07/27/1020713409/here-are-the-9-lawmakers-investigating-the-jan-6-capitol-attack

[31] https://www.politico.com/news/2021/07/19/mccarthy-zeroes-in-on-five-gop-members-for-jan-6-select-committee-500201

[32] The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

[33] Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2

[34] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[35]*McGrain v. Daugherty*, 273 U.S. 135 (1927).  Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160. 7

[36] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.  *Watkins v. United States*, 354 U.S. 178 (1957).  Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served."  *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959).  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the

exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).   As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081.   *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[37] "Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation. *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951). In this case, it is painfully and glaringly obvious the Speaker and the Committee and its members have persistently sought to exercise judicial power.

[38] In the light of the Committee's history and the repeated extensions of its life, as well as the successive appropriations by the House of Representatives for the conduct of its activities, its legislative authority and that of the Subcommittee to conduct the inquiry under consideration here is unassailable; and House Rule XI, 83d Congress, which defines the Committee's authority, cannot be said to be constitutionally infirm on the score of vagueness. *Watkins* v. *United States*, 354 U.S. 178, distinguished. Pp. 116-123.

[39] (a) Rule XI has a "persuasive gloss of legislative history" which shows beyond doubt that, in pursuance of its legislative concerns in the domain of "national security," the House of Representatives has clothed the Committee with pervasive authority to investigate Communist activities in this country. Pp. 117-121.

[40] https://www.govinfo.gov/content/pkg/BILLS-117hr3233ih/pdf/BILLS-117hr3233ih.pdf

[41] (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

[42] https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[43] https://clerk.house.gov/Votes/2021197

[44] H.R.1987 - 115th Congress (2017-2018): Oversight Commission on Presidential Capacity Act | Congress.gov | Library of Congress

[45] H.Res.496 - 115th Congress (2017-2018): Condemning and censuring President Donald

Trump. | Congress.gov | Library of Congress

[46] H.Res.496 - 115th Congress (2017-2018): Condemning and censuring President Donald Trump. | Congress.gov | Library of Congress

[47] https://www.congress.gov/bill/116th-congress/house-resolution/660

[48] Text - H.Res.660 - 116th Congress (2019-2020): Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes. | Congress.gov | Library of Congress

[49] https://www.congress.gov/bill/116th-congress/house-resolution/755#:~:text=The%20resolution%20sets%20forth%20two,by%20the%20House%20of%20Representatives

[50] H.R.8548 - 116th Congress (2019-2020): Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act | Congress.gov | Library of Congress

[51] H.Res.24 - 117th Congress (2021-2022): Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors. | Congress.gov | Library of Congress

[52] https://www.congress.gov/bill/117th-congress/house-resolution/21

[53] https://clerk.house.gov/Votes/2019604

[54] https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[55] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[56] https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[57] https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[58] https://www.congress.gov/bill/116th-congress/house-resolution/660/cosponsors

[59] https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[60] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[61] https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/09/965914210/meet-the-house-managers-laying-out-the-case-to-impeach-donald-trump

[62] https://www.congress.gov/bill/117th-congress/house-resolution/21

[63] https://www.congress.gov/bill/115th-congress/house-bill/1987/text

[64] https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[65] https://abcnews.go.com/Politics/pelosi-propose-experts-review-presidents-mental-fitness-25th/story?id=73507849

[66] https://www.facebook.com/raskin.jamie/photos/donald-trump-is-a-barbarian-a-bigot-a-lout-a-narcissistic-bully-and-a-serial-vio/10154554019399763/

[67] https://twitter.com/repraskin/status/863212423083417600

[68] https://twitter.com/repraskin/status/1018987611791282177

[69] https://bethesdamagazine.com/bethesda-beat/government/after-senate-trial-raskin-reflects-on-his-role-in-trump-impeachment-process/

[70] https://clerk.house.gov/Votes/2019604

[71] https://www.youtube.com/watch?v=JW_aZiVk6Pg

[72] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[73] https://www.congress.gov/bill/117th-congress/house-resolution/21/cosponsors

[74] https://clerk.house.gov/Votes/2019604

[75] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[76] https://www.congress.gov/bill/115th-congress/house-bill/1987/text

[77] https://clerk.house.gov/Votes/2019696 https://clerk.house.gov/Votes/202117

[78] https://lofgren.house.gov/about/democracy-reform-task-force

[79] https://time.com/4635411/democrats-boycotting-donald-trumps-inauguration/

[80] https://lofgren.house.gov/about/democracy-reform-task-force

[81] https://lofgren.house.gov/media/press-releases/lofgren-introduces-resolution-urging-vice-president-and-cabinet-fulfill-duties

[82] https://twitter.com/repzoelofgren/status/1150523317482184705

[83] https://cha.house.gov/media/press-releases/lofgren-opening-statement-hearing-oversight-us-capitol-police-and-preparations

[84] https://clerk.house.gov/Votes/2019604

[85] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[86] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[87] https://www.kerrydougherty.com/allposts/2020/2/11/state-of-the-union-where-was-rep-elaine-luria

[88] https://luria.house.gov/media/press-releases/congresswoman-elaine-luria-calls-impeachment

[89] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[90] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[91] https://clerk.house.gov/Votes/2019604

[92] https://aguilar.house.gov/2019/12/18/aguilar-issues-statement-ahead-house-impeachment-vote/

[93] https://clerk.house.gov/Votes/2019604

[94] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[95] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[96] https://murphy.house.gov/news/documentsingle.aspx?DocumentID=1042

[97] https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf

[98] https://fingfx.thomsonreuters.com/gfx/legaldocs/lbpgnwxdyvq/Sussmann-response-Durham-2022-02-14.pdf

[99]

https://archive.org/stream/TheSteelDossierTrumpIntelligenceAllegations/The%20Steele%20Dossier%20-%20Trump-Intelligence-Allegations_djvu.txt

[100] See, for example, Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever | Fox News

[101] https://www.wsj.com/articles/what-are-the-consequences-for-adam-schiffs-lies-11590174358

[102] https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447

[103] https://homeland.house.gov/news/press-releases/thompson-brady-announce-election-security-task-force-members

[104] https://www.politico.com/story/2017/02/pelosi-trump-russia-23466 and https://www.speaker.gov/newsroom/103017

[105] https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[106] https://www.heritage.org/the-constitution/commentary/pelosi-bill-remove-president-office-needless-political-stunt

[107] https://www.speaker.gov/newsroom/7121-0

[108] https://www.politico.com/story/2019/06/05/pelosi-impeachment-1355435

[109] https://thehill.com/homenews/house/505679-pelosi-hits-trump-for-calling-russian-bounty-controversy-a-hoax-trump-himself/

[110] Adam Kinzinger isn't ruling out a 2024 presidential bid as he considers his future after the House | CNN Politics

[111] https://www.foxnews.com/politics/trump-says-liz-cheney-is-only-upset-because-hes-getting-the-us-out-of-ridiculous-and-costly-endless-wars

[112] https://twitter.com/liz_cheney/status/1422381255807705091

[113] https://january6th.house.gov/news/press-releases/thompson-cheney-statement-pentagon-officials-reported-actions-after-january-6th

[114] https://www.justsecurity.org/wp-content/uploads/2021/12/january-6-clearinghouse-John-Eastman-v-Select-Committee-Verizon-Complaint-Case-1-21-cv-03273.pdf

[115] https://www.speaker.gov/newsroom/72121-2

[116] "Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign.""

[117] As noted, both Liz Cheney and Adam Kinzinger have been censured by the Republican Party for their actions in this matter.

[118] Stephen K. Bannon Indicted for Contempt of Congress | OPA | Department of Justice

[119] Products - Data Briefs - Number 427 - December 2021 (cdc.gov)

---

[120] This finding was also leavened by the fact that the Nixon case involved "the fair administration of criminal justice." *Nixon v. Administrator of General Services*, 433 U.S. 425, 477-78 (1977) Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States* v. *Nixon* , 418 U.S., at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes*, 408 U.S. 665, 688 (1972); *Blackmer* v. *United States*, 284 U.S. 421, 438 (1932); *Blair* v. *United States*, 250 U.S. 273, 281 (1919). Similarly, Congress' interest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established.

[121] See, for example, Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies - The New York Times (nytimes.com).

[122] MSN

[123] See: The Future of Electricity Deregulation: Lessons Learned From the California Crisis. Energy Law Journal, Summer 2003. . "The Restructuring Regulator: A Guidebook and Research Agenda For the Electricity Industry," Energy Law Journal, Fall, 1995.  "Fundamental Issues in Natural Resource Damage Assessments," with Richard Carson, Natural Resource Law Journal, Fall, 1988. . "How Markets For Impure Public Goods Organize," with Jeffery Dubin, Journal of Law, Economics, and Organization, Fall, 1988. . "The Legal History and Economic Implications of Oil Pipeline Regulation," Energy Law Journal, Fall, 1981, with T. Stauffer.  "Financing U.S. Energy Development: An Economist's Perspective," Energy Law Journal, May 1981, Vol. 2, No. 1p

[124] Executive Privilege | Wex | US Law | LII / Legal Information Institute (cornell.edu)

[125] Defining the Limits of Executive Privilege (senate.gov)

[126] "The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form. *44 U.S. Code § 2201 – Definitions."* While official written documents are generally in the possession of the National Archivist and governed by the PRA, the PRA is silent about conversations for which there are no electronic recordings or transcripts.

[127] Executive Privilege | Wex | US Law | LII / Legal Information Institute (cornell.edu) and "Neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. See, *e. g., Marbury* v. *Madison*, 1 Cranch 137, 177; *Baker* v. *Carr*, 369 U.S. 186, 211.  *United States v. Nixon*, 418 U.S. 683, 684 (1974)"

---

[128] https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

[129] See Immunity of the Assistant to the President, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); Immunity of the Former Counsel, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; Immunity of the Counsel to the President from Compelled Congressional Testimony, 20 Op. O.L.C. 308, 308 (1996) ("Immunity of the Counsel to the President "); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("Congressional Demand for Deposition of Counsel "); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Testimony by Presidential Assistants at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Dual-Purpose Presidential Advisers at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

**Short Message Report**

| Conversations: 1 | Participants: 3 |
|---|---|
| Total Messages: 6 | Date Range: 5/23/2022 |

**Outline of Conversations**

 **+12403154515** • 6 messages on 5/23/2022 • Home • Liz Harrington • pknavarro@protonmail.com

**Messages in chronological order** (times are shown in GMT -04:00)

---

💬 **+12403154515**

| | | |
|---|---|---|
| LH | **Liz Harrington** | 5/23/2022, 2:15 PM |
| | Video recorded for Katie 👍 | |
| H | **Home** | 5/23/2022, 2:37 PM |
| | Awesome!!! | |
| LH | **Liz Harrington** | 5/23/2022, 4:12 PM |
| | POTUS has an urgent meeting after this so please keep to only 5 minutes max! | |
| H | **Home** | 5/23/2022, 4:12 PM |
| | Potus needs to call in asap. Got perdue on stage | |
| LH | **Liz Harrington** | 5/23/2022, 4:12 PM |
| | He should be calling Joe | |
| LH | **Liz Harrington** | 5/23/2022, 4:13 PM |
| | Now* | |

**To:**       elizabeth.aloi@usdoj.gov[elizabeth.aloi@usdoj.gov]
**Cc:**       wgiardina@fbi.gov[wgiardina@fbi.gov], Katz, Adam[akatz@goldbergsegalla.com]
**From:**     pknavarro[pknavarro@protonmail.com]
**Sent:**     Wed 6/1/2022 4:26:11 PM (UTC-04:00)
**Subject:**  Navarro response to Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631
Response to grand jury subpoena FINAL 6.1.22.docx

Please see attached.

Sent with Proton Mail secure email.

June 1, 2022


VIA Email

U.S. Attorney's Office for the District of Columbia
601 D Street NW   5ᵗʰ Floor
Washington, DC 20530

Mathew M. Graves and Elizabeth Aloi
United States Attorney and Assistant United States Attorney

Dear Mathew M. Graves/Elizabeth Aloi:

I am in receipt of Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May
26, 2022.   This subpoena has put me in the untenable position of choosing between conflicting
privilege claims that are of constitutional origin and dimension and for which there is no settled
law.   Accordingly, I would ask for your cooperation in resolving this matter in the least
burdensome ways.

On May 31, 2022, I filed a lawsuit in District Court (Case #1:22-cv-01519) seeking to enjoin
your office from enforcing the Grand Jury Subpoena and from further proceeding against me in
the manner and form provided by law as the *ultra vires,* illegal, and unenforceable House
Resolution 1037 117ᵗʰ Congress (2021-2022) recommends.

Your Grand Jury Subpoena appears to be derivative of the fruit of the poisonous tree *ultra vires,*
illegal, and unenforceable subpoena issued to me by the Select Committee To Investigate the
January 6ᵗʰ Attack on the United States Capital (Committee) dated February 9, 2022.   In
particular, your Grand Jury Subpoena seeks to enforce that portion of the Committee subpoena
which is restricted to a "Request for Documents." Given that the Committee's subpoena is *ultra
vires,* unlawful, and unenforceable, so, too, is your Grand Jury Subpoena according to the
lawsuit I have filed.

In your Grand Jury Subpoena, you also make explicit your attack on the institution of executive
privilege (while implicitly ignoring my right to testimonial immunity) by requesting "any
communications with former President Trump and/or his counsel or representatives." In this
regard, I will tell you what I told the Committee:

The executive privilege of President Donald John Trump is not mine to waive, and your best and
least burdensome course of action to acquire the information you seek is to negotiate directly
with President Trump and his attorneys a full or partial waiver of the privilege. If President
Trump waives all or part of the privilege, I would be happy to provide whatever is negotiated.

The executive privilege of President Trump is likewise not Joe Biden's to waive.  Here, as I
noted in my lawsuit, allowing a sitting president of one political party to strip a predecessor of
another political party of executive privilege – regardless of whether this is done under the flag

of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege.

If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that executive privilege (and the related institution of testimonial immunity) are supposed to serve in our Republic.  Because this is so, I ask that the DOJ tread lightly in this matter until there is settled law regarding this controversy – with settling this  controversy at the Supreme Court being a key objective of my lawsuit.

Beyond the controversy related to executive privilege raised by your Grand Jury Subpoena, there is the very clearcut controversy  related to the *absolute* testimonial immunity that senior White House advisors such as myself are covered by.  On this basis alone, your office should not have issued that Grand Jury Subpoena.

Here, I note with irony, that it has been a long-standing policy of the Department of Justice through its Office of Legal Counsel (OLC) that the testimonial immunity for senior White House advisors is indeed <u>absolute</u>. As I noted in my lawsuit:

> *As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.' Indeed, <u>this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations</u>." Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.*

> *If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.*

> *If testimonial immunity exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve.  Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective*

*presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.  [emphasis added]*

If the Department of Justice wants to try and strip me of testimonial immunity by enforcing its Grand Jury Subpoena, I humbly suggest that it first change its long-standing policy in support of absolute testimonial immunity.

With all this said, I would like to seek some type of modus vivendi with your office that neither violates my right to testimonial immunity nor President Trump's right to an executive privilege that is not mine to waive.

As I understand your Grand Jury Subpoena, you are not compelling my testimony before the Grand Jury. You are simply commanding me to provide documents arguably covered by both privilege and testimonial immunity.

My very practical problem in complying with this request – and it is a very serious one with significant legal implications – is that it would be impossible for me to provide a completely accurate accounting of all of the documents that have been so broadly and generally requested in the Committee's fishing expedition. Here, the vagaries of searching through old emails and documents and other electronic files on some ill-defined mission when some may have been deleted or misfiled or corrupted in the normal course of events may expose me to potentially criminal charges that some how I hid something from you.

The equally practical reality here is that you have it within your own powers to much more quickly obtain virtually all of the documents that you might find applicable without my direct assistance and therefore without forcing me to violate executive privilege or relinquish my absolute testimonial immunity.  Conceptually, virtually all of these documents would appear to potentially fit into the following boxes:

1.  All the documents generated during my tenure at the White House, e.g., emails, word documents.

2.  All phone communications and text messages on my official White House phone

3.  All communications by email in my personal accounts

4.  All phone contacts and messages on my personal cell phones

Regarding #1 and #2, as I told the Committee, I do not have ready access to all of the government documents, phone mail messages, phone contacts, or email messages during my four years in service at the White House. On the other hand, this should be at your fingertips with a simple phone call either to the White House or the National Archivist and therefore this is your least burdensome alternative short of negotiating with the president himself.

Regarding categories #3 and #4, I have no idea whether there is anything in this correspondence of interest.  I do know that, again as the least burdensome alternative short of negotiating with the president, it is well within the powers of your office to directly subpoena my private phone and email records as was done with others, e.g., former Chief of Staff Mark Meadows. In such a case, since the privilege is not mine to waive, your only concern would be with the president and his attorneys objecting.

As for anything else not covered by these four categories, I would ask for guidance from your office in this matter to determine whether there is a similar modus vivendi.  My obvious problem here is that the Committee's subpoena (and therefore yours) is so vague as to be meaningless. Perhaps you could be more specific in your request.

In summary, you have within your powers the ability to access all of my government records, all my personal phone records, and all my personal emails and therefore virtually all of which you appear to be seeking and which may or may not apply. I am unclear as to what further you might want given the vagueness of the original Committee subpoena that you appear to be trying to enforce and seek guidance in this matter.

In the meantime, although I am representing myself pro se in the bulk of these matters, I would refer you to Attorney Adam Katz to discuss next steps.  He can be reached at 516-302-5655.

I would also ask that you respond forthwith to the question of whether I am a target of any investigation by the Department of Justice by email to pknavarro@protonmail.com.

**To:** lizshew[lizshew@protonmail.com]
**From:** pknavarro[pknavarro@protonmail.com]
**Sent:** Mon 5/30/2022 10:03:35 PM (UTC-04:00)
**Subject:** Navarro lawsuit

0 Navarro v Pelosi et al 6 1 22 FINAL.pdf

Liz,

This lawsuit of mine drops tomorrow.  Can you be sure POTUS gets a copy asap and let him know I'll call to brief him (and you) sometime tomorrow or Wednesday.

He'll like this a lot (mostly).

Peter

Sent with Proton Mail secure email.

PETER NAVARRO, *pro se*
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
 202-489-7479
 pknavarro@protonmail.com

Jury Trial Requested

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER NAVARRO,
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
pknavarro@protonmail.com

     *Plaintiff,*

     v.                                    Case No. _____

NANCY PELOSI, in her official
capacity as Speaker of the United States
House of Representatives;

BENNIE G. THOMPSON, in his official                Jury Trial Requested
capacity as Chair of the Select Committee
to Investigate the January 6th Attack on the
United States Capitol;

ELIZABETH L. CHENEY, in her official
capacity as a member of the United States
House of Representatives;

ADAM B. SCHIFF, in his official
capacity as a member of the United States
House of Representatives;

1

JAMIE B. RASKIN, in his official
capacity as a member of the United States
House of Representatives;

SUSAN E. LOFGREN, in her official
capacity as a member of the United States
House of Representatives;

ELAINE G. LURIA, in her official
capacity as a member of the United States
House of Representatives;

PETER R. AGUILAR, in his official
capacity as a member of the United States
House of Representatives;

STEPHANIE MURPHY, in her official
capacity as a member of the United States
House of Representatives;

ADAM D. KINZINGER, in his official
capacity as a member of the United States
House of Representatives;

HOUSE SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH
ATTACK ON THE UNITED STATES
CAPITOL;

UNITED STATES HOUSE OF
REPRESENTATIVES; and

MATTHEW M. GRAVES  in his
official capacity as United States Attorney
for the District of Columbia.

*Defendants*.

2

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**PRELIMINARY STATEMENT**

1.      I, the Plaintiff, Dr. Peter Navarro, am a private citizen who previously served as a senior White House advisor during the four years of Donald John Trump's presidency.  I bring this complaint *pro se*, request a jury trial, and seek declaratory and injunctive relief to: (1) declare that the House Select Committee To Investigate the January 6th Attack on the United States Capital (Committee) is neither duly authorized nor properly constituted and therefore its legislative acts, including its subpoena issued to me and Committee Report 117-284 of the 2nd session of the 117th Congress are therefore ultra vires, unlawful, and unenforceable; (2)  declare that the Committee's subpoena, the Committee's Report 117-284, and House Resolution 1037 117th Congress (2021-2022) all represent <u>legislative acts</u> that violate the principle of separation of powers in their unlawful simultaneous pursuit of a judicial function under the flag, and behind the shield, of a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable; (3) declare that the Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable; (4) declare that the subpoena issued to me improperly compels testimony of a senior executive official; (5) enjoin the U.S. Attorney for the District of Columbia from proceeding against me "in the manner and form provided by law" as  H.Res. 1037 recommends; (6) enjoin the U.S. Attorney for the District of Columbia from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and unenforceable Committee subpoena dated February 9, 2022; and (7) declare that President Joe Biden does not have the

legal authority to waive the executive privilege or testimonial immunity invoked by his predecessor in this civil case.

2.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not, however, a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Congress (2021)[1] and with its own authorizing resolution, House Resolution 503 117th Cong. Therefore, the subpoena it has issued to me is invalid and unenforceable.

3.     For a Congressional Committee to duly issue valid and enforceable subpoenas during an investigation — and by extension, seek criminal contempt charges against those who fail to comply with such subpoenas — that investigation must have a valid "legislative function."[2] The *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][3]

4.     *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown, 381 U.S. 437, 448 (1965).* The Committee's subpoena and the Committee's Report to Congress 117-284 recommending that I be held in contempt of Congress along with H. Res. 1037 all represent "legislative acts."

5.     While the unwillingness of the courts to look beyond "facially valid" congressional investigations may have been correct law within the context of the balance of

power within the three branches of government in prior times, over time, the setting of this low "facially valid" bar has been an open invitation for legislators to simultaneously pursue an unconstitutional judicial function under the false flag, and behind the shield of, their legislative function.   It should be clear here that a pursuit of a facially valid legislative function does not preclude the unconstitutional and unlawful simultaneous pursuit of judicial function.

6.     The result of the courts' silence in this matter is now clear: Repeated abuses by Congress in using its investigatory powers to simultaneously serve both facially valid legislative and unconstitutional judicial functions have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance of powers – and the separation thereof — between the legislative, judicial, and executive branches of our government.   In this case, the legislative history of the Committee and its members broadly viewed over a more than five-year period reveals an undeniable and overwhelming pattern of the weaponization of Congress' investigatory powers to pursue a judicial, and by implication, a political function.

7.     In this case, the legislative acts of the Committee and its members together with H.Res 1037 constitute an unlawful exercise of the judicial function over and above the Committee's "facially valid" legislative function, thereby violate the principle of the separation of powers, and cannot advance a legal contempt of Congress charge against me through the United States Attorney's office.

8.     The Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 constitute legislative acts that violate the constitutional proscription against bills of attainder, and each should be invalidated and declared unenforceable.  These legislative acts violate the Constitutional proscription against bills of attainder because: (1) they seek to determine guilt

and inflict punishment on me in the forms of shame, humiliation, banishment, ostracization, incitement of public hate, possible imprisonment, and the confiscation of my property, all without adequate provision of the protections of a judicial trial, and (2) the Committee, contrary to the court's guidance, failed to pursue less burdensome alternatives to achieve its alleged "legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). The set of deprivations which the Committee and its members and which the Democrat-controlled House have inflicted and seek to inflict on me are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977). At my age of seventy-two, with the average life expectancy in America for males at seventy-six, a one-year prison term would constitute over 25% of my remaining expected life while a $100,000 fine would be equivalent to a significant fraction of my wealth for retirement.

9.     Rather than pursuing the less burdensome alternatives of negotiating a waiver of executive privilege and testimonial immunity from President Trump and his attorneys or a civil suit as *Nixon v. Administrator of General Services* and *Committee on Judiciary v. Miers* guides, the Committee and Congress with its passage of H.Res. 1037 have pursued the most burdensome and punitive alternative with a potential criminal prosecution in their naked effort to threaten and coerce me into turning my back on my duty to my country and appearing before their kangaroo court. By the Committee's refusal to negotiate directly with President Trump and his attorneys on the issue of executive privilege and testimonial immunity – the least burdensome alternative – and by failing to pursue the second least burdensome alternative of a civil suit, my due process has been violated, the legislative acts of the Committee and House of Representatives against me have been exposed as bills of attainder, and these legislative acts of

6

the Committee and Congress in this case must be invalidated. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). *Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).*

10.   There is no settled law to support the absurd, fanciful, and extremely dangerous proposition that an incumbent president can waive the executive privilege invoked by his predecessor or waive the testimonial immunity of the senior advisers serving under that predecessor.

11.   Executive privilege is an institution dating back to the days of George Washington that has been deemed critical to effective presidential decision-making; executive privilege, together with testimonial immunity for senior White House advisers provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

12.   I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension for which there is no settled law.  Allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the false flag of the national interest – represents the most extreme and dangerous form of qualifying the privilege and the testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn deal a mortal blow to the critical functions that executive privilege and testimonial immunity are supposed to serve in our Republic. These functions are to: (1) help ensure the separation of powers; and (2) provide for optimum candor in presidential decision-making.   Any settled law that institutionalizes a

revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.

13.    The Committee's members along with House Speaker Nancy Pelosi over a more than five year period have been engaged in a "repeatable strategic game" of "gotcha" and punishment that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic ping pong game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office or serve in government.

14.    The time is ripe for the court to address this controversy and the question of whether an incumbent president can strip his predecessor of executive privilege and testimonial immunity.  Here, if the Committee and Joe Biden manage to pull this deadly game off now and effectively establish the principle in settled law that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.

15.    Congress cannot lawfully hold me in contempt of Congress for failure to comply with a subpoena that compels me to testify before the Committee because, under long-standing Department of Justice Office of Legal Counsel (OLC) policy, I have absolute testimonial immunity as a senior White House official. As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from

testimonial compulsion by a congressional committee.'  Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."   Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

16.    If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.

17.    If testimonial immunity exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve.  Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.

18.    On May 26, 2022, two FBI special agents banged loudly on my door in the early morning hours to present me with a fruit of the poisonous tree Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 commanding me to comply with the original *ultra vires,* illegal and unenforceable subpoena issued to me by the Committee dated February 9,

2022. Specifically, this Grand Jury Subpoena from Matthew M. Graves, the U.S. Attorney for the District of Columbia pointedly ignored all claims of executive privilege and testimonial immunity while commanding me to testify before Grand Jury #22-3 of the U.S. District Court for the District of Columbia on June 2, 2022 and present "[a]ll documents relating to the subpoena dated February 9, 2022" that I "received from the House Select Committee to investigate the January 6, 2021, attack on the US Capitol, including but not limited to any communications with formal President Trump and/or his counsel or representative." [emphasis added]

19.     As demonstrated in this brief, the Committee's original subpoena cited by the U.S. Attorney is indeed *ultra vires*, unlawful, and unenforceable because: (1) the Committee is neither duly authorized nor properly constituted; (2) the Committee's subpoena together with the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function; (3) the Committee's legislative acts against me, including its subpoena, violate the constitutional proscription against bills of attainder; and (4) both executive privilege and testimonial apply.

20.     The U.S. Attorney cannot issue a Grand Jury Subpoena deemed to be lawful and enforceable that is derivative of a fruit of the poisonous tree *ultra vires,* unlawful, and unenforceable subpoena issued by the Committee and the equally poisonous trees of the Committee's Report 117-284, and H.Res. 1037.

21.     Since the subpoena of the Committee is *ultra vires*, unlawful, and unenforceable, the U.S. Attorney's Grand Jury Subpoena is likewise *ultra vires*, unlawful, and unenforceable and the U.S. Attorney must be enjoined from any actions to enforce this subpoena.

22.     As demonstrated in this brief, the executive privilege invoked by President Trump

10

is not mine or Joe Biden's to waive.  Rather, as with the Committee, the U.S. Attorney has

constitutional and due process obligations to negotiate my appearance before Grand Jury #22-3

not with me but rather with President Trump and his attorneys and I am bound by privilege to

fail to comply with this Grand Jury Subpoena absent these negotiations and guidance from

President Trump.

23.    I come to this case far exceeding ""the irreducible constitutional minimum of

standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  I will demonstrate substantial injury

through punishment from Speaker Pelosi, the Committee, and Democrat-controlled House of

Representatives responsible for passage of H.Res. 1037 along with possible imminent,

existential injury through punishment and the threat of punishment from the U.S. Attorney of

the District of Columbia. Only a set of favorable rulings by this court will clearly redress these

injuries and prevent further injury.

### PARTIES

1.    Plaintiff  Peter Navarro served as a senior White House adviser during all four

years of the Trump administration.

2.    Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S.

House of Representatives and Speaker of the House.

3.    Defendant  Bennie G. Thompson ("Chairman Thompson") is a Democrat

member of the U.S. House of Representatives and Chairman of the Committee to Investigate

the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued

with his authority as Chair.  Thompson also introduced H. Res. 1037 – 117th Congress (2021-

2022) with zero cosponsors.

4.    Defendant  Elizabeth L. Cheney is a Republican member of the U.S. House of

Representatives and members of the Committee to Investigate the January 6th Attack on the

United States Capitol.

5.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

6.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

7.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

8.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

9.      Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

10.      Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.      Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.      Defendant Select Committee to Investigate the January 6th Attack on the United

States Capitol ("Committee") was created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

13.     Defendant House of Representatives passed H. Res. 1037 by the yeas and nays 220-203 along party lines (with two Republican votes) on April 6, 2022.

14.     Defendant Mathew Graves is U.S. Attorney for the District of Columbia who served me with a subpoena (based on an *ultra vires*, unlawful, and unenforceable fruit of the poisonous tree subpoena issued by the Committee) to appear before Grand Jury #22-3 of the U.S. District Court for the District of Columbia.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

2.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House.

3.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Committee and introduced H. Res. 1037.

4.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Committee that issued the Navarro subpoena from Washington, D.C.

5.     This Court has personal jurisdiction over the Committee because it is located and operates in Washington, D.C.

6.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events

giving rise to the claim occurred in Washington, DC.

