**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| v. ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT DR. PETER K. NAVARRO'S MEMORANDUM IN AID OF SENTENCING

> And whether [the government] think[s] the President invoked
> [executive privilege] or not here, [Dr. Navarro] thought he
> invoked. . . . I don't know that anybody would really dispute that
> Dr. Navarro thought he was supposed to invoke.
>
> ~The Honorable Amit P. Mehta, Hr'g Tr., at 119:18-23 (Aug. 28, 2023) (ECF No. 148)

\* \* \*

No one statement better encapsulates the very challenge that this Court faces in sentencing Defendant Dr. Peter K. Navarro, one of former President Trump's longest serving advisors and one of several advisors from the Trump Administration to refuse to comply with subpoenas issued by the U.S. House Select Committee to Investigate the January 6 Attack on the U.S. Capitol.  How should the Court sentence a senior advisor who was convicted for acting in a way that comported with the behaviors of several presidential advisors from presidential administrations throughout history?  How should the Court sentence someone whose defense was hamstrung by antiquated precedent and the Court's finding on "an open question"?  "Above the law" is how the government describes Dr. Navarro, but in so doing the prosecution ignores the fact that with novel issues of first impression, like minds might disagree.

Dr. Navarro's trial and conviction involves a series of firsts:  the first time an incumbent President waived the executive privilege of a former President; the first time a senior presidential advisor was charged with contempt of congress by the Justice Department, let alone the Justice Department of a political rival; the first time a District Court held an evidentiary hearing on whether a former President had properly invoked executive privilege; and the first time a senior presidential advisor was convicted, and now is to be sentenced, for following what that advisor reasonably believed was an instruction by the former President not to comply with the Select Committee's subpoenas.  One thing that was not a first for this case, however, is the Court's astute observation that Dr. Navarro found himself in an untenable position.  *Compare Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962) ("Although this question is not before the Court, it does feel that if contempt is, indeed, the only existing method, Congress should consider creating a method of allowing these issues to be settled by declaratory judgment.  Even though it may be constitutional to put a man to guessing how a court will rule on difficult questions like those raised in good faith in this suit, what is constitutional is not necessarily most desirable.  Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights." (quoting *United States v. Tobin*, 195 F. Supp 588, 616-17 (D.D.C. 1961)), *with* Hr'g Tr., at 120:2-9, 19-25, 121:1-2 (Aug. 28, 2023) (ECF No. 148) ("The Court: [S]houldn't we at least demand more of Congress before we subject somebody to contempt after they've invoked a Presidential communications immunity or privilege?  [] So if Congress itself makes a determination that privilege does not apply without resorting to a federal court to confirm that determination, a former senior advisor who was following the instruction of [] the former President is automatically subject to [or] potentially subject to criminal contempt; is that

right?  I mean, that's where we find ourselves, so clearly that's what the Department of Justice thinks.").

Yes, the subpoena which initiated this prosecution arose following the events of January 6, 2021.  But, contrary to the government's misleading opening statement, *see* Trial Tr., at 365:5-12 (Sept. 6, 2023) (ECF No. 150) ("Throughout our history, one President has handed over the reins to his successor from George Washington to John Adams. . . .  But about two years ago, a little over two blocks from here, that cherished tradition almost ended."), his trial was not about January 6, 2021, and his sentence should not reflect any relationship with the events of that day. Rather, as this Court recognized, Dr. Navarro's conviction reflects the application of antiquated, questionable precedent in this District.  History is replete those to have refused to comply with congressional subpoenas, and Dr. Navarro's sentence should not be disproportionate from those similarly situated individuals.  Moreover, and considering the numerous novel issues and open questions with which this Court was confronted, Dr. Navarro should be granted release pending appeal while he seeks appellate review.

Dr. Navarro's sentencing should reflect the tenor of the law giving rise to his conviction. When the base level offense is properly calculated, the offense level begins at four (4), and is lowered by two mitigating circumstances to arrive at a net score of zero (0).  In related cases with a net score of zero, probation is the norm.  Further still, this Court has recognized that Dr. Navarro thought he had been instructed by a former president to invoke executive privilege rather than appear for testimony.  Accordingly, Dr. Navarro respectfully requests the Court sentence him to not more than six (6) months of probation for each count, to run concurrently, and to pay a fine of $100 for each count.

I.    BACKGROUND

Dr. Navarro was one of the longest-tenured cabinet members of the Presidential Administration of Donald J. Trump, and one of the few members of the Trump Administration to begin his tenure on the day of President Trump's inauguration and end his tenure on the day of President Biden's inauguration.  Dr. Navarro advised President Trump on many matters, including but not limited to trade and manufacturing policies, matters of national security, and the Administration's response to the Covid-19 pandemic.

This Court is certainly aware of the events that occurred at the United States Capitol on January 6, 2021.  On July 1, 2021, the House of Representatives established the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").  That Congress wanted to investigate such an unprecedented attack is not surprising.  However, Congress is still bound by its own rules.  *See generally Yellin v. United*, 374 U.S. 109 (1963) (conviction for contempt of congress must be reversed where congressional committee failed to adhere to its own rules).  Given the nature of the events which the Select Committee sought to investigate, the Select Committee's formation was highly contested and ultimately unorthodox.  Pursuant to House Resolution 503, the Select Committee was established to be made up of thirteen (13) total members, eight (8) selected by the Majority Party (Democratic Party) and five (5) selected by the Minority Party (Republican Party).  On July 21, 2023, then-U.S. House Speaker Nancy Pelosi rejected two of then-House Minority Leader Kevin McCarthy's selections, a move that Congresswoman Pelosi has acknowledged was unprecedented.  Press Release, Office of the Speaker of the United Staes House of Representatives, *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capito*l (July 21, 2021) ("With

respect for the integrity of the investigation. . . I must reject the recommendations of Representative Banks and Jordan to the Select Committee. [] The unprecedent nature of January 6th demands this unprecedented decision.").[1]  Later that day, then-Minority Leader McCarthy made the similarly unprecedented move of rescinding his selections and refusing to select more individuals on behalf of the Republican Party and refusing to participate in the Select Committee unless all his original selections were accepted.  *See* Annie Grayer and Jeremy Herb, *McCarthy pulls his 5 GOP members from 1/6 committee after Pelosi rejects 2 of his picks*, CNN (last updated July 21, 2021) ("'Unless Speaker Pelosi reverses course and seats all five Republican nominees, Republicans will not be party to their sham process and will instead pursue our own investigation of the facts,' McCarthy said.").[2]  As a result, the Select Committee's makeup did not comply with House Resolution 503, as it was not made up of five (5) members selected by the Minority.