## RELEVANT FACTS

1.     On August 3, 2020, the Democrat-funded Transition Integrity Project publicly released a detailed plan to skew the 2020 presidential election in favor of Joe Biden using a combination of lawfare and grassroots tactics. Their overarching purpose was to stuff the ballot box in key battleground states with absentee ballots, many of which would, under the lax, and often illegal, rules they sought to impose, would be illegal votes, and therefore unlawful to count.[4]

2.     In a *Time* magazine cover story, journalist Molly Ball published an article after the election entitled "The Secret History of the Shadow Campaign That Saved the 2020 Election" which confirmed many of the strategies and tactics the Democrats had used to tilt the election in favor of Joe Biden as had been set forth in the TIP plan. Notes Ball: "Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding."[5]

3.     In the wake of the November 3, 2020 election, numerous analyses emerged revealing the elaborate strategies and tactics the Democrats had indeed used to skew the election and that the Transition Integrity Project had foreshadowed.  This set of analyses included the Plaintiff's "Navarro Report;"[6] and as noted in that report:

> *On January 13, 2021, the Democrat-controlled House of Representatives passed House Resolution 24 "impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors."  A primary justification for this overwhelmingly partisan impeachment is that "President Trump repeatedly issued false statements asserting that the Presidential election results were the*

14

*product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."*

*If it can be demonstrated that President Trump had a good faith belief that the November 3, 2020 Presidential election results were, indeed, the poisonous fruit of widespread fraud and election irregularities, POTUS45 must not only be found Not Guilty. The U.S. Senate must also call for a prompt investigation of these alleged irregularities.*

*The three volumes of the Navarro Report provide just such a demonstration. These three volumes have been consolidated herein into a single document explicitly designed as a useful evidentiary handbook and reference guide for the upcoming Senate impeachment trial.*

*Evidence used in the preparation of the Navarro Report includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.*

*Volume One finds significant election irregularities across six key battleground states – Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These irregularities range from outright voter fraud, ballot mishandling, and contestable process fouls to Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.*

*Volume Two examines a two-pronged Grand "Stuff the Ballot Box" Strategy used by the Democrat Party and its political operatives to flood the battleground states with enough illegal absentee and mail-in ballots to turn a decisive Trump victory into a narrow, and arguably illegitimate, Biden "win." To strategically game the Presidential election, the Democrats and their operatives were found to have at times bent or broken both election rules and laws.*

*Volume Three provides the most up-to-date statistical "receipts" with respect to the potential number of illegal votes cast in each battleground state. Volume III*

15

*thereby provides investigators with a well-documented tally of potentially illegal votes on a state-by-state and category-by- category basis. A key finding is that the number of potentially illegal votes dwarfs the very thin alleged Biden "victory" margins across all six battleground states.*

4.      Public opinion polls today indicate that a significant fraction of the American electorate believes the 2020 presidential election was rigged or stolen. [7]

5.      There is no definitive proof offered by the Committee or available in the public square that the November 3, 2020 presidential election was a fair election unmarred by election irregularities.

6.      In the Committee's letter of February 9, 2022 transmitting a subpoena electronically to me, the Committee accuses me of making "many claims of fraud in the election" but also insists that these claims have been discredited by "public reporting, by state officials, and courts."[8] Yet, the only "proof" the Committee's Chair Bennie Thompson offers is a laughable footnote citing an article in the long-discredited Forbes magazine – Forbes is owned by Chinese investors and has been turned largely into a propaganda organ for the Chinese Communist Party.[9]

7.      On January 6, 2020, a large group of Trump supporters gathered in Washington in the American tradition of peaceful protest to support the president in his peaceful bid to get a legal counting of the vote. At this point in time, President Trump had a strong presumption that the election was likely rigged and stolen from him based on the data and analyses available to him, including the "Navarro Report."

8.      Among a large crowd of Trump supporters, there were small pockets of extremists likely seeking to instigate violence that could be blamed on President Trump. These extremists ranged from members of the Marxist group Black Lives Matter and the anarchist Antifa group

to far right militia groups.[10]

9.     There is likewise evidence that among the crowd were individuals serving as informants to the FBI who may have possibly instigated the violence.[11]

10.     The Committee was formed against the backdrop of this January 6 history. In justifying its investigation, the Committee and its members refer repeatedly to the role of President Trump and his advisors, including the Plaintiff, in instigating an unlawful insurrection and promoting an unlawful attempt to overturn the 2020 election while insisting that the election was fair – again, despite no definitive evidence proving the election was fair.[12]

11.     For the four years of the Trump administration, I, the Plaintiff, served as a senior White House adviser to President Donald J. Trump.  While I would carry several titles during my term of service – Director of the National Trade Council, Director of the Office of Trade and Manufacturing Policy, Defense Production Act Policy Coordinator – my duties and responsibilities in the White House as an Assistant to the President during the relevant times here spanned a far broader spectrum of economic, trade, border security, and national security issues.

12.     During my service, President Trump would regularly seek my candid advice on matters that might seem far outside my "official" duties; and a narrow construction of my role in the White House as the Committee has done based merely on my titles fundamentally misunderstands how the Trump White House worked.

13.     In the aftermath of the November 3rd, 2020 election, I began an investigation that would quickly lead to deep national and economic security concerns about election integrity.  In a series of previously referenced analyses titled collectively "The Navarro Report," I identified not just an abundance of fraud and election irregularities.  I exposed how the Democrat Party

and its operatives effectively made what should have been a landslide win by President Trump into an election close enough to steal.

14.     Given the economic and national security ramifications of a possibly stolen election, I worked diligently in my official capacity as a government official within the White House and as a senior White House adviser to help the president and other senior advisers navigate what appeared to me to be the most sophisticated assault on American democracy ever perpetrated.

15.     In the days leading up to January 6, and as reported in my book *In Trump Time: My Journal of America's Plague Year* referenced by the Committee,[13] I described a legal and constitutional strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887.[14]   The goal was to delay certification of the election for at least another several weeks "while Congress and the various state legislatures involved investigate[d] all of the fraud and election irregularities" that would be raised that day on Capitol Hill.

16.     As noted in *In Trump Time,* the goal of this strategy was "*not* to get the election overturned" as the Committee would insist. Rather, the goal was "to subject the ballots – the *legal* votes of American citizens along what we believed to be a flood of ballots – to careful scrutiny and investigation."

17.     Finally, as noted in *In Trump Time,* because implementation of the Green Bay Sweep strategy required "only peace and calm on Capitol Hill," the last thing President Trump and I wanted was "to hand Congress an excuse to abort the operation" with an outbreak of violence and chaos and the last people "who wanted to see violence erupt that January 6 day on Capitol Hill" included both myself and President Trump (along with Stephen K. Bannon).

18.     To date, the Committee has offered no significant or conclusive proof that the November 3 election was fair or that the Navarro Report was in any way inaccurate or misleading.  Nor has the Committee offered any significant or conclusive proof that either I or President Trump or any of the senior advisors sought to <u>illegally</u> overturn the election.

19.     To recap, the Committee asserts without facts and evidence that "many claims of purported fraud in the election...have been discredited in public reporting, by state officials, and courts." This is but one of many pieces of evidence that the Committee is operating upon under the flawed assumption that the 2020 presidential election was fair and without reasonable controversy. From this flawed assumption, this kangaroo court of a Committee is pursuing a judicial function in seeking to punish President Trump and any of his senior advisors who publicly reject the unproven claim that the election was indeed fair.

20.     Against this stark backdrop of lack of evidence for its allegations, the Committee continues to subject President Trump and senior advisors such as myself to the punishment of shame, humiliation, banishment, ostracization, and the incitement of public hatred by portraying us as insurrectionists rather than as patriots seeking to get the bottom of what looks to be, just as with the Nixon-Kennedy 1960 election, a likely stolen election.[15]

21.     The Committee's efforts are also geared at inflicting equally traditional forms of punishment such as imprisonment and the confiscation of the property of Trump's most senior advisors who dare to defy the Committee's unlawful subpoenas and investigation using the U.S. Attorney and the vast resources of a Democrat-controlled Department of Justice as its cudgels. In seeking to build a criminal case against President Trump and his most senior advisors for their alleged roles in seeking to overturn a fair election, the Committee is clearly venturing far beyond its facially valid legislative function into the realm of the unconstitutional pursuit of a

judicial *cum* political function.

22.     On February 9, 2022, I received the Committee's subpoena in which I was "commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol" (Committee) and "to testify at a deposition touching matters of inquiry committed to said committee or subcommittee" on March 2, 2022 at 10:00 am and further to "not to depart without leave of said committee or subcommittee."[16]

23.     I was also commanded under this subpoena "to produce the things identified on the attached schedule."[17]   I found the breadth and invasiveness of this subpoena and its attachment to be breathtaking and a direct frontal assault on both executive privilege and testimonial immunity while it also gave the appearance of a criminal investigation, not a fact-finding mission.

24.     Upon receipt of this subpoena, as a former senior White House adviser to President Donald J. Trump clearly covered by testimonial immunity, I was faced with three broad choices:[18] (1) respect President Trump's invoking of executive privilege in the Committee's investigation and fail to comply with the subpoena; (2) unilaterally waive President Trump's Executive Privilege and my own testimonial immunity by providing all of the requested documents and testifying before the Committee as commanded; or (3) preserve President Trump's executive privilege while at least superficially meeting the requirements of the subpoena by appearing before the Committee to testify but invoking my Fifth Amendment rights during such testimony.

25.     After considerable reflection and a broad overview of the law – both settled and unsettled – I chose Choice #1: fail to comply with the subpoena while preserving the executive privilege asserted by President Trump.  I was swayed both by my own personal experience

within the White House as one of the president's most senior and trusted advisors and by the wisdom of *United States v. Nixon* that opines that "[a] President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon, 418 U.S. 638 at 708.*

26.    Further, as noted in *Trump v. Mazars, 140 S. Ct. 2019 at 2032,* executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Mazars, 140 S. Ct. at 2032* at 448–449.

27.    From this vantage point, I believed at the time of my receipt of the Committee's subpoena – and also keenly mindful of the absolute testimonial immunity historically granted to senior White House officials --  it was my duty to President Trump, the Constitution, and the Republic that I had pledged to serve and defend to honor the executive privilege that President Trump had invoked.

28.    I made Choice #1 knowing that it would put me in an untenable position, and I did so despite the obvious risks to my freedom and my financial position that might come with a criminal contempt prosecution.[19]  That I might face criminal charges was no idle speculation as one such criminal prosecution was already in progress against another former Trump advisor Stephen K. Bannon and another criminal contempt charge was possibly pending against former Trump Chief of Staff Mark Meadows.  Yet, in making Choice #1, I believed that duty and honor

21

must come first.

29.    Regarding Choice #2, comply with the Committee's subpoena, there is settled law that dictates the executive privilege in this matter was not mine to waive, e.g., the Supreme Court has held that executive privilege "can neither be claimed nor waived by a private party." *United States v. Reynolds, 345 U.S. 1, 7–8 (1953).*  If I were to ignore President Trump's invocation of privilege by opting for Choice #2, I would be engaging in an act contrary to settled law while violating due process.  This would be an act of betrayal both of the president I served and of my country.  I would be violating constitutional law by waiving the privilege myself and fully cooperating with the Committee.

30.    With Choice #2, to the extent that I was choosing it "to save my own skin," as the saying goes, I would be committing an act of cowardice under partisan Congressional fire – the exact opposite of the honorable and patriotic choice epitomized by Choice #1.  I note here in this regard that several high-ranking Trump White House officials, including President Trump's son-in-law Jared Kushner, chose to ignore the critical privilege and immunity issues at stake and testify before the Committee.  Predictably, their cowardly actions would be used to criticize both my principled position as well as President Trump himself, as illustrated in this news coverage of a comment from the Committee's Chair Bennie Thompson: "A person close to the Trump family told CNN the former President's children never saw a reason not to cooperate with the committee because none of them felt appearing before the panel put them at any risk.[20]...In his interview with CNN, Thompson questioned why the former President did not object to his family members testifying while key White House aides are now being held in contempt of Congress by the House after refusing to testify, saying they had been instructed by the President to claim executive privilege over their conversations. '"Now we have four individuals who are

being held in contempt of Congress because they were directed by the President not to come. So they are under the bus, but his children are not. They came," Thompson said. "Now to me, that's Donald Trump that we are discovering. It's 'do as I say, but not do as I do.' Do you understand? I say don't go and testify, but when my children or my in-laws are involved, you can go testify.'"[21]

31.   As for Choice #3, complying with the subpoena but invoking my Fifth Amendment rights, I believed that by doing so I would be undermining executive privilege in a way every bit as dishonorable as Choice #2. To wit: I would be invoking the Fifth Amendment rather than staunchly defending Executive Privilege.

32.   With Choice #3, I also was keenly aware of the reputational harm that would come because far too many Americans wrongly associate guilt with invoking the Fifth Amendment.   As just one data point, a Morning Consult poll of 1993 registered voters conducted May 10-14, 2018 found that 36% of respondents believed that invoking the Fifth Amendment "usually implies the person is guilty."[22]   Here, Justice Felix Frankfurter has famously criticized those who believe the Fifth Amendment implies guilt: "Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. "  Of course, no such admonition by Frankfurter would have been necessary if the problem didn't exist.  *United States v. Chase*, 281 F.2d 225, 228 (7th Cir. 1960).

33.   In this case, Justice Frankfurter might just as well have been criticizing the Chair of the Committee Bennie Thompson for unlawfully judging – and publicly branding -- anyone who invoked the Fifth Amendment during testimony before his Committee as guilty indeed.  In a public statement on December 2nd, 2021 illustrating the unconstitutional punitive nature of a

Committee that is supposed to be pursuing a non-punitive legislative agenda and exposing the "judge, jury, and executioner" judicial function mindset of the Committee, Thompson baldly asserted that those who appear before his Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, Real Clear Politics, Dec. 2, 2021.[23]

34.    Having worked hard my entire life to live honorably with a reputation for honesty, I was not inclined to invoke the Fifth Amendment in a demonstration of gamesmanship to avoid a contempt charge. Nor was I going to be tainted with the charge of "guilty until testifying" in the ugly game Thompson and the Committee were obviously playing.

35.    Finally, I note that I was aware at this time of a critical decision I would have to make that if I were to bend to the Committee's coercive will.  To wit, I would not only be undermining the institution of executive privilege and its critical role in the separation of powers. I would be weakening the companion institution of testimonial immunity for senior White House advisers.

36.    While there has been some case law arguing for a qualified rather than absolute executive privilege – the law remains unsettled – history and the law on testimonial immunity has leaned far closer to the absolute end of the spectrum.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet

with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.'  Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."   Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

37.    Having made Choice #1 to honor the executive privilege invoked by President Trump (and cognizant of the sanctity of absolute testimonial immunity), I responded to the subpoena I had received in an email dated February 27, 2022 addressed to  Senior Investigative Counsel for the  Committee, Dan George as follows: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.  Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."

38.    Note that I clearly assert in this email that the privilege is not my to waive, and I clearly indicate the Committee should "directly negotiate with President Trump and his attorneys."

39.    The court can also see in my response that I am anticipating a possible assault on President Trump's privilege by Joe Biden by clearly indicating that the privilege is not Biden's to waive either.  In fact, the very next day, on February 28, 2022 I received a letter by email from Deputy Counsel to the President Jonathan Su of the White House Legal Counsel's office advising me that President Biden "has decided not to assert executive privilege" as regards to either my "testimony" or "documents" commanded by the Committee."[24]

40.    Even a cursory view of the case law, Executive Orders, and OLC opinions

indicates that Su's bold assertion that Joe Biden has the legal authority to waive the privilege of his immediate predecessor and the immunity of that's predecessor's senior advisers within a matter of mere months of the transition of power is anything but settled law.

41.    Upon receipt of the Su letter, I immediately wondered whether the Committee had had somehow signaled to Su and the White House to take this action as a way of further coercing me into bending to their will.   Here, it has been said that there are no conspiracies, but there are also no coincidences while Occam's Razor teaches us that the simplest explanation is also the most likely.  In this instance, the simplest explanation for the Su/Biden correspondence is not that it was a coincidence but rather that the Committee either tacitly or explicitly colluded with the White House to elicit this correspondence in a blatant attempt to do an end run around due process and the law.  If Joe Biden could strip Donald Trump of executive privilege and me of testimonial immunity, then neither I nor any Trump senior White House adviser would have an excuse not to appear before the Committee – or so their illegal and indefensible position would become.

42.    My second thought upon receiving the Su letter was that no court of law would find it reasonable to allow an incumbent president to strip his predecessor of executive privilege within months of taking office no matter what fig leaf of a broader national interest the incumbent might seek to cover its assault in.  The chilling effect of such an action, if upheld by the courts, would be tantamount to destroying executive privilege and testimonial immunity as we know them as no future White House senior advisor or president would have confidence in the privilege.

43.    To make this point early, and it shall be made often, whatever vague "extraordinary" "national interest" the Su letter cites in support of its half-baked assertions, these

concerns pale in comparison to the transformation of executive privilege and testimonial immunity into partisan ping pong balls that provide no real assurances to future White House advisers or presidents of the kind of confidentiality necessary to make sound decisions.

44.     Within the context of strategic game theory, if the assault on Executive Privilege and testimonial immunity by the Committee and the White House in this case are allowed by this court, it will spell the end of both Executive Privilege and testimonial immunity as this Republic has known them because we will quickly bear witness to a "repeatable game" in which whichever party controls <u>both</u> the House of Representatives and White House, that party will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.  Of course, this will all be done under the false flags of national emergency and national security.

45.     If, in this case, the Committee and Joe Biden are able to effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, <u>I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will lead the charge</u>.

46.     On February 28th, after receiving Mr. Su's correspondence and additional correspondence from Mr. George, I reaffirmed to Mr. George that: "President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."

47.     I would further subsequently note in a press release on March 26, 2021 that I would honor whatever decision President Trump made in the matter and assist the Committee in expediting the matter to the Supreme Court to settle the law on this controversy: "This is an

unprecedented partisan assault on executive privilege. The committee knows full well that President Trump has invoked executive privilege and it is not my privilege to waive. If President Trump waives the privilege, I would be happy to testify. It is premature for the committee to pursue criminal charges against an individual of the highest rank within the White House for whom executive privilege undeniably applies. Until this matter has been settled at the Supreme Court, where it is inevitably headed, the Committee should cease its tactics of harassment and intimidation. I would be happy to cooperate with the committee in expediting a review of this matter by the Supreme Court and look forward to arguing the case."[25]

48.    After a more careful reading of the Su letter, it is clear, if not altogether obvious, that the Biden White House does not directly seek to waive President Trump's privilege in the matter. All Mr. Su is informing me of is that President Biden "has decided not to assert executive privilege." To believe that this waives the privilege invoked by President Trump, <u>one must make the leap that the decision by Biden not to invoke privilege is equivalent to waiving the privilege invoked by Trump. This is not at all clear from the Su letter</u>. In fact, Su may be purposely opaque knowing the quicksand of unsettled law he has waded into. And it may be useful to note as well that Su makes no reference to any case law that would indicate Biden is seeking to hijack the Trump privilege. Yet, the Committee would be more than eager to make this leap.

49.    On March 28, 2022, the Committee voted unanimously (9-0) to recommend that I, along with former Trump senior White House adviser Dan Scavino, be held in contempt of Congress.

50.    On April 4, the House Rules Committee voted along party lines, 9 Democrats for to 4 Republicans against, to advance the contempt charge against me.[26]

28

51.     On April 6, the House of Representatives passed H.Res. 1037 virtually along party lines by a vote of 220-203, with two Republicans voting in the affirmative.[27]  This Resolution recommends  to the United States Attorney for the District of Columbia  that the  Plaintive "be proceeded against in the manner and form provided by law"  for criminal contempt of Congress, whereby this contempt charge  carries with it a prison term of up to one year  and the confiscation of the Plaintiff's  of up to $100,000.

52.     The Supreme Court has long recognized that due process protections apply to all congressional investigations.  *Watkins v. United States*, 354 U.S. 178,188 (1957); *Quinn v. United States*, 349 U.S. 155,161 (1955).  The Committee had its own duty to honor due process and attempt such negotiations with President Trump in good faith – and thereby avoid obvious bill of attainder complications.  Negotiations was the least burdensome (punitive) alternative at the Committee's disposal while a civil suit was the next least burdensome alternative.   Instead, the Committee pursued the most burdensome (punitive) alternative of a criminal contempt of Congress charge.

**My Subpoena Was Not Issued by a Duly Authorized and Properly Constituted Committee and is Unenforceable**

1.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Cong. (2021)[28] and its own authorizing resolution, House Resolution 503 117th Cong. (2021).[29]

2.     Section 3(b)(1) of H.Res. 8 provides: "During the One Hundred Seventeenth Congress, the chair of a standing committee…upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena,

by a member or counsel of such committee." [emphasis added] By H.Res 8, consultation with the ranking minority member is therefore a necessary condition for the issuance of any subpoena by the Committee.

3.     Section 5 (c) (6)(A) of H. Res. 503 states: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." By H.Res 1037, consultation with the ranking minority member is likewise a necessary condition for the issuance of any subpoena by the Committee.

4.     Section 2(a) of H. Res. 503 states that "The Speaker shall appoint 13 Members to the Committee, 5 of whom shall be appointed after consultation with the minority leader."

5.     Presumably, the minority leader would propose five members of his own party under Section 2(a) of H. Res. 503 so that the partisan balance would reflect an albeit still partisanly skewed 13-5, near three-to-one Democrat majority on the Committee.

6.     Upon passage of H.R. 503, Speaker Pelosi appointed Bennie Thompson to serve as Chair of the Select Committee along with six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.[30]

7.     Following the instructions of H.R. 503, House Minority Leader Kevin McCarthy recommended Rep. Jim Banks of Indiana, to serve as minority ranking member of the Committee.[31]   However, Pelosi refused to seat Banks; and the Committee has no ranking minority member despite the requirement of H.Res. 503 that it should and the requirements

imposed by H.Res 8 for the issuance of valid subpoenas.

8.    Minority Leader McCarthy also recommended to Pelosi the appointment of four additional  Republican members to serve as minority members on the Select Committee – Illinois' Rodney Davis: Ohio's Jim Jordan,  North Dakota's Kelly Armstrong, and Texas' Troy Nehls. None were appointed by Pelosi.

9.    If Pelosi had simply appointed the members recommended by McCarthy along with Banks as ranking minority member, this would have met the requirements of H.Res. 503 to have a 13-member commission with five minority representatives and a ranking minority member.[32] Instead, without the consultation of McCarthy, again in contradiction to H.Res. 503, Pelosi appointed Illinois' Adam Kinzinger and Wyoming Liz Cheney—two Republicans with clear animus against President Trump.

10.    The Committee's failure to comport with Section 2(a) of H.Res. 503 is evident in: (1) the failure of House Speaker Nancy Pelosi to appoint the proper number of members (9 instead of 13); (2) an even more skewed 7-2 ratio of Democrats to Republicans instead of the 8-5 ratio called for by H.Res. 503; (3) the failure of Pelosi to consult with Minority Leader Kevin McCarthy prior to the seating of the two titular Republicans on the Committee, neither of which were proposed by McCarthy; (4) the absence of a ranking minority member; and (5) the rejection by Pelosi of all five members, including a ranking minority member, proposed by McCarthy.

11.    The Committee's failure to comport with Section 3(b)(1) of H. Res. 8 as well as Section 2(a) of H. Res. 503 is evident in the fact that of those nine members Speaker Pelosi appointed to the Committee, none were appointed after consultation with the ranking minority member as required by the authorizing resolutions.

12.    Since Speaker Pelosi allowed no ranking minority member on the Committee

there is no ranking minority member to "consult" with and therefore the Chair may not "order the taking of depositions" "pursuant to subpoena."

13.     Absent a ranking minority member, the Committee has no legal authority to duly issue, much less legally enforce subpoenas and advance resolutions finding private citizens in contempt of Congress for refusal to comply with the illegal subpoenas issued by the Select Committee.

14.     The absence of a ranking minority member on the Committee alone is sufficient for this court to rule that all of the Committee's subpoenas are invalid.   Chairman Thompson derives the authority to issue subpoenas from both H.Res. 8 and H.Res. 503 Section 5(C)(6)(A) of the Committee's authorizing statute, but these authorities are qualified, not absolute. The Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Committee.

15.     As the Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena to me. The subpoena thus runs afoul of the Committee's authorizing resolution as well as H.Res. 8, making it invalid and unenforceable; and my failure to comply with the Committee's subpoena cannot be grounds in H. Res. 1037 for holding me in contempt of Congress.

16.     In a public statement, Pelosi acknowledged she had taken an "unprecedented decision"[33] in establishing what amounts to nothing more than a highly partisan and score-settling kangaroo court of a Committee with a fig leaf of Republican membership, no ranking minority member, and <u>four empty seats</u> in clear violation of the specifications of H.R. 503 for a duly authorized and properly constituted committee.

17.     Congress' failure to act in accordance with its own rules is judicially cognizable.

*Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

18.     In this case, former senior White House officials, including myself, have been held in contempt of Congress on the basis of invalid and unenforceable subpoenas from a Committee that is neither duly authorized nor properly constituted yet we face possible imprisonment of up to one year and a significant confiscation of personal property in the forms of up to $100,000 in fines and the substantial cost burden of legal representation.

## The Legislative Acts of the Committee and H.Res 1037 Violate the Principle of Separation of Powers Because They Also Seek To Fulfill a Judicial Function

1.     A key controversy before this court in this case for which there is no settled law is this: If a Congressional entity such as the Committee is pursuing an investigation under the Constitutional flag, and behind the shield of, what appears to be a facially valid legislative function, is it also then free to use that investigation and its subpoena powers to simultaneously pursue an illegitimate judicial function that violates the principle of separation of powers? Here, it should be obvious that the presence of a facially valid legislative function does <u>not</u> rule out the presence of a punitive judicial function – the pursuit of these legitimate legislative and illegal judicial functions can occur simultaneously.

2.     The Constitution contains no provision explicitly declaring that the powers of the three branches of the federal government shall be separated yet the principle of separation of powers is implicit in its construction: Article I vests all legislative powers in the Congress; Article II vests executive power in the president, and Article III vests judicial power in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

3.     Congress has no enumerated constitutional power to conduct investigations or issue subpoenas.   For a Congressional Committee to duly issue valid and enforceable subpoenas in the course of an investigation – and by extension, seek contempt charges against those who fail to comply with such subpoenas -- that investigation must have a valid and <u>non-punitive</u> "legislative function."[34]

4.     Congress' power to investigate is limited because it is "justified <u>solely</u> as an adjunct to the legislative process."[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).   (emphasis added).

5.     A hallmark of the judicial function is the power to punish.  "The power to punish is inherent in the courts."  *United States v. Landes*, 97 F.2d 378, 381 (2d Cir. 1938).

6.     To ensure the principle of separation of powers, Congress has no judicial power and therefore does not have the power to investigate in pursuit of a judicial function and "inflict punishment."  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

7.     The Committee and its members have "no Congressional power to expose for the sake of exposure" *Watkins v. United States*, 354 U.S. 178, 200 (1957).   Exposing for the sake of exposure represents an unlawful exercise of judicial power and seeks to perform a judicial function because, in causing such results as shame, banishment, humiliation, or ostracization, such exposure administers various forms of punishment.  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).  Justice Black notes "There is nothing strange or novel about this kind of punishment. It is in fact one of the oldest forms of <u>governmental punishment</u> known to mankind; branding, the pillory, ostracism and <u>subjection to public hatred</u> being but a few examples of it. <u>Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment</u>.  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959)

[emphasis added]

8.     The courts have never firmly addressed the controversy of whether a Congressional investigation should be invalidated if that investigation represents a simultaneous exercise of <u>both</u> a facially valid legislative function and an unconstitutional and unlawful judicial function. Yet, as the frequency and intensity of overtly partisan and weaponized Congressional investigations have accelerated in the vacuum of settled law in this matter, it is a question and controversy that begs for this court's wisdom. To borrow a phrase from *Trump v. Mazars*, this case, the hallmark of which is Speaker Pelosi's frank admission of the overtly partisan construction of an "unprecedented" Committee, "represents a significant departure from historical practice." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2031 (2020). Accordingly, this case and controversy by Pelosi's own words invites the court to settle the law and thereby set precedent.

9.     Historically, the courts have been reluctant to dive into the deep end of this separation of powers pool in their relatively few rulings on the subpoena power of Congress. For example, the *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][36]

10.     The reluctance of the courts to pierce the veil of a facially valid legislative function and find a companion unconstitutional judicial function has been attributed in part to the 'hurly burly' nature of politics. As *Trump v. Mazurs* notes: "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they

have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel). *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020)

11.     The unwillingness of the Courts to look beyond facially valid congressional investigations may have been tolerable within the context of the balance of power within the three branches of government in prior times.  However, over time, the setting of this low, facially valid legislative function bar to the exclusion of the possibility that a judicial function is simultaneously and unconstitutionally being pursued has been an open invitation for legislators to pursue just such a judicial function under the false flag, and behind the shield of, their legislative function.

12.     The result of the court's silence in this matter is now clear: Repeated abuses by partisans and political score settlers like those on the Committee have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance and separation of powers between the legislative, judicial, and executive branches of our government.

13.     In considering whether to address this controversy in this case, the court should indeed take Speaker Pelosi at her word when she describes the formation of the Committee as "unprecedented."  It is indeed unprecedented for Congress to form a rabidly partisan and score-settling congressional committee that has no minority ranking member and fails to abide by its own authorizing resolution.  It is equally unprecedented to allow this Committee to wield such powerful investigatory powers in pursuit of a judicial function behind the flag and shield of a

facially valid legislative function.

14.     While the courts have been loathe to address the controversy before us, they have not been entirely silent on the matter.  For example, *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951) opens the door to new precedent when it opines "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."   In *Tenney v. Brandhove*, such usurpation was not "obvious."  However, as shall be demonstrated with a review of the legislative history of the Committee and its members below, this is a case where such an usurpation is overwhelmingly and painfully obvious.[37]

15.     With regard to the importance of "legislative history," the courts have deemed the "legislative history" of any given investigation to be a critical factor in assessing the validity of a Committee's investigatory powers.  In *Barenblatt v. United States*, for example, the court references "[i]n the light of the Committee's history" to rule "legislative authority" "unassailable".[38]   The case likewise refers to the "persuasive gloss of legislative history"[39] and also uses the phrase "In light of the legislative history."  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

16.     Building on *Barenblatt*, *Nixon v. Administrator of General Services* establishes a "legislative history" test to probe for the unconstitutional presence of the judicial function. It urges us to ask in that case whether the "legislative history" indicates if "the Act before us is regulatory [legislative] and not punitive in character?" 408  F.  Supp., at 373 *Nixon v. Administrator of General Services, 433 U.S. 425, 478 (1977).*

17.     In this case, the legislative history of the Committee and its members reveals an overwhelmingly "obvious" pattern of the weaponization of Congress' investigatory powers to

pursue a punishing judicial, and by implication, a political function.  As Justice Black might say today "It seems to me that the proof that the ... Committee is here undertaking a purely judicial function is overwhelming" *Barenblatt v. United States*, 360 U.S. 109, 154 (1959).