On February 9, 2022, Dr. Navarro accepted informal service of a congressional subpoena from the Select Committee, and communicated to the Select Committee's representative that President Trump had informed Dr. Navarro to invoke executive privilege over the subpoena on President Trump's behalf.  *See* Trial Tr., at 462:2 (Sept. 6, 2023) ("Dan George: [Dr. Navarro] said, "Yes.  No counsel.  Executive privilege.") (ECF No. 150).  After some back-and-forth communication discussions with the Select Committee's representative, Dr. Navarro believed he had invoked testimonial immunity based upon his communications with President Trump which he relayed to the Select Committee's representative.  Dr. Navarro also based this belief upon his

---

[1] Accessible at
https://web.archive.org/web/20211103161840/https://www.speaker.gov/newsroom/72121-2.

[2] Accessible at https://www.cnn.com/2021/07/21/politics/nancy-pelosi-rejects-republicans-from-committee/index.html

understanding of the Department of Justice's longstanding policy of not pursuing contempt of congress charges against executive branch officials who congress voted to hold in contempt. *See id.* at 480:5-15 ("Mr. Crabb: And what did Mr. Navarro tell you in his correspondence?" "Dan George: He said, 'Please be advised that President Trump had invoked executive privilege in the matter and it's neither mine' - meaning Mr. Navarro's - "privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."). Further, the Select Committee's representative acknowledged that Dr. Navarro had invoked executive privilege. *See* Indictment, ¶ 18 (June 2, 2022) (ECF No. 001) ("The Select Committee responded by email . . . 'In any event, you must appear to assert any executive privilege objections on a question-by-question basis during the deposition."). Dr. Navarro even provided the Select Committee's representative with an exact course of how he could secure his testimony. *See id.*, at 480:12-15 ("Dan George: And [Dr. Navarro] said that 'Our best course of action would be to directly negotiate with President Trump and his attorneys regarding any and all things related to the matter.'").

On June 2, 2022, a grand jury in this District returned an indictment of Dr. Navarro charging him with two counts of contempt of congress Indictment (June 2, 2022) (ECF No. 1). On June 3, 2022, Dr. Navarro was arrested in a public airport before being able to self-surrender, and was eventually released on personal recognizance. *See* Arrest Warrant (June 3, 2023) (ECF No. 008).[3] Both prior to and after that moment, Dr. Navarro consistently asserted that President Trump had invoked executive privilege and that Dr. Navarro understood that at the very least to mean that he could not be prosecuted solely for his default upon the Select Committee's subpoena and that Dr. Navarro's actions were informed by the Department of Justice Office of

---

[3] Such an action was taken after Dr. Navarro contacted one of the prosecutors in this matter two days prior, providing her with a pledge of cooperation and the contact information of an attorney representing Dr. Navarro.

Inspector General legal opinions which stated individuals in Dr. Navarro's position should not be prosecuted.  I, Letter Motion, at 2 (June 6, 2022) (ECF No. 012) ("To my knowledge, no high-ranking senior White House official has ever wound up in leg irons after simply standing up for constitutional privilege, executive privilege, and testimonial immunity.").  Accordingly, for the first time ever, this Court held an evidentiary hearing to determine whether former President Trump had properly invoked executive privilege as to Dr. Navarro.  *See* Mem.Op., at 2-3 (July 28, 2023) (ECF No. 96) ("Such an invocation by a former President would act as a constitutional constraint on the scope of the contempt statute, not as a diminution of congressional authority to issue compulsory process in the first instance. . . .  The court therefore will permit Defendant, through his own testimony or other evidence, to establish the factual predicate for the actual, proper invocation of executive privilege or testimonial immunity, or both, by the former President.").  Ultimately, the Court concluded, former President Trump had not properly invoked executive privilege as to Dr. Navarro.  *See* Hr'g Tr., at 25:11-18 (Aug. 30, 2023) (ECF No. 149) ("The [evidence] leads the Court to conclude and find that there was no formal invocation of executive privilege after personal consideration with respect to the Select Committee's subpoena to Dr. Navarro, nor any authorization to Dr. Navarro to invoke the privilege on the President's behalf.").

On September 7, 2023, Dr. Navarro became the first former senior presidential advisor to be convicted of contempt of congress.  *See, e.g.*, Trial Tr., at 684:2, 6 (Sept. 7, 2023) (ECF No. 154).

II.    APPLICATION OF SECTION 3553(A) FACTORS

a.    *Nature and circumstances of the offense.*

Despite the government's effort to label Dr. Navarro as an insurrectionist, the reality is that his conviction arises solely from a conviction for his refusal to comply with the Select

Committee's subpoena and has nothing to do with the events that occurred at the Capitol on January 6, 2021.  As recognized by this Court, this case is unique because of its defendant.  *See* Hr'g Tr., at 119:15-23 (Aug. 28, 2023) (ECF No. 148) ("The Court: I will tell you the one thing that I have always found a little – I'm trying to be neutral – odd about this case is that it does involve a former senior advisor").  Dr. Navarro was a former senior presidential advisor who reasonably believed he had lawfully been instructed by the President under whom he served to invoke executive privilege in response to the congressional subpoena at issue in this case.  Based upon an understanding that he could not testify, Dr. Navarro informed the Select Committee that he was entirely unable to comply with the subpoena.  The Court acknowledged Dr. Navarro's belief that President Trump had invoked executive privilege and Dr. Navarro's belief that he was unable to testify as a result.  *See id.*, at 119:18-23 ("The Court: And whether you [the government] think the President invoked or not here, [Dr. Navarro] thought he invoked. . . .  I don't know that anybody would really dispute that Dr. Navarro thought he was supposed to invoke.").  Dr. Navarro provided a very precise explanation on how the Select Committee could secure his compliance that the Select Committee refused to follow up on.  Dr. Navarro's actions were based upon the Department of Justice's own position on this matter for nearly forty years through his tenure as a senior official in the White House, including positions taken during his tenure with his peers in the White House in almost identical circumstances.