18.     The "overwhelming" and "obvious" proof in this case is embodied a legislative history dating back more than five years that demonstrates the repeated attempts of the Speaker of the House and the members of the Committee to publicly shame, humiliate, banish, ostracize, and possibly even imprison President Trump by trying him in their various kangaroo courts and legislative acts.  Through such exposure for the sake of exposure, they have incited public hatred and thereby punished Trump by harming his re-election chances in 2020 even as they have sought repeatedly to remove him outright from office and prevent him from either legally or practically from ever occupying the Oval Office again by running in, and winning, the 2024 election.  This sordid record of the Committee and its members has been nothing more and nothing less than the pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  As *McGrain v. Daugherty* once warned in another context "[t]he committee has assumed all of the functions of prosecutor, judge and jury with apparently none of the customary rules governing evidence and procedure. " *McGrain v. Daugherty*, 273 U.S. 135, 145 (1927).

19.     The underlying legislative history of the Committee itself reveals its clear partisan and score-settling intent to punish and humiliate President Trump in the course of its investigation and in pursuit of a judicial function.

20.     On May 14, 2021, Democrat Congressman Bennie Thompson introduced H.R. 3233, a *bicameral* bill to establish a ten-member commission to investigate the January 6th assault on the Capitol requiring approval of both the House and Senate.[40]   This commission, by

legislative design, would have struck a very clear bipartisan 5-5 balance. It was to consist of five members appointed by Democrats, five members appointed by Republicans, a Democrat Chair and a Republican Vice-Chair.[41]

21.    While H.R. 3233 passed the House on May 19, 2021 by a 252 – 175 vote , it failed in the Senate when a cloture motion failed by a vote of 54 yeas to 35 nays.[42] In response, on June 28, 2021, Speaker Pelosi took the Senate out of the equation – and therefore a <u>bicameral</u> approach to the proposed investigation – by next introducing a simple House Resolution requiring only the approval of the House she controlled.

22.    Pelosi's Democrat-controlled House passed H. Res. 503 on May 21, 2021 on a virtually party-line 222-190 vote.[43] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois – both with scores to settle against Donald Trump – voted in favor of H. Res. 503. Each would wind up on the Committee as the only two titular Republicans.

23.    H. Res. 503 offers a very sharp <u>partisan</u>, one-legislative-chamber contrast to the bipartisan, bicameral construction of H.R. 3233. As has been demonstrated, instead of a <u>commission</u> evenly split between Democrats and Republicans, H. Res. 503 specifies the creation of a highly partisan and score-settling <u>Committee</u> intent on punishing and humiliating President Trump, inciting public hatred, and ensuring he never becomes president again through the exercise of an illegitimate and unconstitutional judicial function.

24.    Just as this Committee has a sordid legislative history offering obvious and overwhelming proof that it "is undertaking a purely judicial function," *Barenblatt v. United States*, 360 U.S. 109, 154 (1959), so, too, does <u>the far broader legislative history</u> of the Committee <u>members</u> reveal a clear intent to simultaneously pursue a judicial *cum* political function rather than a purely legislative function. This legislative history spanning a period of

more than five years reveals at least seven additional legislative acts along with a "Russia Hoax" perpetrated by Committee members seeking to shame, humiliate, and banish President Trump from office while inciting public hatred of Trump and, by implication, Trump's advisers.  These seven legislative acts include:

a.   H.Res. 1987, introduced on April 6, 2017 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch an Oversight Commission on Presidential Capacity to determine whether the President is mentally or physically unable to discharge the powers and duties of office.[44]  Its clear target was Trump, and the clear goal was to remove him from office;

b.   H.Res. 496, introduced on August 18, 2017, "censures and condemns President Trump for his inadequate response to the violence in Charlottesville, Virginia, on August 12, 2017, for his failure to condemn the White supremacist groups responsible for actions of domestic terrorism, for asserting that "both sides" were to blame and excusing the violent behavior of participants in the Unite the Right rally, and for employing people with ties to White supremacist movements in the White House. [45]  It also urges President Trump to fire all White House advisors who have urged him to cater to the White supremacist movement;"[46]

c.   H.Res. 660, introduced on October 29, 2019 as part of the first impeachment trial of President Trump,[47] directed "certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes;"[48]

d.  H.Res. 755, introduced on December 10, 2019, impeaches President Donald J. Trump for high crimes and misdemeanors.  The resolution sets forth two articles of impeachment of the President: (1) abuse of power by soliciting the interference of Ukraine in the 2020 U.S. presidential election, and (2) obstruction of Congress by directing defiance of certain subpoenas issued by the House of Representatives;[49]

e.  H.Res. 8548, introduced on October 9, 2020 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch a Commission on Presidential Capacity to Discharge the Powers and Duties of the Office to determine whether the President is mentally or physically unable to discharge the powers and duties of office;[50]

f.  H.Res.24, introduced on January 11, 2021, impeaches President Donald John Trump for high crimes and misdemeanors.  It sets forth an article of impeachment stating that President Trump incited an insurrection against the government of the United States;[51] and

g.  H. Res. 21, introduced on January 11, 2021 by Committee member Jamie Raskin, calls upon Vice President Michael R. Pence (1) to immediately use his powers under section 4 of the Twenty-fifth Amendment to convene and mobilize the principal officers of the executive departments to declare that the President is unable to successfully discharge the duties and powers of his office, and (2) to transmit to the President pro tempore of the Senate and the Speaker of the House notice that he will be immediately assuming the powers and duties of the office as Acting President.[52]

25.     As to how each of the members of the Committee participated in one or more of these legislative acts (and otherwise demonstrated anti-Trump behavior), the Chair of the Committee, Bennie Thompson, voted "yes" on H. Res. 660,[53] he cosponsored H. Res. 496[54] condemning and censuring President Donald Trump, voted yes on both impeachment trials[55] and did not show up at President Trump's inauguration in 2016.[56] Indicating his desire to punish the president with his removal from office, Thompson has described President Trump as "racist and unfit to serve." [57]

26.     Committee member Jamie Raskin cosponsored both H. Res. 660[58] and H. Res. 496,[59] voted "yes" on both impeachment trials, [60] and was the lead House Impeachment Manager for the second impeachment trial.[61]   Raskin also authored H. Res. 21,[62] H.Res 1987,[63] and H.Res. 8548.[64] In 2018, Raskin set up a panel of mental health experts to publicly discuss the president's mental fitness,[65] has referred to Trump as "a barbarian,"[66] consistently questioned Trump's mental capacity,[67] repeatedly pushed the phony Russia hoax,[68] and, revealing his clear intent to use Congress' investigatory powers for a judicial function, publicly stated that "We have to come up with a legislative mechanism for calling a president to account if he decides to turn the White House into a for-profit enterprise. We cannot allow that precedent to stand."[69]

27.     Committee member Adam Schiff voted "yes" on H.Res. 660,[70] was the lead investigator for the first Trump impeachment trial of President Trump,[71] and voted yes for both impeachments.[72] He also cosponsored H. Res. 21.[73]

28.     Committee member Zoe Lofgren voted "yes" on H. Res. 660, [74] cosponsored H. Res. 24,[75] and H.R. 1987, [76] and voted "yes" on both impeachment trials. [77]   In 2017, Lofgren served as a member of the Democracy Reform Taskforce that claimed President Trump had "shown blatant disregard for the laws and norms in place to prevent public corruption."[78]

42

Lofgren also boycotted the inauguration of President Trump in 2017.[79]  In revealing her desire for Congress to wield more judicial power, she opined that Congress needs "more enforcement authority."[80] She also introduced a resolution urging a "medical and psychiatric evaluation of US President Donald Trump."[81] Illustrating her desire to publicly humiliate and shame the president and incite public hatred, Lofgren stated that "POTUS is an ignorant bigot trying to delegitimize duly elected Members of Congress based on ethnicity and gender. President Trump shames our country."[82] That Lofgren wants to use the investigatory and impeachment powers of Congress to serve a judicial function and thereby, in the ultimate punishment, end the political career of President Trump is evident in her saying that it "was both constitutional and necessary to impeach and convict former President Trump...and to disqualify him from holding future office.[83]

29.    Committee member Elaine Luria voted "yes" on H.Res. 660,[84] cosponsored H.Res. 24,[85] voted "yes" on both Trump impeachments, [86] and boycotted Trump's 2020 State of the Union address.[87]  That she has not hesitated to sit as both judge and jury of President Trump in her quest to inflict punishment upon the president is evident in remarks about Trump such as ""It is clear to me that he has betrayed the public trust and abandoned his obligations to the Constitution by elevating his own interests over the national interest. Allegations of this gross misconduct meet the threshold of high crimes and misdemeanors set by the Constitution."[88]

30.    Committee member Pete Aguilar likewise voted "yes" on both impeachments[89] and cosponsored H.Res. 24[90] which initiated the second impeachment.  He also voted "yes" on H.Res. 660. [91]  In acting as judge and jury in the second impeachment trial, Aguilar insisted as if it were fact that "The fact is that President Trump attempted to use the power of his office to

coerce a foreign government to interfere in an American election."[92]  This was not a fact at all; it was merely an accusation designed to punish and humiliate.

31.     Committee member Stephanie Murphy voted "yes" on H.Res. 660[93] and both impeachments[94] while cosponsoring H.Res. 24. [95]  In a May 22, 2019 letter "My Thoughts on Impeachment," Murphy clearly expresses her intention to use the investigatory powers of Congress in a judicial function to coerce and punish not just President Trump but "anyone in his administration" that dares to defy a congressional subpoena: "Should President Trump or anyone in his Administration ignore a final federal court order to turn over information that Congress has requested, I would consider it a threat to our careful system of checks and balances and would therefore support an impeachment inquiry on that individual—the first step in the impeachment process and one that better empowers congressional investigators to attain documents and testimony."[96]  [emphasis added]

32.     Key Committee members were also instrumental in perpetrating a now deeply discredited "Russia Hoax."[97]  This was the spurious and now discredited claim that the 2016 Trump Campaign colluded with Russia to defeat Hillary Clinton and that Russia preferred Trump over Clinton because Russian intelligence operatives had damning evidence they could use to blackmail Trump once he ascended to the Oval Office.[98]

33.     The alleged "facts" of the Russia Hoax turned out to be a fiction ginned up by Democrat operatives paid by the Clinton campaign. These operatives, most prominently former British intelligence officer Christopher Steele, created a phony "Steele Dossier"[99] that created the false Russia Hoax narrative. The FBI would then use this dossier to bogusly obtain Foreign Intelligence Surveillance Warrants (FISA) warrants to spy on members of the Trump campaign. As events unfolded, the whole hoax itself would be given institutional credence by a series of

false statements.[100]

34.     Committee member Adam Schiff was the *de facto* leader in Congress pushing the Russia hoax and a primary source of false statements, to the point of being caught repeatedly in lies during his public appearances.[101]  Upon becoming House Intelligence Committee Chairman in 2019, Schiff hired investigators and other personnel to launch the Russia Hoax investigation, and later expanded a probe into President Trump "beyond Russia" to investigate Trump's connections to other foreign countries.[102]

35.     The Chair of the Committee, Bennie Thompson created a task force in 2017 as part of the perpetuation of the Russia hoax.[103]

36.     This lengthy legislative history likewise illustrates how Speaker Pelosi has sought to weaponize the investigatory powers of Congress in pursuit of a judicial function aimed at the punishment of Donald Trump and senior advisers such as myself.  Pelosi called for an FBI probe in February 2017 into President Trump's alleged financial and personal ties to the Russian government as part of the perpetuation of the Russia hoax and called for a second investigation in October 2017.[104]  She endorsed the push to censure President Trump after events in Charlottesville.[105]  She voted yes to impeach President Trump twice and oversaw the second impeachment trial. In 2020, Pelosi backed H. R. 8548[106] and is the chief architect of and catalyst for her own "unprecedented" Committee now seeking to punish and humiliate President Trump and incite public hatred against Trump, and by implication, Trump advisers such as myself.[107]

37.     As perhaps the most graphic illustration of how Pelosi and committees such as the Committee in this case are pursuing a highly punitive judicial *cum* political function, Pelosi was caught in a private meeting saying that "I do not want to see him impeached, I want to see him in prison."[108]  She has described the President, himself, as "a hoax."[109] [emphasis added]

45

38.     From this broad, dynamic review of the legislative history, it should be clear that for more than five years, the American Republic has been cursed with various Democrat kangaroo courts and legislative acts in pursuit of a judicial *cum* political function often with the same Democrat kangaroos running those courts and sponsoring those acts.

39.     In this case, Speaker Pelosi, along with all seven Democrat members of the Committee, have yet again established a kangaroo court that has empowered them to act as judge, jury, and executioner through a judicial function replete with (1) multiple forms of punishment aimed at shaming, humiliating, banishing, ostracizing, and inciting public hatred; (2) the removal of President Trump from office; and (3)  the punishing, including possible imprisonment, of his most trusted senior advisors.   This is all being done through the unconstitutional weaponization of Congress' subpoena power and resultant punishment, coercion, and threats.

40.     The two Republican members of the Committee have a similar, albeit shorter, legislative history that reveals the score-settling nature of their assaults on President Trump and his advisors through the weaponization of the Committee's investigatory powers. Both Liz Cheney and Adam Kinzinger voted "yes" on the second impeachment trial of Donald Trump while Kinzinger repeatedly sided with the Democrats on the Russia hoax.  Kinzinger also publicly issued a statement asking President Trump to delete his Twitter account in December 2020 after President Trump was calling for investigations into the 2020 election.

41.     For his anti-Trump activities, Kinzinger was forced out of running for reelection by the subsequent backlash, holds Trump responsible and clearly has a score to settle with Trump.  In addition, Kinzinger is also considering a run for president so the elimination of the frontrunner Trump in the 2024 election through punishment and humiliation would be in

Kinzinger's self-interest.[110]

42.   Liz Cheney is a long-term foe of President Trump because of Trump's perennial criticism of Cheney's father; Vice President Dick Cheney.  According to Trump, Vice President Cheney played a major role in prosecuting the "endless wars" of Afghanistan and Iraq, wars that killed hundreds of thousands of people and drained trillions of dollars of treasure from our Republic.[111]

43.   That Cheney, along with the Chair Bennie Thompson, seek to use the Committee's subpoena power in a judicial function in violation of the principle of separation of powers is evident in their public statements that the purpose of their investigation is to ensure "those who are responsible for the attack are held accountable,"[112] to "tell the complete story of the unprecedented and extraordinary events of January 6th,"[113] and to "get answers for the American people about what happened on January 6th."[114] The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice- Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

44.   This lengthy legislative history spanning a period of nearly five years reveals obvious, overwhelming, and indisputable proof that Speaker Pelosi and members of the Committee have a well-established pattern of seeking to weaponize the investigatory powers of Congress behind the mask and shield of facially valid legislative acts while simultaneously pursuing punitive, unconstitutional judicial agendas.  In this case, the clear arc of the Committee's investigation has to been to build a criminal case against President Trump while

*four of the president's most senior advisers have been held in contempt and face possible prison terms and fines.*

45.     Given that this Committee and its members been so clearly flushed out in the open in its pursuit of a judicial function by their legislative history, it is incumbent upon this court to address the controversy presented in this case.  To put this in a more textured, policy-analytic way, a clear controversy to be settled in this case by this court is whether there is a <u>threshold</u> above which the simultaneous exercise of a judicial function is sufficient to render illegal any legislative acts taken under the flag, and behind the shield of, the facially valid legislative function. Considering the facts presented in this case, no reasonable court would deny the need for such a threshold balancing test.  Nor, upon review of an abundance of evidence of a judicial *cum* political function of the Committee, would a reasonable court deny that in this case, that threshold has been more than exceeded.

46.     It is incumbent upon this court therefore to take Speaker Pelosi at her word. To recap, Pelosi has described the formation of this kangaroo court of a Committee as "unprecedented";[115] and it is indeed unprecedented for a rabidly partisan and score-settling congressional Committee that lacks no ranking minority member and fails to abide even by its own authorizing resolution to wield such powerful investigatory powers in pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  <u>With her "unprecedented" pronouncement, Pelosi thereby has invited this court to establish new precedent in a new time where the weaponization of Congress' investigatory powers for judicial ends threatens to become  the new norm , thereby upsetting  balance of power among the three major branches of government</u>.

47.     As a private citizen and a former senior advisor to President Trump, I stand as

48

collateral damage from the unlawful and unconstitutional efforts of Speaker Pelosi and the Committee members to incite public hatred, punish through shame, humiliation, ostracization, and banishment, and perhaps even imprison Donald Trump and many of those like me associated closely with him.

48.    I am seventy-two years old.  I have spent my entire career in some form of public service – from the Peace Corps and more than twenty-five years as a professor at the University of California to my years in the White House.  Through my White House service, I can lay claim to saving thousands of American lives during the pandemic, helping President Trump create millions of jobs, and addressing numerous national and economic security issues related to the economic aggression of Communist China.  At this stage in my career, I should be allowed to retire with all of the thanks and honors and dignity and grace normally afforded people with such a resume.  Instead, I have been hauled before the Committee's kangaroo court, subjected to public hatred, and been forced to endure all the other punishments they can muster with their false accusations and threats of criminal prosecution.   Only by squarely addressing the controversies in this case and by granting the declaratory and injunctive relief that I seek will this punishment cease and be redressed.

**The Committee's Subpoena and Report 117-284 and H.Res. 1037 Violate the Constitutional Proscription Against Bills of Attainder**

1.  Article I, Section 9, Clause 3 of the Constitution states that "No Bill of Attainder … Law shall be passed."

2.  *Nixon v. Administrator of General Services* defines a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  See *United States* v. *Brown*, 381

U.S. 437, 445, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315-316 (1946); *Ex parte Garland*, 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri*, 4 Wall. 277, 323 (1867). *Nixon v. Administrator of General Services*, 433 U.S. 425, 468-69 (1977).

3. *United States* v. *Lovett* notes the need for a liberal interpretation of what constitutes a bill of attainder: "(a) The Bill of Attainder Clause , Art. I, § 9, cl. 3, was intended to implement the separation of powers among the three branches of the Government by guarding against the legislative exercise of judicial power . Pp. 441-446. (b) The Bill of Attainder Clause is to be liberally construed in the light of its purpose to prevent legislative punishment of designated persons or groups. *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *United States* v. *Lovett*, 328 U.S. 303. Pp. 447-449." [emphasis added]

4. *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown, 381 U.S. 437, 448 (1965).* [emphasis added]

5. The Committee's subpoena and along with the Committee's Report 117-284 and H. Res. 1037 all represent forms of "legislative acts" under settled law. *United States v. Brown*, 381 U.S. 437, 448 (1965). Each of these legislative acts identifies me as a named individual; and each violates the Constitutional proscription against bills of attainder.

6. Historically, common bill of attainder punishments have included "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Bellsouth Corporation v. F.C.C*, 162 F.3d 678, 685 (D.C. Cir. 1998).[116]   In this case, I

face possible imprisonment of up to one year – more than one-fourth of my remaining expected life as well as the confiscation of up to $100,000 of my retirement savings, a significant share of those savings.

7. In this case, a Democrat-controlled House of Representatives has voted overwhelmingly along party lines[117] on the basis of the Committee's subpoena and the Committee's Report 117-284 to hold me in contempt of Congress without the benefit of addressing Congress on this Resolution and without the benefit of a judicial trial.  Furthermore, this legislative act has been taken based on an invalid and unenforceable subpoena that violates the principle of separation of powers and thereby falsely associates me with unpatriotic and treasonous efforts to overturn what Committee members insist was a fair election despite abundant evidence to the contrary, thereby inciting public hatred of me.  Through these legislative acts, the Democrat-controlled House has thereby subjected me to the punishments of shame, humiliation, ridicule, banishment, public hatred, and ostracization at great reputational cost.

8. If the U.S. Attorney for the District of Columbia chooses to act on H.Res. 1037 and charge me with contempt of Congress – as has already been done in a similar case involving a former Trump senior adviser[118] – I face significant additional punitive consequences in the forms of both imprisonment for up to one year and the punitive confiscation of my property, i.e., up to a $100,000 fine.

9. Even prior to, or absent any, any move to imprison and fine me by the U.S. Attorney, H.Res. 1037 is a punitive act of economic coercion and psychological terror designed to bully me into bending to the will of an illegally constituted Committee in unconstitutional pursuit of a judicial function.

10. H.Res. 1037, in and of itself, represents economic coercion and a de facto confiscation of my personal property because in order to defend myself against this bill of attainder, I must either spend what may well add up to more than $100,000 on legal representation. Alternatively, as I have chosen, I must do the legal work *pro se* and thereby pay the substantial opportunity costs of the time I must use by writing this brief and representing myself.

11. In addition, the stigma and public hatred that has come from a contempt charge implying a treasonous attempt to overthrow an allegedly fair election has turned me into a pariah in many academic and corporate quarters and thereby cost me remunerative opportunities ranging from teaching, lecturing, and public speaking to appearing on otherwise Republican-friendly networks like Fox News, e.g., Fox has adopted a cancel culture policy of refusing to put pro-Trump people like me on the air  who question the results of the November 3 and are associated, falsely or otherwise, with the events of January 6. The loss of these remunerative opportunities has significant financial implications as teaching stipends and speaking fees have historically been important sources of my income stream while appearances on networks like Fox help promote the books and articles I write and thereby generate sales and royalties.  Most broadly, the harm to my reputation has been incalculable.

12. It is well worth noting that a common political tactic used on both sides of the aisle is to engage in "lawfare" to tie up the time and resources of political rivals and possibly put them in jail.  In this case, the Committee is simultaneously pursuing a judicial, rather than a purely legislative, function and brazenly violating the Bill of Attainder Clause in its efforts to ensnare Donald Trump and his most senior advisers in their tar pit of false

allegations, endless litigation, possible imprisonment, and the de facto confiscation of my personal property by necessitating expenditures on legal representation or incurring the opportunity costs of representing myself.

13. H.Res. 1037 as a legislative act represents a punitive psychological terror as well. At 72 years old, a one-year prison sentence would indeed take more than a quarter of my remaining expected life – the average expected life of a male in America is 76 years[119] -- while a $100,000 fine would confiscate a significant slice of my retirement nest egg. I do not look forward either to a prison cell or to having to choose between food or medicine as far too many American senior citizens must do just because an uber-partisan and score-settling kangaroo court decided to slap me with a bill of attainder and drain my pockets.

14. The set of deprivations that I face from the legislative acts of the Committee and H.Res. 1037 are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).

15. In reviewing whether the legislative acts of the Committee and H.Res. 1037 constitute bills of attainder, *Nixon v. Administrator of General Services* provides this court with a number of possible tests, including most pertinently: (1) "the law plainly must be held to be an act of nonpunitive legislative policymaking" for it not to be considered a Bill of Attainder; (2) the "legislative history" must indicate that "the acts are "regulatory and not punitive in character?" 408 F. Supp., at 373;" and (3) any given legislative act must use the "less burdensome alternative" to achieve "its legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).

16. In the Nixon case, the Court found no evidence of a punitive component in the regulatory

act in question and therefore no bill of attainer issue.[120] In this case, however, the Committee's subpoena, its recommendation to hold me in contempt of Congress, and the passage of H.Res. 1037 clearly fail Test One.  With all the threats of imprisonment and confiscation of my property along with the reputational harm, banishment, and ostracization these legislative acts carry, they each and together have an undeniable strong punitive objective.  That punitive objective is to bully and coerce me into violating what I believe to be my patriotic duty and obligation under the traditional institutions of executive privilege and testimonial immunity.  The presence of such a strong punitive objective, in turn, points to a clear violation of the bill of attainder clause according to Test One.

17. With Test Two, and as noted in *Doe v. Selective Service System,* the court in the Nixon case analyzed whether the law, viewed through the lens of its <u>legislative history</u>, reasonably could be said to "further nonpunitive legislative purposes" and concluded in the affirmative, thereby rejecting the bill of attainder claim by Nixon. *Doe v. Selective Service System*, 557 F. Supp. 937, 944 (D. Minn. 1983).

18. In this case, however, we clearly and firmly must reach the opposite conclusion as the legislative history of the Committee, together with the legislative history of Speaker Pelosi and the Committee members over a period spanning more than five years, points clearly to a punitive exercise of legislative power – and therefore the pursuit of a judicial function.

19. To recap, we reviewed the legislative history of the Committee, its members, and Speaker Pelosi at length in the previous section of this brief; and it provided this court with an undeniable spectacle of a series of kangaroo legislative acts and kangaroo courts formed

with many of the same "kangaroos" populating the Committee all seeking to punish President Trump and his advisers. From this legislative history, we must conclude that Test Two in this case points clearly to bills of attainder in the legislative acts of the Committee and Democrat-controlled House that specifically identify me by name.

20. It is worth noting here that *U.S. v. Brown* calls for such a full and dynamic analysis of the relevant legislative history when parsing bill of attainder issues, which is why in this case, we must provide such a legislative history analysis <u>not just of the Committee but its individual members as well as Speaker Pelosi.</u> Notes *U.S. v. Brown*:

> The Bill of Attainder Clause was not to be given a narrow historical reading ... but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups. United States v. Brown, 381 U.S. 437, 442-43 (1965)

> The proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. United States v. Brown, 381 U.S. 437, 442-43 (1965)

> [T]he Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. United States v. Brown, 381 U.S. 437, 442 (1965)

21. <u>It is Test Three offered in Nixon v. GSA that should remove any legal doubt that the</u>

<u>legislative acts of the Committee and H.Res. 1037 represent bills of attainder</u>.  To recap, this test speaks to the need to "inquire into the existence of <u>less burdensome alternatives</u>" by which a "legislature could have achieved its legitimate nonpunitive objectives. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).  [emphasis added]

22. Clearly, if the Committee in this case has failed to rely on "less burdensome alternatives" to achieve its alleged "legitimate nonpunitive objectives," that furthers the case that the legislative acts of both the Committee and House of Representatives to pursue contempt of Congress charges against me constitute bills of attainders.

23. In this case, there surely was, as a matter of both fairness and due process, <u>two</u> far less burdensome alternatives available to the Committee to achieve its putatively "legitimate nonpunitive objectives": (1) negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and/or testimonial immunity; and (2) a civil suit to enforce compliance with the subpoena rather using coercion and terror through a threatened criminal prosecution.

24. In my email response to the Committee on March 1, 2022, I indicated: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."  That was the Committee's least burdensome alternative; yet, it appears to make no effort pursuit this alternative.

25. As a matter of due process and to avoid bill of attainder complications, the Committee could and should have pursued this far less burdensome alternative of negotiation than the one it chose.  Instead, either by coincidence or explicit or tacit collusion, the

Committee made an end run around Trump's invocation of executive privilege and testimonial immunity through the attempted stripping of that privilege and immunity by the incumbent president Joe Biden.

26. To recap, this end run is evident in Deputy Counsel to the President Jonathan Su's letter to me of February 28, 2022. Su notified me that "President Biden has determined that an assertion of executive privilege is not in the national interest" and that "[f]or the same reasons...President Biden...will not assert immunity to preclude you from testifying before the Select Committee." Yet, as this brief will address further in the next section, in the absence of criminal conduct, there is no settled law in support of such a fanciful and absurd action by an incumbent president to strip either executive privilege or testimonial immunity from a predecessor and those senior advisers like me who may have served that predecessor.

27. As a matter of fairness and due process and in the clear absence of settled law in support of the dubious right of an incumbent president to strip a predecessor of both privilege and immunity, it was incumbent upon the Committee to pursue the least burdensome alternative by directly negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and related testimonial immunity. This was particular true because I made it clear publicly that I would abide by any decision made by President Trump in this matter: "If President Trump waives the privilege, I would be happy to testify."[121] Clearly, I am indicating to the Committee my full cooperation pending the outcome of their negotiation. Instead of pursuing such a negotiation, this kangaroo court of a Committee chose to dive right into the deep end of the pool of unsettled law on the rights of incumbent versus former presidents as regards the invoking or waiving of

executive privilege and the related testimonial immunity of senior White House advisors.

28. If the right of an incumbent president to strip his immediate predecessor of executive privilege and testimonial immunity were settled law, the Committee might have a leg to stand on in defending itself against the "failure to pursue the less burdensome alternative" charge I make in this brief.   But for the Committee to proceed with the far more burdensome alternative of holding me in criminal contempt of Congress against the backdrop of a far from resolved controversy for which there is no settled law smacks of a purely partisan and punitive measure and exercise of the judicial function and further solidifies the bill of attainder case.

29. I include further in this record that in my email response of March 1, 2022 to the Committee, I also point out the following: "In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact." Clearly, much of the documentary material that the Committee with its subpoena was insisting that I provide was in the hands of the government itself.   One wonders if the Committee has sought to obtain this material as a "less burdensome alternative."   If so, the only remaining documentary material seemingly in play in their subpoena would be that of phone messages and email on my private accounts.   Here, the less burdensome alternative would have been to simply subpoena such information from the service providers as they did with, for example, former Trump Chief of Staff Mark Meadows. [122] If the Committee did so, then they would have needed nothing from me and the contempt charge would have been all but moot.

30. To recap, negotiating directly with President Trump and his attorneys over a full or partial waiver in my case of executive privilege and/or testimonial immunity would clearly have been the least burdensome alternative the Committee could have pursued to achieve its alleged nonpunitive legislative end.   Yet, <u>there was also a second least burdensome alternative available to the Committee and the House well short of a criminal prosecution</u>.

31. As the opinion of District Judge John D. Bates in *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008) makes clear, the second least burdensome alternative would have been to pursue a civil suit rather than a criminal prosecution.  As OLC put it in a memorandum, a civil action would be superior because "Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, <u>not at inflicting punishment on an individual who failed to produce them</u>." C*ommittee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).   [emphasis added]

32. In *Committee on Judiciary v. Miers, "*[t]he Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, ask[ed] the Court to declare that former White House Counsel Harriet Miers must comply with a subpoena and appear before the Committee to testify regarding an investigation into the forced resignation of nine United States Attorneys in late 2006, and that current White House Chief of Staff Joshua Bolten must produce a privilege log in response to a congressional subpoena. *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008).