Dr. Navarro has always readily admitted that he defaulted on the subpoena at issue.  However, Dr. Navarro has disputed that he "willfully" defaulted as used in 2 U.S.C. § 192.  *See e.g.*, Mot Dismiss, at 42 (Aug. 17, 2022) (ECF No. 035) ("The information so far provided to the defense also does not include any discussion or guidance provided to the grand jury about the level of *mens rea* required by the statute [] or what is required by that provision's requirement

that the defendant acted 'willfully'."). *See, e.g.*, Opp., at 9-11 (Oct. 12, 2022) (ECF No. 059)

(analyzing case law on whether term "willfully" and arguing that not all defaults on

congressional subpoenas are "willful").

Dr. Navarro only proceeded to trial when the government pushed for a stipulated bench

trial that would require conceding points unrelated to the government's theory of the case and

likely would have left him unable to appeal the relevant points in this matter. *See* Mot. *In*

*Limine*, at 2-3 (Sept. 5, 2023) (ECF No. 120) ("Following the Court's ruling. . . defense counsel

immediately engaged government counsel in an effort to craft a stipulation of facts the

government intended to prove at trial and thereby [] expediting appellate review of the Court's

rulings in this case.  Ultimately, those negotiations proved unsuccessful because of the

government's insistence that the stipulation include two ultimate issues of fact for determination

by the trier of fact.").  Dr. Navarro sought to present evidence to the jury that, *inter alia*, disputed

the government's position that any default was "willful" as defined under 2 U.S.C. § 192,

because Dr. Navarro's default was based upon his understanding that he could not testify before

congress without the issue of executive privilege being resolved with President Trump.

> b. *History and characteristics of the defendant.*

Dr. Navarro is 74 years old.  *See* PSR, at 3 (Jan. 11, 2024) (ECF No. 156).  Dr. Navarro

has no criminal history, criminal history points of zero, and therefore a criminal history category

of I.  *See id.* at 10-11.  Though Dr. Navarro's parents divorced when he was about 9 years old,

Dr. Navarro's upbringing was a stable one, and he enjoyed healthy relationships with his late

mother and with his brothers.  *See id.id.* at at 1111.  Dr. Navarro is twice divorced, and is

currently engaged.  *See id.id.* at at 1212.  Importantly, Dr. Navarro suffers from debilitating health

issues that cannot be treated while incarcerated.

     c. *Seriousness of the offense, respect for the law, and just punishment.*

Dr. Navarro was convicted of two misdemeanor counts of contempt of congress.  While Dr. Navarro understands why he was convicted under 2 U.S.C. § 192 and that Congress has subpoena power, the very question that central to Dr. Navarro's issue (whether default is "willful" under 2 U.S.C. § 192 where it is caused by an invocation of executive privilege, and whether a member of congress's unilateral refusal to accept the privilege requires a subpoenaed witness to comply) is an issue that is currently being considered at the D.C. Circuit Court of Appeals.  *See* Lindsay Whitehurst, *Steve Bannon appeals conviction in Jan. 6 committee contempt case*, PBS, (Nov. 10, 2023) ("'Mr. Bannon acted in the only way he understood from his lawyer that he was permitted to behave,' attorney David Schoen said, adding that Bannon was wrongly blocked from making that argument at trial.").[4]

     As stated herein, Dr. Navarro's actions do not stem from a disrespect for the law, nor do they stem from any belief that he is above the law.  Rather, Dr. Navarro acted because he reasonably believed he was duty-bound to assert executive privilege on former President Trump's behalf.  *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019).  Further, Dr. Navarro has a criminal history score of zero and was released on personal recognizance and complied with the terms of his release without issue, as reflected in the Presentence Investigation Report.  *See* PSR, at 4, 10 (Jan. 11, 2024) (ECF No. 156).

     d. *Deterrence to criminal conduct and protection from further crimes.*

     Another way Dr. Navarro's circumstances are unique is that Dr. Navarro has no need to be deterred from further criminal conduct nor is he at risk of committing other crimes.  Most

---

[4] Available at https://www.pbs.org/newshour/politics/steve-bannon-appeals-conviction-in-jan-6-committee-contempt-case.

notably and as stated herein, Dr. Navarro has no prior criminal record.  *See id.* at 10.  As stated

herein and throughout the trial, Dr. Navarro's case was intended to preserve for appeal a

challenge to case law in the D.C. Circuit, the statute, and constitutional law.

Due to the unique nature of the offenses for which Dr. Navarro has been convicted, he is

unlikely to ever again face the situation which led to his conviction.  Should Dr. Navarro's

appeal(s) fail and his verdict and/or sentence be upheld, Dr. Navarro would tailor any response to

future congressional subpoenas with how the Court has interpreted this matter, whether that be

by seeking the current or former president's formal invocation of executive privilege and/or

permission to comply with the congressional subpoena, or by appearing for testimony and

producing documents to Congress.

Nor is there any need for deterrence in the community.  The appeal of this case will

definitely answer what is required of a former President to invoke executive privilege as to their

senior advisors and no future advisor will be in the same position of not knowing that the

President they served had not properly invoked the privilege.

     *e.   Need for treatment and training.*

Dr. Navarro does not drink alcohol nor does he use illicit drugs.  *See id.* at 13.  Dr.

Navarro is mentally stable, and he is not aware of any family history of any mental illness.  *See id.*

     *f.   Sentences available.*

Both counts of the offense for conviction are misdemeanors under 2 U.S.C. § 192, which

reads that such offense shall be, "punishable by a fine of not more than $1,000 nor less than $100

and imprisonment in a common jail for not less than one month nor more than twelve months."

One count reflects that Dr. Navarro did not provide testimony, while the other count reflects that

Dr. Navarro did not provide documents.  However, for reasons to be outlined below, the statute's reference to the District's "common jail" obviates the need for imprisonment.

> g.   *Need to avoid sentencing disparities.*

There are no similarly situated individuals to Dr. Navarro, as he is the first former senior presidential advisor to be prosecuted, let alone convicted, pursuant to 2 U.S.C. § 192 following an assertion of the executive privilege of the President for whom the advisor served.  Notably, however, many others have pled guilty to counts of 2 U.S.C. § 192 as part of a plea agreement and received no jail time.