33. *Miers* was a situation where Democrats controlled the House of Representatives as in this case but, unlike in this case, the Democrats faced an uncooperative Republican president

and Attorney General.  This effectively foreclosed the far most burdensome alternative of the highly punitive criminal prosecution Democrats originally sought.

34. After the Democrat-controlled House passed a resolution recommending criminal contempt charges against both Miers and Bolten – as the House has done against me in this case – the Republican Attorney General declined to prosecute. At that point, illustrating the viability of the less burdensome civil suit option while acknowledging the partisan nature of the battle, the Judiciary Committee filed the suit against Miers.  As noted in this lengthy passage from the *Miers* opinion:

*Frustrated by the Executive's actions, the full Committee met on July 25, 2007 and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for contempt of Congress for refusal to comply with subpoenas issued by the Committee." See 153 Cong. Rec. D1051-01 (2007). Chairman Conyers provided Mr. Fielding with a copy of the Committee's report in the hope that it might prompt the White House voluntarily to change its position. See Pl.'s Stmt. of Facts ¶ 52. He received no response. So, on November 5, 2007, the Committee filed its report with the full House of Representatives. Id. ¶ 54. Once again, Chairman Conyers wrote to Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute." Id. ¶ 55. This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse." Pl.'s Mot. Ex. 34. He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal. Id.*

*The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the*

*Department has determined that non-compliance . . . with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee — invoking Resolution 980 — filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.*

*In support of the case before being "a justiciable controversy" and therefore a viable less burdensome alternative – not the reference to "not inflicting punishment" -- the opinion of District Judge John D. Bates cites "[t]wo significant OLC [Office of Legal Counsel] opinions issued during the Reagan administration" germane to this case.*

*In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce subpoenas issued to executive officials. See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion"). As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court. When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt." Id. at 142 (emphasis added). That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, see id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal*

*prosecution loomed over the President's close advisors, see id. at 142.
Significantly, OLC also determined that "the same reasoning that suggests that
the statute could not constitutionally be applied against a Presidential assertion
of privilege applies to Congress' inherent contempt powers as well." Id. at n. 42.
Thus, neither criminal prosecution nor inherent contempt could be employed
against a recalcitrant executive branch official, as OLC saw it.*

*Instead, "Congress [can] obtain a judicial resolution of the underlying privilege
claim and vindicate its asserted right to obtain any documents by a civil action
for enforcement of a congressional subpoena." Id. at 137. As OLC put it, a civil
action would be superior because:*

*Congress has a legitimate and powerful interest in obtaining any
unprivileged documents necessary to assist it in its lawmaking function . . . [and]
[a] civil suit to enforce the subpoena would be aimed at the congressional
objective of obtaining the documents, not at inflicting punishment on an
individual who failed to produce them. Thus, even if criminal sanctions were not
available against an executive official who asserted the President's claim of
privilege, Congress would be able to vindicate its legitimate desire to obtain
documents if it could establish that its need for the records outweighed the
Executive's interest in preserving confidentiality.  Id. ...*

*A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper
reached the same conclusion. See Response to Congressional Requests for
Information Regarding Decisions Made Under the Independent Counsel Act, 10
U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion"). In
that opinion, OLC restated its position that Congress may institute "a civil suit
seeking declaratory enforcement of [a] subpoena." Id. at 83. Likewise, OLC
indicated that although inherent contempt is theoretically available to Congress
and could ultimately be challenged by the executive branch through a writ of
habeas corpus brought by the detained official, "it seems most unlikely that
Congress could dispatch the Sergeant at-Arms to arrest and imprison an*

*Executive Branch official who claimed executive privilege."* <u>Id.</u> *at 86.*
*Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008).*

35. In this case, the highly partisan Committee and Democrat-controlled Congress in all likelihood believe they have a friend in a Democrat Attorney General who will help them use the criminal prosecution alternative to apply maximum coercive pressure in support of their punitive ends.  Yet, this is clearly not the less burdensome alternative.

36. *Miers* makes clear that a civil suit in this case does indeed represent a justiciable controversy and a far less burdensome alternative than a criminal prosecution involving a contempt of Congress charge against me, with all its accompanying economic coercion, psychological terror, and other punishments. That the Committee and its members and the Democrat majority in the House instead <u>pursued the single most burdensome option of criminal prosecution</u> confirms the bill of attainder nature and punitive objective of their coercive tactics.  In this way, the Committee and its members along with the Democrat-controlled House miserably fails Test Three of *Nixon v. Administrator of General Services* and thereby confirms their legislative acts represent bills of attainder.

37. In summary, H. Res. 1037 and the Committee's Report along with the subpoena issued by the Committee that constitutes the basis for its contempt charge, together and separately violate the Bills of Attainder Clause of the Constitution.  H. Res. 1037 should thereby be ruled by this Court as an invalid legislative act, both the Committee subpoena and Committee Report should likewise be ruled illegal and unconstitutional, and the U.S. Attorney for the District of Columbia should be enjoined from any further action in this matter.

**An Incumbent President Cannot Waive the Executive Privilege of His Predecessor or Testimonial Immunity of Senior Advisers Not Serving that Incumbent**

1.     We come now to more squarely address the third major controversy in this case: What rights, if any, does an incumbent president have to strip away executive privilege from a predecessor or other former presidents and/or to waive testimonial immunity for the senior advisors of a predecessor or other former presidents?  Because this controversy is so central to this case, because there is no settled law, and because it has such broader implications for the future viability of executive privilege and testimonial immunity as positive forces for effective presidential decision-making, it is a controversy ripe for judicial review.

2.     That this controversy is even a controversy stunned me when I first heard of it. While I am not a lawyer, I'm not without legal expertise.  One of my areas of expertise in economics for which I have a Ph.D. in is regulatory economics; and this sub-field requires a keen understanding of regulatory law.  I am therefore not without experience in reading case law and parsing legal arguments, and I have also published numerous articles in law journals.[123] When I was made aware that the Committee was going to try to circumvent my duties and obligations under the executive privilege invoked by President Trump and deny me the protections of testimonial immunity by having President Biden strip Trump and myself of these bulwarks of presidential decision-making, I began reading what little case law there is about the viability of such a blatant end run around due process.  *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of

really useful and unambiguous authority applicable to concrete problems of executive power.").

3.    Upon review of this sparse and anything but settled law, I didn't know whether to laugh at the absurdity of the attempted legal end run of the Committee and White House or cry at how low the Democrats appeared to be willing to stoop that they would be willing to wreck both executive privilege and testimonial immunity as their means to achieve the end of Donald Trump and advisers like me.

4.    The tradition and institution of executive privilege dates back to the days of George Washington, who saw immediately the separation of powers dangers inherent in a legislative branch given free reign to meddle in the affairs of the executive branch.

5.    The *Legal Information Institute* defines executive privilege as "the power of the President and other officials in the executive branch to withhold certain forms of confidential communication from the courts and the legislative branch[124] while Senate.gov sees executive privilege "as a collection of different rights, united by the general principle that the president and key advisers must be able to have internal discussions without fear of exposure."[125]

6.    *Ala. Educ. Ass'n v. Bentley* likewise notes: "Executive privilege "refers to a doctrine under which "documents from a former or an incumbent President [or, arguably, the chief executive of a state government] are presumptively privileged." *United States v. Poindexter,* 727 F. Supp. 1501, 1505 (D.D.C. 1989) (citing *United States v. Nixon,* 418 U.S. 683, 708-13 (1974)  *Ala. Educ. Ass'n v. Bentley*, Civil Action No. CV-11-S-761-NE, at *26 (N.D. Ala. Jan. 7, 2013).  However, this definition is too limiting as it excludes the private conversations between and among presidents and advisers for which there are no "documentary materials," as defined by the Presidential Records Act.[126]  [emphasis added]

7.    The common legal thread in each of these definitions is that that the institution of

executive privilege is critical to effective presidential decision-making as executive privilege (along with the companion institution of testimonial immunity) provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

8.     As *United States v. Nixon* notes: "A President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately." *Mazars, 140 S. Ct. at 2032* further notes that the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977)

9.     It follows from this principle that the more executive privilege (and testimonial immunity) are <u>qualified,</u> the less  candor there is likely to be in the conduct of official White House business and the less optimal presidential decision-making will likely be.  Yet settled law is sparse as regards how executive privilege should be qualified. This is partly a function of the relatively few cases that have addressed matters of executive privilege. As *Comm. on Judiciary v. McGahn* notes: "To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, 'there were [still] very few cases dealing with the investigative power.'" *Id.* at 194, <u>77 S.Ct. 1173</u>. *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 181 (D.D.C. 2019).

10.    As previously noted in *Trump v. Mazurs*, much of the time, disputes over executive privilege between the executive and legislative branches have been negotiated in the "hurly-burly" of the political arena and therefore case law on this subject is sparse:   "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).

11.    The few generally accepted principles considered to be settled law date back to the *United States v. Nixon* a.k.a. the Watergate scandal and *Nixon v. Administrator of General Services*.

12.    The Watergate Scandal opened the door to the qualification of privilege <u>in the presence of criminal conduct</u>, e.g., the privilege is waived if the communications are criminal in nature.   Yet, this qualification would indeed quickly be "cabined" to the criminal sphere. *Committee on Judiciary v. Miers* notes: "*Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums* , <u>561 F.2d at 245–46</u>." *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 540 n.11 (D.C. Cir. 2020)

13.    *United States v. Nixon* also helped confirm that "the Judiciary is the ultimate arbiter when it comes to claims of executive privilege" while "the *Miers* opinion stands for the proposition that    courts    have    federal    jurisdiction    over subpoena enforcement

disputes between the Legislature and the Executive branch, and that such disputes are justiciable….” *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 173 (D.D.C. 2019).

14.    Note that *Comm. on Judiciary v. McGahn* is a highly flawed opinion that was overturned on appeal.  Comm. On Judiciary of U.S. House of Representatives v. McGahn, 951 F.3d 510 (D.C. Cir. 2020).  Nothing in it qualifies as precedent.

15.    *Nixon v. Administrator of General Services* likewise makes clear that incumbent presidents are not the only ones who can claim executive privilege: “We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them.” *Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977).  Yet this case also put forth the dubious proposition based on a District Court ruling – and again cast within the shadow of possible criminal activity -- that the claims of a former president “carries much less weight than a claim asserted by the incumbent himself." *Id.*, at 345.” *Nixon v. Administrator of General Services*, 433 U.S. 425, 448 (1977).

16.    *United States v. Nixon* also helped set the precedent that the applicability of executive privilege should be decided on a case-by-case basis by weighing the need to protect confidentiality and preserve executive privilege against the need for the administration of justice.[127]  Yet, as previously noted with the “cabined” reference, this principle itself was again limited by the context of the case itself with respect to the criminality involved.  “[T]he Supreme Court in United States v. Nixon explicitly cabined its opinion to the criminal arena. See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.")." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008).

[emphasis added]

17.   Of course, it may be arguable that neither presidents nor their advisors should be shielded in ways that would allow criminal conduct to flourish. But it must be at this criminal water's edge where the qualification of executive privilege and testimonial immunity by both the Committee and the White House must stop if these two important bulwarks of effective presidential decision-making are to be maintained.  At this water's edge, there is not a scintilla of <u>settled</u> law over the controversy as to whether an incumbent president can waive the privilege of his or her predecessor and/or the testimonial immunity of that predecessor's senior advisers. To recap, *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

18.   While the Committee and its lawyers are free to make whatever arguments they might want in support Joe Biden's actions in this case, the ideas that a sitting president can strip his predecessor or former presidents of executive privilege and the president's most senior advisors of testimonial immunity are both fanciful and absurd on their face. It is even more fanciful and absurd in this case when the sitting president, a Democrat, is seeking to strip the executive privilege of the man he allegedly beat in the 2020 presidential election, Republican Donald Trump, even as both Biden and the Democrat Party are doing everything within their substantial political powers not just to end the presidential career of Donald Trump but to bury any challenges to the fairness and integrity of a 2020 election that remains hotly disputed.

69

19.     Stripped of rhetoric, allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the alluring banner of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege and testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn executive privilege and testimonial immunity into partisan ping-pong balls and deal a mortal blow to the critical functions each are supposed to serve in our Republic: (1) help uphold the principle of separation of powers; and (2) provide for optimum candor in presidential decision-making.

20.     Even if such instances of an incumbent president waiving the privilege of his predecessor were seen as rare and occurring in only extreme circumstances as *Dellums v. Powell* alludes to, if this were settled law, it would be enough to mortally wound privilege as an essential ingredient of effective presidential decision-making. This is particularly so within the context of this case where it is clear that the Committee has, as previously noted, in all probability either explicitly or tacitly colluded with the incumbent president to have the Trump privilege waived so the Committee can then have its judicial function and bill of attainder ways with President Trump and his most senior advisors.  Here, *Dellums v. Powell* has it right when it opines: [T]hose on whom a President relies for advice <u>would be foolish indeed</u> to discuss the demands of executive decision-making with candor, when every proposal would be subject to public disclosure through civil discovery. *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). [emphasis added]

21.     Here, however, *Dellums v. Powell* has it wrong when it argues that it is such a rare

70

"infrequent" occurrence in which privilege and immunity might be waived that it would not materially affect the risk calculus of future senior White House advisers: "We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977) [emphasis added] and "[T]he need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome." *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

22.     The clear problem with this "relatively infrequent occasions" argument in the context of this case is that the current situation clearly indicates a long term "repeatable game" pattern of partisan abuse of the House's investigatory powers over more than five-year period rather than a "one and done" rare event based on extraordinary circumstances occurring in, as *Dellums v. Powell* qualifies it, the "context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977).   (To recap, this pattern of partisan abuse by the Committee and its members along with Speaker Pelosi was firmly established in a previous section of this brief.)

23.     From my perspective as a trained economist, and through the lens of strategic game theory, I see the punitive legislative acts and chronic pattern of partisan abuses associated with the Committee and its members over a more than five-year period indeed as a "repeatable game" of gotcha and punishment rather than a one-off rare event that that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to:

(1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.

24.     As partisans in the Congress wield their investigatory powers, they will enlist whatever friendly president might be in the White House to strip the executive privilege of former presidents and the testimonial immunity of former senior White House advisors; and it will all be done under the false flags of national emergency and national security. In this case, if the Committee and Joe Biden are able to pull this deadly game off and effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, <u>I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will "tit for tat" lead the charge.</u>

25.     In summary, if the goal is to preserve executive privilege and testimonial immunity to promote optimal presidential decision-making through maximum candor, than the idea that a former president's entitlement to such privilege is somehow of a "lesser weight" than a present president is indeed fanciful and absurd  <u>Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.</u>  Because this is so, the time is ripe for this court to address this controversy.  By ruling in my favor, the court will lift the burdensome punishments now being inflicted upon me and provide the appropriate relief.

26.     I note in closing that as I came to this particular controversy, it was settled law that executive privilege is not my privilege to waive. Absent a waiver of that privilege by President Trump, it was – and remains -- my duty not to comply with the Committee's subpoena.

Importantly, and I repeat, <u>I have also made it clear publicly that I would abide by any decision made by President Trump in this matter.</u> [128]

27.    Instead of negotiating directly with President Trump and his attorneys as settled law demanded, the Committee and its members used the Biden unsettled law waiver of privilege and immunity to try to effectively strip me of any legal right, duty, or constitutional obligation I might have had to fail to comply with their subpoena and, after I failed to comply with what I believed their unlawful subpoena, the Committee and Democrat-controlled House pursued <u>the</u> most burdensome and punitive alternative of a criminal contempt charge rather than the less burdensome options of negotiating the privilege with President Trump or filing a civil suit.

28.    As a result, I was put in the untenable position in which the president I served under has invoked a privilege that a president that I did <u>not</u> serve under has appeared to waive. Given that it was my sworn duty to uphold the law and abide by the Constitution and that it remains my belief that there is no settled law to support the acts of the Biden White House and Committee and given that I believe the law strongly leans in my favor, I had – and have -- no other honorable choice than to fail to comply with the Committee's subpoena.  In the absence of even a scintilla of settled law in this matter, it would be both unlawful and dishonorable for me to consider President Trump's privilege and my own testimonial immunity waived just because Joe Biden says they are.

29.    I therefore ask this court to dive into the deep end of this pool and firmly address a controversy that is ripe for adjudication and thereby settle the law in this matter.

**The Plaintiff's Testimonial Immunity is Absolute and His Failure to Comply With a Congressional Subpoena Cannot Be the Legal Basis for a Contempt of Congress Charge.**

1.      Congress cannot lawfully hold the Plaintiff in contempt of Congress for failure to comply with a subpoena that compels him to testify before the Committee because, under long-standing Department of Justice policy, the Plaintiff has absolute testimonial immunity as a senior White House official and has a duty to his country and the executive branch not to comply with said subpoena.

2.      The right of a senior White House official to testimonial immunity is conceptual and legally distinct from executive privilege.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.  As OLC notes:

> *This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making... But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no*

74

*statutory authority and instead act solely to advise and assist the President. Their*

*independence from Congress reflects that of the President.*

*Since the 1970s, this Office has consistently advised that "the President and his*

*immediate advisers are absolutely immune from testimonial compulsion by a*

*Congressional committee" on matters related to their official duties. Memorandum for*

*All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from*

*John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re:*

*Executive Privilege at 5 (May 23, 1977) ("Harmon Memorandum"); see also Rehnquist*

*Memorandum at 7 ("The President and his immediate advisers—that is, those who*

*customarily meet with the President on a regular or frequent basis—should be deemed*

*absolutely immune from testimonial compulsion by a congressional committee.").*

*Indeed, this Office has endorsed that legal principle on more than a dozen occasions,*

*over the course of the last eight presidential administrations.* [129]

3.    If the testimonial immunity of senior White House officials is absolute and exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, then it can't be waived by the adviser and certainly not by an incumbent president seeking to unlawfully strip his predecessor of both executive privilege and the right to grant testimonial immunity.

4.    Only the courts have the power to waive testimonial immunity on a case by case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  Indeed, if the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such

candor and therefore less optimal decision-making.

5.    I propose the following test for this court to consider: Would a current White House adviser be significantly less likely to engage in the kind of candor necessary for effective presidential decision-making as recognized under *Nixon v. Administrator of General Services* if that adviser understands that any claim to testimonial immunity by that adviser may be waived by a president that adviser did not serve under?  If the answer is yes, then testimonial immunity must be considered absolute in this circumstance or, alternatively, waived only on a case by case basis by the courts with extreme caution.

6.    I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and for which there is no settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of the testimonial immunity afforded to that predecessor's senior White House advisors in the absence of possible criminal conduct – regardless of whether this is done under the flag of the national interest – is arguably the most extreme and dangerous form of qualifying testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that testimonial immunity are supposed to serve in our Republic.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a. A declaratory judgment that the Committee is neither duly authorized nor properly constituted and therefore its legislative acts, including the subpoena issued to the Plaintiff and Committee Report 117-284, are therefore *ultra vires*, unlawful, and unenforceable;

b. A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that, as revealed by the legislative history, violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function and are therefore *ultra vires*, unlawful, and unenforceable;

c. A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore *ultra vires*, unlawful, and unenforceable;

d. A declaratory judgment that the Committee subpoena issued to the Plaintiff improperly compels testimony of a senior executive official;

e. An injunction against the U.S. Attorney for the District of Columbia enjoining him from further proceeding against the Plaintiff "in the manner and form provided by law" as H.Res. 1037 recommends;

f. An injunction against the U.S. Attorney General enjoining him from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and

unenforceable Committee subpoena dated February 9, 2022; and

g.   A declaratory judgment against President Joe Biden that he does not have the legal authority to waive any executive privilege or testimonial immunity invoked by his predecessor in this case.

WHEREFORE, the Plaintiff respectfully requests a jury trial and that the Court enter judgment in his favor and against the Defendants.

Respectfully Submitted,

Date:   June 1, 2022

Peter Navarro
Plaintiff, *pro se*
801 Pennsylvania Ave NW, Unit 1021
Washington, DC 20004
pknavarro@protonmail.com
202-489-7479

78

# ENDNOTES

---

[1] Hoyer, Stenny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," U.S. Congress, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[2] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[3] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[4] Transition Integrity Project, "Preventing a Disrupted Presidential Election and Transition," August 3, 2020. https://s3.documentcloud.org/documents/7013152/Preventing-a-Disrupted-Presidential-Election-and.pdf

[5] Ball, Molly, "The Secret History of the Shadow Campaign That Saved the 2020 Election," *Time Magazine*, February 4, 2021. https://time.com/5936036/secret-2020-election-campaign/

[6] Navarro, Peter, "The Navarro Report," November 2020 – January 2021. https://www.dropbox.com/s/584r7xtnngauc4t/The%20Navarro%20Report%20Vol%20I%2C%20II%2C%20III%20-%20Feb.%202%2C%202021.pdf?dl=0

[7] Axios/Momentive, "January 6th Revisited," January 2022. https://www.surveymonkey.com/curiosity/axios-january-6-revisited/

NPR/Ipsos, "Public Poll Findings and Methodology," December 2021. https://www.ipsos.com/sites/default/files/ct/news/documents/2022-01/Topline-NPR-Ipsos-poll.pdf

[8] Electronic email from Rep. Bennie Thompson to Peter Navarro, February 9, 2022 transmitting subpoena

[9] Morris, Chris, "10 iconic American companies owned by Chinese investors," *CNBC*, May 11, 2017. https://www.cnbc.com/2017/05/11/10-iconic-american-companies-owned-by-chinese-investors.html?msclkid=d9761daed16b11ec9b17634761de7e42

[10] Hoft, Joe, "Jan 6 Remembered: Ignored By Media And FBI: Antifa-BLM Activists Are Posting Photos and Bragging Online About Storming US Capitol on Jan. 6," *The Gateway Pundit*, January 6, 2022. https://www.thegatewaypundit.com/2022/01/jan-6-remembered-ignored-media-fbi-antifa-blm-activists-posting-photos-bragging-online-storming-us-capitol-jan-6/

[11] Williams, Jordan, "FBI had informant in crowd during Capitol riot: report," The Hill, September 25, 2021. https://thehill.com/policy/national-security/fbi/573915-fbi-had-informant-in-crowd-during-capitol-riot-report/

[12] McFarlane, Scott, et al., "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. "In short: [Dan Scavino and Peter Navarro] played key roles in the ex-President's efforts to overturn the results of the 2020 election…" (Rep. Bennie Thompson) https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

Amri, Farnoush, et al., "Capitol siege Steve Bannon Politics Bennie Thompson Crime Congress Dan Scavino Peter Navarro Donald Trump Subpoenas Jan. 6 committee votes to hold Scavino, Navarro in contempt," *AP News*, March 29, 2022. https://apnews.com/article/capitol-siege-steve-bannon-subpoenas-dan-scavino-peter-navarro-3247f6b7a644ff3e2c6f14d41f6cd0c8

"He hasn't been shy about his role in efforts to overturn the results of the 2020 election and has even discussed the former President's support for those plans…" (Rep. Bennie Thompson)

[13] Navarro, Peter, "In Trump Time: My Journal of America's Plague Year," *All Seasons Press*, November 2, 2021. https://www.amazon.com/gp/product/1737478501?pf_rd_r=EH88QR628VHK7JAYF7MP&pf_rd_p=1ab92b69-98d7-4842-a89b-ad387c54783f&pd_rd_r=6e00e6fea73a-4f19-9b0e-e6a63cc1ef41&pd_rd_w=Z7psz&pd_rd_wg=58b0Z&ref_=pd_gw_unk

[14] 3 U.S. Code § 15, "Counting electoral votes in Congress." https://www.law.cornell.edu/uscode/text/3/15

[15] Martin, Alison, "This Week in History: JFK and the Stolen Election," *Chicago Sun Times*, December 16, 2020. https://chicago.suntimes.com/2020/12/16/22176920/jfk-stolen-1960-election-chicago-illinois

[16] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[17] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[18] A fourth choice would have been piecemeal negotiation over what the Committee wanted but after watching the spectacle with Meadows, I wanted no part of that.

[19] Thompson, Bennie, "Resolution Recommending That The House Of Representatives Find Peter K. Navarro And Daniel Scavino, Jr., In Contempt Of Congress For Refusal To Comply With Subpoenas Duly Issued By The Select Committee To Investigate The January 6th At- Tack On The United States CapitoL," U.S. House of Representatives, April 4, 2022. , https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HRPT-117-NA.pdf

[25] The prison term for this offense makes it a Class A misdemeanor. 18 U.S.C. § 3559(a)(6). By that classification, the penalty for contempt § 192 increased from $1,000 to $100,000. 18 U.S.C. § 3571(b)(5).

[20] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivankatrump-january-6-committee-bennie-thompson/index.html

[21] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivankatrump-january-6-committee-bennie-thompson/index.html

[22] Yokely, Eli, "Voters Don't Necessarily Think Pleading the Fifth Implies Guilt, But It Varies by Party, *Morning Consult*, May 16, 2018. https://morningconsult.com/2018/05/16/votersdont-necessarily-think-pleading-the-fifth-implies-guilt-but-it-varies-by-party/#:~:text=51%25%20of%20registered%20voters%20said,independents%20who%20said%20the%20same

[23] Hains, Tim, "Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty," *RealClear Politics*, December 2, 2021. https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html

[24] Su, Jonathan Letter of Feb 28, 2022.

[25] See, for example: Broadwater, Luke, "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times*, March 24, 2022. https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html

[26] Kaplan, Rebecca, "House committee advances contempt motion against Navarro and Scavino," *CBS News*, April 4, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-contempt-motion-advances-to-full-house/

[27] "Roll Call 118: Bill Number: H. Res. 1037," *Clerk of the U.S. House of Representatives*, April 6, 2022. https://clerk.house.gov/Votes/2022118

28 Hoyer, Steny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," *U.S. Congress*, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress.

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[29] Pelosi, Nancy, "H.Res.503 - Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," *U.S. Congress*, June 28, 2021. https://www.congress.gov/bill/117thcongress/house-resolution/503?q=%7B%22search%22%3A%5B%22h.res+503+117%22%2C%22h.res%22%2C%22503%22%2C%22117%22%5D%7D&s=1&r=8

[30] Sprunt, Barbara, "Here Are The 9 Lawmakers Investigating The Jan. 6 Capitol Attack," *NPR*, July 27, 2021. https://www.npr.org/2021/07/27/1020713409/here-are-the-9-lawmakers-investigating-the-jan-6-capitol-attack
[31] Beavers, Olivia, et al., "McCarthy makes his 5 GOP picks for Jan. 6 select committee," *Politico*, July 19, 2021. https://www.politico.com/news/2021/07/19/mccarthy-zeroes-in-on-five-gop-members-for-jan-6-select-committee-500201

[32] The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

[33] Pelosi, Nancy, "Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[34] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).  Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160. 7

[36] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.  *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959).  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).   As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081.  *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[37] "Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation.  *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951).  In this case, it is painfully and glaringly obvious the Speaker and the Committee and its members have persistently sought to exercise judicial power.

[38] In the light of the Committee's history and the repeated extensions of its life, as well as the successive appropriations by the House of Representatives for the conduct of its activities, its legislative authority and that of the Subcommittee to conduct the inquiry under consideration here is unassailable; and House Rule XI, 83d Congress, which defines the Committee's authority, cannot be said to be constitutionally infirm on the score of vagueness. *Watkins* v. *United States*, 354 U.S. 178, distinguished.  Pp. 116-123.
[39] (a) Rule XI has a "persuasive gloss of legislative history" which shows beyond doubt that, in pursuance of its legislative concerns in the domain of "national security," the House of Representatives has clothed the Committee with pervasive authority to investigate Communist activities in this country. Pp. 117-121.

[40] Thompson, Bennie, et al., "To establish the National Commission to Investigate the January 6 Attack on the United States Capitol Complex, and for other purposes," *U.S. Congress*, May 14, 2021. https://www.govinfo.gov/content/pkg/BILLS-117hr3233ih/pdf/BILLS-117hr3233ih.pdf

[41] (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

[42] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[43] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[44] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[45] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[46] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[47] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[48] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[49] Nadler, Jerrold, "H.Res.755 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors.," *U.S. Congress*, December 10, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/755#:~:text=The%20Democrat%20sets%20forth%20two,by%20the%20House%20of%20Representatives

[50] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," *U.S. Congress*, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[51] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24

[52] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/21

[53] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[54] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[55] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696
"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[56] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[57] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[58] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019.  https://www.congress.gov/bill/116th-congress/house-resolution/660/cosponsors

[59] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[60] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696
"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[61] Booker, Brackton, "Meet The House Managers Laying Out The Case To Impeach Donald Trump," *NPR*, February 9, 2021. https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/09/965914210/meet-the-house-managers-laying-out-the-case-to-impeach-donald-trump

[62] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117thcongress/house-resolution/21

[63] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115thcongress/house-bill/1987

[64] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," U.S. Congress, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[65] Siegel, Ben, et al., "Pelosi proposes experts review a president's mental fitness under 25th Amendment," *ABC News*, October 9, 2020. https://abcnews.go.com/Politics/pelosi-propose-experts-review-presidents-mental-fitness-25th/story?id=73507849

[66] Raskin, Jamie, October 8, 2016. https://www.facebook.com/raskin.jamie/photos/donald-trump-is-a-barbarian-a-bigot-a-lout-a-narcissistic-bully-and-a-serial-vio/10154554019399763/

[67] Raskin, Jamie, May 12, 2017. https://twitter.com/repraskin/status/863212423083417600

[68] Raskin, Jamie, July 16, 2018.  https://twitter.com/repraskin/status/1018987611791282177

[69] Peck, Louis, "After Senate trial, Raskin reflects on his role in Trump impeachment process," *Bethesda Magazine*, February 11, 2020. https://bethesdamagazine.com/bethesda-beat/government/after-senate-trial-raskin-reflects-on-his-role-in-trump-impeachment-process/

[70] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[71] Schiff, Adam, "Rep. Schiff's full opening argument in the Trump impeachment trial | Trump impeachment trial," January 22, 2020.