Though Stephen Bannon was recently convicted for two counts of 2 U.S.C. § 192 and sentenced to four months in prison, Mr. Bannon's case is wholly distinguishable from Dr. Navarro's.  Namely, Mr. Bannon's subpoena sought hardly any information related to Mr. Bannon's brief tenure in the White House, and the government took the position that Mr. Bannon's status as a private citizen and that the materials sought related to matters he took as a private citizen prevented him from raising executive privilege.  *See, e.g.*, Sentencing Memo., at 4, *United States v. Bannon*, No. 21-cr-670 (D.D.C. Oct. 17, 2022) (ECF No. 152) ("[Mr. Bannon] was a private citizen who had not worked at the White House for years' the subpoena's demands sought records and information wholly unrelated to [Mr. Bannon's] tenure there; and multiple categories of the subpoena were completely unrelated to communications with the former President.").  Further, Mr. Bannon's appeal is primarily (but not exclusively) based upon an advice of counsel defense that Dr. Navarro has not raised.  *See, e.g.*, Sentencing Memo., at 1, *United States v. Bannon*, No. 21-cr-670 (D.D.C. Oct. 17, 2022) ("Should a person who has spent a lifetime listening to experts [] be jailed for relying on the advice of his lawyers?").  Dr. Navarro's tenure in the White House lasted for the entirety of Donald Trump's Presidential

Administration, and the subpoena at issue sought material which related to actions taken during Dr. Navarro's tenure in the White House.

III.   STATUTORY AND GUIDELINE ANALYSIS

a.   *Only USSG §2J1.5 is Applicable*

Appendix A of the United States Sentencing Guidelines ("USSG") provides that the base-level offense for a conviction pursuant to 2 U.S.C. § 192 is either USSG § 2J1.1 or § 2J1.5.  In turn, § 2J1.1 ("Contempt") provides merely a cross-reference to § 2X5.1, which provides guidance *only* for felony offenses.  Accordingly, § 2X5.1 is inapplicable for convictions pursuant to 2 U.S.C. § 192, which is a misdemeanor offense.  Nevertheless, the Probation Officer suggests that USSG § 2X5.2 is the appropriate guideline for a baseline offense because § 2X5.1 Cmt. 3 provides, "For Class A misdemeanor offenses *that have not been referenced in Appendix A*, apply § 2X5.2 (Class A Misdemeanors (Not Covered by Another Specific Offense Guideline)) (emphasis added)."  *See* PSR, at 9 (Jan. 11, 2024) (ECF No. 156).  The problem with the Probation Officer's logic is that 2 U.S.C. § 192 offenses *are* referenced in Appendix A and *are* covered by another specific offense guideline.  Indeed, the Probation Officer's bias is confirmed by the response to Dr. Navarro's objection to the application of § 2X5.2:  "Should the Court rule that USSG §2J1.5 is applicable, the events that occurred on January 6, 2021 involved misdemeanors and felonies. In the Probation Officer's assessment, the base offense level would be 6, USSG §2J1.5(a)(1)."  PSR, at 26 (Jan. 11, 2024) (ECF No. 156).  Yet Dr. Navarro's prosecution did not arise because of any conduct related to the events of January 6, 2021.  *See, e.g.*, Trial Tr., at 424:9-17 (Sept. 26, 2023) (ECF No. 150) ("The Court: I think it's fair [to reference the objective of the Select Committee to establish] that the Committee was investigating the conditions that led to the events of January 6th.  Nobody here is contending that [Dr. Navarro] was a direct cause; let me put it in those terms.").  To the contrary, the most

analogous is guideline is a material witness that failed to appear in a misdemeanor case, which results in a base level of 4. §2J1.5(a)(2).

>    b.  *Dr. Navarro is Eligible for an Additional Two Point Decrease for Acceptance of Responsibility*

The Probation Officer has stated that Dr. Navarro is not eligible to receive any downward departure for the acceptance of guilt solely because he proceeded to trial.  PSR, at 9 (Jan. 11, 2024) (ECF No. 156).  However, the PSR does explicitly state that USSG § 3E1.1 comment n.2 outlines that, "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."  *Id.*

As stated herein, Dr. Navarro proceeded to trial to preserve for appeal a constitutional challenge to 2 U.S.C. § 192, and existing case law based upon his position as a recent executive branch official.  Indeed, this case only proceeded to jury trial because the government's proposal for a stipulated bench trial would have required Dr. Navarro to needlessly concede the points he sought to preserve for appeal, which Dr. Navarro sought to negotiate in an effort to expedite the appeal process.  *See* Mot. *in Limine*, pp. 2-3 (Sept. 5, 2023) (ECF No. 120) ("Following the Court's ruling. . . defense counsel immediately engaged government counsel in an effort to craft a stipulation of facts the government intended to prove at trial and thereby [] expediting appellate review of the Court's rulings in this case.  Ultimately, those negotiations proved unsuccessful because of the government's insistence that the stipulation include two ultimate issues of fact for determination by the trier of fact.").  Further, Dr. Navarro did not present any evidence at trial once he was barred from raising the matters he preserved for appeal.  Dr. Navarro falls squarely

into the unique situation where a defendant is allowed to establish acceptance of responsibility

despite proceeding to trial and thus, Dr. Navarro is eligible for and should receive a two (2) point

deduction for acceptance of responsibility on the basis that he only proceeded to trial to reach the

appellate court on matters by which the District Court were bound by precedent.

This two (2) point deduction would be in addition to the Chapter Four Adjustment that

the Probation Officer recommends for Dr. Navarro's criminal history score of zero (0) and

pursuant to USSG §§ 4C1.1(a) and (b).  PSR, at 10 (Jan. 11, 2024) (ECF No. 156).  Such a

calculation results in an offense level of zero (0), which comports with the understanding that Dr.

Navarro need not be imprisoned for his offense of conviction.

   c.   *The Language and Application of the Statute Do Not Require Imprisonment*

The Probation Officer claims that 2 U.S.C. § 192 has a mandatory minimum of one

month imprisonment requiring the Court to ignore that the guideline range for this conviction is

0 to 6 months imprisonment and to instead consider that the range is 1 to 6 months of

imprisonment.  PSR, at 18 (Jan. 11, 2024) (ECF No. 156).  However, Dr. Navarro respectfully

notes that the statute does not have a mandatory minimum term of imprisonment, and that the

few prior convictions under the statute which should guide this Court have seen the respective

defendants sentenced to probation despite being convicted under the statute.

   i.   *Section 192's Reference to a "Common Jail" Refers to a Facility That No*
        *Longer Exists*

2 U.S.C. § 192's usage of the term "common jail" raises substantial questions about

whether the statute requires a mandatory sentence of at least one month imprisonment.  The

statute was enacted in 1857, before the formal existence of the Federal Bureau of Prisons and

when no federal penitentiaries existed.  *See* Bosworth, Mary, The U.S. Federal Prison System, at

4 (2002) ("The U.S. Congress formally established the Federal Bureau of Prisons in 1930. [] The

so-called Three Prisons Act, which was passed in 1891, began the process of creating the federal prison system[.]")