[72] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696
"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[73] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as

84

acting President," *U.S. Congress*, January 12, 2021 https://www.congress.gov/bill/117thcongress/house-resolution/21/cosponsors

[74] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[75] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117thcongress/house-resolution/24/cosponsors

[76] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," *U.S. Congress*, April 6, 2021. https://www.congress.gov/bill/115thcongress/house-bill/1987

[77] "Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[78] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracyreform-task-force

[79] Reilly, Katie, et al., "Here Are the Democrats Boycotting Donald Trump's Inauguration," *Time Magazine*, January 17, 2017. https://time.com/4635411/democrats-boycotting-donald-trumps-inauguration/

[80] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracyreform-task-force

[81] "Lofgren introduces resolution urging Vice President and Cabinet to fulfill duties under 25th Amendment," U.S. Representative Zoe Lofgren, August 18, 2017. https://lofgren.house.gov/media/pressreleases/lofgren-introduces-resolution-urging-vice-president-and-cabinet-fulfill-duties

[82] Lofgren, Zoe, July 14, 2019. https://twitter.com/repzoelofgren/status/1150523317482184705

[83] Lofgren, Zoe, "Lofgren Opening Statement At Hearing, "Oversight Of The U.S. Capitol Police And Preparations For And Response To The Attack Of January 6," *Committee on House Administration*, April 15, 2021. https://cha.house.gov/media/pressreleases/lofgren-opening-statement-hearing-oversight-us-capitol-police-and-preparations

[84] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[85] https://www.congress.gov/bill/117thcongress/house-resolution/24/cosponsors

[86] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[87] Dougherty, Kerry, "State of the Union: Where Was Rep. Elaine Luria?," February 12, 2019. https://www.kerrydougherty.com/allposts/2020/2/11/stateof-the-union-where-was-rep-elaine-luria

[88] "Congresswoman Elaine Luria Calls for Impeachment," U.S. *Representative Elaine Luria*, September 23, 2019. https://luria.house.gov/media/pressreleases/congresswoman-elaine-luria-calls-impeachment

[89] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[90] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress,* January 11, 2021. https://www.congress.gov/bill/117thcongress/house-resolution/24/cosponsors

[91] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[92] Aguilar, Pete, "AGUILAR ISSUES STATEMENT AHEAD OF HOUSE IMPEACHMENT VOTE," December 18, 2019. https://aguilar.house.gov/2019/12/18/aguilarissues-statement-ahead-house-impeachment-vote/

[93] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[94] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[95] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress,* January 11, 2021. https://www.congress.gov/bill/117thcongress/house-resolution/24/cosponsors

[96] Murphy, Stephanie, : My Thoughts on Impeachment," May 22, 2019. https://murphy.house.gov/news/documentsingle.aspx?DocumentID=1042

[97] Select Committee on Intelligence, "RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION," *U.S. Senate.* https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf

98 *United States of America v. Michael Sussman*, In the United States District Court for the District of Columbia, Case No. 1:21-cr-00582, February 14, 2022.

https://fingfx.thomsonreuters.com/gfx/legaldocs/lbpgnwxdyvq/Sussmanresponse-Durham-2022-02-14.pdf
[99] Steele, Christopher, "US Presidential Election: Republican Candidate Donald Trump's Activities In Russia And Compromising Relationship With The Kremlin," January 11, 2017. https://archive.org/stream/TheSteelDossierTrumpIntelligenceAllegations/The%20Steele%20Dossier%20-%20Trump-Intelligence-Allegations_djvu.txt

[100] See, for example, Jarrett, Greg, "Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever," *Fox News*, October 7, 2020. Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever | Fox News

[101] George, Andre, "What Are the Consequences for Adam Schiff's Lies?," *Wall Street Journal*, May 22, 2020. https://www.wsj.com/articles/what-are-the-consequences-for-adam-schiffs-lies-11590174358

[102] Schiff, Adam, "Chairman Schiff Statement on House Intelligence Committee Investigation," *U.S. Permanent Select Committee on Intelligence,* February 6, 2019. https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447

[103] "Thompson, Brady Announce Election Security Task Force Members," *U.S. House Homeland Securit Committeey.* July 20, 2017. https://homeland.house.gov/news/pressreleases/thompson-brady-announce-election-security-task-force-members

[104] Bennett, John, "Democrats Want Probe of 'Unfit' Flynn's Russia Ties," *Roll Call*, February 14, 2017. https://www.politico.com/story/2017/02/pelositrump-russia-23466

Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*, October 30, 2017. https://pelosi.house.gov/news/pressreleases/pelosi-statement-on-censure-resolution-against-president-trump

[105] Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*, October 30, 2017. https://pelosi.house.gov/news/pressreleases/pelosi-statement-on-censure-resolution-against-president-trump

[106] Spakovsky, Hans, "Pelosi Bill to Remove President From Office Is a Needless Political Stunt," *The Heritage Foundation*, October 20, 2020. https://www.heritage.org/the-constitution/commentary/pelosibill-remove-president-office-needless-political-stunt

[107] Pelosi, Nancy, "Pelosi Names Members to Select Committee to Investigate January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House*, July 1, 2021.  https://www.speaker.gov/newsroom/7121-0

[108] Caygle, Heather, "Pelosi tells Dems she wants to see Trump 'in prison'," *Politico,* June 5, 2019. https://www.politico.com/story/2019/06/05/pelosiimpeachment-1355435

[109] Johson, Marty, "Pelosi: Trump 'himself is a hoax'," *The Hill*, July 2, 2020. https://thehill.com/homenews/house/505679pelosi-hits-trump-for-calling-russian-bounty-controversy-a-hoax-trump-himself/

[110] Zanona, Melanie, "Adam Kinzinger isn't ruling out a 2024 presidential bid as he considers his future after the House," *CNN,* https://www.cnn.com/2021/11/04/politics/adam-kinzinger-exit-interview/index.html

[111] Signman, Brooke, "Trump says Liz Cheney 'only upset' because he's getting US out of 'ridiculous and costly Endless Wars'," *Fox News,* July 23, 2020. https://www.foxnews.com/politics/trump-says-liz-cheney-is-only-upset-because-hes-getting-the-us-out-of-ridiculous-and-costly-endless-wars

[112] Cox, Chelsea, "Liz Cheney calls for answers, accountability on Jan. 6: 'We must know what happened'," *USA Today,* July 27, 2021. https://www.usatoday.com/story/news/politics/2021/07/27/liz-cheney-statement-jan-6-committee-probing-capitol-insurrection/5375885001/

[113] Thompson, Bennie, et al., "Thompson & Cheney Statement On Pentagon Officials' Reported Actions After January 6th", *Select Committee to Investigate the January 6th Attack on the United States Capitol,* September 16, 2021. https://january6th.house.gov/news/pressreleases/thompson-cheney-statement-pentagon-officials-reported-actions-after-january-6th

[114] *John Eastman v. Bennie Thompson*, In the United States District Court for the District of Columbia, Case 1:21-cv-03273, December 14, 2021. https://www.justsecurity.org/wp-content/uploads/2021/12/january6-clearinghouse-John-Eastman-v-Select-Committee-Verizon-Complaint-Case-1-21-cv-03273.pdf

[115] Pelosi, Nancy, "Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House,* July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[116] "Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign.""

[117] As noted, both Liz Cheney and Adam Kinzinger have been censured by the Republican Party for their actions in this matter.

[118] "Stephen K. Bannon Indicted for Contempt of Congress," *U.S. Department of Justice*, November 12, 2021. https://www.justice.gov/opa/pr/stephen-k-bannon-indicted-contempt-congress?msclkid=20e1a95ccd4d11ec9d22a02aa3d42000

[119] "Mortality in the United States," December 2021. https://www.cdc.gov/nchs/products/databriefs/db427.htm#section_1

[120] This finding was also leavened by the fact that the Nixon case involved "the fair administration of criminal justice."   *Nixon v. Administrator of General Services*, 433 U.S. 425, 477-78 (1977) Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States* v. *Nixon* , 418 U.S., at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes*, 408 U.S. 665, 688 (1972); *Blackmer* v. *United States*, 284 U.S. 421, 438 (1932); *Blair* v. *United States*, 250 U.S. 273, 281 (1919). Similarly, Congress' interest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established.

[121] See, for example, Broadwater, Luke, et al., "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times,* March 24, 2020. https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html?msclkid=6ed093bfd17311ecba8e3e7af7cdb5bb

[122] "Report: Jan. 6 Committee Has Subpoenaed Phone Records Of More Than 100 People," *MSN*, December 7, 2021. https://www.msn.com/en-us/news/politics/report-jan-6-committee-has-subpoenaed-phone-records-of-more-than-100-people/ar-AARA6G9

[123] See: The Future of Electricity Deregulation: Lessons Learned From  the California Crisis. Energy Law Journal, Summer 2003. "The Restructuring Regulator: A Guidebook and Research Agenda For the Electricity Industry," Energy Law Journal, Fall, 1995.   "Fundamental Issues in Natural Resource Damage Assessments," with Richard Carson, Natural Resource Law Journal, Fall, 1988. .  "How Markets For Impure Public Goods Organize," with Jeffery Dubin, Journal of Law, Economics, and Organization, Fall, 1988.  . "The Legal History and Economic Implications of Oil Pipeline Regulation," Energy Law Journal, Fall, 1981, with T. Stauffer.  "Financing U.S. Energy Development: An Economist's Perspective," Energy Law Journal, May 1981, Vol. 2, No. 1p

[124] "Executive Privilege," *Cornell Law School*,  https://www.law.cornell.edu/wex/executive_privilege

[125] Blunt, Roy, "Defining The Limits Of Executive Privilege," *Senate Republican Policy Committee*, October 6, 2021. https://www.rpc.senate.gov/policy-papers/defining-the-limits-of-executive-privilege

[126] "The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form. *44 U.S. Code § 2201 – Definitions."* While official written documents are generally in the possession of the National Archivist and governed by the PRA, the PRA is silent about conversations for which there are no electronic recordings or transcripts.

[127] "Executive Privilege," *Cornell Law School*, https://www.law.cornell.edu/wex/executive_privilege and "Neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. See, *e. g., Marbury* v. *Madison*, 1 Cranch 137, 177; *Baker* v. *Carr*, 369 U.S. 186, 211. *United States v. Nixon*, 418 U.S. 683, 684 (1974)".

[128] McFarlane, Scott, "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

[129] See Immunity of the Assistant to the President, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); Immunity of the Former Counsel, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; Immunity of the Counsel to the President from Compelled Congressional Testimony, 20 Op. O.L.C. 308, 308 (1996) ("Immunity of the Counsel to the President "); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("Congressional Demand for Deposition of Counsel "); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Testimony by Presidential Assistants at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Dual-Purpose Presidential Advisers at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

PETER NAVARRO, *pro se*
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
202-489-7479
pknavarro@protonmail.com

Jury Trial Requested

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER NAVARRO,
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
pknavarro@protonmail.com

      *Plaintiff,*

      v.

Case: 1:22−cv−01519
Assigned To : Moss, Randolph D.
Assign. Date : 5/31/2022
Description: Pro Se Gen. Civ. (F−DECK)

NANCY PELOSI, in her official
capacity as Speaker of the United States
House of Representatives; 1236 Longworth HOB
Washington DC 20515 Jury Trial Requested

BENNIE G. THOMPSON, in his official
capacity as Chair of the Select Committee
to Investigate the January 6th Attack on the
United States Capitol; 2466 Rayburn HOB
Washington DC 20515

ELIZABETH L. CHENEY, in her official
capacity as a member of the United States
House of Representatives; 416 Cannon House Office Bldg
Washington DC 20515

ADAM B. SCHIFF, in his official
capacity as a member of the United States
House of Representatives;
2309 Rayburn HOB
Washington DC 20515

RECEIVED
MAY 3 1 2022
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

JAMIE B. RASKIN, in his official
capacity as a member of the United States
House of Representatives;
2242 Rayburn HOB
Washington DC 20515

SUSAN E. LOFGREN, in her official
capacity as a member of the United States
House of Representatives;   1401 Longworth HOB
Washington DC 20515

ELAINE G. LURIA, in her official
capacity as a member of the United States
House of Representatives;   412 Cannon HOB
Washington DC 20515

PETER R. AGUILAR, in his official
capacity as a member of the United States
House of Representatives;   109 Cannon HOB
Washington DC 20515

STEPHANIE MURPHY, in her official
capacity as a member of the United States
House of Representatives;   1710 Longworth HOB
Washington DC 20515

ADAM D. KINZINGER, in his official
capacity as a member of the United States
House of Representatives;   2245 Rayburn HOB
Washington DC 20515

HOUSE SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH
ATTACK ON THE UNITED STATES
CAPITOL;   Longworth HOB   20515
Washington DC

UNITED STATES HOUSE OF
REPRESENTATIVES; and   Office of General Counsel
5140 O'Neill HOB
Washington DC 20515

MATTHEW M. GRAVES in his
official capacity as United States Attorney
for the District of Columbia.   U.S. Attorney and
Patrick Henry Bld
491 D St NW DC 20530
Washington

        *Defendants.*

2

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.     I, the Plaintiff, Dr. Peter Navarro, am a private citizen who previously served as a senior White House advisor during the four years of Donald John Trump's presidency.  I bring this complaint *pro se*, request a jury trial, and seek declaratory and injunctive relief to: (1) declare that the House Select Committee To Investigate the January 6th Attack on the United States Capital (Committee) is neither duly authorized nor properly constituted and therefore its legislative acts, including its subpoena issued to me and Committee Report 117-284 of the 2nd session of the 117th Congress are therefore ultra vires, unlawful, and unenforceable; (2)  declare that the Committee's subpoena, the Committee's Report 117-284, and House Resolution 1037 117th Congress (2021-2022) all represent legislative acts that violate the principle of separation of powers in their unlawful simultaneous pursuit of a judicial function under the flag, and behind the shield, of a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable; (3) declare that the Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable; (4) declare that the subpoena issued to me improperly compels testimony of a senior executive official; (5) enjoin the U.S. Attorney for the District of Columbia from proceeding against me "in the manner and form provided by law" as  H.Res. 1037 recommends; (6) enjoin the U.S. Attorney for the District of Columbia from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and unenforceable Committee subpoena dated February 9, 2022; and (7) declare that President Joe Biden does not have the

legal authority to waive the executive privilege or testimonial immunity invoked by his predecessor in this civil case.

2.      Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not, however, a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Congress (2021)[1] and with its own authorizing resolution, House Resolution 503 117th Cong. Therefore, the subpoena it has issued to me is invalid and unenforceable.

3.      For a Congressional Committee to duly issue valid and enforceable subpoenas during an investigation — and by extension, seek criminal contempt charges against those who fail to comply with such subpoenas — that investigation must have a valid "legislative function."[2] The *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][3]

4.      *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown, 381 U.S. 437, 448 (1965).* The Committee's subpoena and the Committee's Report to Congress 117-284 recommending that I be held in contempt of Congress along with H. Res. 1037 all represent "legislative acts."

5.      While the unwillingness of the courts to look beyond "facially valid" congressional investigations may have been correct law within the context of the balance of

4

power within the three branches of government in prior times, over time, the setting of this low

"facially valid" bar has been an open invitation for legislators to simultaneously pursue an

unconstitutional judicial function under the false flag, and behind the shield of, their legislative

function.  It should be clear here that a pursuit of a facially valid legislative function does not

preclude the unconstitutional and unlawful simultaneous pursuit of judicial function.

6. The result of the courts' silence in this matter is now clear: Repeated abuses by

Congress in using its investigatory powers to simultaneously serve both facially valid legislative

and unconstitutional judicial functions have institutionalized a partisan weaponization of

Congress' investigatory powers that now threatens the delicate balance of powers – and the

separation thereof — between the legislative, judicial, and executive branches of our

government.  In this case, the legislative history of the Committee and its members broadly

viewed over a more than five-year period reveals an undeniable and overwhelming pattern of

the weaponization of Congress' investigatory powers to pursue a judicial, and by implication, a

political function.

7. In this case, the legislative acts of the Committee and its members together with

H.Res 1037 constitute an unlawful exercise of the judicial function over and above the

Committee's "facially valid" legislative function, thereby violate the principle of the separation

of powers, and cannot advance a legal contempt of Congress charge against me through the

United States Attorney's office.

8. The Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037

constitute legislative acts that violate the constitutional proscription against bills of attainder,

and each should be invalidated and declared unenforceable.  These legislative acts violate the

Constitutional proscription against bills of attainder because: (1) they seek to determine guilt

5

and inflict punishment on me in the forms of shame, humiliation, banishment, ostracization, incitement of public hate, possible imprisonment, and the confiscation of my property, all without adequate provision of the protections of a judicial trial, and (2) the Committee, contrary to the court's guidance, failed to pursue less burdensome alternatives to achieve its alleged "legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). The set of deprivations which the Committee and its members and which the Democrat-controlled House have inflicted and seek to inflict on me are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably ... fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977). At my age of seventy-two, with the average life expectancy in America for males at seventy-six, a one-year prison term would constitute over 25% of my remaining expected life while a $100,000 fine would be equivalent to a significant fraction of my wealth for retirement.

9.      Rather than pursuing the less burdensome alternatives of negotiating a waiver of executive privilege and testimonial immunity from President Trump and his attorneys or a civil suit as *Nixon v. Administrator of General Services* and *Committee on Judiciary v. Miers* guides, the Committee and Congress with its passage of H.Res. 1037 have pursued the most burdensome and punitive alternative with a potential criminal prosecution in their naked effort to threaten and coerce me into turning my back on my duty to my country and appearing before their kangaroo court. By the Committee's refusal to negotiate directly with President Trump and his attorneys on the issue of executive privilege and testimonial immunity – the least burdensome alternative – and by failing to pursue the second least burdensome alternative of a civil suit, my due process has been violated, the legislative acts of the Committee and House of Representatives against me have been exposed as bills of attainder, and these legislative acts of

the Committee and Congress in this case must be invalidated. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). *Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).*

10.     There is no settled law to support the absurd, fanciful, and extremely dangerous proposition that an incumbent president can waive the executive privilege invoked by his predecessor or waive the testimonial immunity of the senior advisers serving under that predecessor.

11.     Executive privilege is an institution dating back to the days of George Washington that has been deemed critical to effective presidential decision-making; executive privilege, together with testimonial immunity for senior White House advisers provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

12.     I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension for which there is no settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the false flag of the national interest – represents the most extreme and dangerous form of qualifying the privilege and the testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn deal a mortal blow to the critical functions that executive privilege and testimonial immunity are supposed to serve in our Republic. These functions are to: (1) help ensure the separation of powers; and (2) provide for optimum candor in presidential decision-making.   Any settled law that institutionalizes a

7

revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.

13.     The Committee's members along with House Speaker Nancy Pelosi over a more than five year period have been engaged in a "repeatable strategic game" of "gotcha" and punishment that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic ping pong game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office or serve in government.

14.     The time is ripe for the court to address this controversy and the question of whether an incumbent president can strip his predecessor of executive privilege and testimonial immunity.  Here, if the Committee and Joe Biden manage to pull this deadly game off now and effectively establish the principle in settled law that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, <u>just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.</u>

15.     Congress cannot lawfully hold me in contempt of Congress for failure to comply with a subpoena that compels me to testify before the Committee because, under long-standing Department of Justice Office of Legal Counsel (OLC) policy, I have absolute testimonial immunity as a senior White House official. As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from

8

testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations." Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

16.    If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.

17.    If testimonial immunity exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve. Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly. If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.

18.    On May 26, 2022, two FBI special agents banged loudly on my door in the early morning hours to present me with a fruit of the poisonous tree Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 commanding me to comply with the original *ultra vires,* illegal and unenforceable subpoena issued to me by the Committee dated February 9,

2022. Specifically, this Grand Jury Subpoena from Matthew M. Graves, the U.S. Attorney for the District of Columbia pointedly ignored all claims of executive privilege and testimonial immunity while commanding me to testify before Grand Jury #22-3 of the U.S. District Court for the District of Columbia on June 2, 2022 and present "[a]ll documents relating to the subpoena dated February 9, 2022" that I "received from the House Select Committee to investigate the January 6, 2021, attack on the US Capitol, including but not limited to any communications with formal President Trump and/or his counsel or representative." [emphasis added]

19.     As demonstrated in this brief, the Committee's original subpoena cited by the U.S. Attorney is indeed *ultra vires*, unlawful, and unenforceable because: (1) the Committee is neither duly authorized nor properly constituted; (2) the Committee's subpoena together with the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function; (3) the Committee's legislative acts against me, including its subpoena, violate the constitutional proscription against bills of attainder; and (4) both executive privilege and testimonial apply.

20.     The U.S. Attorney cannot issue a Grand Jury Subpoena deemed to be lawful and enforceable that is derivative of a fruit of the poisonous tree *ultra vires,* unlawful, and unenforceable subpoena issued by the Committee and the equally poisonous trees of the Committee's Report 117-284, and H.Res. 1037.

21.     Since the subpoena of the Committee is *ultra vires*, unlawful, and unenforceable, the U.S. Attorney's Grand Jury Subpoena is likewise *ultra vires*, unlawful, and unenforceable and the U.S. Attorney must be enjoined from any actions to enforce this subpoena.

22.     As demonstrated in this brief, the executive privilege invoked by President Trump

10

is not mine or Joe Biden's to waive. Rather, as with the Committee, the U.S. Attorney has constitutional and due process obligations to negotiate my appearance before Grand Jury #22-3 not with me but rather with President Trump and his attorneys and I am bound by privilege to fail to comply with this Grand Jury Subpoena absent these negotiations and guidance from President Trump.

23. I come to this case far exceeding ""the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). I will demonstrate substantial injury through punishment from Speaker Pelosi, the Committee, and Democrat-controlled House of Representatives responsible for passage of H.Res. 1037 along with possible imminent, existential injury through punishment and the threat of punishment from the U.S. Attorney of the District of Columbia. Only a set of favorable rulings by this court will clearly redress these injuries and prevent further injury.

## PARTIES

1. Plaintiff Peter Navarro served as a senior White House adviser during all four years of the Trump administration.

2. Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

3. Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair. Thompson also introduced H. Res. 1037 – 117th Congress (2021-2022) with zero cosponsors.

4. Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the

United States Capitol.

5.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

6.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

7.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

8.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

9.      Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

10.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.     Defendant Select Committee to Investigate the January 6th Attack on the United

States Capitol ("Committee") was created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

13.     Defendant House of Representatives passed H. Res. 1037 by the yeas and nays 220-203 along party lines (with two Republican votes) on April 6, 2022.

14.     Defendant Mathew Graves is U.S. Attorney for the District of Columbia who served me with a subpoena (based on an *ultra vires*, unlawful, and unenforceable fruit of the poisonous tree subpoena issued by the Committee) to appear before Grand Jury #22-3 of the U.S. District Court for the District of Columbia.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

2.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House.

3.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Committee and introduced H. Res. 1037.

4.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Committee that issued the Navarro subpoena from Washington, D.C.

5.     This Court has personal jurisdiction over the Committee because it is located and operates in Washington, D.C.

6.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events

13

giving rise to the claim occurred in Washington, DC.

## RELEVANT FACTS

1.     On August 3, 2020, the Democrat-funded Transition Integrity Project publicly released a detailed plan to skew the 2020 presidential election in favor of Joe Biden using a combination of lawfare and grassroots tactics. Their overarching purpose was to stuff the ballot box in key battleground states with absentee ballots, many of which would, under the lax, and often illegal, rules they sought to impose, would be illegal votes, and therefore unlawful to count.[4]

2.     In a *Time* magazine cover story, journalist Molly Ball published an article after the election entitled "The Secret History of the Shadow Campaign That Saved the 2020 Election" which confirmed many of the strategies and tactics the Democrats had used to tilt the election in favor of Joe Biden as had been set forth in the TIP plan. Notes Ball: "Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding."[5]

3.     In the wake of the November 3, 2020 election, numerous analyses emerged revealing the elaborate strategies and tactics the Democrats had indeed used to skew the election and that the Transition Integrity Project had foreshadowed.  This set of analyses included the Plaintiff's "Navarro Report;"[6] and as noted in that report:

> *On January 13, 2021, the Democrat-controlled House of Representatives passed House Resolution 24 "impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors."  A primary justification for this overwhelmingly partisan impeachment is that "President Trump repeatedly issued false statements asserting that the Presidential election results were the*

14

*product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."*

*If it can be demonstrated that President Trump had a good faith belief that the November 3, 2020 Presidential election results were, indeed, the poisonous fruit of widespread fraud and election irregularities, POTUS45 must not only be found Not Guilty. The U.S. Senate must also call for a prompt investigation of these alleged irregularities.*

*The three volumes of the Navarro Report provide just such a demonstration. These three volumes have been consolidated herein into a single document explicitly designed as a useful evidentiary handbook and reference guide for the upcoming Senate impeachment trial.*

*Evidence used in the preparation of the Navarro Report includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.*

*Volume One finds significant election irregularities across six key battleground states – Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These irregularities range from outright voter fraud, ballot mishandling, and contestable process fouls to Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.*

*Volume Two examines a two-pronged Grand "Stuff the Ballot Box" Strategy used by the Democrat Party and its political operatives to flood the battleground states with enough illegal absentee and mail-in ballots to turn a decisive Trump victory into a narrow, and arguably illegitimate, Biden "win." To strategically game the Presidential election, the Democrats and their operatives were found to have at times bent or broken both election rules and laws.*

*Volume Three provides the most up-to-date statistical "receipts" with respect to the potential number of illegal votes cast in each battleground state. Volume III*

*thereby provides investigators with a well-documented tally of potentially illegal votes on a state-by-state and category-by- category basis. A key finding is that the number of potentially illegal votes dwarfs the very thin alleged Biden "victory" margins across all six battleground states.*

4.      Public opinion polls today indicate that a significant fraction of the American electorate believes the 2020 presidential election was rigged or stolen.[7]

5.      There is no definitive proof offered by the Committee or available in the public square that the November 3, 2020 presidential election was a fair election unmarred by election irregularities.

6.      In the Committee's letter of February 9, 2022 transmitting a subpoena electronically to me, the Committee accuses me of making "many claims of fraud in the election" but also insists that these claims have been discredited by "public reporting, by state officials, and courts."[8] Yet, the only "proof" the Committee's Chair Bennie Thompson offers is a laughable footnote citing an article in the long-discredited Forbes magazine – Forbes is owned by Chinese investors and has been turned largely into a propaganda organ for the Chinese Communist Party.[9]

7.      On January 6, 2020, a large group of Trump supporters gathered in Washington in the American tradition of peaceful protest to support the president in his peaceful bid to get a legal counting of the vote. At this point in time, President Trump had a strong presumption that the election was likely rigged and stolen from him based on the data and analyses available to him, including the "Navarro Report."

8.      Among a large crowd of Trump supporters, there were small pockets of extremists likely seeking to instigate violence that could be blamed on President Trump. These extremists ranged from members of the Marxist group Black Lives Matter and the anarchist Antifa group

to far right militia groups.[10]

9.     There is likewise evidence that among the crowd were individuals serving as informants to the FBI who may have possibly instigated the violence.[11]

10.     The Committee was formed against the backdrop of this January 6 history. In justifying its investigation, the Committee and its members refer repeatedly to the role of President Trump and his advisors, including the Plaintiff, in instigating an unlawful insurrection and promoting an unlawful attempt to overturn the 2020 election while insisting that the election was fair – again, despite no definitive evidence proving the election was fair.[12]

11.     For the four years of the Trump administration, I, the Plaintiff, served as a senior White House adviser to President Donald J. Trump.  While I would carry several titles during my term of service – Director of the National Trade Council, Director of the Office of Trade and Manufacturing Policy, Defense Production Act Policy Coordinator – my duties and responsibilities in the White House as an Assistant to the President during the relevant times here spanned a far broader spectrum of economic, trade, border security, and national security issues.

12.     During my service, President Trump would regularly seek my candid advice on matters that might seem far outside my "official" duties; and a narrow construction of my role in the White House as the Committee has done based merely on my titles fundamentally misunderstands how the Trump White House worked.

13.     In the aftermath of the November 3rd, 2020 election, I began an investigation that would quickly lead to deep national and economic security concerns about election integrity.  In a series of previously referenced analyses titled collectively "The Navarro Report," I identified not just an abundance of fraud and election irregularities.  I exposed how the Democrat Party

17

and its operatives effectively made what should have been a landslide win by President Trump into an election close enough to steal.

14.     Given the economic and national security ramifications of a possibly stolen election, I worked diligently in my official capacity as a government official within the White House and as a senior White House adviser to help the president and other senior advisers navigate what appeared to me to be the most sophisticated assault on American democracy ever perpetrated.

15.     In the days leading up to January 6, and as reported in my book *In Trump Time: My Journal of America's Plague Year* referenced by the Committee,[13] I described a legal and constitutional strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887.[14]  The goal was to delay certification of the election for at least another several weeks "while Congress and the various state legislatures involved investigate[d] all of the fraud and election irregularities" that would be raised that day on Capitol Hill.

16.     As noted in *In Trump Time,* the goal of this strategy was "*not* to get the election overturned" as the Committee would insist. Rather, the goal was "to subject the ballots – the *legal* votes of American citizens along what we believed to be a flood of ballots – to careful scrutiny and investigation."

17.     Finally, as noted in *In Trump Time,* because implementation of the Green Bay Sweep strategy required "only peace and calm on Capitol Hill," the last thing President Trump and I wanted was "to hand Congress an excuse to abort the operation" with an outbreak of violence and chaos and the last people "who wanted to see violence erupt that January 6 day on Capitol Hill" included both myself and President Trump (along with Stephen K. Bannon).

18

18.    To date, the Committee has offered no significant or conclusive proof that the November 3 election was fair or that the Navarro Report was in any way inaccurate or misleading. Nor has the Committee offered any significant or conclusive proof that either I or President Trump or any of the senior advisors sought to <u>illegally</u> overturn the election.

19.    To recap, the Committee asserts without facts and evidence that "many claims of purported fraud in the election...have been discredited in public reporting, by state officials, and courts." This is but one of many pieces of evidence that the Committee is operating upon under the flawed assumption that the 2020 presidential election was fair and without reasonable controversy. From this flawed assumption, this kangaroo court of a Committee is pursuing a judicial function in seeking to punish President Trump and any of his senior advisors who publicly reject the unproven claim that the election was indeed fair.

20.    Against this stark backdrop of lack of evidence for its allegations, the Committee continues to subject President Trump and senior advisors such as myself to the punishment of shame, humiliation, banishment, ostracization, and the incitement of public hatred by portraying us as insurrectionists rather than as patriots seeking to get the bottom of what looks to be, just as with the Nixon-Kennedy 1960 election, a likely stolen election.[15]

21.    The Committee's efforts are also geared at inflicting equally traditional forms of punishment such as imprisonment and the confiscation of the property of Trump's most senior advisors who dare to defy the Committee's unlawful subpoenas and investigation using the U.S. Attorney and the vast resources of a Democrat-controlled Department of Justice as its cudgels. In seeking to build a criminal case against President Trump and his most senior advisors for their alleged roles in seeking to overturn a fair election, the Committee is clearly venturing far beyond its facially valid legislative function into the realm of the unconstitutional pursuit of a

judicial *cum* political function.