Prior to the formal establishment of the federal prison system but during the time relevant to the statute's passage, there only existed two permanent jails in the District of Columbia.  One was known as the Arsenal Penitentiary, which opened in 1831 and closed in September 1862, and would then be reactivated as a military prison in April of 1865 where eight conspirators of President Lincoln's were held and put to trial, four of which were executed.  *See generally* William J. O'Brien, *The Washington Arsenal, Historic Landmark of the Nation's Capital*, Army Ordnance, Vol. 16, No. 91, at 32-37 (1935).  The other was the Old Capitol Prison, which housed primarily military and political prisoners of the American Civil War from 1861 to 1867.  *See* Robert Brammer, *The Old Capitol Prison and the United States Supreme Court*, Library of Congress (Jan. 24, 2020), https://blogs.loc.gov/law/2020/01/the-old-capitol-prison-and-the-united-states-supreme-court/ ("During the Civil War, the Old Capitol was repurposed as a prison for Confederate prisoners of war, spies, blockade runners, and Union army officials convicted of insubordination.").  Indeed, the Old Capitol Prison building would be demolished in or before 1932, to clear the site for the building that now houses the Supreme Court of the United States. *See* Architect of the Capitol, *Has the Capitol been used as a Prison?* (last visited Jan. 17, 2024)[5] ("The old brick Capitol was then used for various purposes; during the Civil War it served as a prison for the confinement of Confederate captives and of suspected collaborators. Following the Civil War the building was converted to residences.  It was removed before the October 1932 laying of the cornerstone of the Supreme Court building.").

---

[5] Available at https://www.aoc.gov/explore-capitol-campus/capitol-hill-facts/has-capitol-been-used-prison

Also noteworthy from this ancient time, the District of Columbia sent prisoners to the Albany Penitentiary in Albany, New York. *See The Albany Penitentiary*, Friends of Albany History (Jan. 23, 2018) ("When [penitentiary officials] learned that the District of Columbia's penitentiary was being taken over by the United States Arsenal, they arranged for Albany to be the Penitentiary for the District of Columbia. . . [beginning] in September 162 with the transfer of 131 convicts, and continued for decades after the war ended[.]"). The Albany Penitentiary closed in 1931 and was demolished in 1933. See *id.* ("The old Albany Penitentiary was finally closed after a new one opened in 1931[.] The penitentiary was razed in 1933[.]").

The first person to be tried under 2 U.S.C. § 192 was John Wolcott in 1858, who was initially imprisoned under Congress's inherent contempt power. *See* Carl Beck, Contempt of Congress: A Study of the Prosecutions Initiated by the Committee on Un-American Activities, 1945-1957, at 191-214 (1959). Once the matter of statutory contempt was litigated, Mr. Wolcott agreed to a plea where he would comply with the congressional subpoena and paid a fine, but was not imprisoned for the violation of 2 U.S.C. § 192. This should be compared with the government's current position that once an individual defaults on a congressional statute, the default cannot be cured by complying with the subpoena. Hr'g Tr., (June 21, 2023) at 79:19-22 (ECF No. 090) ("The Court: Say . . . I came to the conclusion that there was no qualified immunity, does Dr. Navarro then get the opportunity to cure?" "Ms. Aloi: No.").

Another of the first people imprisoned under the statute was Thaddeus Hyatt, who in response to a subpoena sent the Senate a letter which stated that the Senate Committee that had issued a subpoena for his testimony did not have subpoena power to compel his testimony. *See generally* Edgar Langsdorf, *Thaddeus Hyatt in Washington Jail*, The Kansas Historical Quarterly Vol. 9, No. 3, pp. 225-239 (Aug. 1940). On March 12, 1860, Senator James M. Mason issued a

resolution which moved for Mr. Hyatt to be committed, "to the common jail of the District of Columbia." *See* Journal of the Senate, at 238 (Mar. 9, 1860) ("Whereas Thaddeus Hyatt has failed satisfactorily to answer questions propounded to him by order of the Senate, and has not purged himself of the contempt with which he stands charged [] Thaddeus Hyatt be committed by the Sergeant-at-Arms to the common jail of the District of Columbia."  Mr. Hyatt was imprisoned for three months in "the common jail of the District of Columbia" without being convicted of a violation of 2 U.S.C. § 192, and eventually was released without conviction once the Senate Committee for which he failed to appear was discharged.  *See id.* ("Thaddeus Hyatt be committed by the Sergeant-at-Arms to the common jail of the District of Columbia, to be kept in close custody until he shall signify his willingness to answer the questions propounded to him by the Senate[.]").  *See also* Langsdorf, at 234-35 ("The select committee was discharged and Mason moved that Hyatt be released, saying: So far as I was instrumental in procuring the [Hyatt's] arrest. . .  and committal to jail, it was done in vindication of the authority of the Senate . . . but the committee now being discharged from its duty, there is no committee before which the testimony can go; and, therefore, I move his discharge").

In order to find that there is a minimum sentence of one month in prison, the Court would need to find that the statute either mandates that a contemnor must be imprisoned within a specific institution or institutions which no longer exist, or that the statute's use of "common jail" clearly references institutions which did not yet exist at the time of the statute's enactment.  To the contrary, where a law is vague to the extent that its interpretation can lead to additional punishment based upon a vagueness, the void-for-vagueness doctrine requires that portion of the statute to be struck down.  *See United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) ("But does [the statute at issue] require [defendants] to suffer additional punishment, on top of everything

else.  Even if you think it's *possible* to read the statute to impose such additional punishment, it's *impossible* to say that Congress surely intended that result, or that the law gave [defendants] fair warning that [the statute at issue]'s mandatory penalties would apply to their conduct." (emphasis in original)).