22.    On February 9, 2022, I received the Committee's subpoena in which I was "commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol" (Committee) and "to testify at a deposition touching matters of inquiry committed to said committee or subcommittee" on March 2, 2022 at 10:00 am and further to "not to depart without leave of said committee or subcommittee."[16]

23.    I was also commanded under this subpoena "to produce the things identified on the attached schedule."[17]   I found the breadth and invasiveness of this subpoena and its attachment to be breathtaking and a direct frontal assault on both executive privilege and testimonial immunity while it also gave the appearance of a criminal investigation, not a fact-finding mission.

24.    Upon receipt of this subpoena, as a former senior White House adviser to President Donald J. Trump clearly covered by testimonial immunity, I was faced with three broad choices:[18] (1) respect President Trump's invoking of executive privilege in the Committee's investigation and fail to comply with the subpoena; (2) unilaterally waive President Trump's Executive Privilege and my own testimonial immunity by providing all of the requested documents and testifying before the Committee as commanded; or (3) preserve President Trump's executive privilege while at least superficially meeting the requirements of the subpoena by appearing before the Committee to testify but invoking my Fifth Amendment rights during such testimony.

25.    After considerable reflection and a broad overview of the law – both settled and unsettled – I chose Choice #1: fail to comply with the subpoena while preserving the executive privilege asserted by President Trump.  I was swayed both by my own personal experience

within the White House as one of the president's most senior and trusted advisors and by the wisdom of *United States v. Nixon* that opines that "[a] President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon, 418 U.S. 638 at 708.*

26.    Further, as noted in *Trump v. Mazars, 140 S. Ct. 2019 at 2032*, executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Mazars, 140 S. Ct. at 2032* at 448–449.

27.    From this vantage point, I believed at the time of my receipt of the Committee's subpoena – and also keenly mindful of the absolute testimonial immunity historically granted to senior White House officials -- it was my duty to President Trump, the Constitution, and the Republic that I had pledged to serve and defend to honor the executive privilege that President Trump had invoked.

28.    I made Choice #1 knowing that it would put me in an untenable position, and I did so despite the obvious risks to my freedom and my financial position that might come with a criminal contempt prosecution.[19]  That I might face criminal charges was no idle speculation as one such criminal prosecution was already in progress against another former Trump advisor Stephen K. Bannon and another criminal contempt charge was possibly pending against former Trump Chief of Staff Mark Meadows.  Yet, in making Choice #1, I believed that duty and honor

must come first.

29.    Regarding Choice #2, comply with the Committee's subpoena, there is settled law that dictates the executive privilege in this matter was not mine to waive, e.g., the Supreme Court has held that executive privilege "can neither be claimed nor waived by a private party." *United States v. Reynolds, 345 U.S. 1, 7–8 (1953)*. If I were to ignore President Trump's invocation of privilege by opting for Choice #2, I would be engaging in an act contrary to settled law while violating due process. This would be an act of betrayal both of the president I served and of my country. I would be violating constitutional law by waiving the privilege myself and fully cooperating with the Committee.

30.    With Choice #2, to the extent that I was choosing it "to save my own skin," as the saying goes, I would be committing an act of cowardice under partisan Congressional fire – the exact opposite of the honorable and patriotic choice epitomized by Choice #1. I note here in this regard that several high-ranking Trump White House officials, including President Trump's son-in-law Jared Kushner, chose to ignore the critical privilege and immunity issues at stake and testify before the Committee. Predictably, their cowardly actions would be used to criticize both my principled position as well as President Trump himself, as illustrated in this news coverage of a comment from the Committee's Chair Bennie Thompson: "A person close to the Trump family told CNN the former President's children never saw a reason not to cooperate with the committee because none of them felt appearing before the panel put them at any risk.[20]...In his interview with CNN, Thompson questioned why the former President did not object to his family members testifying while key White House aides are now being held in contempt of Congress by the House after refusing to testify, saying they had been instructed by the President to claim executive privilege over their conversations. '"Now we have four individuals who are

being held in contempt of Congress because they were directed by the President not to come. So they are under the bus, but his children are not. They came," Thompson said. "Now to me, that's Donald Trump that we are discovering. It's 'do as I say, but not do as I do.' Do you understand? I say don't go and testify, but when my children or my in-laws are involved, you can go testify.'"[21]

31. As for Choice #3, complying with the subpoena but invoking my Fifth Amendment rights, I believed that by doing so I would be undermining executive privilege in a way every bit as dishonorable as Choice #2. To wit: I would be invoking the Fifth Amendment rather than staunchly defending Executive Privilege.

32. With Choice #3, I also was keenly aware of the reputational harm that would come because far too many Americans wrongly associate guilt with invoking the Fifth Amendment.  As just one data point, a Morning Consult poll of 1993 registered voters conducted May 10-14, 2018 found that 36% of respondents believed that invoking the Fifth Amendment "usually implies the person is guilty."[22]  Here, Justice Felix Frankfurter has famously criticized those who believe the Fifth Amendment implies guilt: "Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. "  Of course, no such admonition by Frankfurter would have been necessary if the problem didn't exist. *United States v. Chase*, 281 F.2d 225, 228 (7th Cir. 1960).

33. In this case, Justice Frankfurter might just as well have been criticizing the Chair of the Committee Bennie Thompson for unlawfully judging – and publicly branding -- anyone who invoked the Fifth Amendment during testimony before his Committee as guilty indeed.  In a public statement on December 2nd, 2021 illustrating the unconstitutional punitive nature of a

Committee that is supposed to be pursuing a non-punitive legislative agenda and exposing the "judge, jury, and executioner" judicial function mindset of the Committee, Thompson baldly asserted that those who appear before his Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, Real Clear Politics, Dec. 2, 2021.[23]

34.     Having worked hard my entire life to live honorably with a reputation for honesty, I was not inclined to invoke the Fifth Amendment in a demonstration of gamesmanship to avoid a contempt charge. Nor was I going to be tainted with the charge of "guilty until testifying" in the ugly game Thompson and the Committee were obviously playing.

35.     Finally, I note that I was aware at this time of a critical decision I would have to make that if I were to bend to the Committee's coercive will.  To wit, I would not only be undermining the institution of executive privilege and its critical role in the separation of powers. I would be weakening the companion institution of testimonial immunity for senior White House advisers.

36.     While there has been some case law arguing for a qualified rather than absolute executive privilege – the law remains unsettled – history and the law on testimonial immunity has leaned far closer to the absolute end of the spectrum.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary. "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet

with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations." Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

37. Having made Choice #1 to honor the executive privilege invoked by President Trump (and cognizant of the sanctity of absolute testimonial immunity), I responded to the subpoena I had received in an email dated February 27, 2022 addressed to Senior Investigative Counsel for the Committee, Dan George as follows: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."

38. Note that I clearly assert in this email that the privilege is not my to waive, and I clearly indicate the Committee should "directly negotiate with President Trump and his attorneys."

39. The court can also see in my response that I am anticipating a possible assault on President Trump's privilege by Joe Biden by clearly indicating that the privilege is not Biden's to waive either. In fact, the very next day, on February 28, 2022 I received a letter by email from Deputy Counsel to the President Jonathan Su of the White House Legal Counsel's office advising me that President Biden "has decided not to assert executive privilege" as regards to either my "testimony" or "documents" commanded by the Committee."[24]

40. Even a cursory view of the case law, Executive Orders, and OLC opinions

indicates that Su's bold assertion that Joe Biden has the legal authority to waive the privilege of his immediate predecessor and the immunity of that's predecessor's senior advisers within a matter of mere months of the transition of power is anything but settled law.

41.     Upon receipt of the Su letter, I immediately wondered whether the Committee had had somehow signaled to Su and the White House to take this action as a way of further coercing me into bending to their will.   Here, it has been said that there are no conspiracies, but there are also no coincidences while Occam's Razor teaches us that the simplest explanation is also the most likely.  In this instance, the simplest explanation for the Su/Biden correspondence is not that it was a coincidence but rather that the Committee either tacitly or explicitly colluded with the White House to elicit this correspondence in a blatant attempt to do an end run around due process and the law.  If Joe Biden could strip Donald Trump of executive privilege and me of testimonial immunity, then neither I nor any Trump senior White House adviser would have an excuse not to appear before the Committee – or so their illegal and indefensible position would become.

42.     My second thought upon receiving the Su letter was that no court of law would find it reasonable to allow an incumbent president to strip his predecessor of executive privilege within months of taking office no matter what fig leaf of a broader national interest the incumbent might seek to cover its assault in.  The chilling effect of such an action, if upheld by the courts, would be tantamount to destroying executive privilege and testimonial immunity as we know them as no future White House senior advisor or president would have confidence in the privilege.

43.     To make this point early, and it shall be made often, whatever vague "extraordinary" "national interest" the Su letter cites in support of its half-baked assertions, these

concerns pale in comparison to the transformation of executive privilege and testimonial immunity into partisan ping pong balls that provide no real assurances to future White House advisers or presidents of the kind of confidentiality necessary to make sound decisions.

44. Within the context of strategic game theory, if the assault on Executive Privilege and testimonial immunity by the Committee and the White House in this case are allowed by this court, it will spell the end of both Executive Privilege and testimonial immunity as this Republic has known them because we will quickly bear witness to a "repeatable game" in which whichever party controls <u>both</u> the House of Representatives and White House, that party will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office. Of course, this will all be done under the false flags of national emergency and national security.

45. If, in this case, the Committee and Joe Biden are able to effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024. In fact, <u>I don't need to imagine this repeat of the strategic game. If I'm not dead or in prison, I will lead the charge.</u>

46. On February 28th, after receiving Mr. Su's correspondence and additional correspondence from Mr. George, I reaffirmed to Mr. George that: "President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."

47. I would further subsequently note in a press release on March 26, 2021 that I would honor whatever decision President Trump made in the matter and assist the Committee in expediting the matter to the Supreme Court to settle the law on this controversy: "This is an

27

unprecedented partisan assault on executive privilege. The committee knows full well that President Trump has invoked executive privilege and it is not my privilege to waive. If President Trump waives the privilege, I would be happy to testify. It is premature for the committee to pursue criminal charges against an individual of the highest rank within the White House for whom executive privilege undeniably applies. Until this matter has been settled at the Supreme Court, where it is inevitably headed, the Committee should cease its tactics of harassment and intimidation. I would be happy to cooperate with the committee in expediting a review of this matter by the Supreme Court and look forward to arguing the case."[25]

48.     After a more careful reading of the Su letter, it is clear, if not altogether obvious, that the Biden White House does not directly seek to waive President Trump's privilege in the matter. All Mr. Su is informing me of is that President Biden "has decided not to assert executive privilege." To believe that this waives the privilege invoked by President Trump, <u>one must make the leap that the decision by Biden not to invoke privilege is equivalent to waiving the privilege invoked by Trump. This is not at all clear from the Su letter</u>. In fact, Su may be purposely opaque knowing the quicksand of unsettled law he has waded into. And it may be useful to note as well that Su makes no reference to any case law that would indicate Biden is seeking to hijack the Trump privilege. Yet, the Committee would be more than eager to make this leap.

49.     On March 28, 2022, the Committee voted unanimously (9-0) to recommend that I, along with former Trump senior White House adviser Dan Scavino, be held in contempt of Congress.

50.     On April 4, the House Rules Committee voted along party lines, 9 Democrats for to 4 Republicans against, to advance the contempt charge against me.[26]

28

51.     On April 6, the House of Representatives passed H.Res. 1037 virtually along party lines by a vote of 220-203, with two Republicans voting in the affirmative.[27] This Resolution recommends to the United States Attorney for the District of Columbia that the Plaintive "be proceeded against in the manner and form provided by law" for criminal contempt of Congress, whereby this contempt charge carries with it a prison term of up to one year and the confiscation of the Plaintiff's of up to $100,000.

52.     The Supreme Court has long recognized that due process protections apply to all congressional investigations. *Watkins v. United States*, 354 U.S. 178,188 (1957); *Quinn v. United States*, 349 U.S. 155,161 (1955). The Committee had its own duty to honor due process and attempt such negotiations with President Trump in good faith – and thereby avoid obvious bill of attainder complications. Negotiations was the least burdensome (punitive) alternative at the Committee's disposal while a civil suit was the next least burdensome alternative. Instead, the Committee pursued the most burdensome (punitive) alternative of a criminal contempt of Congress charge.

**My Subpoena Was Not Issued by a Duly Authorized and Properly Constituted Committee and is Unenforceable**

1.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Cong. (2021)[28] and its own authorizing resolution, House Resolution 503 117th Cong. (2021).[29]

2.     Section 3(b)(1) of H.Res. 8 provides: "During the One Hundred Seventeenth Congress, the chair of a standing committee…upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena,

29

by a member or counsel of such committee." [emphasis added] By H.Res 8, consultation with the ranking minority member is therefore a necessary condition for the issuance of any subpoena by the Committee.

3.      Section 5 (c) (6)(A) of H. Res. 503 states: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." By H.Res 1037, consultation with the ranking minority member is likewise a necessary condition for the issuance of any subpoena by the Committee.

4.      Section 2(a) of H. Res. 503 states that "The Speaker shall appoint 13 Members to the Committee, 5 of whom shall be appointed after consultation with the minority leader."

5.      Presumably, the minority leader would propose five members of his own party under Section 2(a) of H. Res. 503 so that the partisan balance would reflect an albeit still partisanly skewed 13-5, near three-to-one Democrat majority on the Committee.

6.      Upon passage of H.R. 503, Speaker Pelosi appointed Bennie Thompson to serve as Chair of the Select Committee along with six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.[30]

7.      Following the instructions of H.R. 503, House Minority Leader Kevin McCarthy recommended Rep. Jim Banks of Indiana, to serve as minority ranking member of the Committee.[31]   However, Pelosi refused to seat Banks; and <u>the Committee has no ranking minority member despite the requirement of H.Res. 503 that it should and the requirements</u>

30

imposed by H.Res 8 for the issuance of valid subpoenas.

8.      Minority Leader McCarthy also recommended to Pelosi the appointment of four additional Republican members to serve as minority members on the Select Committee – Illinois' Rodney Davis: Ohio's Jim Jordan, North Dakota's Kelly Armstrong, and Texas' Troy Nehls. None were appointed by Pelosi.

9.      If Pelosi had simply appointed the members recommended by McCarthy along with Banks as ranking minority member, this would have met the requirements of H.Res. 503 to have a 13-member commission with five minority representatives and a ranking minority member.[32] Instead, without the consultation of McCarthy, again in contradiction to H.Res. 503, Pelosi appointed Illinois' Adam Kinzinger and Wyoming Liz Cheney—two Republicans with clear animus against President Trump.

10.     The Committee's failure to comport with Section 2(a) of H.Res. 503 is evident in: (1) the failure of House Speaker Nancy Pelosi to appoint the proper number of members (9 instead of 13); (2) an even more skewed 7-2 ratio of Democrats to Republicans instead of the 8-5 ratio called for by H.Res. 503; (3) the failure of Pelosi to consult with Minority Leader Kevin McCarthy prior to the seating of the two titular Republicans on the Committee, neither of which were proposed by McCarthy; (4) the absence of a ranking minority member; and (5) the rejection by Pelosi of all five members, including a ranking minority member, proposed by McCarthy.

11.     The Committee's failure to comport with Section 3(b)(1) of H. Res. 8 as well as Section 2(a) of H. Res. 503 is evident in the fact that of those nine members Speaker Pelosi appointed to the Committee, none were appointed after consultation with the ranking minority member as required by the authorizing resolutions.

12.     Since Speaker Pelosi allowed no ranking minority member on the Committee

31

there is no ranking minority member to "consult" with and therefore the Chair may not "order the taking of depositions" "pursuant to subpoena."

13.     Absent a ranking minority member, the Committee has no legal authority to duly issue, much less legally enforce subpoenas and advance resolutions finding private citizens in contempt of Congress for refusal to comply with the illegal subpoenas issued by the Select Committee.

14.     The absence of a ranking minority member on the Committee alone is sufficient for this court to rule that all of the Committee's subpoenas are invalid.   Chairman Thompson derives the authority to issue subpoenas from both H.Res. 8 and H.Res. 503 Section 5(C)(6)(A) of the Committee's authorizing statute, but these authorities are qualified, not absolute. The Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Committee.

15.     As the Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena to me. The subpoena thus runs afoul of the Committee's authorizing resolution as well as H.Res. 8, making it invalid and unenforceable; and my failure to comply with the Committee's subpoena cannot be grounds in H. Res. 1037 for holding me in contempt of Congress.

16.     In a public statement, Pelosi acknowledged she had taken an "unprecedented decision"[33] in establishing what amounts to nothing more than a highly partisan and score-settling kangaroo court of a Committee with a fig leaf of Republican membership, no ranking minority member, and four empty seats in clear violation of the specifications of H.R. 503 for a duly authorized and properly constituted committee.

17.     Congress' failure to act in accordance with its own rules is judicially cognizable.

*Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

18.     In this case, former senior White House officials, including myself, have been held in contempt of Congress on the basis of invalid and unenforceable subpoenas from a Committee that is neither duly authorized nor properly constituted yet we face possible imprisonment of up to one year and a significant confiscation of personal property in the forms of up to $100,000 in fines and the substantial cost burden of legal representation.

## The Legislative Acts of the Committee and H.Res 1037 Violate the Principle of Separation of Powers Because They Also Seek To Fulfill a Judicial Function

1.     A key controversy before this court in this case for which there is no settled law is this: If a Congressional entity such as the Committee is pursuing an investigation under the Constitutional flag, and behind the shield of, what appears to be a facially valid legislative function, is it also then free to use that investigation and its subpoena powers to simultaneously pursue an illegitimate judicial function that violates the principle of separation of powers? Here, it should be obvious that the presence of a facially valid legislative function does <u>not</u> rule out the presence of a punitive judicial function – the pursuit of these legitimate legislative and illegal judicial functions can occur simultaneously.

2.     The Constitution contains no provision explicitly declaring that the powers of the three branches of the federal government shall be separated yet the principle of separation of powers is implicit in its construction: Article I vests all legislative powers in the Congress; Article II vests executive power in the president, and Article III vests judicial power in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

33

3.    Congress has no enumerated constitutional power to conduct investigations or issue subpoenas.  For a Congressional Committee to duly issue valid and enforceable subpoenas in the course of an investigation – and by extension, seek contempt charges against those who fail to comply with such subpoenas -- that investigation must have a valid and non-punitive "legislative function."[34]

4.    Congress' power to investigate is limited because it is "justified solely as an adjunct to the legislative process."[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).   (emphasis added).

5.    A hallmark of the judicial function is the power to punish.  "The power to punish is inherent in the courts." *United States v. Landes*, 97 F.2d 378, 381 (2d Cir. 1938).

6.    To ensure the principle of separation of powers, Congress has no judicial power and therefore does not have the power to investigate in pursuit of a judicial function and "inflict punishment." *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

7.    The Committee and its members have "no Congressional power to expose for the sake of exposure" *Watkins v. United States*, 354 U.S. 178, 200 (1957).   Exposing for the sake of exposure represents an unlawful exercise of judicial power and seeks to perform a judicial function because, in causing such results as shame, banishment, humiliation, or ostracization, such exposure administers various forms of punishment. *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).  Justice Black notes "There is nothing strange or novel about this kind of punishment. It is in fact one of the oldest forms of governmental punishment known to mankind; branding, the pillory, ostracism and subjection to public hatred being but a few examples of it. Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment. *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959)

34

[emphasis added]

8. The courts have never firmly addressed the controversy of whether a Congressional investigation should be invalidated if that investigation represents a simultaneous exercise of <u>both</u> a facially valid legislative function and an unconstitutional and unlawful judicial function. Yet, as the frequency and intensity of overtly partisan and weaponized Congressional investigations have accelerated in the vacuum of settled law in this matter, it is a question and controversy that begs for this court's wisdom. To borrow a phrase from *Trump v. Mazars*, this case, the hallmark of which is Speaker Pelosi's frank admission of the overtly partisan construction of an "unprecedented" Committee, "represents a significant departure from historical practice." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2031 (2020). Accordingly, this case and controversy by Pelosi's own words invites the court to settle the law and thereby set precedent.

9. Historically, the courts have been reluctant to dive into the deep end of this separation of powers pool in their relatively few rulings on the subpoena power of Congress. For example, the *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][36]

10. The reluctance of the courts to pierce the veil of a facially valid legislative function and find a companion unconstitutional judicial function has been attributed in part to the 'hurly burly' nature of politics. As *Trump v. Mazurs* notes: "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they

have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel). *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020)

11.     The unwillingness of the Courts to look beyond facially valid congressional investigations may have been tolerable within the context of the balance of power within the three branches of government in prior times. However, over time, the setting of this low, facially valid legislative function bar to the exclusion of the possibility that a judicial function is simultaneously and unconstitutionally being pursued has been an open invitation for legislators to pursue just such a judicial function under the false flag, and behind the shield of, their legislative function.

12.     The result of the court's silence in this matter is now clear: Repeated abuses by partisans and political score settlers like those on the Committee have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance and separation of powers between the legislative, judicial, and executive branches of our government.

13.     In considering whether to address this controversy in this case, the court should indeed take Speaker Pelosi at her word when she describes the formation of the Committee as "unprecedented." It is indeed unprecedented for Congress to form a rabidly partisan and score-settling congressional committee that has no minority ranking member and fails to abide by its own authorizing resolution. It is equally unprecedented to allow this Committee to wield such powerful investigatory powers in pursuit of a judicial function behind the flag and shield of a

facially valid legislative function.

14.     While the courts have been loathe to address the controversy before us, they have not been entirely silent on the matter.  For example, *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951) opens the door to new precedent when it opines "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."  In *Tenney v. Brandhove*, such usurpation was not "obvious."  However, as shall be demonstrated with a review of the legislative history of the Committee and its members below, this is a case where such an usurpation is overwhelmingly and painfully obvious.[37]

15.     With regard to the importance of "legislative history," the courts have deemed the "legislative history" of any given investigation to be a critical factor in assessing the validity of a Committee's investigatory powers.  In *Barenblatt v. United States*, for example, the court references "[i]n the light of the Committee's history" to rule "legislative authority" "unassailable".[38]  The case likewise refers to the "persuasive gloss of legislative history"[39] and also uses the phrase "In light of the legislative history." *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

16.     Building on *Barenblatt*, *Nixon v. Administrator of General Services* establishes a "legislative history" test to probe for the unconstitutional presence of the judicial function. It urges us to ask in that case whether the "legislative history" indicates if "the Act before us is regulatory [legislative] and not punitive in character?" 408 F. Supp., at 373 *Nixon v. Administrator of General Services, 433 U.S. 425, 478 (1977)*.

17.     In this case, the legislative history of the Committee and its members reveals an overwhelmingly "obvious" pattern of the weaponization of Congress' investigatory powers to

pursue a punishing judicial, and by implication, a political function. As Justice Black might say today "It seems to me that the proof that the ... Committee is here undertaking a purely judicial function is overwhelming" *Barenblatt v. United States*, 360 U.S. 109, 154 (1959).

18.     The "overwhelming" and "obvious" proof in this case is embodied a legislative history dating back more than five years that demonstrates the repeated attempts of the Speaker of the House and the members of the Committee to publicly shame, humiliate, banish, ostracize, and possibly even imprison President Trump by trying him in their various kangaroo courts and legislative acts. Through such exposure for the sake of exposure, they have incited public hatred and thereby punished Trump by harming his re-election chances in 2020 even as they have sought repeatedly to remove him outright from office and prevent him from either legally or practically from ever occupying the Oval Office again by running in, and winning, the 2024 election. This sordid record of the Committee and its members has been nothing more and nothing less than the pursuit of a judicial function behind the mask and shield of a facially valid legislative function. As *McGrain v. Daugherty* once warned in another context "[t]he committee has assumed all of the functions of prosecutor, judge and jury with apparently none of the customary rules governing evidence and procedure. " *McGrain v. Daugherty*, 273 U.S. 135, 145 (1927).

19.     The legislative history of the Committee itself reveals its clear partisan and score-settling intent to punish and humiliate President Trump in the course of its investigation and in pursuit of a judicial function.

20.     On May 14, 2021, Democrat Congressman Bennie Thompson introduced H.R. 3233, a *bicameral* bill to establish a ten-member commission to investigate the January 6th assault on the Capitol requiring approval of both the House and Senate.[40] This commission, by

legislative design, would have struck a very clear bipartisan 5-5 balance. It was to consist of five members appointed by Democrats, five members appointed by Republicans, a Democrat Chair and a Republican Vice-Chair.[41]

21.　While H.R. 3233 passed the House on May 19, 2021 by a 252 – 175 vote , it failed in the Senate when a cloture motion failed by a vote of 54 yeas to 35 nays.[42] In response, on June 28, 2021, Speaker Pelosi took the Senate out of the equation – and therefore a bicameral approach to the proposed investigation – by next introducing a simple House Resolution requiring only the approval of the House she controlled.

22.　Pelosi's Democrat-controlled House passed H. Res. 503 on May 21, 2021 on a virtually party-line 222-190 vote.[43] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois – both with scores to settle against Donald Trump – voted in favor of H. Res. 503. Each would wind up on the Committee as the only two titular Republicans.

23.　H. Res. 503 offers a very sharp partisan, one-legislative-chamber contrast to the bipartisan, bicameral construction of H.R. 3233. As has been demonstrated, instead of a commission evenly split between Democrats and Republicans, H. Res. 503 specifies the creation of a highly partisan and score-settling Committee intent on punishing and humiliating President Trump, inciting public hatred, and ensuring he never becomes president again through the exercise of an illegitimate and unconstitutional judicial function.

24.　Just as this Committee has a sordid legislative history offering obvious and overwhelming proof that it "is undertaking a purely judicial function," *Barenblatt v. United States*, 360 U.S. 109, 154 (1959), so, too, does the far broader legislative history of the Committee members reveal a clear intent to simultaneously pursue a judicial *cum* political function rather than a purely legislative function. This legislative history spanning a period of

more than five years reveals at least seven additional legislative acts along with a "Russia Hoax" perpetrated by Committee members seeking to shame, humiliate, and banish President Trump from office while inciting public hatred of Trump and, by implication, Trump's advisers. These seven legislative acts include:

a. H.Res. 1987, introduced on April 6, 2017 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch an Oversight Commission on Presidential Capacity to determine whether the President is mentally or physically unable to discharge the powers and duties of office.[44] Its clear target was Trump, and the clear goal was to remove him from office;

b. H.Res. 496, introduced on August 18, 2017, "censures and condemns President Trump for his inadequate response to the violence in Charlottesville, Virginia, on August 12, 2017, for his failure to condemn the White supremacist groups responsible for actions of domestic terrorism, for asserting that "both sides" were to blame and excusing the violent behavior of participants in the Unite the Right rally, and for employing people with ties to White supremacist movements in the White House. [45] It also urges President Trump to fire all White House advisors who have urged him to cater to the White supremacist movement;"[46]

c. H.Res. 660, introduced on October 29, 2019 as part of the first impeachment trial of President Trump,[47] directed "certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes;"[48]

40

d.  H.Res. 755, introduced on December 10, 2019, impeaches President Donald J. Trump for high crimes and misdemeanors. The resolution sets forth two articles of impeachment of the President: (1) abuse of power by soliciting the interference of Ukraine in the 2020 U.S. presidential election, and (2) obstruction of Congress by directing defiance of certain subpoenas issued by the House of Representatives;[49]

e.  H.Res. 8548, introduced on October 9, 2020 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch a Commission on Presidential Capacity to Discharge the Powers and Duties of the Office to determine whether the President is mentally or physically unable to discharge the powers and duties of office;[50]

f.  H.Res.24, introduced on January 11, 2021, impeaches President Donald John Trump for high crimes and misdemeanors. It sets forth an article of impeachment stating that President Trump incited an insurrection against the government of the United States;[51] and

g.  H. Res. 21, introduced on January 11, 2021 by Committee member Jamie Raskin, calls upon Vice President Michael R. Pence (1) to immediately use his powers under section 4 of the Twenty-fifth Amendment to convene and mobilize the principal officers of the executive departments to declare that the President is unable to successfully discharge the duties and powers of his office, and (2) to transmit to the President pro tempore of the Senate and the Speaker of the House notice that he will be immediately assuming the powers and duties of the office as Acting President.[52]

41

25. As to how each of the members of the Committee participated in one or more of these legislative acts (and otherwise demonstrated anti-Trump behavior), the Chair of the Committee, Bennie Thompson, voted "yes" on H. Res. 660,[53] he cosponsored H. Res. 496[54] condemning and censuring President Donald Trump, voted yes on both impeachment trials[55] and did not show up at President Trump's inauguration in 2016.[56] Indicating his desire to punish the president with his removal from office, Thompson has described President Trump as "racist and unfit to serve." [57]

26. Committee member Jamie Raskin cosponsored both H. Res. 660[58] and H. Res. 496,[59] voted "yes" on both impeachment trials, [60] and was the lead House Impeachment Manager for the second impeachment trial.[61] Raskin also authored H. Res. 21,[62] H.Res 1987,[63] and H.Res. 8548.[64] In 2018, Raskin set up a panel of mental health experts to publicly discuss the president's mental fitness,[65] has referred to Trump as "a barbarian,"[66] consistently questioned Trump's mental capacity,[67] repeatedly pushed the phony Russia hoax,[68] and, revealing his clear intent to use Congress' investigatory powers for a judicial function, publicly stated that "We have to come up with a legislative mechanism for calling a president to account if he decides to turn the White House into a for-profit enterprise. We cannot allow that precedent to stand."[69]

27. Committee member Adam Schiff voted "yes" on H.Res. 660,[70] was the lead investigator for the first Trump impeachment trial of President Trump,[71] and voted yes for both impeachments.[72] He also cosponsored H. Res. 21.[73]

28. Committee member Zoe Lofgren voted "yes" on H. Res. 660, [74] cosponsored H. Res. 24,[75] and H.R. 1987, [76] and voted "yes" on both impeachment trials. [77] In 2017, Lofgren served as a member of the Democracy Reform Taskforce that claimed President Trump had "shown blatant disregard for the laws and norms in place to prevent public corruption."[78]

Lofgren also boycotted the inauguration of President Trump in 2017.[79]  In revealing her desire for Congress to wield more judicial power, she opined that Congress needs "more enforcement authority."[80] She also introduced a resolution urging a "medical and psychiatric evaluation of US President Donald Trump."[81] Illustrating her desire to publicly humiliate and shame the president and incite public hatred, Lofgren stated that "POTUS is an ignorant bigot trying to delegitimize duly elected Members of Congress based on ethnicity and gender. President Trump shames our country."[82] That Lofgren wants to use the investigatory and impeachment powers of Congress to serve a judicial function and thereby, in the ultimate punishment, end the political career of President Trump is evident in her saying that it "was both constitutional and necessary to impeach and convict former President Trump...and to disqualify him from holding future office.[83]

29.     Committee member Elaine Luria voted "yes" on H.Res. 660,[84] cosponsored H.Res. 24,[85] voted "yes" on both Trump impeachments, [86] and boycotted Trump's 2020 State of the Union address.[87]  That she has not hesitated to sit as both judge and jury of President Trump in her quest to inflict punishment upon the president is evident in remarks about Trump such as ""It is clear to me that he has betrayed the public trust and abandoned his obligations to the Constitution by elevating his own interests over the national interest. Allegations of this gross misconduct meet the threshold of high crimes and misdemeanors set by the Constitution."[88]

30.     Committee member Pete Aguilar likewise voted "yes" on both impeachments[89] and cosponsored H.Res. 24[90] which initiated the second impeachment.  He also voted "yes" on H.Res. 660.[91]  In acting as judge and jury in the second impeachment trial, Aguilar insisted as if it were fact that "The fact is that President Trump attempted to use the power of his office to

coerce a foreign government to interfere in an American election."[92]  This was not a fact at all; it was merely an accusation designed to punish and humiliate.