### ii.   Other Contempt of Congress Convictions

The limited 2 U.S.C. § 192 convictions which have been upheld similarly reflect that the United States – both the Executive and Judicial Branches – have not construed the statute to impose a mandatory minimum of one-month imprisonment.  In the 1970s, two former government officials pled *nolo contendere* to one count of 2 U.S.C. § 192 in lieu of prosecution for perjury charges (which can carry a term of imprisonment of up to five years, *see* 18 U.S.C. § 1621), and neither were sentenced to any imprisonment.  *See United States v. Kleindienst*, CR. No. 256 (D.D.C. 1974); *United States v. Helms*, CR. No. 650 (D.D.C. 1977).  This practice mirrors *the first* contemnor to be charged with contempt of congress.  In 1858, John W. Wolcott was brought before the bar of the House of Representatives, but declined to answer questions concerning his knowledge of purported bribery concerning the tariff act of 1857.  After pleading *nolle prosequi*, Wolcott paid a fine of $1,000 and costs.  *See* Beck, at 195-196.[6]  Similarly, in 1991, former Assistant Secretary of State Elliott Abrams pled guilty to one count of 2 U.S.C. § 192 for withholding information from Congress relating to the Iran-Contra Affair.[7]  *U.S. v. Abrams*, CR No. 91-575 (D.D.C. 1991).  In 2009, former professional baseball player Miguel

---

[6] Although Wolcott was not sentenced to any imprisonment, despite the mandatory minimum included in 2 U.S.C. § 192, he was imprisoned by the House following its adoption of a Resolution directing the same.

[7] Mr. Abrams was pardoned by President George H.W. Bush in 1992.  *See* Department of Justice, Pardons Granted by President George H.W. Bush (1989-1993), https://www.justice.gov/pardon/pardons-granted-president-george-h-w-bush-1989-1993.

Tejada pled guilty to one count of 2 U.S.C. § 192 and received no term of incarceration for information withheld from Congress about Tejada's knowledge that his teammates had used performance enhancing substances while playing in Major League Baseball.  *United States v. Tejada*, Magistrate No. 09-MJ-077 (D.D.C. 2009).

Dr. Navarro does note the existence of *United States v. Bloch*, 800 F. Supp. 2d 165 (D.D.C. 2011), where a magistrate judge in this district read a mandatory minimum sentence into 2 U.S.C. § 192.  However, the government took the opposite position in *Bloch*, acknowledging that recent 2 U.S.C. § 192 convictions (*Tejada* and *Abrams*) had not included any term of imprisonment and that the government's reading of the statute did not lead to the understanding that the terms of imprisonment were not mandatory.  *Bloch*, 800 F. Supp. at 169 ("First, the government states that the record demonstrates that defendant believed he could receive a sentence of probation when he pled guilty on April 27, 2010.  The government notes that it 'shared this same belief,' in part because the U.S. Probation Office had concluded one year earlier that 2 U.S.C. § 192 allowed for a sentence of probation in *United States v. Miguel Tejada*, 09–mj–077.").

### iii.   Mandatory Imprisonment in a Common Jail Has Been Waived Under the Concept of Desuetude

The Supreme Court has ultimately recognized a concept the executive branch's longstanding decision not to assert a power that may have been conferred upon it is "significant in determining whether such power was actually conferred."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)).  Federal district courts in other circuits have recognized and applied a more explicit version of this concept as the principle of "desuetude."  *See generally United States v. Elliott*, 266 F. Supp. 318 (S.D.N.Y. 1967).  *See also United States v. Agriprocessors, Inc*, 2009 U.S. Dist. LEXIS 64592, at

20

*52-53 (N.D. Iowa July 27, 2009) ("[T]he government's apparent concession that this case is the first [] prosecution [under the specific statute] in the 88-year history of the [statute] raises a related due process concern: the defense of desuetude. [] Desuetude is a civil law doctrine rending a statute abrogated by reason of its long and continued non-use." (quoting *Elliott*, 266 F. Supp. at 325)).  While the status of desuetude is unclear at the federal level, in common law the principle has been used to outlaw the practice of specific and outdated required sentences for certain crimes.  *See e.g.*, *Wright v. Crane*, 13 Serg. & Rawle 220, 228 (Pa. 1825) (Pennsylvania state court declining to enforce the mandatory punishment of "ducking" for a "common scold" conviction based upon a, "total disuse of any civil institution for ages past [which] may afford just and rational objections against disrespected and superannuated ordinances.").

Ultimately, the factors of desuetude outlined in *Elliot* and *Agriproccessors, Inc.* support that this Court can and should find that the government's persistent historical non-pursuit of any mandatory prison sentence in 2 U.S.C. § 192 serves as a waiver that that is a requirement of the statute that, if applied, would create problems of fair notice and selective enforcement.  *See e.g. Elliott*, 266 F. Supp. at 324-26.

IV.    RELEASE PENDING APPEAL

Never before has a former senior Presidential advisor been charged with – let alone convicted of – contempt of congress pursuant to 18 U.S.C. § 192, following an assertion of executive privilege over communications during that advisor's tenure and for which he believed he was duty-bound to follow.  *McGahn*, 415 F. Supp. 3d at 213 n.34 ("[T]he President can certainly identify sensitive information that he deems subject to executive privilege, and his doing so gives rise *to a legal duty* on the part of the aide to invoke the privilege on the President's behalf . . . ." (internal citation omitted) (citing *United States v. Nixon*, 418 U.S. 683,

21

713 (1974)).  Similarly unprecedented was this Court's August 28, 2023, evidentiary hearing for the purpose of determining whether former President Trump had properly invoked executive privilege with respect to the Select Committee subpoenas at issue in this action.  And although the Court concluded that Dr. Navarro had not presented evidence sufficient to show that former President Trump had "formally" invoked executive privilege, the Court also acknowledged:  (a) that it was beyond dispute that Dr. Navarro *believed* former President Trump had properly invoked the privilege and that he was following President Trump's instructions in failing to provide documents to and/or appearing before the Select Committee pursuant to its subpoena, *see* Hr'g Tr., at 119:18-23 (Aug. 28, 2023) (ECF No. 148) ("The Court: And whether you [the government] think the President invoked or not here, [Dr. Navarro] thought he invoked. . . .I don't know that anybody would really dispute that Dr. Navarro thought he was supposed to invoke."); and (b) that the Court's holding was an issue of first impression.  *See* Hr'g Tr., at 8:19-25, 9:1-2 (Aug. 30, 2023) (ECF No. 149) ("[T]he issue of whether a president must personally invoke the presidential communications privilege remains an open question, and the court need not decide it now as neither party raised it below or on appeal . . . .  So I want to make the record clear that this is an open question.").