     31.    Committee member Stephanie Murphy voted "yes" on H.Res. 660[93] and both impeachments[94] while cosponsoring H.Res. 24. [95]  In a May 22, 2019 letter "My Thoughts on Impeachment," Murphy clearly expresses her intention to use the investigatory powers of Congress in a judicial function to coerce and punish not just President Trump but "anyone in his administration" that dares to defy a congressional subpoena: "Should President Trump or anyone in his Administration ignore a final federal court order to turn over information that Congress has requested, I would consider it a threat to our careful system of checks and balances and would therefore <u>support an impeachment inquiry on that individual</u>—the first step in the impeachment process and one that <u>better empowers</u> congressional investigators to attain documents and testimony."[96]  [emphasis added]

     32.    Key Committee members were also instrumental in perpetrating a now deeply discredited "Russia Hoax."[97]  This was the spurious and now discredited claim that the 2016 Trump Campaign colluded with Russia to defeat Hillary Clinton and that Russia preferred Trump over Clinton because Russian intelligence operatives had damning evidence they could use to blackmail Trump once he ascended to the Oval Office.[98]

     33.    The alleged "facts" of the Russia Hoax turned out to be a fiction ginned up by Democrat operatives paid by the Clinton campaign. These operatives, most prominently former British intelligence officer Christopher Steele, created a phony "Steele Dossier"[99] that created the false Russia Hoax narrative. The FBI would then use this dossier to bogusly obtain Foreign Intelligence Surveillance Warrants (FISA) warrants to spy on members of the Trump campaign. As events unfolded, the whole hoax itself would be given institutional credence by a series of

false statements.[100]

34.   Committee member Adam Schiff was the *de facto* leader in Congress pushing the Russia hoax and a primary source of false statements, to the point of being caught repeatedly in lies during his public appearances.[101] Upon becoming House Intelligence Committee Chairman in 2019, Schiff hired investigators and other personnel to launch the Russia Hoax investigation, and later expanded a probe into President Trump "beyond Russia" to investigate Trump's connections to other foreign countries.[102]

35.   The Chair of the Committee, Bennie Thompson created a task force in 2017 as part of the perpetuation of the Russia hoax.[103]

36.   This lengthy legislative history likewise illustrates how Speaker Pelosi has sought to weaponize the investigatory powers of Congress in pursuit of a judicial function aimed at the punishment of Donald Trump and senior advisers such as myself.  Pelosi called for an FBI probe in February 2017 into President Trump's alleged financial and personal ties to the Russian government as part of the perpetuation of the Russia hoax and called for a second investigation in October 2017.[104] She endorsed the push to censure President Trump after events in Charlottesville.[105] She voted yes to impeach President Trump twice and oversaw the second impeachment trial. In 2020, Pelosi backed H. R. 8548[106] and is the chief architect of and catalyst for her own "unprecedented" Committee now seeking to punish and humiliate President Trump and incite public hatred against Trump, and by implication, Trump advisers such as myself.[107]

37.   As perhaps the most graphic illustration of how Pelosi and committees such as the Committee in this case are pursuing a highly punitive judicial *cum* political function, Pelosi was caught in a private meeting saying that "I do not want to see him impeached, I want to see him in prison."[108] She has described the President, himself, as "a hoax."[109] [emphasis added]

45

38.     From this broad, dynamic review of the legislative history, it should be clear that for more than five years, the American Republic has been cursed with various Democrat kangaroo courts and legislative acts in pursuit of a judicial *cum* political function often with the same Democrat kangaroos running those courts and sponsoring those acts.

39.     In this case, Speaker Pelosi, along with all seven Democrat members of the Committee, have yet again established a kangaroo court that has empowered them to act as judge, jury, and executioner through a judicial function replete with (1) multiple forms of punishment aimed at shaming, humiliating, banishing, ostracizing, and inciting public hatred; (2) the removal of President Trump from office; and (3) the punishing, including possible imprisonment, of his most trusted senior advisors.   This is all being done through the unconstitutional weaponization of Congress' subpoena power and resultant punishment, coercion, and threats.

40.     The two Republican members of the Committee have a similar, albeit shorter, legislative history that reveals the score-settling nature of their assaults on President Trump and his advisors through the weaponization of the Committee's investigatory powers. Both Liz Cheney and Adam Kinzinger voted "yes" on the second impeachment trial of Donald Trump while Kinzinger repeatedly sided with the Democrats on the Russia hoax.   Kinzinger also publicly issued a statement asking President Trump to delete his Twitter account in December 2020 after President Trump was calling for investigations into the 2020 election.

41.     For his anti-Trump activities, Kinzinger was forced out of running for reelection by the subsequent backlash, holds Trump responsible and clearly has a score to settle with Trump.  In addition, Kinzinger is also considering a run for president so the elimination of the frontrunner Trump in the 2024 election through punishment and humiliation would be in

Kinzinger's self-interest.[110]

42.     Liz Cheney is a long-term foe of President Trump because of Trump's perennial criticism of Cheney's father; Vice President Dick Cheney. According to Trump, Vice President Cheney played a major role in prosecuting the "endless wars" of Afghanistan and Iraq, wars that killed hundreds of thousands of people and drained trillions of dollars of treasure from our Republic.[111]

43.     That Cheney, along with the Chair Bennie Thompson, seek to use the Committee's subpoena power in a judicial function in violation of the principle of separation of powers is evident in their public statements that the purpose of their investigation is to ensure "those who are responsible for the attack are held accountable,"[112] to "tell the complete story of the unprecedented and extraordinary events of January 6th,"[113] and to "get answers for the American people about what happened on January 6th."[114] The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice- Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

44.     This lengthy legislative history spanning a period of nearly five years reveals obvious, overwhelming, and indisputable proof that Speaker Pelosi and members of the Committee have a well-established pattern of seeking to weaponize the investigatory powers of Congress behind the mask and shield of facially valid legislative acts while simultaneously pursuing punitive, unconstitutional judicial agendas. In this case, the clear arc of the Committee's investigation has to been to build a criminal case against President Trump while

four of the president's most senior advisers have been held in contempt and face possible prison terms and fines.

45.    Given that this Committee and its members been so clearly flushed out in the open in its pursuit of a judicial function by their legislative history, it is incumbent upon this court to address the controversy presented in this case.  To put this in a more textured, policy-analytic way, a clear controversy to be settled in this case by this court is whether there is a <u>threshold</u> above which the simultaneous exercise of a judicial function is sufficient to render illegal any legislative acts taken under the flag, and behind the shield of, the facially valid legislative function. Considering the facts presented in this case, no reasonable court would deny the need for such a threshold balancing test.  Nor, upon review of an abundance of evidence of a judicial *cum* political function of the Committee, would a reasonable court deny that in this case, that threshold has been more than exceeded.

46.    It is incumbent upon this court therefore to take Speaker Pelosi at her word. To recap, Pelosi has described the formation of this kangaroo court of a Committee as "unprecedented";[115] and it is indeed unprecedented for a rabidly partisan and score-settling congressional Committee that lacks no ranking minority member and fails to abide even by its own authorizing resolution to wield such powerful investigatory powers in pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  <u>With her "unprecedented" pronouncement, Pelosi thereby has invited this court to establish new precedent in a new time where the weaponization of Congress' investigatory powers for judicial ends threatens to become  the new norm , thereby upsetting  balance of power among the three major branches of government.</u>

47.    As a private citizen and a former senior advisor to President Trump, I stand as

48

collateral damage from the unlawful and unconstitutional efforts of Speaker Pelosi and the Committee members to incite public hatred, punish through shame, humiliation, ostracization, and banishment, and perhaps even imprison Donald Trump and many of those like me associated closely with him.

48.     I am seventy-two years old.  I have spent my entire career in some form of public service – from the Peace Corps and more than twenty-five years as a professor at the University of California to my years in the White House.  Through my White House service, I can lay claim to saving thousands of American lives during the pandemic, helping President Trump create millions of jobs, and addressing numerous national and economic security issues related to the economic aggression of Communist China.  At this stage in my career, I should be allowed to retire with all of the thanks and honors and dignity and grace normally afforded people with such a resume.  Instead, I have been hauled before the Committee's kangaroo court, subjected to public hatred, and been forced to endure all the other punishments they can muster with their false accusations and threats of criminal prosecution.   Only by squarely addressing the controversies in this case and by granting the declaratory and injunctive relief that I seek will this punishment cease and be redressed.

## The Committee's Subpoena and Report 117-284 and H.Res. 1037 Violate the Constitutional Proscription Against Bills of Attainder

1.  Article I, Section 9, Clause 3 of the Constitution states that "No Bill of Attainder … Law shall be passed."

2.  *Nixon v. Administrator of General Services* defines a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  See *United States* v. *Brown*, 381

U.S. 437, 445, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315-316 (1946); *Ex parte Garland*, 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri*, 4 Wall. 277, 323 (1867). *Nixon v. Administrator of General Services*, 433 U.S. 425, 468-69 (1977).

3. *United States* v. *Lovett* notes the need for a <u>liberal interpretation</u> of what constitutes a bill of attainder: "(a) The Bill of Attainder Clause , Art. I, § 9, cl. 3, was intended to implement the separation of powers among the three branches of the Government by guarding against the legislative exercise of judicial power . Pp. 441-446.  (b) The Bill of Attainder Clause is to be <u>liberally construed</u> in the light of its purpose to prevent legislative punishment of designated persons or groups. *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *United States* v. *Lovett*, <u>328 U.S. 303</u>. Pp. 447-449." [emphasis added]

4. *United States v. Brown* makes clear that "[l]egislative acts, <u>no matter what their form</u>, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."  *United States v. Brown, 381 U.S. 437, 448 (1965)*. [emphasis added]

5. The Committee's subpoena and along with the Committee's Report 117-284 and H. Res. 1037 all represent forms of "legislative acts" under settled law. *United States v. Brown*, 381 U.S. 437, 448 (1965).  Each of these legislative acts identifies me as a named individual; and each violates the Constitutional proscription against bills of attainder.

6. Historically, common bill of attainder punishments have included "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Bellsouth Corporation v. F.C.C*, 162 F.3d 678, 685 (D.C. Cir. 1998).[116]  In this case, I

face possible imprisonment of up to one year – more than one-fourth of my remaining expected life as well as the confiscation of up to $100,000 of my retirement savings, a significant share of those savings.

7. In this case, a Democrat-controlled House of Representatives has voted overwhelmingly along party lines[117] on the basis of the Committee's subpoena and the Committee's Report 117-284 to hold me in contempt of Congress without the benefit of addressing Congress on this Resolution and without the benefit of a judicial trial. Furthermore, this legislative act has been taken based on an invalid and unenforceable subpoena that violates the principle of separation of powers and thereby falsely associates me with unpatriotic and treasonous efforts to overturn what Committee members insist was a fair election despite abundant evidence to the contrary, thereby inciting public hatred of me. Through these legislative acts, the Democrat-controlled House has thereby subjected me to the punishments of shame, humiliation, ridicule, banishment, public hatred, and ostracization at great reputational cost.

8. If the U.S. Attorney for the District of Columbia chooses to act on H.Res. 1037 and charge me with contempt of Congress – as has already been done in a similar case involving a former Trump senior adviser[118] – I face significant additional punitive consequences in the forms of both imprisonment for up to one year and the punitive confiscation of my property, i.e., up to a $100,000 fine.

9. Even prior to, or absent any, any move to imprison and fine me by the U.S. Attorney, H.Res. 1037 is a punitive act of economic coercion and psychological terror designed to bully me into bending to the will of an illegally constituted Committee in unconstitutional pursuit of a judicial function.

10. H.Res. 1037, in and of itself, represents economic coercion and a de facto confiscation of my personal property because in order to defend myself against this bill of attainder, I must either spend what may well add up to more than $100,000 on legal representation. Alternatively, as I have chosen, I must do the legal work *pro se* and thereby pay the substantial opportunity costs of the time I must use by writing this brief and representing myself.

11. In addition, the stigma and public hatred that has come from a contempt charge implying a treasonous attempt to overthrow an allegedly fair election has turned me into a pariah in many academic and corporate quarters and thereby cost me remunerative opportunities ranging from teaching, lecturing, and public speaking to appearing on otherwise Republican-friendly networks like Fox News, e.g., Fox has adopted a cancel culture policy of refusing to put pro-Trump people like me on the air who question the results of the November 3 and are associated, falsely or otherwise, with the events of January 6. The loss of these remunerative opportunities has significant financial implications as teaching stipends and speaking fees have historically been important sources of my income stream while appearances on networks like Fox help promote the books and articles I write and thereby generate sales and royalties. Most broadly, the harm to my reputation has been incalculable.

12. It is well worth noting that a common political tactic used on both sides of the aisle is to engage in "lawfare" to tie up the time and resources of political rivals and possibly put them in jail. In this case, the Committee is simultaneously pursuing a judicial, rather than a purely legislative, function and brazenly violating the Bill of Attainder Clause in its efforts to ensnare Donald Trump and his most senior advisers in their tar pit of false

allegations, endless litigation, possible imprisonment, and the de facto confiscation of my

personal property by necessitating expenditures on legal representation or incurring the

opportunity costs of representing myself.

13. H.Res. 1037 as a legislative act represents a punitive psychological terror as well.  At 72

years old, a one-year prison sentence would indeed take more than a quarter of my

remaining expected life – the average expected life of a male in America is 76 years[119] --

while a $100,000 fine would confiscate a significant slice of my retirement nest egg.  I do

not look forward either to a prison cell or to having to choose between food or medicine

as far too many American senior citizens must do just because an uber-partisan and score-

settling kangaroo court decided to slap me with a bill of attainder and drain my pockets.

14. The set of deprivations that I face from the legislative acts of the Committee and H.Res.

1037 are "so disproportionately severe and so inappropriate to nonpunitive ends that they

unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of

General Services*, 433 U.S. 425, 473 (1977).

15. In reviewing whether the legislative acts of the Committee and H.Res. 1037 constitute

bills of attainder, *Nixon v. Administrator of General Services* provides this court with a

number of possible tests, including most pertinently: (1) "the law plainly must be held to

be an act of nonpunitive legislative policymaking" for it not to be considered a Bill of

Attainder; (2) the "legislative history" must indicate that "the acts are "regulatory and not

punitive in character?" 408 F. Supp., at 373;" and (3) any given legislative act must use

the "less burdensome alternative" to achieve "its legitimate nonpunitive objectives."

*Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).

16. In the Nixon case, the Court found no evidence of a punitive component in the regulatory

act in question and therefore no bill of attainer issue.[120] In this case, however, the Committee's subpoena, its recommendation to hold me in contempt of Congress, and the passage of H.Res. 1037 clearly fail Test One. With all the threats of imprisonment and confiscation of my property along with the reputational harm, banishment, and ostracization these legislative acts carry, they each and together have an undeniable strong punitive objective. That punitive objective is to bully and coerce me into violating what I believe to be my patriotic duty and obligation under the traditional institutions of executive privilege and testimonial immunity. The presence of such a strong punitive objective, in turn, points to a clear violation of the bill of attainder clause according to Test One.

17. With Test Two, and as noted in *Doe v. Selective Service System,* the court in the Nixon case analyzed whether the law, viewed through the lens of its <u>legislative history</u>, reasonably could be said to "further nonpunitive legislative purposes" and concluded in the affirmative, thereby rejecting the bill of attainder claim by Nixon. *Doe v. Selective Service System*, 557 F. Supp. 937, 944 (D. Minn. 1983).

18. In this case, however, we clearly and firmly must reach the opposite conclusion as the legislative history of the Committee, together with the legislative history of Speaker Pelosi and the Committee members over a period spanning more than five years, points clearly to a punitive exercise of legislative power – and therefore the pursuit of a judicial function.

19. To recap, we reviewed the legislative history of the Committee, its members, and Speaker Pelosi at length in the previous section of this brief; and it provided this court with an undeniable spectacle of a series of kangaroo legislative acts and kangaroo courts formed

54

with many of the same "kangaroos" populating the Committee all seeking to punish President Trump and his advisers. From this legislative history, we must conclude that Test Two in this case points clearly to bills of attainder in the legislative acts of the Committee and Democrat-controlled House that specifically identify me by name.

20. It is worth noting here that *U.S. v. Brown* calls for such a full and dynamic analysis of the relevant legislative history when parsing bill of attainder issues, which is why in this case, we must provide such a legislative history analysis <u>not just of the Committee but its individual members as well as Speaker Pelosi.</u> Notes *U.S. v. Brown:*

> The Bill of Attainder Clause was not to be given a narrow historical reading ... but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups. *United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> The proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. *United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> [T]he Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. *United States v. Brown, 381 U.S. 437, 442 (1965)*

21. <u>It is Test Three offered in Nixon v. GSA that should remove any legal doubt that the</u>

legislative acts of the Committee and H.Res. 1037 represent bills of attainder. To recap, this test speaks to the need to "inquire into the existence of less burdensome alternatives" by which a "legislature could have achieved its legitimate nonpunitive objectives. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). [emphasis added]

22. Clearly, if the Committee in this case has failed to rely on "less burdensome alternatives" to achieve its alleged "legitimate nonpunitive objectives," that furthers the case that the legislative acts of both the Committee and House of Representatives to pursue contempt of Congress charges against me constitute bills of attainders.

23. In this case, there surely was, as a matter of both fairness and due process, two far less burdensome alternatives available to the Committee to achieve its putatively "legitimate nonpunitive objectives": (1) negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and/or testimonial immunity; and (2) a civil suit to enforce compliance with the subpoena rather using coercion and terror through a threatened criminal prosecution.

24. In my email response to the Committee on March 1, 2022, I indicated: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter." That was the Committee's least burdensome alternative; yet, it appears to make no effort pursuit this alternative.

25. As a matter of due process and to avoid bill of attainder complications, the Committee could and should have pursued this far less burdensome alternative of negotiation than the one it chose. Instead, either by coincidence or explicit or tacit collusion, the

Committee made an end run around Trump's invocation of executive privilege and testimonial immunity through the attempted stripping of that privilege and immunity by the incumbent president Joe Biden.

26. To recap, this end run is evident in Deputy Counsel to the President Jonathan Su's letter to me of February 28, 2022. Su notified me that "President Biden has determined that an assertion of executive privilege is not in the national interest" and that "[f]or the same reasons...President Biden...will not assert immunity to preclude you from testifying before the Select Committee." Yet, as this brief will address further in the next section, in the absence of criminal conduct, there is no settled law in support of such a fanciful and absurd action by an incumbent president to strip either executive privilege or testimonial immunity from a predecessor and those senior advisers like me who may have served that predecessor.

27. As a matter of fairness and due process and in the clear absence of settled law in support of the dubious right of an incumbent president to strip a predecessor of both privilege and immunity, it was incumbent upon the Committee to pursue the least burdensome alternative by directly negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and related testimonial immunity. This was particular true because I made it clear publicly that I would abide by any decision made by President Trump in this matter: "If President Trump waives the privilege, I would be happy to testify."[121] Clearly, I am indicating to the Committee my full cooperation pending the outcome of their negotiation. Instead of pursuing such a negotiation, this kangaroo court of a Committee chose to dive right into the deep end of the pool of unsettled law on the rights of incumbent versus former presidents as regards the invoking or waiving of

executive privilege and the related testimonial immunity of senior White House advisors.

28. If the right of an incumbent president to strip his immediate predecessor of executive privilege and testimonial immunity were settled law, the Committee might have a leg to stand on in defending itself against the "failure to pursue the less burdensome alternative" charge I make in this brief. But for the Committee to proceed with the far more burdensome alternative of holding me in criminal contempt of Congress against the backdrop of a far from resolved controversy for which there is no settled law smacks of a purely partisan and punitive measure and exercise of the judicial function and further solidifies the bill of attainder case.

29. I include further in this record that in my email response of March 1, 2022 to the Committee, I also point out the following: "In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact." Clearly, much of the documentary material that the Committee with its subpoena was insisting that I provide was in the hands of the government itself. One wonders if the Committee has sought to obtain this material as a "less burdensome alternative." If so, the only remaining documentary material seemingly in play in their subpoena would be that of phone messages and email on my private accounts. Here, the less burdensome alternative would have been to simply subpoena such information from the service providers as they did with, for example, former Trump Chief of Staff Mark Meadows.[122] If the Committee did so, then they would have needed nothing from me and the contempt charge would have been all but moot.

30. To recap, negotiating directly with President Trump and his attorneys over a full or partial waiver in my case of executive privilege and/or testimonial immunity would clearly have been the least burdensome alternative the Committee could have pursued to achieve its alleged nonpunitive legislative end. Yet, there was also a second least burdensome alternative available to the Committee and the House well short of a criminal prosecution.

31. As the opinion of District Judge John D. Bates in *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008) makes clear, the second least burdensome alternative would have been to pursue a civil suit rather than a criminal prosecution. As OLC put it in a memorandum, a civil action would be superior because "Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008). [emphasis added]

32. In *Committee on Judiciary v. Miers,* "[t]he Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, ask[ed] the Court to declare that former White House Counsel Harriet Miers must comply with a subpoena and appear before the Committee to testify regarding an investigation into the forced resignation of nine United States Attorneys in late 2006, and that current White House Chief of Staff Joshua Bolten must produce a privilege log in response to a congressional subpoena. *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008).

33. *Miers* was a situation where Democrats controlled the House of Representatives as in this case but, unlike in this case, the Democrats faced an uncooperative Republican president

and Attorney General. This effectively foreclosed the far most burdensome alternative of the highly punitive criminal prosecution Democrats originally sought.

34. After the Democrat-controlled House passed a resolution recommending criminal contempt charges against both Miers and Bolten – as the House has done against me in this case – the Republican Attorney General declined to prosecute. At that point, illustrating the viability of the less burdensome civil suit option while acknowledging the partisan nature of the battle, the Judiciary Committee filed the suit against Miers. As noted in this lengthy passage from the *Miers* opinion:

*Frustrated by the Executive's actions, the full Committee met on July 25, 2007 and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for contempt of Congress for refusal to comply with subpoenas issued by the Committee." See 153 Cong. Rec. D1051-01 (2007). Chairman Conyers provided Mr. Fielding with a copy of the Committee's report in the hope that it might prompt the White House voluntarily to change its position. See Pl.'s Stmt. of Facts ¶ 52. He received no response. So, on November 5, 2007, the Committee filed its report with the full House of Representatives. Id. ¶ 54. Once again, Chairman Conyers wrote to Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute." Id. ¶ 55. This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse." Pl.'s Mot. Ex. 34. He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal. Id.*

*The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the*

*Department has determined that non-compliance . . . with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee — invoking Resolution 980 — filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.*

*In support of the case before being "a justiciable controversy" and therefore a viable less burdensome alternative – not the reference to "not inflicting punishment" -- the opinion of District Judge John D. Bates cites "[t]wo significant OLC [Office of Legal Counsel] opinions issued during the Reagan administration" germane to this case.*

*In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce subpoenas issued to executive officials. See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion"). As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court. When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt." Id. at 142 (emphasis added). That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, see id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal*

61

*prosecution loomed over the President's close advisors, see id. at 142. Significantly, OLC also determined that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." Id. at n. 42. Thus, neither criminal prosecution nor inherent contempt could be employed against a recalcitrant executive branch official, as OLC saw it.*

*Instead, "Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." Id. at 137. As OLC put it, a civil action would be superior because:*

*Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate its legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality. Id. ...*

*A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper reached the same conclusion. See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion"). In that opinion, OLC restated its position that Congress may institute "a civil suit seeking declaratory enforcement of [a] subpoena." Id. at 83. Likewise, OLC indicated that although inherent contempt is theoretically available to Congress and could ultimately be challenged by the executive branch through a writ of habeas corpus brought by the detained official, "it seems most unlikely that Congress could dispatch the Sergeant at-Arms to arrest and imprison an*

*Executive Branch official who claimed executive privilege." Id. at 86. Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008).*

35. In this case, the highly partisan Committee and Democrat-controlled Congress in all likelihood believe they have a friend in a Democrat Attorney General who will help them use the criminal prosecution alternative to apply maximum coercive pressure in support of their punitive ends. Yet, this is clearly not the less burdensome alternative.

36. *Miers* makes clear that a civil suit in this case does indeed represent a justiciable controversy and a far less burdensome alternative than a criminal prosecution involving a contempt of Congress charge against me, with all its accompanying economic coercion, psychological terror, and other punishments. That the Committee and its members and the Democrat majority in the House instead pursued the single most burdensome option of criminal prosecution confirms the bill of attainder nature and punitive objective of their coercive tactics. In this way, the Committee and its members along with the Democrat-controlled House miserably fails Test Three of *Nixon v. Administrator of General Services* and thereby confirms their legislative acts represent bills of attainder.

37. In summary, H. Res. 1037 and the Committee's Report along with the subpoena issued by the Committee that constitutes the basis for its contempt charge, together and separately violate the Bills of Attainder Clause of the Constitution. H. Res. 1037 should thereby be ruled by this Court as an invalid legislative act, both the Committee subpoena and Committee Report should likewise be ruled illegal and unconstitutional, and the U.S. Attorney for the District of Columbia should be enjoined from any further action in this matter.

**An Incumbent President Cannot Waive the Executive Privilege of His Predecessor or Testimonial Immunity of Senior Advisers Not Serving that Incumbent**

1.      We come now to more squarely address the third major controversy in this case: What rights, if any, does an incumbent president have to strip away executive privilege from a predecessor or other former presidents and/or to waive testimonial immunity for the senior advisors of a predecessor or other former presidents?  Because this controversy is so central to this case, because there is no settled law, and because it has such broader implications for the future viability of executive privilege and testimonial immunity as positive forces for effective presidential decision-making, it is a controversy ripe for judicial review.

2.      That this controversy is even a controversy stunned me when I first heard of it. While I am not a lawyer, I'm not without legal expertise.  One of my areas of expertise in economics for which I have a Ph.D. in is regulatory economics; and this sub-field requires a keen understanding of regulatory law.  I am therefore not without experience in reading case law and parsing legal arguments, and I have also published numerous articles in law journals.[123] When I was made aware that the Committee was going to try to circumvent my duties and obligations under the executive privilege invoked by President Trump and deny me the protections of testimonial immunity by having President Biden strip Trump and myself of these bulwarks of presidential decision-making, I began reading what little case law there is about the viability of such a blatant end run around due process. *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of

64

really useful and unambiguous authority applicable to concrete problems of executive power.").

3.    Upon review of this sparse and anything but settled law, I didn't know whether to laugh at the absurdity of the attempted legal end run of the Committee and White House or cry at how low the Democrats appeared to be willing to stoop that they would be willing to wreck both executive privilege and testimonial immunity as their means to achieve the end of Donald Trump and advisers like me.

4.    The tradition and institution of executive privilege dates back to the days of George Washington, who saw immediately the separation of powers dangers inherent in a legislative branch given free reign to meddle in the affairs of the executive branch.

5.    The *Legal Information Institute* defines executive privilege as "the power of the President and other officials in the executive branch to withhold certain forms of confidential communication from the courts and the legislative branch[124] while Senate.gov sees executive privilege "as a collection of different rights, united by the general principle that the president and key advisers must be able to have internal discussions without fear of exposure."[125]

6.    *Ala. Educ. Ass'n v. Bentley* likewise notes: "Executive privilege "refers to a doctrine under which "documents from a former or an incumbent President [or, arguably, the chief executive of a state government] are presumptively privileged." *United States v. Poindexter,* 727 F. Supp. 1501, 1505 (D.D.C. 1989) (citing *United States v. Nixon,* 418 U.S. 683, 708-13 (1974) *Ala. Educ. Ass'n v. Bentley*, Civil Action No. CV-11-S-761-NE, at *26 (N.D. Ala. Jan. 7, 2013).  However, this definition is too limiting as it excludes the private conversations between and among presidents and advisers for which there are no "documentary materials," as defined by the Presidential Records Act.[126]  [emphasis added]

7.    The common legal thread in each of these definitions is that that the institution of

executive privilege is critical to effective presidential decision-making as executive privilege (along with the companion institution of testimonial immunity) provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

8.      As *United States v. Nixon* notes: "A President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately." *Mazars, 140 S. Ct. at 2032* further notes that the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977)

9.      It follows from this principle that the more executive privilege (and testimonial immunity) are <u>qualified,</u> the less  candor there is likely to be in the conduct of official White House business and the less optimal presidential decision-making will likely be.  Yet settled law is sparse as regards how executive privilege should be qualified. This is partly a function of the relatively few cases that have addressed matters of executive privilege. As *Comm. on Judiciary v. McGahn* notes: "To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, 'there were [still] very few cases dealing with the investigative power.'" *Id.* at 194, <u>77 S.Ct. 1173</u>. *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 181 (D.D.C. 2019).

10.     As previously noted in *Trump v. Mazurs*, much of the time, disputes over executive privilege between the executive and legislative branches have been negotiated in the "hurly-burly" of the political arena and therefore case law on this subject is sparse:  "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).