Given the novel issues with which this Court was presented, any sentence imposed upon Dr. Navarro should be stayed pending the resolution of his appeal of the bevy of determinations the Court was required to reach in this case.

      *a.   Applicable Legal Standard*

Given the unique nature of this matter, Dr. Navarro respectfully requests that this Court stay any sentence imposed pending resolution of his appeal.  A stay pending appeal once an appeal has been filed is warranted should the Court find, "[]by clear and convincing evidence that the person [sentenced to a term of imprisonment] is not likely to flee or pose a danger to the

safety of any other person or the community if released under section 3142(b) or (c) of [Title 18]; and . . . that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal, . . . an order for a new trial, . . . a sentence that does not include a term of imprisonment, or . . . a reduced sentence to a term of imprisonment[.]" 18 U.S.C. § 1343(b)(1)(A)-(B).  In this Circuit, a substantial question is one that is, "a close question or one that very well could be decided the other way." *United States v. Peholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987).  *See also* Order, at 1, *United States v. Connie Meggs*, No. 1:21-cr-00028 (D.D.C. Oct. 31, 2023) (ECF No. 1088) (Mehta, J.) (citing *Peholtz* to define term "substantial question" for purposes of release pending appeal).

       b.   *Dr. Navarro Poses Neither a Flight Risk Nor a Danger to the Community*

Dr. Navarro is neither a flight risk, nor does he pose any danger if released pending appeal.  To the contrary, he has wholly complied with the conditions of his release pending trial for over nineteen (19) months, has been convicted of nonviolent misdemeanors, and lacks any criminal history.

       c.   *This Case Presents "A Close question or One that Very Well Could be Decided the Other Way."*

As importantly, this case raises, "a close question or one that very well could be decided the other way." *Peholtz*, 836 F.2d at 555 (D.C. Cir. 1987).  At the outset, the only other recent sentence for contempt of congress has been stayed pending appeal.  *See* Order, *United States v. Bannon*, No. 1:21-cr-0670 (D.D.C. Nov. 7, 2022) (ECF No. 168).  Here, Dr. Navarro's conviction differs from Mr. Bannon's in a significant respect – Dr. Navarro asserted executive privilege, on behalf of former President Trump, with respect to his communications while he served as a senior presidential advisor.  Indeed, this Court acknowledged the unique nature of Dr. Navarro's prosecution:  "I will tell you the one thing that I have always found a little – I'm trying

to be neutral – odd about this case is that it does involve a former senior advisor."  Hr'g Tr., at 119:15-23 (Aug. 28, 2023) (ECF No. 148).  This Court has also similarly acknowledged that the issue of whether Congress needed to take steps beyond unilaterally rejecting a claim of executive privilege - a question pivotal to Dr. Navarro's defense – could be decided differently by the Court of Appeals.  *See* Hr'g Tr., at 30:5-14 (Aug. 30, 2023) (ECF No. 149) ("Finally, the Court does not believe it can add a judicial gloss of the kind that Dr. Navarro seeks.  Maybe the Court of Appeals will rule differently.").

At issue is whether application of executive privilege to Congressional subpoenas requires a "formal claim of privilege," Order at 4-6 (ECF No. 68), and whether, "it is proper to place the initial evidentiary burden on [a] Defendant to come forth with *some* evidence to show that [a] President . . . made a 'formal claim of privilege' after 'personal consideration' of the [congressional] subpoena [at issue]."  *Id.* at 5.

"Because '[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately,' the privilege 'safeguards the public interest in candid, confidential deliberations within the Executive Branch.'" *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quoting *Nixon v. GSA*, 433 U.S. 424, 447 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974). Indeed, the Supreme Court has recognized that, "Presidential communications" are "presumptively privileged."  *Nixon*, 418 U.S. at 708 (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973)).  *See also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) ("And recipients have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege.").  The

24

identification of sensitive information deemed subject to executive privilege by the President,

"gives rise to a legal duty on the part of the aide to invoke the privilege on the President's

behalf." *McGahn*, 415 F. Supp. 3d at 213 n.34.  To that end, the Supreme Court has recognized:

"it is the province and duty of this Court 'to say what the law is' with respect to the claim of

[executive] privilege.'"  *Nixon*, 418 U.S. at 705 (quoting *Marbury v. Madison*, 5 U.S. 1 (Cranch)

137, 177 (1803)).  *See also Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (Kavanaugh, J.,

respecting denial of application for stay) ("A former President must be able to successfully

invoke the Presidential communications privilege for communications that occurred during his

Presidency, even if the current President does not support the privilege claim.").

Only once has the Supreme Court even addressed the applicability of a congressional

subpoena to a President's information. *Mazars*, 140 S. Ct. at 2026 ("We have never addressed a

congressional subpoena for the President's information.").  In addressing a President's

invocation in the context of civil litigation, the Supreme Court recognized: "[O]ur precedent

provides no support for the proposition that the Executive Branch 'shall bear the burden' of

invoking executive privilege with sufficient specificity and of making particularized objections."

*Cheney v. United States Dist. Court*, 542 U.S. 367, 388 (2004).  Further, this Court identified,

"no case that speaks to the manner in which a President must invoke executive privilege in

response to a congressional subpoena to a former aide."  Order, at 4-6 (Jan. 19, 2023) (ECF No.

68).

Yet here, after holding an evidentiary hearing, the Court concluded:

> So that standard, that is, Presidential privilege, must be claimed by
> the President or an official authorized to speak for the President, in
> my view, means three things.  The terms "claimed" or invoked" with
> respect to privilege [] require an act of some affirmative conduct []
> by either the President or someone who the President has designated
> and authorize to make the claim on the President's behalf.  It also

does require personal consideration. . . .   And, third, what I think it means is that the privilege cannot be validly asserted by mere acquiescence; rather, again, it has to be the product of some affirmative act or conduct.

Hr'g Tr., at 12:14-25, 13:1-6 (Aug. 30, 2023) (ECF No. 149).