11.     The few generally accepted principles considered to be settled law date back to the *United States v. Nixon* a.k.a. the Watergate scandal and *Nixon v. Administrator of General Services*.

12.     The Watergate Scandal opened the door to the qualification of privilege <u>in the presence of criminal conduct</u>, e.g., the privilege is waived if the communications are criminal in nature.   Yet, this qualification would indeed quickly be "cabined" to the criminal sphere. *Committee on Judiciary v. Miers* notes: "*Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums* , <u>561 F.2d at 245–46</u>." *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 540 n.11 (D.C. Cir. 2020)

13.     *United States v. Nixon* also helped confirm that "the Judiciary is the ultimate arbiter when it comes to claims of executive privilege" while "the *Miers* opinion stands for the proposition that    courts    have    federal    jurisdiction    over subpoena enforcement

disputes between the Legislature and the Executive branch, and that such disputes are justiciable…." *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 173 (D.D.C. 2019).

14.    Note that *Comm. on Judiciary v. McGahn* is a highly flawed opinion that was overturned on appeal.  Comm. On Judiciary of U.S. House of Representatives v. McGahn, 951 F.3d 510 (D.C. Cir. 2020).  Nothing in it qualifies as precedent.

15.    *Nixon v. Administrator of General Services* likewise makes clear that incumbent presidents are not the only ones who can claim executive privilege: "We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them." *Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977).  Yet this case also put forth the dubious proposition based on a District Court ruling – and again cast within the shadow of possible criminal activity -- that the claims of a former president "carries much less weight than a claim asserted by the incumbent himself." *Id.*, at 345." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448 (1977).

16.    *United States v. Nixon* also helped set the precedent that the applicability of executive privilege should be decided on a case-by-case basis by weighing the need to protect confidentiality and preserve executive privilege against the need for the administration of justice.[127]  Yet, as previously noted with the "cabined" reference, this principle itself was again limited by the context of the case itself with respect to the criminality involved.  "[T]he Supreme Court in United States v. Nixon explicitly cabined its opinion to the criminal arena. See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.")." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008).

[emphasis added]

17.     Of course, it may be arguable that neither presidents nor their advisors should be shielded in ways that would allow criminal conduct to flourish. But it must be at this criminal water's edge where the qualification of executive privilege and testimonial immunity by both the Committee and the White House must stop if these two important bulwarks of effective presidential decision-making are to be maintained. At this water's edge, there is not a scintilla of settled law over the controversy as to whether an incumbent president can waive the privilege of his or her predecessor and/or the testimonial immunity of that predecessor's senior advisers. To recap, *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

18.     While the Committee and its lawyers are free to make whatever arguments they might want in support Joe Biden's actions in this case, the ideas that a sitting president can strip his predecessor or former presidents of executive privilege and the president's most senior advisors of testimonial immunity are both fanciful and absurd on their face. It is even more fanciful and absurd in this case when the sitting president, a Democrat, is seeking to strip the executive privilege of the man he allegedly beat in the 2020 presidential election, Republican Donald Trump, even as both Biden and the Democrat Party are doing everything within their substantial political powers not just to end the presidential career of Donald Trump but to bury any challenges to the fairness and integrity of a 2020 election that remains hotly disputed.

19.     Stripped of rhetoric, allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the alluring banner of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege and testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn executive privilege and testimonial immunity into partisan ping-pong balls and deal a mortal blow to the critical functions each are supposed to serve in our Republic: (1) help uphold the principle of separation of powers; and (2) provide for optimum candor in presidential decision-making.

20.     Even if such instances of an incumbent president waiving the privilege of his predecessor were seen as rare and occurring in only extreme circumstances as *Dellums v. Powell* alludes to, if this were settled law, it would be enough to mortally wound privilege as an essential ingredient of effective presidential decision-making. This is particularly so within the context of this case where it is clear that the Committee has, as previously noted, in all probability either explicitly or tacitly colluded with the incumbent president to have the Trump privilege waived so the Committee can then have its judicial function and bill of attainder ways with President Trump and his most senior advisors. Here, *Dellums v. Powell* has it right when it opines: [T]hose on whom a President relies for advice <u>would be foolish indeed</u> to discuss the demands of executive decision-making with candor, when every proposal would be subject to public disclosure through civil discovery. *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). [emphasis added]

21.     Here, however, *Dellums v. Powell* has it wrong when it argues that it is such a rare

"infrequent" occurrence in which privilege and immunity might be waived that it would not materially affect the risk calculus of future senior White House advisers: "We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977) [emphasis added] and "[T]he need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome." *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

22.    The clear problem with this "relatively infrequent occasions" argument in the context of this case is that the current situation clearly indicates a long term "repeatable game" pattern of partisan abuse of the House's investigatory powers over more than five-year period rather than a "one and done" rare event based on extraordinary circumstances occurring in, as *Dellums v. Powell* qualifies it, the "context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977).   (To recap, this pattern of partisan abuse by the Committee and its members along with Speaker Pelosi was firmly established in a previous section of this brief.)

23.    From my perspective as a trained economist, and through the lens of strategic game theory, I see the punitive legislative acts and chronic pattern of partisan abuses associated with the Committee and its members over a more than five-year period indeed as a "repeatable game" of gotcha and punishment rather than a one-off rare event that that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to:

(1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.

24.     As partisans in the Congress wield their investigatory powers, they will enlist whatever friendly president might be in the White House to strip the executive privilege of former presidents and the testimonial immunity of former senior White House advisors; and it will all be done under the false flags of national emergency and national security. In this case, if the Committee and Joe Biden are able to pull this deadly game off and effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will "tit for tat" lead the charge.

25.     In summary, if the goal is to preserve executive privilege and testimonial immunity to promote optimal presidential decision-making through maximum candor, than the idea that a former president's entitlement to such privilege is somehow of a "lesser weight" than a present president is indeed fanciful and absurd   Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making. Because this is so, the time is ripe for this court to address this controversy.  By ruling in my favor, the court will lift the burdensome punishments now being inflicted upon me and provide the appropriate relief.

26.     I note in closing that as I came to this particular controversy, it was settled law that executive privilege is not my privilege to waive. Absent a waiver of that privilege by President Trump, it was – and remains -- my duty not to comply with the Committee's subpoena.

Importantly, and I repeat, <u>I have also made it clear publicly that I would abide by any decision made by President Trump in this matter.</u>[128]

27. Instead of negotiating directly with President Trump and his attorneys as settled law demanded, the Committee and its members used the Biden unsettled law waiver of privilege and immunity to try to effectively strip me of any legal right, duty, or constitutional obligation I might have had to fail to comply with their subpoena and, after I failed to comply with what I believed their unlawful subpoena, the Committee and Democrat-controlled House pursued <u>the</u> most burdensome and punitive alternative of a criminal contempt charge rather than the less burdensome options of negotiating the privilege with President Trump or filing a civil suit.

28. As a result, I was put in the untenable position in which the president I served under has invoked a privilege that a president that I did <u>not</u> serve under has appeared to waive. Given that it was my sworn duty to uphold the law and abide by the Constitution and that it remains my belief that there is no settled law to support the acts of the Biden White House and Committee and given that I believe the law strongly leans in my favor, I had – and have -- no other honorable choice than to fail to comply with the Committee's subpoena. In the absence of even a scintilla of settled law in this matter, it would be both unlawful and dishonorable for me to consider President Trump's privilege and my own testimonial immunity waived just because Joe Biden says they are.

29. I therefore ask this court to dive into the deep end of this pool and firmly address a controversy that is ripe for adjudication and thereby settle the law in this matter.

**The Plaintiff's Testimonial Immunity is Absolute and His Failure to Comply With a Congressional Subpoena Cannot Be the Legal Basis for a Contempt of Congress Charge.**

1.     Congress cannot lawfully hold the Plaintiff in contempt of Congress for failure to comply with a subpoena that compels him to testify before the Committee because, under long-standing Department of Justice policy, the Plaintiff has absolute testimonial immunity as a senior White House official and has a duty to his country and the executive branch not to comply with said subpoena.

2.     The right of a senior White House official to testimonial immunity is conceptual and legally distinct from executive privilege.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.  As OLC notes:

> *This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making... But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no*

*statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.*

*Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege at 5 (May 23, 1977) ("Harmon Memorandum"); see also Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.*[129]

3. If the testimonial immunity of senior White House officials is absolute and exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, then it can't be waived by the adviser and certainly not by an incumbent president seeking to unlawfully strip his predecessor of both executive privilege and the right to grant testimonial immunity.

4. Only the courts have the power to waive testimonial immunity on a case by case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly. Indeed, if the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such

candor and therefore less optimal decision-making.

5.    I propose the following test for this court to consider: Would a current White House adviser be significantly less likely to engage in the kind of candor necessary for effective presidential decision-making as recognized under *Nixon v. Administrator of General Services* if that adviser understands that any claim to testimonial immunity by that adviser may be waived by a president that adviser did not serve under?  If the answer is yes, then testimonial immunity must be considered absolute in this circumstance or, alternatively, waived only on a case by case basis by the courts with extreme caution.

6.    I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and for which there is no settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of the testimonial immunity afforded to that predecessor's senior White House advisors in the absence of possible criminal conduct -- regardless of whether this is done under the flag of the national interest -- is arguably the most extreme and dangerous form of qualifying testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that testimonial immunity are supposed to serve in our Republic.

# PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a.  A declaratory judgment that the Committee is neither duly authorized nor properly constituted and therefore its legislative acts, including the subpoena issued to the Plaintiff and Committee Report 117-284, are therefore *ultra vires*, unlawful, and unenforceable;

b.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that, as revealed by the legislative history, violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function and are therefore *ultra vires*, unlawful, and unenforceable;

c.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore *ultra vires*, unlawful, and unenforceable;

d.  A declaratory judgment that the Committee subpoena issued to the Plaintiff improperly compels testimony of a senior executive official;

e.  An injunction against the U.S. Attorney for the District of Columbia enjoining him from further proceeding against the Plaintiff "in the manner and form provided by law" as H.Res. 1037 recommends;

f.  An injunction against the U.S. Attorney General enjoining him from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and

unenforceable Committee subpoena dated February 9, 2022; and

g. A declaratory judgment against President Joe Biden that he does not have the legal authority to waive any executive privilege or testimonial immunity invoked by his predecessor in this case.

WHEREFORE, the Plaintiff respectfully requests a jury trial and that the Court enter judgment in his favor and against the Defendants.

Respectfully Submitted,

Date: ~~June 1, 2022~~  May 31, 2022    *Peter Navarro*

Peter Navarro

Plaintiff, *pro se*

801 Pennsylvania Ave NW, Unit 1021

Washington, DC 20004

pknavarro@protonmail.com

202-489-7479

# ENDNOTES

[1] Hoyer, Stenny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," U.S. Congress, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[2] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[3] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[4] Transition Integrity Project, "Preventing a Disrupted Presidential Election and Transition," August 3, 2020. https://s3.documentcloud.org/documents/7013152/Preventing-a-Disrupted-Presidential-Election-and.pdf

[5] Ball, Molly, "The Secret History of the Shadow Campaign That Saved the 2020 Election," *Time Magazine*, February 4, 2021. https://time.com/5936036/secret-2020-election-campaign/

[6] Navarro, Peter, "The Navarro Report," November 2020 – January 2021. https://www.dropbox.com/s/584r7xtnngauc4t/The%20Navarro%20Report%20Vol%20I%2C%20II%2C%20III%20-%20Feb.%202%2C%202021.pdf?dl=0

[7] Axios/Momentive, "January 6th Revisited," January 2022.  https://www.surveymonkey.com/curiosity/axios-january-6-revisited/

NPR/Ipsos, "Public Poll Findings and Methodology," December 2021. https://www.ipsos.com/sites/default/files/ct/news/documents/2022-01/Topline-NPR-Ipsos-poll.pdf

[8] Electronic email from Rep. Bennie Thompson to Peter Navarro, February 9, 2022 transmitting subpoena

[9] Morris, Chris, "10 iconic American companies owned by Chinese investors," *CNBC*, May 11, 2017. https://www.cnbc.com/2017/05/11/10-iconic-american-companies-owned-by-chinese-investors.html?msclkid=d9761daed16b11ec9b17634761de7e42

[10] Hoft, Joe, "Jan 6 Remembered: Ignored By Media And FBI: Antifa-BLM Activists Are Posting Photos and Bragging Online About Storming US Capitol on Jan. 6," *The Gateway Pundit*, January 6, 2022. https://www.thegatewaypundit.com/2022/01/jan-6-remembered-ignored-media-fbi-antifa-blm-activists-posting-photos-bragging-online-storming-us-capitol-jan-6/

[11] Williams, Jordan, "FBI had informant in crowd during Capitol riot: report," The Hill, September 25, 2021. https://thehill.com/policy/national-security/fbi/573915-fbi-had-informant-in-crowd-during-capitol-riot-report/

[12] McFarlane, Scott, et al., "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. "In short: [Dan Scavino and Peter Navarro] played key roles in the ex-President's efforts to overturn the results of the 2020 election…" (Rep. Bennie Thompson) https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

Amri, Farnoush, et al., "Capitol siege Steve Bannon Politics Bennie Thompson Crime Congress Dan Scavino Peter Navarro Donald Trump Subpoenas Jan. 6 committee votes to hold Scavino, Navarro in contempt," *AP News*, March 29, 2022. https://apnews.com/article/capitol-siege-steve-bannon-subpoenas-dan-scavino-peter-navarro-3247f6b7a644ff3e2c6f14d41f6cd0c8

"He hasn't been shy about his role in efforts to overturn the results of the 2020 election and has even discussed the former President's support for those plans…" (Rep. Bennie Thompson)

[13] Navarro, Peter, "In Trump Time: My Journal of America's Plague Year," *All Seasons Press*, November 2, 2021. https://www.amazon.com/gp/product/1737478501?pf_rd_r=EH88QR628VHK7JAYF7MP&pf_rd_p=1ab92b69-98d7-4842-a89b-ad387c54783f&pd_rd_r=6e00e6fc-a73a-4f19-9b0e-e6a63cc1ef41&pd_rd_w=Z7psz&pd_rd_wg=58b0Z&ref_=pd_gw_unk

[14] 3 U.S. Code § 15, "Counting electoral votes in Congress." https://www.law.cornell.edu/uscode/text/3/15

[15] Martin, Alison, "This Week in History: JFK and the Stolen Election," *Chicago Sun Times*, December 16, 2020. https://chicago.suntimes.com/2020/12/16/22176920/jfk-stolen-1960-election-chicago-illinois

[16] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[17] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[18] A fourth choice would have been piecemeal negotiation over what the Committee wanted but after watching the spectacle with Meadows, I wanted no part of that.

[19] Thompson, Bennie, "Resolution Recommending That The House Of Representatives Find Peter K. Navarro And Daniel Scavino, Jr., In Contempt Of Congress For Refusal To Comply With Subpoenas Duly Issued By The Select Committee To Investigate The January 6th At- Tack On The United States CapitoL," U.S. House of Representatives, April 4, 2022. , https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HRPT-117-NA.pdf

[25] The prison term for this offense makes it a Class A misdemeanor. 18 U.S.C. § 3559(a)(6). By that classification, the penalty for contempt § 192 increased from $1,000 to $100,000. 18 U.S.C. § 3571(b)(5).

[20] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivanka-trump-january-6-committee-bennie-thompson/index.html

[21] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivanka-trump-january-6-committee-bennie-thompson/index.html

[22] Yokely, Eli, "Voters Don't Necessarily Think Pleading the Fifth Implies Guilt, But It Varies by Party, *Morning Consult*, May 16, 2018. https://morningconsult.com/2018/05/16/voters-dont-necessarily-think-pleading-the-fifth-implies-guilt-but-it-varies-by-party/#:~:text=51%25%20of%20registered%20voters%20said,independents%20who%20said%20the%20same.

[23] Hains, Tim, "Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty," *RealClear Politics*, December 2, 2021. https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html

[24] Su, Jonathan Letter of Feb 28, 2022.

[25] See, for example: Broadwater, Luke, "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times*, March 24, 2022. https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html

[26] Kaplan, Rebecca, "House committee advances contempt motion against Navarro and Scavino," *CBS News*, April 4, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-contempt-motion-advances-to-full-house/

[27] "Roll Call 118: Bill Number: H. Res. 1037," *Clerk of the U.S. House of Representatives*, April 6, 2022. https://clerk.house.gov/Votes/2022118.

28 Hoyer, Steny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," *U.S. Congress*, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress.

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[29] Pelosi, Nancy, "H.Res.503 - Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," *U.S. Congress*, June 28, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/503?q=%7B%22search%22%3A%5B%22h.res+503+117%22%2C%22h.res%22%2C%22503%22%2C%22117%22%5D%7D&s=1&r=8

[30] Sprunt, Barbara, "Here Are The 9 Lawmakers Investigating The Jan. 6 Capitol Attack," *NPR*, July 27, 2021. https://www.npr.org/2021/07/27/1020713409/here-are-the-9-lawmakers-investigating-the-jan-6-capitol-attack

[31] Beavers, Olivia, et al., "McCarthy makes his 5 GOP picks for Jan. 6 select committee," *Politico*, July 19, 2021. https://www.politico.com/news/2021/07/19/mccarthy-zeroes-in-on-five-gop-members-for-jan-6-select-committee-500201

[32] The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

[33] Pelosi, Nancy, "Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[34] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927). Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160. 7

[36] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[37] "Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation. *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951). In this case, it is painfully and glaringly obvious the Speaker and the Committee and its members have persistently sought to exercise judicial power.

[38] In the light of the Committee's history and the repeated extensions of its life, as well as the successive appropriations by the House of Representatives for the conduct of its activities, its legislative authority and that of the Subcommittee to conduct the inquiry under consideration here is unassailable; and House Rule XI, 83d Congress, which defines the Committee's authority, cannot be said to be constitutionally infirm on the score of vagueness. *Watkins* v. *United States*, 354 U.S. 178, distinguished. Pp. 116-123.

[39] (a) Rule XI has a "persuasive gloss of legislative history" which shows beyond doubt that, in pursuance of its legislative concerns in the domain of "national security," the House of Representatives has clothed the Committee with pervasive authority to investigate Communist activities in this country. Pp. 117-121.

[40] Thompson, Bennie, et al., "To establish the National Commission to Investigate the January 6 Attack on the United States Capitol Complex, and for other purposes," *U.S. Congress*, May 14, 2021. https://www.govinfo.gov/content/pkg/BILLS-117hr3233ih/pdf/BILLS-117hr3233ih.pdf

[41] (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

[42] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[43] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[44] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[45] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[46] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[47] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[48] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[49] Nadler, Jerrold, "H.Res.755 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors.," *U.S. Congress*, December 10, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/755#:~:text=The%20resolution%20sets%20forth%20two,by%20the%20House%20of%20Representatives

[50] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," *U.S. Congress*, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[51] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24

[52] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/21

[53] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[54] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[55] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[56] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[57] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[58] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660/cosponsors

[59] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[60] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[61] Booker, Brackton, "Meet The House Managers Laying Out The Case To Impeach Donald Trump," *NPR*, February 9, 2021. https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/09/965914210/meet-the-house-managers-laying-out-the-case-to-impeach-donald-trump

[62] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/21

[63] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[64] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," U.S. Congress, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[65] Siegel, Ben, et al., "Pelosi proposes experts review a president's mental fitness under 25th Amendment," *ABC News*, October 9, 2020. https://abcnews.go.com/Politics/pelosi-propose-experts-review-presidents-mental-fitness-25th/story?id=73507849

[66] Raskin, Jamie, October 8, 2016. https://www.facebook.com/raskin.jamie/photos/donald-trump-is-a-barbarian-a-bigot-a-lout-a-narcissistic-bully-and-a-serial-vio/10154554019399763/

[67] Raskin, Jamie, May 12, 2017. https://twitter.com/repraskin/status/863212423083417600

[68] Raskin, Jamie, July 16, 2018. https://twitter.com/repraskin/status/1018987611791282177

[69] Peck, Louis, "After Senate trial, Raskin reflects on his role in Trump impeachment process," *Bethesda Magazine*, February 11, 2020. https://bethesdamagazine.com/bethesda-beat/government/after-senate-trial-raskin-reflects-on-his-role-in-trump-impeachment-process/

[70] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[71] Schiff, Adam, "Rep. Schiff's full opening argument in the Trump impeachment trial | Trump impeachment trial," January 22, 2020.

[72] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[73] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as

[74] acting President," *U.S. Congress*, January 12, 2021 https://www.congress.gov/bill/117th-congress/house-resolution/21/cosponsors
[74] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604
[75] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors
[76] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," *U.S. Congress*, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987
[77] "Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117
[78] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracy-reform-task-force
[79] Reilly, Katie, et al., "Here Are the Democrats Boycotting Donald Trump's Inauguration," *Time Magazine*, January 17, 2017. https://time.com/4635411/democrats-boycotting-donald-trumps-inauguration/
[80] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracy-reform-task-force

[81] "Lofgren introduces resolution urging Vice President and Cabinet to fulfill duties under 25th Amendment," U.S. Representative Zoe Lofgren, August 18, 2017. https://lofgren.house.gov/media/press-releases/lofgren-introduces-resolution-urging-vice-president-and-cabinet-fulfill-duties

[82] Lofgren, Zoe, July 14, 2019. https://twitter.com/repzoelofgren/status/1150523317482184705

[83] Lofgren, Zoe, "Lofgren Opening Statement At Hearing, "Oversight Of The U.S. Capitol Police And Preparations For And Response To The Attack Of January 6," *Committee on House Administration*, April 15, 2021. https://cha.house.gov/media/press-releases/lofgren-opening-statement-hearing-oversight-us-capitol-police-and-preparations

[84] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604
[85] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors
[86] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696
"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117
[87] Dougherty, Kerry, "State of the Union: Where Was Rep. Elaine Luria?," February 12, 2019. https://www.kerrydougherty.com/allposts/2020/2/11/state-of-the-union-where-was-rep-elaine-luria

[88] "Congresswoman Elaine Luria Calls for Impeachment," U.S. *Representative Elaine Luria*, September 23, 2019. https://luria.house.gov/media/press-releases/congresswoman-elaine-luria-calls-impeachment

[89] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696
"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117
[90] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress,* January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors
[91] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[92] Aguilar, Pete, "AGUILAR ISSUES STATEMENT AHEAD OF HOUSE IMPEACHMENT VOTE," December 18, 2019. https://aguilar.house.gov/2019/12/18/aguilar-issues-statement-ahead-house-impeachment-vote/

[93] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604
[94] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[95] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress,* January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[96] Murphy, Stephanie, : My Thoughts on Impeachment," May 22, 2019. https://murphy.house.gov/news/documentsingle.aspx?DocumentID=1042

[97] Select Committee on Intelligence, "RUSSIAN ACTIVE MEASURES CAMPAIGNS AND INTERFERENCE IN THE 2016 U.S. ELECTION," *U.S. Senate.* https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf

[98] *United States of America v. Michael Sussman*, In the United States District Court for the District of Columbia, Case No. 1:21-cr-00582, February 14, 2022.

https://fingfx.thomsonreuters.com/gfx/legaldocs/lbpgnwxdyvq/Sussmann-response-Durham-2022-02-14.pdf

[99] Steele, Christopher, "US Presidential Election: Republican Candidate Donald Trump's Activities In Russia And Compromising Relationship With The Kremlin," January 11, 2017. https://archive.org/stream/TheSteelDossierTrumpIntelligenceAllegations/The%20Steele%20Dossier%20-%20Trump-Intelligence-Allegations_djvu.txt

[100] See, for example, Jarrett, Greg, "Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever," *Fox News*, October 7, 2020. Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever | Fox News

[101] George, Andre, "What Are the Consequences for Adam Schiff's Lies?," *Wall Street Journal*, May 22, 2020. https://www.wsj.com/articles/what-are-the-consequences-for-adam-schiffs-lies-11590174358

[102] Schiff, Adam, "Chairman Schiff Statement on House Intelligence Committee Investigation," *U.S. Permanent Select Committee on Intelligence,* February 6, 2020. https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447

[103] "Thompson, Brady Announce Election Security Task Force Members," *U.S. House Homeland Securit Committeey.* July 20, 2017. https://homeland.house.gov/news/press-releases/thompson-brady-announce-election-security-task-force-members

[104] Bennett, John, "Democrats Want Probe of 'Unfit' Flynn's Russia Ties," *Roll Call*, February 14, 2017. https://www.politico.com/story/2017/02/pelosi-trump-russia-23466

Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*, October 30, 2017. https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[105] Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*, October 30, 2017. https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[106] Spakovsky, Hans, "Pelosi Bill to Remove President From Office Is a Needless Political Stunt," *The Heritage Foundation*, October 20, 2020. https://www.heritage.org/the-constitution/commentary/pelosi-bill-remove-president-office-needless-political-stunt

[107] Pelosi, Nancy, "Pelosi Names Members to Select Committee to Investigate January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House*, July 1, 2021. https://www.speaker.gov/newsroom/7121-0

[108] Caygle, Heather, "Pelosi tells Dems she wants to see Trump 'in prison'," *Politico,* June 5, 2019. https://www.politico.com/story/2019/06/05/pelosi-impeachment-1355435

[109] Johson, Marty, "Pelosi: Trump 'himself is a hoax'," *The Hill*, July 2, 2020. https://thehill.com/homenews/house/505679-pelosi-hits-trump-for-calling-russian-bounty-controversy-a-hoax-trump-himself/

[110] Zanona, Melanie, "Adam Kinzinger isn't ruling out a 2024 presidential bid as he considers his future after the House," *CNN,* https://www.cnn.com/2021/11/04/politics/adam-kinzinger-exit-interview/index.html

[111] Signman, Brooke, "Trump says Liz Cheney 'only upset' because he's getting US out of 'ridiculous and costly Endless Wars'," *Fox News,* July 23, 2020. https://www.foxnews.com/politics/trump-says-liz-cheney-is-only-upset-because-hes-getting-the-us-out-of-ridiculous-and-costly-endless-wars

[112] Cox, Chelsea, "Liz Cheney calls for answers, accountability on Jan. 6: 'We must know what happened'," *USA Today,* July 27, 2021. https://www.usatoday.com/story/news/politics/2021/07/27/liz-cheney-statement-jan-6-committee-probing-capitol-insurrection/5375885001/

[113] Thompson, Bennie, et al., "Thompson & Cheney Statement On Pentagon Officials' Reported Actions After January 6th," *Select Committee to Investigate the January 6th Attack on the United States Capitol,* September 16, 2021. https://january6th.house.gov/news/press-releases/thompson-cheney-statement-pentagon-officials-reported-actions-after-january-6th

[114] *John Eastman v. Bennie Thompson*, In the United States District Court for the District of Columbia, Case 1:21-cv-03273, December 14, 2021. https://www.justsecurity.org/wp-content/uploads/2021/12/january-6-clearinghouse-John-Eastman-v-Select-Committee-Verizon-Complaint-Case-1-21-cv-03273.pdf

[115] Pelosi, Nancy, "Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House,* July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[116] "Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign.""

[117] As noted, both Liz Cheney and Adam Kinzinger have been censured by the Republican Party for their actions in this matter.

[118] "Stephen K. Bannon Indicted for Contempt of Congress," *U.S. Department of Justice*, November 12, 2021. https://www.justice.gov/opa/pr/stephen-k-bannon-indicted-contempt-congress?msclkid=20e1a95ccd4d11ec9d22a02aa3d42000

[119] "Mortality in the United States," December 2021. https://www.cdc.gov/nchs/products/databriefs/db427.htm#section_1

[120] This finding was also leavened by the fact that the Nixon case involved "the fair administration of criminal justice." *Nixon v. Administrator of General Services*, 433 U.S. 425, 477-78 (1977) Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States* v. *Nixon*, 418 U.S., at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes*, 408 U.S. 665, 688 (1972); *Blackmer* v. *United States*, 284 U.S. 421, 438 (1932); *Blair* v. *United States*, 250 U.S. 273, 281 (1919). Similarly, Congress' interest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established.

[121] See, for example, Broadwater, Luke, et al., "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times,* March 24, 2020. https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html?msclkid=6ed093bfd17311ecba8e3e7af7cdb5bb

[122] "Report: Jan. 6 Committee Has Subpoenaed Phone Records Of More Than 100 People," *MSN*, December 7, 2021. https://www.msn.com/en-us/news/politics/report-jan-6-committee-has-subpoenaed-phone-records-of-more-than-100-people/ar-AARA6G9

[123] See: The Future of Electricity Deregulation: Lessons Learned From the California Crisis. Energy Law Journal, Summer 2003. "The Restructuring Regulator: A Guidebook and Research Agenda For the Electricity Industry," Energy Law Journal, Fall, 1995. "Fundamental Issues in Natural Resource Damage Assessments," with Richard Carson, Natural Resource Law Journal, Fall, 1988. . "How Markets For Impure Public Goods Organize," with Jeffery Dubin, Journal of Law, Economics, and Organization, Fall, 1988. . "The Legal History and Economic Implications of Oil Pipeline Regulation," Energy Law Journal, Fall, 1981, with T. Stauffer. "Financing U.S. Energy Development: An Economist's Perspective," Energy Law Journal, May 1981, Vol. 2, No. 1p

[124] "Executive Privilege," *Cornell Law School*, https://www.law.cornell.edu/wex/executive_privilege

[125] Blunt, Roy, "Defining The Limits Of Executive Privilege," *Senate Republican Policy Committee*, October 6, 2021. https://www.rpc.senate.gov/policy-papers/defining-the-limits-of-executive-privilege

[126] "The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form. *44 U.S. Code § 2201 – Definitions."* While official written documents are generally in the possession of the National Archivist and governed by the PRA, the PRA is silent about conversations for which there are no electronic recordings or transcripts.

[127] "Executive Privilege," *Cornell Law School*, https://www.law.cornell.edu/wex/executive_privilege and "Neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. See, *e. g., Marbury* v. *Madison*, 1 Cranch 137, 177; *Baker* v. *Carr*, 369 U.S. 186, 211. *United States v. Nixon*, 418 U.S. 683, 684 (1974)".

[128] McFarlane, Scott, "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

[129] See Immunity of the Assistant to the President, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); Immunity of the Former Counsel, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; Immunity of the Counsel to the President from Compelled Congressional Testimony, 20 Op. O.L.C. 308, 308 (1996) ("Immunity of the Counsel to the President "); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("Congressional Demand for Deposition of Counsel "); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Testimony by Presidential Assistants at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Dual-Purpose Presidential Advisers at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.