The novelty of this prosecution cannot be understated: for the first time a senior presidential advisor was charged with – let alone convicted of –contempt of congress.  Dr. Navarro submits that his assertion of executive privilege precluded his prosecution absent an order overcoming the privilege and compelling his testimony.  The Department of Justice has acknowledged as much both in this case and in the prosecution of Mr. Bannon.  First, when asked by this Court if a formal invocation of executive privilege barred Dr. Navarro's prosecution, the government conceded, it would be up to the Court to decide whether former President Trump's executive privilege could be overcome.  H'ng T., at 122:11-24 (Aug. 28, 2023) (ECF No. 148).  Second, at argument on appeal before the D.C. Circuit, the government, in Mr. Bannon's case, acknowledged that:  "If it's an Executive Branch employee and we actually have an assertion of privilege, that case wouldn't get prosecuted."  Oral Arguments *United States v. Bannon*, No. 22-3086 (D.C. Cir. Nov. 9, 2023).[8]

> d.   *Dr. Navarro's Prosecution Was Motivated by Political Bias.*

The Court can no longer ignore that, to the government, Dr. Navarro's prosecution is inextricably intertwined with the events of January 6, 2021.  We now know that the zeal with which Dr. Navarro's prosecutors sought his conviction relates directly to the results of the 2020 election and the contention that Dr. Navarro, like former President Trump, spread false allegations of election fraud.  Specifically, on November 12, 2020, Assistant United States

---

[8] Available at https://www.youtube.com/watch?v=-uMUFj9X2Vw, at 35:26-35:48

Attorneys J.P. Cooney, Molly Gaston, and Liz Aloi signed a letter to then-Attorney General Bill

Barr in which they decried that the allegations regarding election fraud were "false."  *See* Reply

ISO Mot. Selective Prosecution, Ex. 1, *United States v. Trump*, No. 23-cr-257 (D.D.C. Nov. 22,

2023) (ECF No. 161.1) ("Second, the timing of your decision to change the non-interference

policy inappropriately injects the Department and its field offices into a political thicket.  You

issued your Memorandum within days of a polarizing election, during a time in which false

allegations of widespread voter fraud are running rampant and risk undermining confidence in

the election's outcome.").[9]  Cooney, Gaston, and Aloi were all part of the prosecution team that

investigated and ultimately sought an indictment of Dr. Navarro (Cooney and Gaston have since

joined the Special Counsel's Office prosecuting former President Trump while Aloi remained

part of the trial team that prosecuted Dr. Navarro).  And although this Court concluded there was

insufficient evidence of bias in the Department's prosecution of Dr. Navarro, while

simultaneously declining to prosecute former President Trump's Chief of Staff, Mark Meadows,

and Deputy Chief of Staff, Dan Scavino, these prosecutors were part of the team that declined to

prosecute Messrs. Meadows and Scavino.  *See* Mem. Op., at 24-28 (Jan. 19, 2023) (ECF 068).

*See generally* Mem. Op. (July 28, 2023) (ECF No. 097).

However, the government betrayed its motive at trial when it improperly associated Dr.

Navarro's prosecution with the events of January 6, 2021.  A selective prosecution claim is not a

defense on the merits to the criminal charge itself, but an independent assertion that the

---

[9] In irony that can only be described as too thick by half, Ms. Aloi, along with her colleagues, further complains that then-Attorney General Barr's, "abrupt decision to revise [a] 40-year-old non-interference policy ends the Department imprimatur to conspiracy theories and counterfactual balloting fraud allegations that risk permanent damage to the integrity of the election process, *the timing gives the unseemly appearance that the Department's motives arise from political partisanship.*"  Reply ISO Mot. Selective Prosecution, Ex. 1, *United States v. Trump*, No. 23-cr-257 (D.D.C. Nov. 22, 2023) (ECF No. 161.1) (emphasis added).

prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.*

To whit, the government's opening statement to the jury highlighted the significance of our Nation's peaceful transition of power – a fact not even close to relevant to Dr. Navarro's decision not to comply with the Congressional subpoena at issue here. *See* Trial Tr., at 365:5-12 (Sept. 6, 2023) (ECF No. 150) ("Mr: Crabb: Throughout our history, one President has handed over the reins to his successor from George Washington to John Adams. . . . But about two years ago, a little over two blocks from here, that cherished tradition almost ended."). Thereafter, the trial of Dr. Navarro focused as much on the abhorrent events of January 6 as it did on Dr. Navarro's decision not to comply with the subpoena in question. *See* Trial Tr., at 365:13-19 (Sept. 6, 2023) (ECF No. 150) ("Mr. Crabb: In the aftermath [of January 6, 2021] Congress decided that it needed to investigate what happened, why it happened, and what steps it could take to make sure something like that never happens again."). Tellingly, the government sought to have the jury associate Dr. Navarro with domestic terrorists. *See* Trial Tr., at 421:16-18 (ECF No. 150) ("The Court: So anybody want to tell me whether we've got any more documents coming in that use words like 'domestic terrorism' and the like?"); *id., at* 428:12-18 ("The Court: So you can do that, but I want to make sure it's not done in a way that has potential for [] inflaming this jury.").

The improper motive with which Dr. Navarro's prosecution was pursued further compels a stay pending appeal of the novel legal issues presented by Dr. Navarro's prosecution so that the

Circuit can resolve (or affirm) these questions without political zealousness with which Dr. Navarro's conviction was attained.

## **CONCLUSION**

For the reasons contained herein, Dr. Navarro respectfully requests that this Court sentence him to not more than six (6) months of probation for each count of conviction, to run concurrently, and to pay a fine of $100 for each count.

[SIGNATURE ON NEXT PAGE]

Dated: January 18, 2024               Respectfully Submitted,

E&W Law, LLC

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (301) 807-5670
Email: john.irving@earthandwatergroup.com


SECIL LAW PLLC

_____/s/ John P. Rowley, III_____
John P. Rowley, III  (D.C. Bar No. 392629)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com

BRAND WOODWARD LAW, LP

*/s/ Stanley E. Woodward, Jr.*
Stan M. Brand (D.C. Bar No. 213082)
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
400 Fifth Street Northwest, Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Dr. Peter K. Navarro*

## CERTIFICATE OF SERVICE

On January 18, 2023, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which will automatically send electronic notification of such filing to all registered parties.

Respectfully submitted,

 /s/ Stanley E. Woodward, Jr.
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
400 Fifth Street Northwest, Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Dr. Peter K. Navarro*